**KAYLA M. BRADY**, individually           *       IN THE
and as personal representative of
the estate of JACOB C. MACE                 *       CIRCUIT COURT
45231 Woodstown Way
California, MD 20619                         *       FOR

and                                         *       PRINCE GEORGE'S

Minor child, ▆▆▆▆▆▆ ▆▆▆           *       COUNTY
By and through his mother
and next friend, NICOLE CLARK               *
147 Calvert Towne Road
Prince Frederick, MD 20678                  *       Case No.: _____

and                                         *

Minor child, ▆▆▆▆▆ ▆▆▆           *
By and through his mother
and next friend, KAYLA M. BRADY             *
45231 Woodstown Way
California, MD 20619                         *

and                                         *

**DEBRA MCCREARY**                          *
39375 Summit Hill Drive
Mechanicsville, MD 20659                     *

and                                         *

**MARK MACE**                               *
8382 Tomahawk Drive
King George, VA 22485                        *

        Plaintiffs,                         *

v.                                          *

**WALMART INC.**                            *
702 SW 8th Street
Bentonville, AR  72716                       *
SERVE ON:   Resident Agent
  THE CORPORATION TRUST                      *
  INCORPORATED
  2405 York Road, Suite 201                  *
  Lutherville-Timonium, MD 21093

1

and                                              *

**WAL-MART STORES EAST, LP**                     *
702 SW 8th Street
Bentonville, AR 72716                            *
SERVE ON: Resident Agent
 THE CORPORATION TRUST,                          *
 INCORPORATED
2405 York Road, Suite 201                        *
Lutherville-Timonium, MD 21093
                                                 *
     Defendants,
                                                 *
     *     *     *     *     *     *     *     *     *     *     *     *

## COMPLAINT AND REQUEST FOR JURY TRIAL

Plaintiffs, KAYLA BRADY, individually and as the personal representative of the ESTATE OF JACOB MACE, ▓▓▓▓▓▓▓ ▓▓▓▓, ▓▓▓▓ M▓▓E, DEBRA MCCREARY, and MARK MACE by and through their undersigned counsel, sue Defendants WALMART INC. and WAL-MART STORES EAST, LP and respectfully allege as follows:

### INTRODUCTION

1.     This case is about Defendants WALMART INC.'s and WAL-MART STORES EAST, LP'S (together, "WALMART") decision on November 15, 2019, to place profit over human life by negligently and/or unlawfully selling a Hatfield shotgun (the "Shotgun"), to Plaintiffs' decedent, JACOB MACE (a WALMART employee), despite WALMART's knowledge of his mental illness, suicidal ideation, state of intoxication, and one or more prior suicide attempts.

2.     JACOB MACE foreseeably used the Shotgun a few hours later to take his own life.

3.     WALMART, when it chose to become a Federal Firearms Licensee ("FFL") engaged in the business of selling firearms, voluntarily assumed a duty to not only comply with

2

all relevant federal and state firearms laws, but also to exercise the highest degree of care in selling guns.

4.      One of the important laws that WALMART agreed to follow included, but is not limited to, Maryland's prohibition on the possession of a shotgun by an individual suffering from a mental disorder who has a history of violence directed at himself or others. *See* Md. Code Ann., Pub. Safety § 5-205(b)(6).

5.      In addition to this specific statutory duty, the common law duty of reasonable care required WALMART, among other things, to train and supervise all employees to recognize signs of mental or emotional distress in prospective buyers and to avoid entrusting firearms to individuals displaying indications that they are a danger to themselves or others.

6.      But for WALMART's knowing violation of one or more relevant laws applicable to the sale or marketing of firearms and its breach of relevant standards of care, JACOB MACE would not have had access to the Shotgun and could not have harmed himself with the Shotgun.

7.      WALMART knew that it was a foreseeable risk that if it sold firearms in violation of the statutes and standards it was required to follow, that its firearms would be used in suicides.

8.      Exactly such a tragedy was both the direct and proximate result of WALMART's negligent and/or unlawful misconduct in selling the Shotgun to JACOB MACE.

9.      This lawsuit does not seek to impose liability on firearms retailers who sell guns legally and responsibly.   Instead, Plaintiffs seek to hold WALMART accountable for the foreseeable consequences of selling a gun illegally and irresponsibly that caused and contributed to the death by suicide of JACOB MACE.

3

## PARTIES

10.     At all times relevant to the cause of action asserted herein, the Decedent, JACOB MACE, was an employee of WALMART in Supercenter #1981 located in St. Mary's County, Maryland.

11.     Plaintiff KAYLA BRADY is an adult resident of St. Mary's County, Maryland, the surviving spouse of JACOB MACE, and the duly appointed Personal Representative of the Estate of JACOB MACE, deceased.

12.     Plaintiff C_____ M____ is a surviving son of JACOB MACE and a minor resident of St. Mary's County, Maryland, who brings this action by and through his mother and next friend, KAYLA BRADY.

13.     Plaintiff C_____, C____ is a surviving son of JACOB MACE and a minor resident of Calvert County, Maryland, who brings this action by and through his mother and next friend, NICOLE CLARK.

14.     Plaintiff DEBRA MCCREAVY is an adult resident of St. Mary's County, Maryland, and surviving mother of JACOB MACE.

15.     Plaintiff MARK MACE is an adult resident of King George County, Virginia, and surviving father of JACOB MACE.

16.     The Defendants, WALMART INC. and WAL-MART STORES EAST, LP, are American multinational corporations incorporated under the laws of the State of Delaware and headquartered in Bentonville, Arkansas.

17.     The Defendants, WALMART INC. and WAL-MART STORES EAST, LP, are registered to do business in the State of Maryland and are marked as businesses in good standing.

4

18.    WALMART INC. owns and operates at least forty-eight stores in the State of Maryland including Prince George's County.

19.    At all times relevant, WALMART INC. and WAL-MART STORES EAST, LP maintained a Federal Firearms License and held themselves out as marketers and sellers of firearms.

20.    At all times relevant, WALMART INC. and WAL-MART STORES EAST, LP carry on regular businesses in Prince George's County, Maryland and holds themselves out to the Prince George's County community as a holder of a Federal Firearms License.

### JURISDICTION &VENUE

21.    Jurisdiction is proper because the Defendants, WALMART INC. and WAL-MART STORES EAST, LP, carry on regular businesses in Prince George's County, Maryland.  Md. Code Ann., Cts. & Jud. Proc. § 6-201.

22.    The amount in controversy exceeds seventy-five thousand dollars ($75,000) exclusive of interest and costs.

23.    Plaintiffs are, and at all times relevant to this action have been, residents of Maryland and Virginia.

24.    Defendants are, and at all times relevant to this action have been, transacting and carrying on a regular business in Prince George's County, Maryland.  In the course of this business, Defendants have caused tortious injury in the State by an act and/or omission.

25.    Venue is proper in Prince George's County, Maryland.

### FACTUAL ALLEGATIONS

I.     **WALMART Had a Duty to Sell Firearms in a Safe, Lawful, and Responsible Manner**

5

26.    When WALMART applied for and received the privilege of acting as an FFL, it accepted the "responsibility to ensure that, in the course of sales or other dispositions . . ., weapons are not obtained by individuals whose possession of them would be contrary to the public interest." *Abramski v. United States*, 573 U.S. 169, 190 (2014) (internal quotation and alteration omitted).

27.    WALMART's duty to act as a gatekeeper is not limited to running a federally-required Brady background check (*see* 18 U.S.C. § 922(t)); indeed, a dealer such as WALMART cannot and must not make sales where, independent of the results of any background check, the dealer has actual or constructive knowledge that a potential purchaser is legally disqualified from owning a weapon. See § 922(d).

28.    WALMART has a responsibility to learn and carefully follow all relevant laws at all times.

29.    In Maryland, individuals who are "suffer[ing] from a mental disorder as defined in § 10-101(i)(2) of the Health–General Article and ha[ve] a history of violent behavior against the[mselves] or another" may not lawfully possess a shotgun. Md. Code Ann., Pub. Safety § 5-205(b)(6).

30.    The relevant definition of "mental disorder" incorporates a "mental illness that so substantially impairs the mental or emotional functioning of an individual as to make care or treatment necessary or advisable for the welfare of the individual or for the safety of the person or property of another." Md. Code Ann., Health-General § 10-101(i)(2).

31.    An individual who aids and abets another's unlawful possession of a firearm with actual or constructive knowledge that such an individual is disqualified is equally responsible, as an accessory, for any direct statutory violations by the disqualified possessor. *See* Md. Code Ann., Crim. Pro. § 4-204.

6

29.     Prior to and during the sale of shotgun to JACOB MACE, WALMART had actual or constructive knowledge of its statutory duty not to provide a shotgun to individuals barred under, *inter alia*, Md. Code Ann., Pub. Safety § 5-205(b)(6).

30.     A FFL's duty to act as a gatekeeper who keeps guns from dangerous individuals extends beyond solely complying with relevant statutes.

31.     A dealer has the discretion to deny a sale even upon successful completion of a background check and compliance with other statutory requirements.

32.     A dealer should exercise its discretion to deny a gun sale in the event it has knowledge that a potential purchaser may be a danger to himself or others, including knowledge gained from observing erratic or suspicious behavior indicative of potential mental disturbance or criminality.

33.     A responsible FFL must not place its desire for profits over public safety.

34.     A responsible FFL should refuse to provide a gun to anyone who displays clear indicators he may harm himself or others regardless of whether a sale is prohibited by statute.

35.     This duty incorporates an obligation for firearms retailers to carefully select, train, and monitor their employees in order to make sure that their employees have internalized and are following both the law and all relevant safety protocols.

36.     Firearms industry actors and others have repeatedly recognized that reasonable care requires that firearms sellers employ safeguards to mitigate against the risk of firearms suicide.

37.     Firearms are the most frequent means by which individuals attempt to commit suicide; indeed, suicide by firearm is more common than suicide by all other means combined.

38.     A suicide attempt utilizing a firearm is also more likely to result in death than an attempt by any other means.

7

39.   A suicide committed with a firearm is a foreseeable consequence of failure to follow relevant laws and safety protocols.

40.   Upon information and belief, WALMART was well aware, prior to and during the sale of the Shotgun to MACE, that suicide by firearm is a large contributor to our nation's epidemic of gun violence and that gun dealers have a duty to implement measures to prevent their firearms from being obtained for use in suicides.

41.   Actors both within and outside of the firearms industry have recognized the importance of implementing and enforcing reasonable safeguards at the point of sale to minimize the significant risk of firearm suicide.

42.   These safeguards are in addition to any statutory duties imposed on FFL's.

43.   For example, the National Shooting Sports Foundation ("NSSF")—the firearms industry's trade association—partnered with the American Foundation for Suicide Prevention to develop a Suicide Prevention Toolkit for firearms retailers like WALMART to utilize in order to help prevent customers from using their guns in suicides.

44.   This toolkit lists a number of "[s]uicide [w]arning [s]igns" that should be taken "[s]eriously" including, *inter alia*, an individual talking about killing him or herself and/or increasing use of alcohol or narcotics.

45.   Recognizing the intersection between firearms access and actual suicide attempts, this toolkit recommends various practices to limit a suicidal individual's ability to access firearms.

46.   Similarly, multiple states where WALMART conducts business have guidance for gun dealers on screening customers for suicidal ideation.

8

47.     The New Hampshire Firearm Safety Coalition has noted that almost one in ten suicides in New Hampshire occur with a recently purchased firearm—often within hours of the purchase—and produced a tip sheet to help combat this problem.

48.     This tip sheet, produced in collaboration with firearms dealers in New Hampshire, recommends that a dealer who observes a visibly distraught customer ask screening questions including, *inter alia*, an individual's intended use of the firearm and, in appropriate circumstances, whether the individual is suicidal.

49.     The tip sheet further encourages dealers who identify a potentially suicidal customer to contemplate a variety of steps including asking the customer to consider delaying his or her purchase, directing him or her to other self-defense products (like pepper-spray) which are less easily used in a suicide attempt and denying the sale of the product even where it might be allowed by statute.  The sheet reminds FFLs  that "you are under no obligation to sell a gun to anyone."

50.     The Safer Homes Collaborative—a joint project between gun owners and the mental health community—adapted the New Hampshire Firearm Safety Coalition tip sheet to produce a similar resource for Missouri firearms retailers.

51.     WALMART has, itself, upon information and belief, joined the above consensus by recognizing and accepting that its duty of reasonable care requires it to implement protocols to prevent firearms from being diverted into the hands of individuals showing a propensity to harm themselves or others but who may not necessarily be disqualified under relevant federal or state laws.

52.     Specifically, upon information and belief, WALMART has a formal or informal policy of "blacklisting" whereby an individual, including one suffering from a dangerous mental

9

issue, can be reported to the management of a relevant store and the store management will decline

to sell a firearm to that individual regardless of whether he is prohibited from possessing a firearm.

## II.    WALMART Had Actual and/or Constructive Knowledge that JACOB MACE was a Disqualified Possessor Undergoing a Mental Crisis

53.    JACOB MACE began working for WALMART in Supercenter #1981 part-time in

February 2018 and continued to work for about nine months before a hiatus.

54.    He returned to WALMART for part-time employment from February 2019 until

his death in November 2019.

55.    JACOB MACE worked in WALMART's maintenance department.

56.    JACOB MACE's direct supervisor at Walmart was BRENAN JONES.

57.    Over the course of JACOB MACE's two periods of employment, WALMART had

substantial opportunity to observe JACOB MACE and recognize his psychological and mental

health issues.

58.    JACOB MACE was formally diagnosed with major depressive disorders and

borderline personality disorder while working at WALMART INC. in June 2019, but had battled

with mental health issues including depression and suicidal ideation since childhood.

59.    Many of JACOB MACE's coworkers at WALMART, including, but not limited to,

JENNIFER KREBS, CHRISTINA O'SHEA, and HANNAH WERNER were aware that JACOB

MACE had an extensive history of mental health issues including depression and suicidal ideation.

60.    Beginning on October 31, 2019, JACOB MACE began experiencing an acute

mental health crisis that lasted for sixteen days until his death on November 15, 2019.

61.    During this period, JACOB MACE's family removed the gun that WALMART had

previously sold him so he would not have access to a firearm to act on his suicidal ideation.

62.     During this period, JACOB MACE repeatedly sought mental health treatment or evaluation at one or more hospitals and was taking one or more prescription anti-depressants.

63.     As a consequence of multiple hospital visits, JACOB MACE missed work at WALMART several times.

64.     After missing work, JACOB MACE presented letters documenting his hospital visits to his WALMART supervisor JONES.

65.     Although these letters did not specify why JACOB MACE was admitted to the hospital, he explained the mental health crisis motivating these visits in discussions with JONES.

66.     JONES was specifically aware that JACOB MACE had engaged in suicidal ideation and on at least one occasion instructed JACOB MACE to call a suicide hotline while JACOB MACE was at work at Supercenter #1981.

67.     On November 9, 2019, before entering the hospital for three days, JACOB MACE exchanged several text messages with his WALMART coworker and friend, O'SHEA.

68.     JACOB MACE told O'SHEA about his "crippling" depression and that he had attempted suicide earlier in the week.

69.     O'SHEA asked JACOB MACE how he planned to kill himself to which he responded, "[s]lit wrists. Buy a gun."

70.     O'SHEA took a screenshot of her text conversation with JACOB MACE and sent it to JONES—JACOB MACE's supervisor.

71.     This screenshot included JACOB MACE's plan to "[s]lit wrists. Buy a gun."

72.     Upon information and belief, WALMART has an informal policy of "blacklisting" of individuals who should not be sold firearms even if they are not prohibited under relevant state or federal laws.

11

73.   About a half hour after O'SHEA sent JONES the screenshot of her text messages with JACOB MACE, the two met to discuss placing JACOB MACE on this "blacklist."

74.   O'SHEA explained she was worried for JACOB MACE's safety and did not want him to be able to purchase a firearm.

75.   JONES told O'SHEA that he would "take care of it."

76.   Upon information and belief, JONES never followed through on this promise despite both this specific warning and his awareness of JACOB MACE's general mental instability.

77.   WALMART did not utilize its own "blacklist" during the sale to their own employee, JACOB MACE.

78.   On November 12, 2019, JACOB MACE sent a Facebook message to his WALMART coworker ERIC MCLAUGHLIN.

79.   MCLAUGHLIN worked behind the firearm counter at Walmart Supercenter #1981 in the Sports & Outdoors department.

80.   JACOB MACE asked MCLAUGHLIN if WALMART sold single shot shotguns and which one was the cheapest.

III.   **WALMART's Knowingly Violated Statutory Duties and its Duty to Use Reasonable Care in Providing the Shotgun to JACOB MACE, Thereby Foreseeably Causing JACOB MACE's Suicide**

81.   On the morning of November 15, 2019, JACOB MACE showed up for work at Supercenter #1981 at approximately 7:00 a.m. and clocked out for his "lunch" break at approximately 9:30 a.m.

82.   JACOB MACE's WALMART co-worker, KREBS, was able to perceive that JACOB MACE had been drinking that morning.

12

83.     KREBS identified the fact that JACOB MACE had been drinking as unusual because he did not normally drink and had been sober for several months.

84.     JACOB MACE texted O'SHEA and indicated that something was troubling him.

85.     At approximately 9:40 a.m. that morning, JACOB MACE approached WALMART employee MCLAUGHLIN, who was working at the firearms counter in the Sports & Outdoors department.

86.     JACOB MACE then began the process of purchasing the Shotgun during his "lunch" break.

87.     MCLAUGHLIN entered information into the computer's purchasing system for federal and/or state background checks.

88.     WALMART's asset manager, IDA RANDALL arrived at the counter at 9:53 a.m. and approved the purchase as well as JACOB MACE's purchase of a box of ammunition.

89.     As WALMART was aware, among other things, of information from JACOB MACE's conversations with JONES regarding his repeated mental health hospitalizations and suicidal ideation, his disclosure to O'SHEA of a recent suicide attempt, and his plans to buy a gun to kill himself.

90.     As a result, WALMART had actual or constructive knowledge that JACOB MACE was "suffer[ing] from a mental disorder" and had a "history of violent behavior against [himself]" and, thus, could not lawfully possess a shotgun. Md. Pub. Safety Code § 5-205(b)(6).

91.     WALMART, however, chose to act as a culpable accessory and assist JACOB MACE in his unlawful possession of the Shotgun.

92.     WALMART knowingly violated, either directly or as an accomplice and/or co-conspiracy laws applicable to the sale and marketing of firearms, including but not limited to

13

unlawfully providing a shotgun to an individual barred under Md. Code Ann., Pub. Safety § 5-205(b)(6).

93.    WALMART's knowing violation of laws caused JACOB MACE's untimely and preventable death.

94.    WALMART's violation of Md. Code Ann., Pub. Safety § 5-205(b)(6) and potentially other relevant laws constitutes evidence of negligence sufficient to demonstrate that Plaintiff has a prima facie claim for relief.

95.    WALMART's unlawful sale to JACOB MACE was caused by WALMART's failure to appropriately train its employees regarding relevant firearms laws.

96.    Upon information and belief, MCLAUGHLIN and RANDALL also violated their common law duty of reasonable care by willfully ignoring clear indications that JACOB MACE was inebriated and/or distraught at the time of the purchase.

97.    Upon information and belief, MCLAUGHLIN and RANDALL did not ask JACOB MACE any screening questions regarding, for example, his mental state, his intended use for the Shotgun, his desire to buy a "cheap" gun, or his drinking.

98.    Upon information and belief, this lack of screening was a direct and foreseeable result of WALMART's negligent failure to appropriately select, train, and monitor its employees to make sure that they were following critical safety practices designed to prevent the provision of firearms to emotionally unstable individuals.

99.    Upon information and belief, JACOB MACE would not have been able to provide satisfactory answers to screening inquiries like those above and, therefore, a responsible dealer would have declined the sale of the Shotgun.

100.    Upon information and belief, if JACOB MACE had been placed on the "blacklist," or the "blacklist" was utilized properly, no WALMART employee would have processed the sale to JACOB MACE.

101.    Thus, had WALMART followed all relevant laws, complied with its duty of reasonable care by following widely accepted safety guidelines, properly trained its employees and/or applied by its own self-constructed safety protocols, JACOB MACE would not have had the Shotgun on November 15, 2019, and could not have used it to harm himself.

102.    Instead, as a result of WALMART's knowing violation of one or more firearms laws, applicable standard of care and its callous refusal to follow the law or to consider safety of the public—or its own employees—in selling firearms, WALMART placed the Shotgun in JACOB MACE's hands and provided him a receipt time-stamped at 9:58 a.m.

103.    JACOB MACE never returned from his break after leaving with the Shotgun.

104.    This led his friends and family to call 911 for assistance locating him.

105.    Shortly after 12:00 p.m., officers from St. Mary's County Sheriff's Office located JACOB MACE, deceased, inside his truck in a nearby parking lot.

106.    He was pronounced dead at 12:07 p.m. as a result of a single gunshot wound inflicted with the Shotgun and ammunition sold to him by WALMART.

107.    Consistent with KREBS' observation that JACOB MACE had been drinking, his body was found next to partially consumed bottle of Fireball whiskey.

108.    JACOB MACE's death was the foreseeable consequence of WALMART choosing to violate one or more relevant firearms laws, failing to train and supervise its employees to institute relevant safeguards and, ultimately, choosing to entrust a lethal firearm to a person known to be suffering from a mental crisis and operating under the influence of alcohol.

15

109.   Upon information and belief, WALMART has not made any changes to its negligent and/or unlawful training and sales practices, which would reduce the likelihood of similar negligent and/or unlawful transfers of firearms to other individuals.

110.   Upon information and belief, WALMART's continuation of reckless, unsafe and/or unlawful business practices continues to threaten rights of peace, health and safety common to all members of the public and, thus, constitutes an actionable and ongoing public nuisance under Maryland law.

### COUNT I
### Negligence – Wrongful Death

111.   Plaintiffs adopt and incorporate the allegations in Paragraphs 1 through 110 above.

112.   WALMART had a duty to train and supervise its employees to follow all relevant state and federal firearms statutes including, but not limited to, Md. Pub. Safety Code § 5-205(b)(6).

113.   WALMART also had a duty to train and supervise its employees to carefully follow safety protocols designed to screen out potential firearms purchasers showing a risk of harming themselves or others.

114.   Upon information and belief, WALMART failed to appropriately train and supervise employees including, but not necessarily limited to, MCLAUGHLIN, RANDALL and JONES.

115.   But for WALMART's negligent training and supervision, these individuals would have refused to supply the Shotgun to JACOB MACE so as not to aid in this violation of Md. Pub. Safety Code § 5-205(b)(6).

16

116.     WALMART's violation of laws including but not limited to Md. Code Ann., Pub. Safety § 5-205(b)(6) constitutes evidence of negligence sufficient to demonstrate that Plaintiffs have a prima facie case.

117.     Similarly, but for WALMART's negligent training and supervision, these individuals would appropriately applied relevant safety protocols in response to the clear indicators of danger presented by JACOB MACE and would have denied the sale under these protocols.

118.     For example, but for WALMART's negligent training and supervision, WALMART employees would have asked various screening questions of JACOB MACE which he would not have been able to provide satisfactory answers.

119.     WALMART's knowing breach of one or more firearms laws and its common law duty of care directly and foreseeably led to JACOB MACE's suicide by putting a lethal tool in the hands of a distraught and inebriated individual openly threatening self-harm.

120.     Plaintiffs are entitled to damages for the harm that proximately resulted from WALMART's negligent and/or unlawful misconduct.

### COUNT II
### Negligence – Survival Action

121.     Plaintiffs adopt and incorporate the allegations in Paragraphs 1 through 120 above.

122.     The Estate of JACOB MACE was opened on or about December 9, 2019, in St. Mary's County, Maryland and KAYLA BRADY was appointed as personal representative of the estate.

123.     KAYLA BRADY as the personal representative of the estate brings this claim for the conscious pain and suffering, physical injuries, and other damages that the late JACOB MACE experienced on November 15, 2019, as a direct and proximate result of the negligence and breaches of duty by Defendants, by and through its employees.

17

## COUNT III
### Negligent Entrustment –Wrongful Death

124.  Plaintiffs adopt and incorporate the allegations in Paragraphs 1 through 123 above.

125.  All FFLs have a duty not to provide firearms to a class of individuals deemed by Congress or a state legislature as presenting an excessive risk of misusing firearms to harm themselves or others.

126.  This would include not providing firearms to any purchaser disqualified under Md. Code Ann., Pub. Safety § 5-205(b)(6).

127.  All persons are subject to a similar, common law duty to exercise reasonable care by not entrusting a dangerous instrument to a person they know or reasonably should know is displaying a high propensity to use the product in a manner involving unreasonable risk of physical injury to himself or others.

128.  WALMART knowingly breached one or more relevant statutes including, but not limited to, § 5-205(b)(6) and a related duty of reasonable care by entrusting the Shotgun to JACOB MACE.

129.  WALMART also had actual and/or constructive knowledge that JACOB MACE was a prohibited purchaser under § 5-205(b)(6) and inebriated at the time he sought to purchase the Shotgun.

130.  WALMART also had actual knowledge that JACOB MACE was likely to use the Shotgun to harm himself or another due to both a specific warning provided by O'SHEA about JACOB MACE's plan to use a firearm to commit suicide and general awareness of his mental instability.

131.  But for WALMART's breach of one or more statutes and its duty of reasonable care by entrusting the Shotgun to JACOB MACE in defiance of clear "red flags" indicating a high

18

likelihood JACOB MACE would use the gun to harm himself or others, JACOB MACE would not have had access to a firearm November 15, 2019.

132. WALMART's negligent and/or unlawful actions in entrusting the Shotgun to JACOB MACE directly and foreseeably led to JACOB MACE committing suicide with the Shotgun.

133. Plaintiffs are entitled to damages for the harm that proximately resulted from WALMART's negligent and/or unlawful misconduct.

### COUNT IV
### Nuisance – Wrongful Death

134. Plaintiffs adopt and incorporate the allegations in Paragraphs 1 through 133 above.

135. All parties have a duty to refrain from any actions, which will interfere with or undermine rights held in common by the general public.

136. A breach of this duty constitutes a public nuisance.

137. WALMART breached this duty by adopting business practices guaranteeing that it would channel firearms like the Shotgun into the hands of vulnerable individuals like JACOB MACE and, thereby, contribute to avoidable firearms suicides.

138. Sales channeling firearms like the Shotgun into the hands of vulnerable individuals like JACOB MACE are not only negligent but may also constitute direct or indirect violations of one or more relevant state or federal firearms statutes.

139. As a direct and foreseeable consequence of WALMART's creation of a public nuisance, Plaintiffs have suffered a unique harm that is different not only in degree but also in kind from other members of the public.

140. Whereas WALMART's practices impose a general threat to public safety and public convenience by diverting law enforcement and medical resources to respond to avoidable

suicides and away from competing crises, Plaintiffs have suffered categorically different emotional deprivation in that they have lost a cherished family member.

141.    Upon information and belief, WALMART has not changed or modified its sales practices regarding firearms in any significant way since JACOB MACE's death, thereby rendering further, similar tragedies likely and continuing the relevant nuisance.

142.    Plaintiffs are entitled to both damages for the harm already caused by this nuisance and injunctive relief to abate the ongoing nuisance.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant judgement in their favor and against Defendants as follows:

1.      For actual damages, in an amount to be determined at trial, relating to Plaintiffs' causes of action;

2.      Requiring the Defendants to pay interest, costs, and reasonable attorney's fees incurred by Plaintiffs;

3.      For injunctive relief to abate the nuisance created by Defendants' unsafe practices;

4.      For any other and further relief the Court deems appropriate.

## ELECTION FOR JURY TRIAL

Plaintiffs demands a jury trial as to all claims.

Kevin P. Sullivan, Esq. CPF #0312170289
Daniel P. Stringer, Esq. CPF #1112150180
Salsbury Sullivan, LLC
100 N. Charles Street, Suite 900
Baltimore, MD 21201
(443) 869-3920
ksullivan@salsburysullivanlaw.com
dstringer@salsburysullivanlaw.com

_____
Erin C. Davis, Esq., CPF #1608030001
Jonathan E. Lowy, Esq. (Pro Hac Vice to be filed)
Brady, United Against Gun Violence
840 First Street NE #400
Washington DC 20002
202-370-8100
edavis@bradyunited.org
jlowy@bradyunited.org

*Attorneys for Plaintiffs*