**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

KAYLA M. BRADY, *et al.*

    Plaintiffs,

    v.

WALMART INC. *et al.*,

    Defendants.

Civil Case No.: 8:21-cv-01412-CBD

**<u>PLAINTIFFS' OPPOSITION TO</u>**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

<u>*/s/ Kevin P. Sullivan*</u>
Kevin P. Sullivan, Esq., Fed Bar #27506
Daniel P. Stringer, Esq., Fed Bar #19243
Lindsey McCulley, Esq., Fed Bar #19170
SALSBURY SULLIVAN, LLC
100 N. Charles Street, Suite 900
Baltimore, MD 21201
Ph: (443) 869-3920
ksullivan@salsburysullivanlaw.com
dstringer@salsburysullivanlaw.com
lmcculley@salsburysullivanlaw.com
***Attorneys for Plaintiffs***

## Table of Contents

**INTRODUCTION**.................................................................................................................. 2

**STATEMENT OF FACTS** ..................................................................................................... **4**

   A.  The Events of November 2019 and Walmart's Knowledge of Mace's Suicidal Ideation.................. 4

   B.  Walmart's Sub-Par Training and Policies and Procedures Relating to the Sale of Firearms.........12

   C.  Mace's Mental Health and Suicidal Ideation.……………………………………………………14

**STANDARD OF REVIEW** ................................................................................................... **19**

**ARGUMENT** ........................................................................................................................... **19**

   A.  This Case is Not Barred by PLCAA Because It Falls Outside the General Definition of a Prohibited "Qualified Civil Liability Action" and Because the Claims Satisfy at Least One PLCCA Exception. .................................................................................................................................... 19

      1.  This Case Does Not "Result []" From the "Criminal or Unlawful Misuse" of the Shotgun……19

      2.  Even if The General Definition Were Met, All Claims Survive Under PLCAA Exceptions….20

         a.  This Court has Already Determined that PLCAA's Predicate Exception Has been Satisfied……………………………………………………………………………………20

         b.  PLCAA's Negligent Entrustment Exception is also Satisfied…………....................21

   B.  If Read to Bar All of Plaintiffs' Claims Otherwise Permitted Under Maryland Law, PLCAA is Unconstitutional……………………………………………………………………..……………...25

   C.  The Sale of the Firearm to Mace Proximately Caused his Death……………………………………26

   D.  At Best, it is for the Jury to Determine Contributory Negligence…………………………………30

      1.  Mace was Not Contributorily Negligent as a matter of law…………………………………..30

      2.  Mace's Family was Not Contributorily Negligent as a matter of law…………………………32

   E.  As a Federally Licensed Firearms Dealer, Walmart Owed Mace a Duty…………………………35

   F.  Walmart Negligently Entrusted the Firearm to Mace…………………………………………...39

   G.  Maryland's Worker's Compensation Act is Inapplicable to this Case……………………………39

      **CONCLUSION**.............................................................................................................. **43**

## <u>INTRODUCTION</u>

The first thirty-six and a half pages of Walmart's brief tell a disputed, fictitious story of events leading to the death of Jacob Mace.  Walmart spends pages casting blame on the deceased and his family while omitting relevant facts—namely, the plethora of managers at Walmart who knew Mace should not have been sold a firearm.  Walmart hides facts from the Court that have been developed in discovery regarding Walmart's own, active negligence that caused Mace's death.  But as is evident from the facts uncovered in discovery as explained in this opposition, the factual evidence does not support Walmart's arguments, and its motion should be denied.

The remainder of Walmart's brief is primarily a rehash of legal arguments that the Court addressed and rejected in denying Walmart's motion for judgment on the pleadings.  The Court's prior rulings on these legal arguments are the law of the case; they were correct and should not be disturbed.  At that stage, the Court determined that *if* Walmart was aware of Mace's suicidal ideation leading up to his death, which the facts now demonstrate, Plaintiffs' claims are not barred by PLCAA, Walmart owed a duty to Mace, and causation is an issue for the jury.  Given the Court's prior ruling, the sole focus on summary judgment should be whether there is evidence of Walmart's knowledge of Mace's suicidal ideations leading up to his death.  There is. Indeed, the facts outlined in Plaintiff's complaint were borne out in discovery, as were additional facts showing Walmart was aware of Mace's suicidal ideation.

Walmart attempts to bury its head in the sand on this issue, insisting that it is now entitled to summary judgment because its management team had no knowledge of Mace's suicidal ideation or hospitalizations in the weeks leading up to November 15.  Walmart relies on this "fact" over and over to support its arguments that (i) neither the predicate nor negligent entrustment exceptions to PLCCA can be satisfied, (ii) Plaintiffs' claims are barred by

contributory negligence, (iii) Walmart did not owe Mace a duty, and (iv) Walmart did not negligently entrust the firearm to Mace. That Walmart even attempts to suggest this "fact" is undisputed is laughable. Walmart concedes, as it must, that knowledge is acquired by a corporation when officers or agents of the corporation acquire the knowledge and can reasonably be expected to act upon or communicate that knowledge to the corporation. Walmart agrees that would be members of management. The record developed through discovery is replete with evidence establishing that at least five members of Walmart's management team, including the head store manager and his second in command, had actual knowledge of Mace's suicidal ideation and hospitalizations in the weeks leading up the sale of the firearm to Mace.

The following evidence from discovery is just some of the evidence that belies Walmart's claim that it lacked knowledge of Mace's suicidal ideation.

- Walmart employee and friend of Mace, Christina O'Shea, sent a text message to a senior member of Walmart's management team, Brennan Jones, describing Mace's plans to "buy a gun" in an effort to take his life, less than one week prior to Walmart selling the firearm to Mace.

- O'Shea confirmed at deposition that she sent Jones the text message *and* told him directly that Mace was planning to purchase a firearm from Walmart to kill himself.

- O'Shea specifically asked Jones to place Mace on a blacklist to prohibit him from purchasing a firearm and Jones told O'Shea that he would "take care of if."

- Walmart has confirmed that the blacklist did exist, yet Mace was never put on it.

- O'Shea spoke with at least one other member of Walmart's management team about Mace's text messages and intent.

- Jones relayed the information O'Shea told him to the head store manager and a human resource manager.

- The manager of the sporting goods department, Renard Mackell, testified that Mace had told him about his mental health struggles and prior suicide attempt. He testified he would not have sold Mace a gun. And prior to Mace's body being discovered, Mackell questioned why the sales associate who sold Mace the firearm would do such a thing because "everyone knew" about Mace's suicidal ideation.

3

- Walmart employee, Hannah Werner, testified that she overheard the head store manager speaking to another Walmart manager two weeks after Mace's death and saying that Mace should have been on the blacklist and never sold a firearm.

- Members of Walmart's management team were aware of Mace's hospitalizations for suicidal ideation in November 2019.

There is no question that these facts put Walmart's knowledge in dispute and should be put before a trier of fact. Given the numerous witnesses who testified under oath about what Walmart managers knew, Walmart's pretending in its motion that discovery did not create a dispute of fact over their knowledge is nothing short of disingenuous.

There are also various disputes of fact relating to Mace's alleged prior suicide attempts, the relationships Mace had with his various family members and his wife, the causes of his mental distress, and the adequacy of Walmart's policies and procedures relating to the purchase of firearms. These factual disputes also preclude summary judgment.

Finally, Walmart's new argument that the Mace family's sole remedy in this case is through workers' compensation also fails. Mace was not working when he purchased the firearm from Walmart and was not performing any activity within the scope of his employment when he took his life with the weapon negligently entrusted to him by Walmart.

Walmart's motion for summary judgment should be denied in its entirety.

## **STATEMENT OF FACTS**

A. The Events of November 2019 and Walmart's Knowledge of Mace's Suicidal Ideation.

Jacob Mace was an employee of the Walmart store in Leonardtown, Maryland from September 2019 until his untimely death on November 15, 2019. *See* Docket No. 70-1, Def. M. Summ. J., at Exhibit 9. On November 15, 2019, Walmart associate, Eric McLaughlin, sold Mace

a firearm and ammunition during Mace's lunch break.  The sale never should have taken place. Moments after the sale, Mace used the firearm to take his life.

Mace had a long history of mental health struggles and had at least one prior suicide attempt before the events of November 2019.  Mace began suffering from an acute mental health crisis on October 31, 2019.  *See* Deposition Transcript of Nicole Mace ("Nicole Mace Trans."), Exhibit 1, at 60; Deposition Transcript of Jennifer Krebs ("Krebs Trans."), Exhibit 2, at 25.  That evening, Mace's sister, Nicole Mace, discovered him cutting himself in the bathroom of his home and took him to the hospital.  Nicole Mace Trans., Exhibit 1, at 70-76; Deposition Transcript of Kayla Brady ("Brady Trans."), Exhibit 3, at 70. Mace was admitted to the hospital and ultimately discharged on November 3, 2019.

On November 6, 2019, a Walmart co-worker, Joel Barr, drove Mace to the hospital after Mace confessed to having suicidal thoughts to his therapist.  Mace was discharged a few hours later.  On November 7, 2019, Nicole Mace called the police because her brother was making threats to harm himself.  Mace was again taken to the hospital and discharged a few hours later. Nicole Mace Trans., Exhibit 1, at 80-81.

On November 9, 2019 at 10:55am, Mace sent the following text message to several of his Walmart co-workers, including Joel Barr, Christina O'Shea, Jennifer Krebs and an individual named "Cory":



I feel broken. I've been to the hospital, called the suicide hotline twice, been taken to the ER twice, discharged twice, and had to say goodbye to the girl I love. I've felt crippling depression all week and have been suicidal all week. I've had 1 attempt sense I got out of the hospital and I just get more discouraged every time I fail. Each time more determined to succeed next time. I try talking about my feelings but talking doesn't help. Nothing helps. I just want it all to end. Goodbye.



Mace's Walmart co-workers referred to this as Mace's "goodbye message."  Deposition Transcript of Christina O'Shea ("O'Shea Trans."), Exhibit 4, at 41 and 58.  O'Shea was working at Walmart when she received the text.  She started crying when she read it and immediately got on the intercom at Walmart to ask Brennan Jones, a Walmart manager, to come over as soon as possible.  O'Shea Trans., Exhibit 4, at 59.  Jones did not come to talk to O'Shea for several hours.  *Id*.  However, another Walmart manager, Kristin Wagner, approached O'Shea after she got on the Walmart intercom.  *Id*.  Deposition Transcript of Kristin Wagner ("Wagner Trans."), Exhibit 5, at 16-18.  O'Shea expressed her concerns about Mace's intent to commit suicide to Wagner and showed her the "goodbye message."  Wagner Trans., Exhibit 5, at 16 (acknowledging that she discussed the messages with O'Shea).

Mace and O'Shea continued to exchange text messages throughout the morning and early afternoon of November 9.  At 12:50pm, before Jones approached O'Shea, Mace texted O'Shea about his suicide plan to "slit wrists, buy a gun."  O'Shea Trans., Exhibit 4, at 64-65.  O'Shea also told Ms. Wagner about Mace's plan to buy a gun and showed her the text message.  O'Shea Trans., Exhibit 4, at 63.  O'Shea also informed Wagner that Mace had recently been in a mental institution.  Wagner Trans., Exhibit 5, at 35.

O'Shea took a screenshot of the text message from Mace and texted it to Jones.  This is a true and accurate copy of the screenshotted text message from O'Shea to Jones:



of a spontaneous one. I have Christopher. I was planning on sending the goodbye out today and let everyone go crazy now about it so there was less suspicion tomorrow night or monday so nobody would know to stop me.

What were you going to do?

12:50 PM

1 Unread Message

Slit wrists. Buy a gun.

12:56 PM

Please, please please dont

Delivered

Tuesday 4:05 PM

Lettie said you had a name

8

Jones is a senior member of Walmart's management team, he was the co-manager of the store at the time and second in charge. Only Tim Crowley, the head store manager, was above Jones. O'Shea Trans., Exhibit 4, at 21-22; Deposition Transcript of Tim Crowley ("Crowley Trans."), Exhibit 6, at 15-16; Deposition Transcript of Brennan Jones ("Jones Trans."), Exhibit 7, at 20. When Jones finally approached O'Shea on November 9, she relayed to him her concerns about Mace's intent to purchase a firearm and commit suicide. O'Shea told Jones "I think we have to find a way to make sure he's not going to buy one [a firearm] because he has already bought one from here before." O'Shea Trans., Exhibit 4, at 68. O'Shea further explained: "I was trying to stress the importance in being like, this, 'Dude, you need to take this seriously.'" *Id.* O'Shea testified that she "most definitely" expressed to Jones her concerns that Mace was suicidal on November 9, 2019. *Id.* at 68-69. O'Shea also informed Jones that Mace had been hospitalized recently. *Id.* at 70-71.

O'Shea testified at deposition that she explained all this to Jones because she "thought there was a list that he [Mace] could be put on to where they couldn't sell him a gun or, like, maybe Brennan [Jones] would, because of the nature of the crisis, maybe Brennan [Jones] would tell the other managers in the store, because I knew that managers could deny the sale of a gun at any point, and I trusted Brennan [Jones]." O'Shea Trans., Exhibit 4, at 65-66. In response to O'Sheas' request to put Mace on a list to make sure he was not sold a firearm, Jones responded "I will take care of it." O'Shea Trans., Exhibit 4, at 63 and 67-71. O'Shea testified that she expected Jones would put Mace on a "blacklist" so that he could not purchase a firearm from Walmart and that Jones would discuss the issue with other members of management. *Id.* at 69 and 85. O'Shea also testified, unsurprisingly, that she was very upset with Jones after she learned of Mace's death and confronted Jones about his failure to do anything to ensure that

Mace would not be sold a firearm.  O'Shea Trans., Exhibit 4, at 73; Krebs Trans., Exhibit 2, at 48-49.

Jones did speak with other members of Walmart's management team prior to Walmart's sale of the firearm to Mace on November 15.  Jones spoke with one of Walmart's human resource managers, Beverly Madden, about Mace's suicide threats.  Jones Trans., Exhibit 7, at 12-13 and 17; Deposition Transcript of Beverly Madden ("Madden Trans."), Exhibit 8, at 76.  Jones also relayed his discussion with O'Shea to the head store manager, Tim Crowley.  Jones Trans., Exhibit 7, at 33-34.  Jones did not place Mace on any blacklist and did not tell anyone not to sell Mace a firearm.  Jones Trans., Exhibit 7, at 37.[1]

Other managers at Walmart also knew about Mace's suicidal ideations.  Renard Mackell was the manager of the sporting good department at Walmart.  This is the department that oversaw the selling of firearms.  Deposition Transcript of Renard Mackell ("Mackell Trans.), Exhibit 9, at 6-8.  Mackell testified at deposition that Mace told him about his mental health issues and that he had previously attempted suicide.  *Id.* at 33-34.  Mackell testified that he would not have sold Mace the firearm on November 15.  *Id.* at 37.

After Mace purchased the firearm from Walmart but before Mace's body was discovered, the individual salesman who sold Mace the firearm, Eric McLaughlin, had a conversation with Mackell.  When McLaughlin told Mackell that he had sold Mace a firearm earlier that day,

---

[1]  Jones testified at deposition that he did not remember whether or not he received the screen-shotted text message from Mace about his plan to "buy a gun" (Jones Trans., Exhibit 7, at 9), but this is of no matter at this stage of the litigation.  O'Shea confirmed that she sent the message to Jones and both O'Shea and Jones testified as to their discussion about Mace's suicidal state of mind.  Jones Trans., Exhibit 7, at 10.  This occurred just six days prior to Walmart selling the firearm to Mace.

Mackell questioned why McLaughlin would do such a thing because "everybody knew" Mace had mental health issues.  Deposition Transcript of Eric McLaughlin ("McLaughlin Trans."), Exhibit 10, at 86.  Mackell again confirmed to McLaughlin that he would not have sold the firearm to Mace.  *Id.*

Beyond Crowley (top Walmart manager), Jones (second in command), Mackell (sporting goods manager), Wagner (grocery pickup manager), Madden (human resource manager), there is evidence that other members of Walmart management also knew of Mace's mental health history.  O'Shea testified that she told her department manager, "Tabby", about Mace's suicidal ideations the week before his death (O'Shea Trans., Exhibit 4, at 26).  Mace also informed his mother that he had multiple discussions with Walmart management about his mental health struggles and hospitalizations and that they directed him on more than one occasion to call the suicide hotline.  Deposition Transcript of Debra McCreary ("McCreary Trans.), Exhibit 11, at 142-45.  Two weeks after Mace's death, another Walmart employee, Hannah Werner, testified that she overheard Crowley speaking to another Walmart manager, "Sybil", and saying that Mace should have been on the blacklist and never sold a firearm.  Deposition Transcript of Hannah Werner ("Werner Trans.), Exhibit 12, at 28-29 and 38.[2]

Plaintiffs retained two experts to opine on the standard of care in this case, Joseph Vince, Jr. and Mark Abramson.  Mr. Vince served as a special agent with the U.S. Bureau of Alcohol, Tobacco, and Firearms ("ATC") for almost thirty years.  He is currently a professor at Mount St.

---

[2] In addition to various members of management, other Walmart employees knew of Mace's mental health struggles, his hospitalizations and his suicidal ideations, including O'Shea, Barr, Krebs, Werner, "Cory" and "Trevor".  O'Shea Trans., Exhibit 4, at 26; Krebs Trans., Exhibit 2, at 26-33; Deposition Transcript of Joel Barr ("Barr Trans."), Exhibit 13, at 11-12 and 19.  This supports Mackell telling McLaughlin that "everybody knew" about Mace's mental health struggles.

Mary's University in Emmitsburg, Maryland and the president of Crime Gun Solutions.  A copy of Mr. Vince's expert report is attached hereto as Exhibit 14.  Mr. Vince succinctly summarized his overall opinion at deposition:

> The fact of the matter is and the crux of why we're here is that Walmart managers knew, had reasonable cause to believe he shouldn't have a gun and did nothing.
>
> *        *        *
>
> I'm focusing on the fact of all the information that Walmart had and his past record of what they knew. They should not have done this.  No one in their right mind would allow this guy to  have a gun.

Deposition Transcript of Joseph Vince, Jr. ("Vince Trans."), Exhibit 15, at 106 and 159.

Mr. Abramson owns and operates a firearms retail store in Albuquerque, New Mexico.  A copy of Mr. Abramson's expert report is attached hereto as Exhibit 16.  Like Mr. Vince, Mr. Abramson also opined that the sale of the firearm to Mace violated the standard of care relating to the sale of firearms because of Walmart's knowledge of Mace's suicidal ideation in November 2019.  Deposition Transcript of Mark Abramson ("Abramson Trans."), Exhibit 17, at 70-72.

B.  Walmart's Sub-Par Training and Policies and Procedures Relating to the Sale of Firearms.

Although members of Walmart's management team provided conflicting testimony about Walmart's policies relating to the sale of firearms, the polices themselves as well as Walmart's corporate designee, confirm that Walmart has policies that allow any associate or manager to deny the sale of a firearm to anyone for any, non-discriminatory reason and that a firearm should not be sold to an individual if it is suspected that the individual will use the firearm to harm himself or others.[3]  *See* Deposition Transcript of Nicholas Colucci (corporate designee)

---

[3]  Although Walmart's written polices as well as the testimony from its corporate designee confirm Walmart associates have the ability to deny the same of a firearm to anyone for any non-discriminatory reason and that a firearm should not be sold to someone who may use it for self-

("Colucci Trans."), Exhibit 18, at 15-21.  Although these policies exist, the witness testimony

has consistently confirmed that (i) Walmart's training does not include any reference to selling

firearms to individuals suffering from a mental health crisis or suicidal ideation (Jones Trans.,

Exhibit 7, at 41-42; Deposition Transcript of Ida Randall ("Randall Trans."), Exhibit 19, at 40;

Colucci Trans., Exhibit 18, at 23-24; 67-68; Mackell Trans., Exhibit 9, at 26),[4]  and (ii) it is not

encouraged to inquire as to the reasons a potential buyer wishes to purchase a firearm (Randall

Trans., Exhibit 19, at 30; Colucci Trans., Exhibit 18, at 23-24).

      Walmart also has a national policy about blacklisting certain individuals from purchasing

firearms.  According to Walmart's corporate designee, the policy requires a manager who

believes someone is contemplating suicide or self-harm to report those details in real time to a

market asset protection manager and Walmart's emergency operations center.  Colucci Trans.,

Exhibit 18, at 90-92.  From there, the information should be reported to Walmart's corporate

"ATF Compliance Group" who can then place the individual on the blacklist.  The blacklist is

limited to those individuals Walmart believes are at risk of imminent self-harm.  *Id.* at 96-97.

When asked about how the process is supposed to work at the store level, Walmart's corporate

---

harm or to harm others, Walmart's management team did not understand these policies.  For
example, Jones (second in command) testified that if the information he received about someone
intending to commit self-harm was "hearsay" then he could not deny that person their rights to
own a firearm.  Jones Trans., Exhibit 7, at 54-55.  Jones also testified that he would need more
information beyond the fact that a person was suicidal before he would refuse to sell a firearm to
a potential purchaser.  *Id.* at 66.  Mackell (sporting goods manager) testified that the only reasons
he could deny the sale of a firearm are if the potential purchaser is impaired or purchasing the
firearm for someone else (a straw purchase).  Mackell Trans., Exhibit 9, at 27-28.

[4]  Walmart's computer-based training manuals currently discuss not selling guns to people with
mental illness or suicidal ideation.  O'Shea Trans., Exhibit 4, at 88; Colucci Trans., Exhibit 18, at
76.

designee indicated that Crowley (head store manager) would be a better person to explain. Colucci Trans., Exhibit 18, at 101-102.

Crowley, however, testified that he was not aware that such a list even existed. Indeed, Crowley was in the deposition room when Colucci was questioned and subsequently testified that he never heard of such a list until Colucci mentioned it during his deposition. Second Deposition Transcript of Tim Crowley Trans. ("Second Crowley Trans."), Exhibit 24, at 24-25. Jones (second in command) also testified that Walmart maintained no such list. Jones Trans., Exhibit 7, at 12. The human resource manager, Madden, testified similarly. Madden Trans., Exhibit 8, at 59.

In other words, if Crowley's, Jones', and Madden's testimony is to be believed, the evidence shows that Walmart maintains a corporate policy directing store managers to report concerns of suicidal ideation up the chain of command so that an individual can be added to a blacklist and prohibited from purchasing a gun, ***but*** Walmart's managers at its California store never heard of such a policy. Even more astounding is that Walmart associate O'Shea (not a member of management) was aware of this blacklist. That is the reason she approached Jones in the first place – to make sure he put Mace on the blacklist so he couldn't purchase a firearm. Jones never told O'Shea at the time that there was no such list. Rather, he told her he would "take care of it."

C.  Mace' Struggles with Mental Health and Suicidal Ideation.

Mace struggled with mental health as a child and had thoughts of suicide dating back to 2008. McCreary Trans., Exhibit 11, at 81-82. He engaged in self-harming conduct (cutting) for several years (*id.* at 82-86; Brady Trans., Exhibit 3, at 46)), but the testimony of Mace's family is that, at most, he may have attempted suicide once prior to November 15, 2019. Mace's mother

and sister recalled an incident when Mace was in tenth grade when he considered the thought of hanging himself in the garage with a dog leash, but he never actually hung the leash or tied it around his neck.  McCreary Trans., Exhibit 11, at 88-89; Nicole Mace Trans., Exhibit 1, at 48. None of the family members recall an actual suicide attempt other than this instance.  McCreary Trans., Exhibit 11, at 93; Nicole Mace Trans., Exhibit 1, at 44; Brady Trans., Exhibit 3, at 54-56.

Walmart spends many pages blaming the Mace family as the source of Mace's stress and mental health issues and takes no responsibility for being a source of pressure/stress on Mace, but the testimony there is also in dispute.  Mace's mother explained that part of the reason for Mace's acute mental health crisis that began on Halloween night 2019 was that Mace "was feeling stressed at work, they were giving him a hard time about things."  McCreary Trans., Exhibit 11, at 97.  Mace's mother explained that his supervisors at Walmart were rude to him (McCreary Trans., Exhibit 11, at 100) and his wife explained that Mace complained about the way he was treated at Walmart and about being "worked like a dog."  Brady Trans., Exhibit 3, at 109.

Although Mace was clearly under some family stress in November 2019, his family undertook many efforts to protect Mace.  For example, Mace's mother removed a firearm from Mace's home in November 2019.  McCreary Trans., Exhibit 11, at 109.  Walmart criticizes Mace's sister for installing spyware on his phone, but Mace's sister did that "so that she could hear or see if he was making threats to kill himself so that she would know about it so she could intervene and help me get, you know, make sure we intervened appropriately."  McCreary Trans., Exhibit 11, at 102; Nicole Mace Trans., Exhibit 1, at 127-128. The family also took Mace to the hospital and/or called authorities to do so, and discussed the possibility of getting a protective order for Mace but explained that they believed the hospital would do that once he

15

was admitted.  McCreary Trans., Exhibit 11, at 114.  Walmart criticizes the family, especially

Brady, for not telling anyone at Walmart about Mace's mental health crisis or suicidal ideation.

This makes no sense since, as discussed above, multiple members of Walmart's management and

associate team already knew about Mace's mental health crisis, suicidal ideations and

hospitalizations.

Walmart also spends pages detailing problems with Mace's marriage and his alleged

infidelity with another Walmart employee, Hannah Werner.  Ms. Werner, however, denied ever

having an affair with Mace and testified that the two of them were nothing more than platonic

friends and that Mace was dedicated to his wife.  Werner Trans., Exhibit 12, at 14-16.  As for

Mace's wife, Kayla Brady, she explained that they were going through a tough time because he

was communicating with Werner a lot and seemed to have feelings for her.  Brady was also very

emotional at this time as she was eight months pregnant, but she explained in the deposition that

she and Mace were working through their issues, planned to continue to grow their family and

live a normal life together.  Brady Trans., Exhibit 3, at 59, 66, 102, and 139-141.  Mace's sister

testified similarly.  Nicole Mace Trans., Exhibit 1, at 68.  Brady's text messages with Mace

during this time corroborate these accounts.  *See* Text Exchange, Exhibit 23.

Although Walmart criticizes Brady for "snooping" through Mace's Facebook account,

she testified that he gave her access to this account.  Brady Trans., Exhibit 3, at 25.  Walmart

also attempts to highlight the fact that Brady deactivated his phone at one point, but Brady

explained at deposition that this was for maybe a total of thirty minutes.  *Id.* at 74.

It is true that Mace occasionally complained to his friends about his marriage but that is

not unusual.  As his wife explained at deposition, Mace was ultra-sensitive and sometimes took

things more personally than most other people and would often times say dramatic things that he

did not mean.  Brady Trans., Exhibit 3, at 61-62 and 69-70.  It is also true that the couple got into

an argument the night prior to Mace's passing but Brady disputes the account of the argument

where she threw something at Mace or was otherwise violent.  *Id.* at 77-79.  Prior to Mace

leaving for work the next day, November 15, 2019, he kissed his wife goodbye, and everything

seemed fine.  Brady Trans., Exhibit 3, at 83.

 One fact that is not disputed is that Mace loved and adored his son Christopher, was

excited for his new son (Grayson) to be born and intended to care and provide for his sons.

Krebs Trans., Exhibit 2, at 128; Barr Trans., Exhibit 13, at 32-33; Sherwood Trans., Exhibit 20,

at 42-43.

 Obviously, the family was devastated when they heard of Mace's death and have sought

counseling to deal with the tragedy.  McCreary Trans., Exhibit 11, at 138-39; Brady Trans.,

Exhibit 3, at 95-97; Mark Mace Trans., Exhibit 21, at 75-77.

## STANDARD OF REVIEW

 To obtain summary judgement, the moving party must show that there is no genuine

dispute as to any material fact and that that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(a).  To defeat a motion for summary judgment, the non-moving party

can set forth specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-24 (1986).  There is a genuine issue as to material fact "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Sharif v. United Airlines, Inc.*, 841

F.3d 199, 204 (4th Cir. 2016).

 In considering a motion for summary judgment, the court is not to "weigh the evidence

and determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  It also does not make

credibility determinations. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Rather, the court is to draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matushiuta Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (internal citation and quotation marks omitted).   It is the trier of facts' duty to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002) (internal citations omitted).  Indeed, "[s]ummary judgment is inappropriate even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *M & M Medical Supplies & Serv., Inc.*, 981 F.2d 160, 163 (4th Cir. 1992) (internal quotations and citations omitted).

The law of the case doctrine is also applicable here because the Court already addressed several of Walmart's arguments in denying Walmart's motion for judgment on the pleadings. Under the law of the case doctrine, "a legal decision, once made, should ordinarily remain the law throughout the life of the case." *Kiddie Acad. Domestic Franchising, LLC v. Wonder World Learning, LLC*, 2020 U.S. Dist. LEXIS 132931, *39 (D. Md. July 27, 2020) (citation omitted). The doctrine bars a party from resurrecting issues that were previously decided. *Id.* at *40 (citations omitted).  This doctrine advances the interest of efficiency and judicial economy. *Id.* "[T]he law of the case doctrine applies to interlocutory rulings, notwithstanding the fact that such decisions are amenable to revision." *Id.* at *41 (citing *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017)).  When applied by a trial court to its own rulings, the law of the case doctrine is malleable, but the court should be mindful of the need to balance the interest of correctness and finality. *Id.* (citing *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515

18

(4th Cir. 2003)).  A court should only revisit its prior rulings under extraordinary circumstances like a change in applicable law or a clear error.  *Id.* at *41-42 (citations omitted).

## **ARGUMENT**

A. This Case is Not Barred by PLCAA Because It Falls Outside the General Definition of a Prohibited "Qualified Civil Liability Action" and Because the Claims Satisfy at Least One PLCCA Exception.

PLCAA only prohibits "qualified civil liability actions" that meet both the general definition in 15 U.S.C. § 7903(5)(A) and do not fall under any exception in §7903(5)(A)(i) – (vi).  Plaintiffs' case does not meet the general definition and falls within multiple exceptions.

1. This Case Does Not "Result[] From" the "Criminal or Unlawful Misuse" of the Shotgun.

In order to fall within § 7903(5)(A), Plaintiffs' harm must have "result[ed] from" a "criminal or unlawful misuse" of a firearm by a third party.  Plaintiffs' injury resulted, most directly, from Mace's use of the shotgun to commit suicide.  A gun suicide is neither a "criminal [n]or unlawful misuse" of a firearm.  § 7903(5)(A).  In fact, Maryland has decriminalized even attempted suicide.  Md. Code Ann., Crim. Law § 3-101.1(a).

The only "criminal" action Walmart alleges here is Mace's discharge of a firearm on the land of another without obtaining written permission.  Walmart moved to dismiss this case under this same theory, but the Court rejected the attempt because it could not infer from the original complaint anything about the ownership of the land where the firearm was fired.  We are now at the summary judgment stage, and Walmart still has failed to present any admissible evidence confirming who owns the land where Mace discharged the firearm.  For this reason alone, the Court cannot find that Mace's conduct was criminal or unlawful.[5]

---

[5]  In opposing Walmart's motion for judgment on the pleadings, Plaintiffs argued that PLCAA should be narrowly construed so as only to prohibit causes of action for harm *solely* caused by

2. <u>Even if The General Definition Were Met, All Claims Survive Under PLCAA Exceptions.</u>

    a) <u>This Court has Already Determined that PLCAA's Predicate Exception Has been Satisfied.</u>

Under PLCAA's predicate exception, if a gun industry defendant "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm" then this case is not a "qualified civil liability action" and the entire "action" survives. § 7903(5)(A)(iii).

The predicate exception is satisfied because Walmart knowingly violated one or more statutes applicable to the sale or marketing of firearms, including, but not limited to, Md. Code Ann., Pub. Safety § 5-205(b)(6), either directly or as an accomplice. Md. Code Ann., Pub. Safety § 5-205(b)(6) prohibits the ownership of a firearm by a "prohibited person." By selling a shotgun to Mace, a prohibited person, Walmart acted as an accomplice to the illegal possession of a shotgun. Indeed, this Court has already determined that the predicate exception is applicable so long as Walmart "knew or had reasonable cause to believe that Mr. Mace was prohibited from possessing a firearm under Maryland Law." Docket No. 42, Memorandum Opinion at 23-24. That ruling is the law of the case, and Walmart provides no valid reason to revisit or disturb this Court's prior ruling.

Walmart agrees that under Maryland law, knowledge of its management employees is imputed to Walmart. *See* Docket No. 70-1, Def. M. Summ. J. at 52 (citing, among others, *Hecht v. Resol. Tr. Corp.*, 635 A.2d 394, 405 (Md.1994)). As detailed above in the statement of facts,

---

the criminal or lawsuit misuse of a firearm by third parties. The Court rejected that argument. Plaintiffs nevertheless adopt and incorporate it again for the Court's consideration.

at least five members if not more of Walmart's management team, including the head store manager, had knowledge of Mace's suicidal ideations and hospitalizations when it unlawfully sold him the firearm on November 15, 2019.  That should be the end of the analysis.

Walmart next argues that the predicate exception does not apply because the act of suicide breaks the causal chain.  Again, this Court has already correctly rejected this argument in denying Walmart's motion for judgment on the pleadings, and the Court should refuse to revisit its ruling under the law of the case doctrine.  Docket No. 42, Memorandum Opinion at 30-37.  Proximate cause is discussed further below in Section C.

Walmart also argues that the predicate exception does not apply because it is triggered only by violations of statutes that are applicable to the sale or marketing of firearms.  This argument was also properly rejected by this Court when it denied Walmart's motion for judgment on the pleadings.  Docket No. 42, Memorandum Opinion at 16-23.  Walmart provides no valid basis to disturb this Court's prior ruling, and the Court should apply the law of the case doctrine to refuse to revisit its ruling.

b)  PLCAA's Negligent Entrustment Exception is also Satisfied.

This case also falls within PLCAA's negligent entrustment exception.  15 U.S.C. § 7903(5)(A)(ii) exempts from the definition of a "qualified civil liability action" "an action brought against a seller for negligent entrustment…"  In denying Walmart's motion for judgment on the pleadings, this Court noted that "there is significant cause to question" whether the negligent entrustment exception applies to this case but ultimately did not make a determination on the issue because it found that Plaintiffs satisfied the predicate exception.  If the Court is inclined to revisit the negligent entrustment exception, it should find that it applies here.

PLCAA defines "negligent entrustment" as the "supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." § 7903(5)(B).  Taken in the light most favorable to Plaintiffs, this definition is clearly satisfied here.

Maryland law recognizes a negligent entrustment claim on these facts.  Walmart disagrees and cites *Broadwater v. Dorsey*, 688 A.2d 436 (Md. 1997) and several other cases to suggest that Maryland law precludes liability unless the entrustor still had some ability to control the dangerous instrument at the time the entrustee foreseeably misused it.  Walmart's Memorandum at 47.  Although *Broadwater* did find such a requirement (*id*. at 441), all of Walmart's cited cases are limited to the automobile context and predate a more recent case from the Court of Appeals which implicitly rejects this requirement in the firearms context.  Furthermore, Walmart ignores that Maryland has now enacted a law that specifically criminalizes the sale of a shotgun to an individual with known mental health issues and a history of self-harm or who is "visibly intoxicated" – a reality that demonstrates why public policy supports allowing a negligent entrustment claim on these facts.

First, *Valentine v. On Target, Inc.,* 727 A.2d 947 (Md. 1999) found no liability for failing to take precautions to prevent the theft of a gun, but kept the door open to negligent entrustment liability for the sale of a firearm.  The Court noted that "the holding in this case does not mean that a gun store owner may never be held liable to another party for negligence in the display and sale of guns when that other party is injured as a result of the negligence."  *Id*. at 953.  This recognition that the "sale of guns" can support liability *without any limitation to "sales" where the seller continues to have some form of control over the firearm* is significant because it

diverges with *Broadwater* – which limited the types of transfers of an automobile which could support negligent entrustment liability to situations where the entrustor retains some "legal control." *See* 688 A.2d at 443 n. 2.

This difference is not accidental. *Broadwater*, to the extent it remains the law, embodies a specialized rule applicable only to automobiles. There is good reason to treat firearms and cars differently. The primary purpose of a car is to transport people. The primary purpose of a firearm is to injure or kill human beings. *Valentine* recognized this reality, underscoring that "the inherent nature of guns suggests that their use may likely result in serious personal injury or death." 727 A.2d at 953. Events like a car crash are not a "likely result" of a car being used as designed and intended; events like Mace's suicide involve a firearm operating exactly as designed and intended. *See id*. Given the greater foreseeability of harm correlated with the more dangerous nature of the product entrusted, it makes sense not to require a showing that a firearms seller retained any control over the firearm at the time of its misuse.

*Valentine* is consistent with the Restatement (Second) of Torts, § 390 – which *Broadwater* acknowledges as reflective of Maryland law. *See* 688 A.2d at 439. The first comment emphasizes that the doctrine of negligent entrustment "applies to sellers, lessors, donors or lenders, and to all kinds of bailors" without *any requirement of continuing control*. Restat. 2d. of Torts, § 390 (Cmt. a.). The Restatement then provides the following example: "A gives a loaded gun to B, a feeble-minded girl of ten, to be carried by her to C. While B is carrying the gun she tampers with the trigger and discharges it, harming C. A is subject to liability to C." *Id*. (Ilus. 1.). Although the above scenario does not deal with a sale, A clearly has no ability to in any way control the gun while it is in the hands of B. Liability nevertheless attaches because he had control over the gun when he decided to place the gun in B's hands.

Recognizing that the negligent entrustment of a firearm can occur via an unlawful sale regardless of whether the seller retains any continuing control over a firearm would bring this Court into alignment with nearly every court to have addressed this issue. *See Chiapperini,* 13 N.Y.S.3d at 788-90 (state law allowed negligent entrustment claim despite absence of any allegation of continuing control); *Estate of Kim v. Coxe*, 295 P.3d 380, 394-96 (Ak. 2013) (same and citing Restat. 2nd. of Torts, § 390); *Delana*, *v. CED Sales, Inc.,* 486 S.W.3d 316, 324-26, 326 n.6 (Mo. 2016) (*en banc*) (same). *Delana* is particularly instructive. Missouri, like Maryland, follows the Restat. 2nd. of Torts, § 390. *Delana,* 486 S.W.3d at 324-26. *Delana* overruled prior case law which had argued that a sale defeats a claim for negligent entrustment because a seller "permanently relinquishe[s]" the dangerous instrument. *Id*. (internal quotation omitted). *Delana* emphasized that a requirement of continuing control was "inconsistent with [the] definition of 'negligent entrustment' according to the Restatement." *See id*. This Court should follow this reasoning.

As far as Plaintiffs are aware, exactly *one* court has adopted Walmart's contrary position in the firearms context – namely, *Academy,* 2021 Tex. LEXIS 623. *Id*. at *22 (specifically rejecting reliance on Restat. 2d. of Torts, § 390 (Cmt. a.)). There is a reason *Academy* is an outlier; adoption of this rule undermines public policy by removing incentives for sellers of dangerous products to screen purchasers to prevent the foreseeable misuse of their wares.

It is significant that in a law effective after Mace's suicide, Maryland went on to make it a crime for "a [firearms] licensee . . . [to] sell . . . a shotgun" where the "licensee knows or has reasonable cause to believe" that the party 1) has the same disqualifying mental health and self-harm history as in Md. Code Ann., Pub. 5-205(b)(6). While this law may not have been in force at the time of the sale of the shotgun, it constitutes a clear legislative determination that such

24

sales are contrary to public policy because they pose a grave risk that the relevant firearms will be misused.  The Maryland Court of Appeals, in *Kiriakos v. Phillips,* 139 A.3d 1006 (Md. 2016) looked to the presence of a similar law barring adults who allow minors to drink at their homes and allowed a "social host cause of action against [an adult who supplied a minor with alcohol] [under] common law tort principles, *like negligent entrustment*, based on the strong public policy evident in" the law.  *Id*. at 1033 (emphasis added).  Allowing the tort of negligent entrustment to extend to conduct which has already been, in effect, legislatively recognized as constituting a negligent entrustment is both logical and in line with how the Maryland Court of Appeals approaches such situations.

Walmart also argues that, even if the tort of negligent entrustment is applicable, it requires foreseeability on Walmart's part.  Because Walmart's management team was aware of Mace's prior suicide attempts, his suicidal ideations in November 2019 and his hospitalizations, this Court cannot find as a matter of law that Mace's suicide was unforeseeable when Walmart wrongfully sold him a firearm.  That is a question for the jury.

B.  <u>If Read to Bar All of Plaintiffs' Claims Otherwise Permitted Under Maryland Law, PLCAA is Unconstitutional.</u>

In denying Walmart's motion for judgment on the pleadings, the Court did not decide the issue relating to the constitutionality of PLCAA.  To the extent the Court wishes to address that issue now, Plaintiffs adopt and incorporate herein the arguments set forth in Section IV of their opposition to Walmart's motion to dismiss explaining that PLCAA is unconstitutional because it violates Congress' Commerce Clause authority, the Tenth Amendment, Due Process, and Equal Protection.

C.  The Sale of the Firearm to Mace Proximately Caused his Death.

Walmart again reintroduces its previously rejected argument that suicide is a superseding cause that defeats a finding of proximate cause.  The Court's prior ruling is the law of the case. The Court should apply the law of the case doctrine to prevent Walmart from resurrecting these issues that were previously decided.  *See Kiddie Acad. Domestic Franchising, LLC v. Wonder World Learning, LLC*, 2020 U.S. Dist. LEXIS 132931, *39, 41 (D. Md. July 27, 2020) (citation omitted) ("a legal decision, once made, should ordinarily remain the law throughout the life of the case[;]" "the law of the case doctrine applies to interlocutory rulings, notwithstanding the fact that such decisions are amenable to revision.").  The Court's previous ruling should not be disturbed.  *See* Docket No. 42, Memorandum Opinion at 30-37.

Summary judgement on proximate cause cannot be sustained so long as the facts, when viewed in the light most favorable to Plaintiffs, allow for an inference that the intervening actions were sufficiently foreseeable so as not to count as superseding causes.  *See Pittway Corp. v. Collins*, 973 A.2d 771, 786–95 (Md. 2009).  *Kiriakos* clarified that this rule applies where a party entrusts a dangerous product to a party likely to misuse it in a harmful manner.  There, the court found that an adult who supplied a minor with alcohol in violation of a statute could not label the minor's drunk driving as a superseding cause absolving him of liability as a matter of law because the evidence could show that the minor's reckless conduct was to be "anticipated" rather than "unusual or extraordinary."  *See* 139 A.3d  at 1038, 1038 n. 63.  Although no Maryland case has yet addressed proximate cause in the context of a suicide subsequent to the sale of a firearm, *Valentine* implicitly recognized that an intervening third-party misuse of a negligently sold gun could be sufficiently foreseeable so as not to count as a superseding cause. *See* 727 A.2d at 953.

26

Consistent with *Valentine*, cases across the country have found suicide not to be a superseding cause that absolves the initial firearms dealer of harm because a suicide is a foreseeable result of an unlawful or negligent sale.  For example, in *Sogo v. Garcia's Nat'l Gun, Inc.,* 615 So. 2d 184 (Fl. Dist. Ct. App. 1993), the court reversed a grant of summary judgment which had found that a decedent's act of suicide constituted an intervening cause absolving the gun dealer who had sold him a weapon in violation of a waiting period ordinance from liability.  The court found that, "[t]he act of decedent was, by virtue of the ordinance, a foreseeable intervening cause. The complaint therefore sufficiently alleges a causal relationship between [the dealer]'s negligence and decedent's death." *Id*. at 186.  The court rejected the gun dealer's argument that the ordinance was designed only against the misuse of firearms in ways which harmed third parties rather than harm inflicted on oneself, finding that "the required cooling off period is designed to interrupt a plan or impulse by the purchaser to acquire a handgun to use against himself or others, and the ordinance is directed at both." *Id*. at 186.

Similarly, in *Crown v. Raymond*, 764 P.2d 1146 (Az. Ct. App. 1988), a gun dealer who sold a gun to a minor in violation of a statutory age restriction using a transparently fake identification (*id*. at 1147) attempted to argue that the minor's subsequent suicide was a superseding cause absolving him of liability. The court reversed a ruling on summary judgment in favor of the gun dealer because it found that "in enacting the statute, the legislature declared that injury to themselves or others is foreseeable when guns are sold to minors without their parents' knowledge or consent." *Id*. at 1149.

In *Splawnik v. Di Caprio*, 146 A.D.2d 333 (N.Y. App. Div. 1989), the court affirmed a denial of a motion to dismiss a complaint against a gun dealer who provided a handgun to a woman who presented as depressed in a transfer at her home.  *Id*. at 334.  The court found that

"the pleadings adequately allege that defendant supplied a dangerous instrumentality to someone he had reason to know was likely, because of her depressed mental state, to use it in a manner involving unreasonable risk of physical harm to herself." *Id*. at 335-36.

And in a case strikingly similar to this one where Walmart was the negligent party, in *Knight v. Walmart Stores, Inc.*, 889 F. Supp. 1532 (S.D. Ga. 1995), Walmart sold a firearm to a mentally incompetent customer who killed himself with the firearm.  The decedent's family filed a wrongful death suit against Walmart.  The court denied Walmart's motion for summary judgment.  The Court found there was evidence that the sales associates involved in the sale of the firearm knew that the decedent had mental issues.  *Id.* at 1539-41.  On the issue of proximate cause, the court held that the suicide did not break the causal chain because "it is basic common law that defendants remain liable where intervening acts between the negligence and the ultimate harm were foreseeable." *Id.* at 1541.

Here, Mace's suicide, as in *Crown*, *Sogo*, and *Knight* was a foreseeable result of a sale which violated at least one ordinance or law designed to prevent exactly the type of misuse of a firearm which occurred (Md. Code. Ann., Pub. Safety § 5-205(b)(6)).  And, as in *Splawnik*, Walmart was presented with glaring indicators that Mace, "because of h[is] depressed mental state" was likely to use the Shotgun "in a manner involving unreasonable risk of physical harm to himself." *Splawnik,* 146 A.D.2d at 335-56.  Here, at least five members of management knew of Mace's suicidal ideations.  Indeed, as explained in detail above, the second in command was told to put Mace on a list so that he could not buy a gun from Walmart and kill himself.  And, in a moment that can only be described as eerie, Mace was either shooting himself with the gun he purchased from Walmart or had already done so as the manager of the sporting goods section, before knowing what Mace had done, questioned the sales associate on why he sold a gun to

Mace when everyone knew he was mentally unstable.  It is difficult to imagine facts that would make foreseeability more clear.  The facts here are more than sufficient to permit an inference that Mace's suicide was a reasonably foreseeable intervening act rather than a superseding cause entitling Walmart to judgment as a matter of law.

Walmart relies on language contained in *Sindler v. Litman*, 887 A.2d 97 (Md. 2005) and *Young v. Swiney*, 23 F. Supp. 3d 596 (D. Md. 2014) to suggest that the only circumstances where Maryland law imposes liability upon a third party for "actually causing" a suicide is when the defendant's negligence causes the insanity of another.  Motion at 12-14.  That is not the law.  In *Sindler*, a husband attempted to hold a third party liable for the death of his wife by alleging that the third party was responsible for an automobile accident that occurred 10 years earlier and ultimately caused the deceased to go insane and take her life.  The court ultimately found that the expert testimony did not support the contention that the prior accident caused the decedent's insanity. *Young v. Swiney*, 23 F. Supp. 3d 596 (D. Md. 2014) found that expert testimony was sufficient for a similar theory of causation to go to the jury.  Neither case suggested that causing insanity was the *only* means by which a third party can be held liable for suicide and neither case involved a seller negligently and unlawfully providing a lethal weapon to a person who posed a foreseeable risk to himself or others.  It makes no sense that Walmart could be liable if Mace had used the gun to shoot someone else, but not if he shot himself.

Indeed, as the Court pointed out in its Memorandum denying Walmart's motion for judgement on the pleadings, Walmart's interpretation of these cases conflicts with more recent Maryland caselaw holding that suicide is not an intervening event if it is foreseeable and the defendant's negligence is an essential link in the chain of causation.  *See* Docket No. 42, Memorandum Opinion at 33-34 (citing *Baker v. State*, No. 2469, 2021 WL 3052916, at *1-2

(Md. Ct. Spec. App. July 20, 2021) (affirming trial court's exclusion of expert testimony that decedent wanted to commit suicide because it did not break the causal chain between appellants negligent act of distributing heroin laced with Fentanyl and the decedent's death)).

Plaintiffs have provided the necessary evidence in discovery that Walmart's actions were essential to Mace's suicide.  For example, Plaintiffs identified Craig Bryan, PsyD, a board-certified clinical psychologist who specializes in suicide research and related clinical work at Ohio State to provide opinions on causation.  Dr. Bryan summarized his opinions at deposition as follows: "I would say that had the sale not occurred, it's definitely more likely than not he would have not died."  Deposition Transcript of Dr. Craig Bryan ("Dr. Bryan Trans."), Exhibit 22, at 81.  With this evidence, causation is an issue for the jury.

D.  <u>At best, it is for the Jury to Determine Contributory Negligence.</u>

"Ordinarily, the issue of contributory negligence is a question of fact for the jury to resolve." *Woolridge v. Abrishami*, 233 Md. App. 278, 302 (2017) (citing *McQuay v. Schertle*, 126 Md. App. 556, 569 (1999). "Only when no reasonable person could find in favor of the plaintiff on the issue of contributory negligence should the trial court take the issue from the jury." *Id.* (internal quotation marks and citation omitted).  "When measuring contributory negligence, the standard of care 'is the conduct of an ordinarily prudent person under similar circumstances.'" *Id.* (citing *Faith v. Keefer*, 127 Md. App. 706, 747 (1999).

1.  <u>Mace was Not Contributorily Negligent as a Matter of Law.</u>

Walmart argues that Mace was contributorily negligent as a matter of law because he knew that he suffered from suicidal ideation and should not possess a firearm.  Walmart does not cite a single case to support this argument.  Indeed, if this argument were successful, it would

provide complete immunity to all sellers of firearms who wrongfully sell a firearm to a criminal who subsequently uses it in committing a crime.  That is not the law.

To support this argument, Walmart relies solely on a brief deposition exchange with one of Mace's experts, Mr. Joseph Vince, where Mr. Vince testified that Mace made a misrepresentation to Walmart when he checked the box on the Form 4473 indicating that he (Mace) had never been involuntarily committed to a mental institution.  There are several problems with Walmart's reliance on this testimony.  First, Mr. Vince's testimony on this specific point was not factually accurate.  At the time of his deposition, Mr. Vince was under the impression that Mace's admission(s) to the hospital in November 2019 was involuntary; but Mace was never involuntarily admitted to the hospital.  This mistaken fact, however, has no bearing on Mr. Vince's other opinions, *i.e.*, that Walmart had reason to believe Mace would use the firearm to harm himself and thus should not have proceeded with the sale.  Second, Mace's other firearm sales expert, Mr. Mark Abramson, testified that Mace did not make any misrepresentations on Form 4473 and that Walmart still should not have sold him the firearm because it had actual knowledge of his suicidal ideations.  Third, even if Mace did make a misrepresentation on the form (he did not), this would at most be an issue for the jury to determine whether such a misrepresentation would amount to contributory negligence.

Finally, even if Mace did lie on the form and the jury found it amounted to contributory negligence, that act of contributory negligence was not a proximate cause of the harm because Walmart had the last clear opportunity to avoid the harm.  "The doctrine of last clear chance permits a contributorily negligent plaintiff to recover damages from a negligent defendant if each of the following elements is satisfied: (i) the defendant is negligent; (ii) the plaintiff is contributorily negligent; and (iii) the plaintiff makes a showing of something new or sequential,

which affords the defendant a fresh opportunity (of which he fails to avail himself) to avert the consequences of his original negligence." *Carter v. Senate Masonry, Inc.*, 156 Md. App. 162, 168 (2004) (internal quotation marks and citation omitted).  "The theory behind the doctrine is that if the defendant has the last clear opportunity to avoid the harm, the plaintiff's negligence is not a 'proximate cause' of the result." *Id.* (internal quotation marks and citation omitted).  In *Carter*, the Appellate Court of Maryland reversed the grant of a judgment notwithstanding the verdict where a plumber may have been contributorily negligent in kneeling by scaffolding, but the defendant's forklift operator then negligently caused cinder blocked to fall on the plumber. *Id.* at 171-72.  The court held that the doctrine of last clear chance applied and allowed the jury to find that the forklift operator had the last clear chance because he had a fresh opportunity to avoid the accident.  *Id.* Here, Walmart had the last clear chance not to hand Mace the firearm even after he filled out the federal form required to buy it.  Under the last clear chance doctrine, Mace's filling out of the form, even if negligence, was not the proximate cause of the harm.

This issue of Mace's alleged contributory negligence cannot be decided as a matter of law under these facts.

2. <u>Mace's Family was Not Contributorily Negligent as a matter of law.</u>

Walmart argues next that Plaintiffs McCreary, Brady and Mark Mace were negligent as a matter of law because (i) they failed to inform Walmart of Mace's suicidal ideation and (ii) failed to take out an extreme risk protection order to protect Mace.  Walmart again cites no case to support its arguments, which ultimately fail for several reasons.

First, as described in detail above, at least five managers at Walmart, including Mace's the head manager of the store and his second in command, already had actual knowledge of Mace's suicidal ideations in November of 2019 so there would be no need for Mace's family

members to report to Walmart what it already knew.  Second, Mace's family members did not

provide Mace with a firearm. They do not hold a federal firearms license and owe no duty to

report anything to Walmart.  Third, at best, this would be an argument for a jury to determine

whether Mace's family members acted unreasonably in not reporting Mace's condition to

Walmart or in failing to take out an extreme risk protection order, and whether those actions

were a proximate cause of Mace's death.  The facts here suggest otherwise. Mace's family

members removed a firearm from his home, contacted the authorities when he made comments

about self-harm, took him to the hospital several times and intervened in times of Mace's

struggles.  It is unclear whether Brady or Mark Mace even knew what an extreme risk protection

order was or how to seek one. McCreary testified that she thought of taking one out but expected

that the hospital would do that.  Such a thought is not unreasonable as a matter of law and, again,

there was no legal duty owed by the family to attempt to take out such an order, and there is no

evidence that the failure to do so was the proximate cause of Mace's death.[6]

     Moreover, the deposition testimony of Dr. Bryan is enlightening on this issue and would

otherwise preclude summary judgment on contributory negligence. Dr. Bryan explained at

deposition that the likelihood of someone dying from suicide is much more attributable to the

access that person has to firearm as compared to how upset the person might be or the source of

their distress or how much they want to die.  He explained as follows:

> So if we want to understand if someone is likely to die as a result
> of their suicide attempt, the most important factor to consider is
> what method they are using, and it's sort of I think a common
> assumption.  It's a prevailing perspective on suicide, that intent
> that is how upset the person, how badly do they want to die, and
> so if they really want to do it, they're going to find a way to do it.

---

[6]  Even if this Court found that Brady, McCreary, and Mark Mace were contributorily negligent
as a matter of law (it should not), the wrongful death claims filed by the minor children of Mace
would survive as there is no argument that the children were contributorily negligent.

But what research shows is that actually, that those indicators of distress, of intent, are actually pretty weakly correlated with what actually happens, like does a person die or are they severely injured, things like that, or did they just kind of wake up and walk away.

And so a great example to illustrate this, I think is, you know, a person may not be fully resolved to kill themselves. They're maybe thinking about it. They're upset, but they don't have a lot of strong intent.

They decide I can just kill myself. If they have a gun, they'll probably die.

Conversely, you can have someone who's really, really suicidal, who really strongly wants to die. If they don't have access to highly lethal methods [firearms], they're probably not going to die of suicide, even if they do it.

Dr. Bryan Trans., Exhibit 22, at 114-15.[7]

In addition, the last clear chance doctrine would also apply here because any alleged negligence of Plaintiffs McCreary, Brady and Mark Mace occurred before Walmart "held the final opportunity to avoid the accident." *See Carter*, 156 Md. App. at 172. Like in *Carter*, where the facts supported a finding that a forklift operator had the last clear chance to avoid the harm where the injured part was negligence in putting himself in harm's way but the forklift operator then acted negligently in causing a cinder block to fall on the injured party, here the facts support a finding that Walmart had the last clear chance to avoid the harm but instead acted negligently in selling the firearm to Mace. Walmart alleges Plaintiffs McCreary, Brady and Mark Mace were all negligent *before* Walmart sold Mace the firearm. The last clear chance

---

[7] Dr. Bryan also opined, based on the research, that more likely than not Mace would not have gone elsewhere (beyond Walmart) to purchase a firearm to take his life and would not have otherwise committed suicide using other means. He explains in detail the basis for these opinions at deposition. Dr. Bryan Trans., Exhibit 22, at 74-77 and 118-120.

doctrine breaks any link between their alleged negligence and Mace's death because Walmart was the negligence actor who had the final opportunity to avoid the harm. Under the circumstances, contributory negligence is not a bar to any of Plaintiffs' claims.

E.    As a Federally Licensed Firearms Dealer, Walmart Owed Mace a Duty.

Plaintiffs do not contend that Walmart owed Mace a duty to prevent his suicide solely because he was a Walmart employee or because of some other special relationship. Walmart owed the same duty to Mace that it owes to all potential purchasers of firearms – not to sell a firearm when it knew or had reason to believe that the firearm would be used to harm the purchaser or a third party. This duty exists by law regardless of any special relationship between Walmart and Mace and is specifically described in Walmart's own policies and procedures.[8] Indeed, the only way Walmart could prevail on this argument is if the undisputed facts showed that Walmart had no knowledge of Mace's suicidal ideation. As explained in great detail throughout this opposition, this is at best a disputed fact that precludes summary judgment.

*Valentine* did not condition potential liability for the negligent sale of a firearm later used to cause harm on the presence of any type of special relationship, and *Sogo*, *Crown*, *Splawnik*, and *Knight* found potential liability on behalf of the negligent or unlawful entrustor of a firearm

---

[8]  Plaintiff's expert Mark Abramson explained it simply at deposition:  "As a federal firearms licensee, each licensee has a duty to make sure that the process is completed, A, in accordance with the strictures of law of that the background check is complete in its entirety, and that under the circumstances that the discretion that the licensee has in connection with that sale will not result in what could reasonable be decided to be a straw purchase, that the person could be a danger to himself or others, that the person had made an affirmative statement in this 4473 that was not correct.  I'm not saying that happened in this case, but I believe that duty is on every transaction in which a licensee is engaged. We have to be sure that as a licensee we are putting a firearm in the hands of someone who is allowed to be and will not be a danger to himself or others."  Abramson Trans., Exhibit17, at 71-72.

later used in a suicide without any discussion of the presence or absence of an employee-employer relationship.

Numerous other courts—including one of Walmart's own authorities (*Prescott*) – have implicitly or explicitly rejected the special relationship requirement where the defendant's affirmative conduct in negligently or unlawfully entrusting a dangerous firearm or firearm-related item exacerbates a risk that a third party will misuse the firearm or firearm-related item to cause harm.  *See, e.g.,* 410 F. Supp. 3d 1123 at 1141 ("a negligent party may be liable for knowingly creating, at the time of the negligent conduct, such a situation that a third party might avail himself of the opportunity to commit such a tort or crime.  In those scenarios . . .  *a special relationship is not a prerequisite to demonstrating a duty*.") (internal quotation, citation and alteration omitted) (emphasis added); *Cincinnati v. Beretta U.S.A. Corp.,* 768 N.E.2d 1136, 1144 (Oh. 2002) ("The negligence issue before us is not whether appellees owe appellant a duty to control the conduct of third parties. Instead, the issue is whether appellees are themselves negligent by manufacturing, marketing, and distributing firearms in a way that creates an illegal firearms market that results in foreseeable injury. Consequently, the 'special relationship' rule is not determinative of the issue presented here.  Instead, the allegations of the complaint are to be addressed without resort to that rule.") (upholding negligence-based claims);  *Ileto v. Glock Inc*., 349 F.3d 1191, 1206-1208 (9th Cir. 2003) (quoting *City of Cincinnati* and reaching a similar conclusion in allowing negligence claims); *Smith v. Bryco Arms*, 33 P.3d 638, 647 (N.M. Ct. App. 2001) ("the presence or absence of a special relationship between Defendants and [victim] is immaterial because Plaintiffs are clearly not attempting to hold Defendants responsible for failing to control [the accidental shooter]. Plaintiffs are attempting to hold Defendants liable in negligence or strict liability for harm proximately caused

by Defendants' affirmative acts of designing and distributing a defective product which combined with [the shooter's] subsequent misconduct to injure [the victim].") (allowing product liability claims sounding in negligence and strict liability).

The rationale behind this case is clear. The existence of a duty to avoid affirmative conduct exacerbating a risk of harm to others is the basic duty imposed upon all members of society and does not hinge upon any showing of an employee-employer relationship. Walmart cannot avoid this reality by misframing the case as simply involving a failure to prevent Mace's death.

Plaintiffs have set forth facts for a jury to determine that Walmart affirmatively acted in a manner which caused Mace's suicide. In *Eisel v. Board of Educ.*, 597 A.2d 447, 456 (Md. 1990) the Maryland Court of Appeals held that a school counselor owed a duty to prevent a suicide when the counselor was on notice of the student's suicidal intent. The Court in *Eisel* considered the following variables in determining whether a tort duty should be imposed in the context of suicide:

> The foreseeability of the harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise reasonable care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Id.* at 452 (citations omitted). The court went on to note that "[f]oreseeability is the most important variable in the duty calculus, and without there can be no duty to prevent suicide." *Id.*

In *Eisel*, applying the factors above, the court found that the defendants had evidence of the student's intent to commit suicide based on the student telling friends of her intention to kill

herself and her friends reporting this back to the school counselor. *Id.* at 449, 452. The counselor, in turn, failed to intervene or inform the student's parents, and the student tragically took her own life in a murder-suicide pact. *Id.* at 449-450. The court discussed each of the above factors in detail and found them all to be present. *Id.* at 452-456. A similar result is compelled here based on a reading of the facts in the light most favorable to Plaintiffs– including that the individual who committed suicide informed multiple members of Walmart's management team and other Walmart employees and the party in authority (Walmart) failed to respond appropriately by placing Mace on the blacklist or otherwise not selling him a firearm.

As discussed above, foreseeability here could not be more obvious. Walmart took it upon itself to create the blacklist of persons not to sell guns to precisely because it knew that events like Mace's suicide would result if it negligently sold firearms to individuals showing signs they would misuse firearms to harm themselves or others. The degree of certainty that Mace suffered the injury, like the student in *Eisel*, is one hundred percent. The closeness of the connection between Walmart's conduct (wrongfully selling the shotgun) and the injury suffered (Mace using the shotgun to take his life) is also substantial. The moral blame for selling a firearm to someone the seller knows to be suffering from a severe mental illness is tremendous – as confirmed by Maryland's later criminalization of this act. The policy of preventing future suicides was discussed at length in *Eisel* (*Eisel*, 597 A.2d at 453-54) and also exists here. The burden on the defendant to exercise reasonable care when selling firearms is far outweighed by the risk of suicide, homicide or other incidents that occur when the defendant fails to exercise reasonable care. Finally, Walmart has insurance. All of the factors set forth in *Eisel* are satisfied here, and this Court should find Walmart owed Mace a duty to prevent his foreseeable suicide.

F.  Walmart Negligently Entrusted the Firearm to Mace.

For the reasons discussed in Section A.2.b., *supra*, Plaintiffs have asserted and proven

facts sufficient to sustain a claim for negligent entrustment under Maryland law.

G.  Maryland's Worker's Compensation Act is Inapplicable to this Case.

Walmart argues in three paragraphs at the very end of its motion that Maryland's

Workers' Compensation is the sole remedy for Mace's suicide.  Walmart is wrong.  The

Maryland's Workers' Compensation Act entitles covered employees to compensation for

accidental personal injuries that arise out of and in the course of employment.  *See* Md. Code,

Labor and Employment Article (LE), §§ 9-101(b); 9-501(a).  "An injury arises in the course of

employment when it occurs during the period of employment at a place where the employee

reasonably may be in the performance of his duties and while he is fulfilling those duties or

engaged in doing something incident thereto." *Garrity v. Injured Workers' Ins. Fund*, 203 Md.

App. 285, 293 (2012) (internal quotation marks and citation omitted).  It follows that if an

employee is injured while they are not engaged in employment duties or something incident to

those duties, the injury is not covered.

For example, in *Coates v. J. M. Bucheimer Co.*, 242 Md. 198, 200 (1966), a woman was

on a coffee break at work and decided to go to a nearby building that was under construction to

look at the building's new lounge.  While in the other building, she fell and sustained an injury.

The Supreme Court of Maryland held that this injury did not arise out or in the course of the

woman's employment. Instead, it resulted from the "unrestrained curiosity of the employee." *Id.*

at 201.  And in *Blake Construction v. Wells*, 245 Md. 282 (1967), a night watchman, who was

supposed to be watching heaters at a construction site, was found in an automobile asphyxiated

by carbon monoxide. The Supreme Court of Maryland explained that the watchman's death did

not arise out of or in the course of employment as "he was not employed to sit in his car[,]" "[a]sphyxiation by carbon monoxide was not a natural incident of the job he was employed to perform[,]" and "exposure to this hazard [was not] required by the nature of his employment and certainly it was a hazard he shared in common with all users of motor vehicles." *Id.* at 290-91.

Here, Mace was not fulfilling any employment or employment-related duties when he committed suicide.  Mace was on an unpaid lunch break. He was not on Walmart's premises. His suicide was not related to his employment duties.  Indeed, Walmart has been clear that employees are not "on the clock" during their lunch breaks and that they can do anything they want during their lunch break, including buying a firearm. *See* Jones Trans., Exhibit 7, at 42-43 (store manager explaining that employees can do whatever they want when they are off the clock during their lunch break); *See* Madden Trans., Exhibit 8, at 63-64 (human resources manager explaining that employees are completely off the clock for an hour during their lunch break and they can do whatever they choose).  Like the employee in *Coates*, who had left her worksite to observe a nearby lounge, or the employee in *Blake Construction*, who left the jobsite and was sitting in a car, Mace left Walmart and committed suicide.  His suicide was not something related to his employment duties at Walmart, and it was not something that was incidental to his job at Walmart.  His suicide was not an "accidental injury" that would be covered by the Act.

In an ironic move by an employer, Walmart pushes the argument that anything that happens during an employee's lunch break is within the course of employment for purposes of the Workers' Compensation Act.  But it is the exception, not the rule, that an injury during a break is considered work-related (because typically one is not engaged in work-related activities during a break). "Ordinarily, employees who are injured while 'going or coming' from their place of employment are not embraced within the ambit of the Workmen's Compensation Law."

*Miller v. Johns Hopkins Hospital*, 57 Md. App. 135, 138 (1984) (internal citations omitted). This is because an injury that happens while an employee is going to or coming from work generally does not arise "out of or in the course of" his or her employment. *Id.* (citations omitted).   This "going and coming" rule applies to the lunch hour "when the employee has a definite place and time of work, and the time of work does not include the lunch hour[.]" 1 A. Larson, *Workmen's Compensation Law* § 15.51, at 4-116.15 (1985).  That was the case in Mace as he had a definite place and time for work, and it did not include the lunch hour.

Although not spelled out, Walmart alludes to the "personal comfort" exception to the "going and coming" rule.  That exception applies "where the terms of employment provide a paid break in which an employer can attend to his or her personal comforts, and where an employer encourages a break that benefits the employer and the employee."  *Garrity*, 203 Md. App. at 303-04.  The only case Walmart cites for its proposition that a lunch break qualifies under this "personal comfort" exception is *King Waterproofing Co. v. Slovsky*, 71 Md. App. 247, 524 A.2d 1245  (1987).  That case does not come close to holding that activities during a lunch break are always covered, and the facts of the case have no resemblance to this one.  There, the claimant was a part-time telephone solicitor who was struck by an automobile as he crossed the street to get food and drink from a restaurant during a paid break. *Id*. In holding this was an accidental injury under the Workers' Compensation Act, the Appellate Court of Maryland said that this specific short break for food or coffee should be considered a "personal comfort activity incidental to [] employment." The court explained that the employer benefitted from the break because the employees would use the break to renew their vigor and voices as telephone solicitors often by consuming food and drink.  *Id.* at 254.  The explanation for the court's holding belies Walmart's suggestion that it applies to this case.  For one, the court specifically

distinguished the "coffee break" from a lunch break (where the "going and coming" rule would apply).  *Id.* at 253.  The court also cautioned it was not stating "a general rule for injuries sustained during off-premises coffee breaks."  *Id.* at 257.  What's more, the court said other factors to consider in determining if the break was incidental to employment would be whether the break was paid, whether there were restrictions on where the employee could go, and whether the employee's activity during this period would constitute a substantial personal deviation.  *Id.* at 254.  Here, Mace was not injured while attending to a quick personal comfort that would rejuvenate him for work as the employee was doing in *Slovsky*: he was on an unpaid lunch break; it was an hour-long break; he could do whatever he wanted during the break; and suicide was a deviation from any work-related activity.  *Slovsky* has no applicability to this case.

Indeed, *Garrity*, 203 Md. App. at 293, distinguished *Slovsky* and held it did not apply to a bailiff who spilled coffee on his shirt at work, went home to change clothes, and was injured on the way back to work.  On appeal, among other arguments, the bailiff argued that he was on a "personal comfort" break that benefited him and the employer like the employee in *Slovsly*.  The Appellate Court of Maryland held that the bailiff's injury did not occur in the course of his employment.  The Court rejected the bailiff's personal comfort argument because the injury did not occur during a paid break where the employee was attending to his personal comforts.  The Court noted that the bailiff's changing of his shirt was not the type of break that was encouraged by the employer and that benefitted both the employee and employer.  If an employee changing his shirt for work does not qualify as incidental to employment, an employee committing suicide on an unpaid lunch break cannot qualify as incidental to employment.

The bottom line here is that Mace was not engaging in a work-related activity or an activity incidental to his job duties at the time of his suicide.  He was on an unpaid lunch break,

Walmart's position has been that Mace was off the clock and free to do whatever he wanted, and suicide was not incidental to Mace's job duties.  The Maryland's Workers' Compensation Act does not apply to Mace's suicide.

### Conclusion

For the reasons set forth above, Plaintiffs respectfully request that this Court deny Defendants' Motion for Summary Judgment in its entirety.

<div style="margin-left:40%;">

*/s/ Kevin P. Sullivan*
Kevin P. Sullivan, Esq., Fed Bar #27506
Daniel P. Stringer, Esq., Fed Bar #19243
Lindsey McCulley, Esq., Fed Bar #19170
SALSBURY SULLIVAN, LLC
100 N. Charles Street, Suite 900
Baltimore, MD 21201
Ph: (443) 869-3920
ksullivan@salsburysullivanlaw.com
dstringer@salsburysullivanlaw.com
lmcculley@salsburysullivanlaw.com
***Attorneys for Plaintiffs***

</div>

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of January 2024, a copy of the foregoing *Plaintiffs' Opposition to Defendant's Motion for Summary Judgment,* was electronically filed and served on:

    Kevin C. Schiferl, Esq.
    Stephanie V. McGowan, Esq.
    Adam S. Ira, Esq.
    Frost Brown Todd, LLC
    111 Monument Circle, Suite 4500
    Indianapolis, IN 46244-0961
    kschiferl@fbtlaw.com
    smcgowan@fbtlaw.com
    aira@fbtlaw.com

    Christopher R. Dunn, Esq.
    DeCaro, Doran, Siciliano, Gallagher & DeBlasis, LLP
    17251 Melford Blvd., Suite 200

Bowie, MD 20715
cdunn@decarodoran.com
***Attorneys for Defendants***

/s/ Kevin P. Sullivan
Kevin P. Sullivan, Esq., Fed Bar #27506