# EXPERT REPORT
## KAYLA M. BRADY, ET AL, PLAINTIFFS v. WALMART, INC. AND WAL-MART STORES EAST, LP
## IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY,
## CASE NO.: 8:21-cv-01412-CBD

**Joseph J. Vince, Jr.**
**Crime Gun Solutions**
**2214 West Greenleaf Drive**
**Frederick, Maryland 21702**

The Law Firm of Salisbury Sullivan, LLC has asked me to review the evidence in the matter of Brady, et al v. Walmart, Inc. et al and, to examine the firearms sales practices of Wal-Mart Stores East, LP operating in St. Mary's County, Maryland, against quality practices found within the firearms industry in response to the firearm purchase by Jacob Mace.

My proposed testimony is based on observations, research, and opinions drawn from (i) my training, study, and experience in law enforcement and in Federal firearm law enforcement; (ii) a review of published studies relating to firearms trafficking and the diversion of guns to criminals and other prohibited persons; (iii) working with the firearms industry; and (iv) testimony, and documents relating to the defendants. I have been asked to provide my opinions — based on my experience as a special agent for the United States Bureau of Alcohol, Tobacco and Firearms (ATF), decades in study and research of firearms-related violent crime, and understanding of national firearms regulations — on the following:

1) the purpose, structure, and content of national firearms regulations,

2) how a Wal-Mart Store transferred a firearm to Jacob Mace compared to national standards, regulations, and guidelines for Federal Firearms Licensees,



PLAINTIFF'S EXHIBIT

14

3) how the Wal-Mart Store's transfer of a firearm to Jacob Mace, despite having knowledge of mental illness to include suicidal desires, compare to the national standards, regulations, and guidelines for Federal Firearms licensees,

4) how the Wal-Mart Store in question knew or should have known what safe firearm-business practices are and the manner in which legitimate sales of firearms occur and appropriate records are kept as well as the reporting of suspicious activity to law enforcement as required by Federal law and are needed to prevent sales by which prohibited purchasers and others with criminal intent or mental illness are frequently supplied with firearms,

5) how the Wal-Mart Store in question had the means to deny the sale of firearms to prohibited buyers and those who supply prohibited persons and persons with criminal intent or mental illness with firearms, and knew what Federal law and reasonable care requires of licensed firearms dealers prior to allowing access and/or possession of firearms to prohibited and potentially violent and mentally ill individuals,

6) how Wal-Mart Stores' training and policies around firearms sales, safety, and reporting suspicious activity to law enforcement compared to national standards, regulations, and guidelines for Federal Firearms Licensees as well as a duty of reasonable care; and,

7) how the Wal-Mart Store in question has the responsibility to notify law enforcement when they uncover suspicious activity prior to a sale as required by the standards, regulations, and guidelines for Federal Firearms Licensees and that it was foreseeable their negligence of not reporting suspicious activity and stopping a sale would lead to violent criminals, other prohibited persons, and mentally ill persons acquiring firearms.

I will testify that the Wal-Mart Store's dangerous, irresponsible, risky, and below standard sales practices resulted in the transfer of a firearm to a person who they knew

or had reasonable cause to believe may be mentally ill, unstable, and a danger to himself and others and in this case resulted in the suicide and death of Jacob Mace on November 15, 2019. I also will testify that the defendant Wal-Mart Store and their employees:

❖ has known or should have known for a very long time what safe firearm-business practices are and the manner in which such transfers occur and trained employees to these practices; and,

❖ had known, before the sale of a shotgun, that Jacob Mace had serious mental illness and had sought treatment for this illness; and,

❖ had the means to thwart the transfer of a firearm to a person who they had reasonable cause to believe was prohibited from purchasing or possessing a firearm under Federal and State of Maryland law and the discretion to deny the sale of a firearm to anyone based on concerns that the purchaser might misuse a firearm to harm himself or another even if not prohibited; and,

❖ should have taken the reasonable and prudent step of stopping the sale of a shotgun to Jacob Mace without being so advised by the National Instant Check System based on what known by store management and employees; and,

❖ I will further testify that had the defendant, Wal-Mart Store properly followed appropriate procedures provided by both the Federal government and the firearms industry Jacob Mace, would not have left the Wall-Mart Store with a firearm and Jacob Mace would have not been able to kill himself with the shotgun purchased on November 15, 2019.

## I.    Education and Experience

For almost thirty years, I served as a special agent with the U.S. Bureau of Alcohol, Tobacco, and Firearms (ATF). (The Bureau has since added "Explosives" to its title.) I

began my law enforcement career as a deputy sheriff with the Trumbull County Sheriff's Office, Warren, Ohio, from 1969 to 1971. My tenure at ATF began in May 1971 as a special agent in the Detroit, Michigan, Division Office. I also worked as a special agent in Flint, Michigan, and as the Resident Agent in Charge in Omaha, Nebraska. During this period, I received awards for investigative work, including finalist for Special Agent of the Year, and received ATF's Gold Star Award for wounds received in the line of duty.

In 1983, I came to ATF Headquarters, first as Operations Officer in the Firearms Division, then as Special Agent In Charge of the Firearms Tracing Branch, and finally as Special Agent In Charge of the Intelligence Branch. I also served as the Assistant Special Agent in Charge of the Miami Field Division and Special Agent in Charge, Chicago Field Division. In 1994, I was transferred to ATF Headquarters as the Deputy Chief of the Firearms Enforcement Division. In 1995, I was promoted to Chief, Firearms Division. In this position, I was an originator and overseer of the Bureau's Youth Crime Gun Interdiction Initiative (YCGII) a Presidential gun crime-reduction program. From July 1997 through January 1999, I was Chief of the Crime Gun Analysis Branch at ATF's offices in Falling Waters, West Virginia, where ATF maintains its crime-gun tracing information. During my tenure as chief, I worked to reduce gun crime violence and used crime-gun tracing to assist in those efforts. I worked closely with the firearms industry to prevent theft and the illegal diversion of firearms to criminals. During my tenure as Deputy Chief and Chief, Firearms Division and Chief, Crime Gun Analysis Branch I collaborated with members of law enforcement and the firearms industry to research and publish safety and security practices for citizens and industry members.

Currently, I am a professor at Mount St. Mary's University in Emmitsburg, Maryland, and President of Crime Gun Solutions, a company devoted to assisting law enforcement in the collection, access, management, analysis, training, and dissemination of crime-gun information. I have served as a facilitator-instructor for and am a current member of the International Association of Chiefs of Police (IACP). My instruction to law enforcement officers has included gun store security and preventing criminals from obtaining firearms by limiting risk. I serve on the IACP's Firearms Committee, which

examines firearms-related violent crime and makes recommendations to the IACP's Executive Committee and members internationally.

I received an M.A. in Criminal Justice from the University of Detroit in 1979, and a B.A. with a major in Criminal Justice from Youngstown (Ohio) State University in 1970. I have received several notable awards, including the Vice-Presidential Hammer Award for innovations in Federal Firearms Enforcement in 1996. In 1997, I was a finalist for the Innovations in Government award presented by the Ford Foundation and the John F. Kennedy School of Government at Harvard University for work on a project titled "Disarming the Criminal." Upon retirement, I received the Albert Gallatin Award, the Treasury Department's highest award for distinguished government service. I have authored numerous publications, including Crime Gun Analysis Branch reports on the illegal firearms market, and have given numerous lectures, speeches, and presentations training law enforcement groups in the United States and abroad. My curriculum vita is attached as Exhibit 1.

I am sufficiently familiar with the pending action to submit to a deposition concerning the specific testimony, including any opinion and its basis that I give at trial. My hourly fee for providing deposition testimony is $375.00. My hourly fee for consulting with plaintiffs' attorneys is $375.00 per hour.

I have testified or been deposed in the following cases:

2016 - Delana v. CED Sales, Inc., Deposition Lafayette County, Missouri (state court)

2018 - Mata v. Furr Deposition Tarrant County, Texas (state court)

2021 – Ryan Hardy & Matthew O'Connor v. John J. Barthelmes and Chester Arms, LLC, Rockingham County, New Hampshire (state court)

2021 - Judith Miller, et al v. Harps Food Stores, Inc., Circuit Court of Washington County, Arkansas (state court)

## II.    Intent and Requirements of Federal Firearms Laws and Regulations

Persons who seek and acquire an FFL must practice due diligence in allowing access to firearms and ammunition when conducting business, especially when customers act in a suspicious manner or provide indication that the sale of the firearm may not be for legal purposes. In the United States today it is common knowledge that firearm-related violent crime is epidemic across the nation. Everyday national and local media print, broadcast, and digital media report shootings and killing with the use of firearms. In these reported stories, it is not uncommon to be advised that the firearm used by the assailant was purchased from a federally licensed gun dealer. The federal government also advises licensed gun dealers that firearms used by felons, the mentally ill, terrorists, and other prohibited persons are receiving firearms from licensed dealers. Therefore, it can be reasonably foreseen by licensed firearms dealers that the firearms they sell could be used by criminals and others for deadly purposes.

I find it is best when preparing expert reports to provide background and understanding to the reader on the intent of Federal Firearms Laws toward mitigating gun violence and providing law enforcement with tools toward prevention, intervention, and enforcement of firearms-related violent crime. I have researched, written, and spoken about the legislative history of firearms laws as it pertains to the Congressional intent and believe it is important to first cover this area as it pertains to the responsibilities of federally licensed gun dealers.

Throughout the legislative history of Federal firearm laws, the United States Congress has repeatedly prohibited the sale of weapons to certain categories of individuals or limited the sale of certain types of firearms because of violent firearm crimes that had occurred and the foreseeability of the recurrence of those types of violent acts. Specifically relating to this matter, Congress in 1934 deemed machineguns and shotguns with short barrels and/or overall lengths were intended and used by the gangsters of the era and limited their possession and acquisition.  Continually, Congress has reacted to the senseless violence committed by youths and restricted the sale and acquisition of

handguns and/or any firearms that are not traditional hunting or sport firearms. It is abundantly clear that Congress has determined that certain firearms and persons in specified categories have acted or been used in firearm-related violent acts of such a destructive nature that they must be restricted or prohibited to prevent the repetition of lethal crimes. To this day, the courts in the United States have upheld this premise.

The basis for Federal control of the interstate traffic in firearms is found within U.S. Code Title 18, Chapter 44, cited as "The Gun Control Act of 1968 (GCA)."[1]  Congress' purpose in passing the GCA is clearly delineated in the preamble of this act: "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence."[2]  It is evident from Congressional Hearings that Congress' intent in supporting efforts to reduce firearms-related violent crime was twofold: 1) provide a statutory tool for law enforcement to utilize for arresting criminal possession and use of firearms; and 2) decrease the availability and accessibility of firearms from legal and illegal sources to criminals, the mentally ill, and other prohibited/dangerous persons. Because of the harmful and deadly effects on society and commerce by the firearms-related violent crime of the 1960s and the outrage of the American public, Congress sought legislation that would accomplish both goals, while not impeding law-abiding citizens from legally possessing and using firearms. This was specifically elaborated in the GCA in a Section titled "Purpose," which states: "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity…"[3]

By their very nature firearms are inherently dangerous and a destructive tool in the hands of criminals. Federal legislators realized it was equally important to deter and prevent criminals, fugitives, the deranged, narcotics users, juveniles, and others from

---

[1] The Gun Control Act of 1968, Public Law 90-618, Title 18, United States Code, Chapter 44.
[2] Title 18, United States Code, Chapter 44, Title I-State Firearms Control Assistance Section 101.
[3] Ibid.

acquiring firearms as well as arresting and incarcerating those who criminally misuse guns. Congress recognized in 1968, and has repeatedly enumerated, that firearms in the hands of persons who are felons, have mental illnesses, and others who require firearms to commit their nefarious acts is a serious national problem.

Within the GCA, legislators clearly articulated their concern: "The Congress finds and declares that – (A) crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem."[4]   In enacting this legislation, Congress mandated that distinct provisions be adhered to and understood by individuals and corporations (those wishing to manufacture and sell firearms), as well as the specific obligations to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." In other words, Congress designed a legislative framework, <u>which makes retail gun dealers the final line of defense — the "gatekeepers"</u> — for the inherently dangerous products they sell. Federally licensed firearms dealers have a significant role as enforcement for Federal Firearms Laws and is their duty to take care to prevent selling firearms to prohibited persons, those persons showing indicators that they are a danger to themselves or others, or to those that are likely to unlawfully supply firearms to others. U.S. citizens rely on government licensing and regulation to protect them, and industries regularly advertise the professionalism of its personnel and/or service providers.

When a Federal Firearms Licensee first receives a license, ATF's standard operating procedure is to forward a packet of information to assist the licensee in properly setting-up business and following both the intent and letter of the law. This packet includes a copy of Federal firearms laws and regulations[5], State firearms laws and published ordinances[6], FFL Newsletters[7], and applicable forms. This packet also contains a written

---

[4] Title 18, United States Code, Chapter 44, Section 922(q)(1).
[5] Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., Federal Firearms Regulations Reference Guide, ATF P 5300.4.
[6] Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., State Laws and Published Ordinances – Firearms, ATF P 5300.5.
[7] Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., FFL Newsletters, Federal Firearms Licensees Information Service provided by the Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Washington, D.C twice each year.

letter advising the licensee that he/she is required to thoroughly review and become completely knowledgeable concerning the requirements of a firearms licensee. In addition, each licensee is provided with a toll-free telephone number that he/she should utilize to contact an ATF representative to answer any questions arising from the sale of a firearm. It is common for licensees to be visited by ATF inspectors before or shortly after receiving their license. During this in-person visit, applicants or newly licensed dealers are provided with information directly (face-to-face) from the inspector. Since the late 1990s, ATF has also provided information to FFLs using an Internet site.

During a licensee's engagement in business, the licensee has the opportunity to speak directly with an ATF representative at various times. This type of direct interaction could occur during an annual on-site inspection, renewal of the license, contact by ATF's National Tracing Center, and periodic FFL seminars that are held in their regional area of operation. During these opportunities, an FFL is instructed to assist ATF in identifying any suspicious individuals who attempt to purchase firearms for themselves or others. FFLs are also provided with information detailing how FFLs have assisted ATF special agents in perfecting criminal cases.

ATF attempts to educate licensees through the publication of reports and studies, which are available free of charge or on the ATF Web site. This educational process is intended to inform gun dealers on how to thwart and avoid the various schemes and frauds criminals use to acquire firearms. Further contacts with licensees (manufacturers, distributors, and retail dealers) by ATF include periodic transmittals every year of an FFL Newsletter. These newsletters inform the FFL of changes in Federal laws, regulations and forms, methods in which criminals illegally acquire firearms, and measures to enhance the security of their business and their firearm inventory. ATF also provides video seminars on their website for use and training for FFLs. One the video seminars included is "Recognizing and Deterring Illegal Straw Purchases." In addition, media in the United States has publicized how criminals and the mentally ill illegally obtain firearms in print media (newspapers and periodicals), television, radio, the internet, and movies. It is not reasonable for an individual living in the United States, and a long-time licensed

firearms dealer, to say that they have never been informed, read, or heard of the way criminals acquire and use firearms or the epidemic of suicide with firearms.

I have reviewed numerous volumes of the ATF FFL Newsletter as well as other ATF documents and correspondence and have found that every edition contains information that would assist a dealer in abiding by the law, regulations, and methods for keeping criminals, prohibited persons, and persons who pose a danger to themselves and others from illegally acquiring firearms from them. I have found in my more than 50 years of study and law enforcement practice that the retail firearm dealer provides the largest source and quickest access to the firearms demanded by criminals, the mentally ill, terrorists, and other prohibited individuals.

ATF supplies specific critical information directly to federally licensed dealers concerning public safety issues concerning the transfer or sale of firearms to prohibited individuals as needed.  As an example, specific to this matter, in the FFL Newsletter, Volume 2, 1999, page1, an article titled **"NICS Enrollment by Licensees"**[8] states as follows:

> Licensees are reminded that the NICS check does not absolve the prospective purchaser from his or her responsibility to truthfully answer all questions on the Form 4473. ATF is aware that in some cases, licensees have advised prospective purchasers that if they are uncertain as to whether they are prohibited from receiving firearms, they should answer "no" to questions 9b through 9k on the Form 4473 and wait for the licensee to get the results of the NICS check. This advice may result in violations of Federal law. Falsification of answers on the ATF Form 4473 is a felony under the GCA. You as a licensee may be aiding and abetting a felony by advising the purchaser to answer "no" to a question on the Form 4473 where the purchaser has reason to believe that the answer should be "yes."
>
> Licensees should never advise a purchaser to answer "no" to a question on the Form 4473 where the purchaser is uncertain of the answer. The transferee must

---

[8] FFL Newsletter, Volume 2, September 1999, page 1, an article titled "NICS Enrollment by Licensees", Bureau of Alcohol, Tobacco and Firearms, https://www.atf.gov/publications/newsletters/index.html.

fill in Section A of the Form 4473 in his or her own handwriting and must honestly and completely answer all questions in Item 9. If any doubt arises as to the prohibited status of the transferee, the prospective purchaser should be advised to contact ATF for a determination of whether he or she is prohibited from receiving firearms.

The Gun Control Act of 1968 (GCA), codified at 18 U.S.C. 922(a)(6), makes it unlawful for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensee to knowingly make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition.

ATF provided all firearm licensees a Federal Firearms Regulations Reference Guide in 2005 to provide information designed to help in understanding and complying with all the laws and regulations governing the sale of firearms and ammunition.[9] Within that guidebook was a message from the ATF Director which stated as follows:

SPECIAL MESSAGE from the Director
Bureau of Alcohol, Tobacco, Firearms and Explosives
WASHINGTON, DC 20226

Dear Federal Firearms Licensee:
The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is the primary agency responsible for enforcing the Federal firearms laws. Our mission is to prevent terrorism, reduce violent crime, and protect the public. With respect to firearms, ATF works to take armed, violent offenders off the streets and to ensure criminals and other prohibited persons do not possess firearms. Licensees play a

---

[9] Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Justice Department, Washington, D.C., Federal Firearms Reference Regulations Guide, 2005.

critical role in protecting America from violent firearms crime through responsible and lawful distribution of firearms and accurate recordkeeping which assists ATF in tracing guns used to commit crimes. By complying with Federal law, licensees prevented the sale of more than 870,000 firearms to prohibited persons from November 1998 through September 2005. An untold number of lives have been saved and countless crimes have been prevented by stopping such transactions from taking place.

Dedicated licensees also make significant contributions to crime prevention efforts through active support of such collaborative efforts as the National Shooting Sports Foundation (NSSF) campaign "Don't Lie for the Other Guy." We are grateful to the scores of licensees who cooperate with ATF in preventing illegal straw purchases, which helps to disrupt firearms trafficking organizations. We encourage your continued support and we thank you for reporting suspicious criminal activity and firearms thefts to ATF. Please note, to report a theft, you should call 1-888-930-9275, and to report other criminal activity, you should call 1-800-ATF-GUNS.

The 2005 edition of the Federal Firearms Regulations Reference Guide provides information designed to help you comply with all of the laws and regulations governing the manufacture, importation, and distribution of firearms and ammunition. Accordingly, it contains the relevant Federal firearms laws and regulations, some of which have changed since the 2000 edition. It also contains rulings, general information, and questions and answers to give you further guidance on the Federal firearms laws. The laws and regulations are in a different order from previous versions so that this publication will be easier to use. This new edition also contains additional points of contact to help you get in touch with ATF more easily. Since firearms laws can change over time, please be aware that the information in this book may change after the date of publication. The ATF Web site at www.atf.gov is an excellent source for up-to-date information. As always, you are welcome to contact your local ATF field office for information or assistance.

Sincerely yours,

Carl J. Truscott

Director

Regarding the ongoing public health concern in the United States of suicides with firearms as well as persons who have mental disabilities and acquire firearms with grave consequences, studies have found multiple suicide risk factors. These risk factors include but are not limited to family and relationship problems, substance abuse, job and financial concerns, and access to firearms, among others.[10] It was also found that suicide crises are often brief, so strategies that create "time and space" between a person in crisis and their access to a firearm are lifesaving.[11]

As a licensed federal firearms dealer, Walmart must also follow all applicable state laws concerning the sale of firearms, in this case, the State of Maryland. The State of Maryland law regarding selling a firearm to a person who suffers from a mental disorder states individuals who are "suffering from a mental disorder as defined in 10-10-101(i)(2) of the Health-General Article and have a history of violent behavior against themselves or another" may not lawfully possess a shotgun.[12] The definition of 'mental disorder' incorporates "mental illness that so substantially impairs the mental or emotional function of an individual as to make care or treatment necessary or advisable for the welfare of the induvial or the safety of person or property of another."[13] In addition, Maryland Law states that an individual who aides and abets another unlawful possession of a firearm with actual or constructive knowledge that such individual is disqualified is equally responsible, as an accessory, for any direct statutory violation by the disqualified possessor.[14]

---

[10] Morbidity and Mortality Weekly Report; Kegler, Scott R., Stone, Deborah M., Mercy, James A., Dalberg, Linda L.; Center for Disease Control and Prevention (CDC), January 7, 2022.

[11] Fact Sheet: Biden Administration Takes Steps to Prevent Suicide, Including by Promoting Safe Storage of Firearms, November 2, 2021, Whitehouse, Washington, DC.

[12] Maryland Code Ann., Public Safety 5-205(b)(6)

[13] Maryland Code Ann., Health-General 10-101-(i)(2)

[14] Maryland Code Ann., Criminal Pro 4-204

Importantly, an FFL's duty as a gatekeeper controlling access to firearms is not limited to complying solely with relevant statutes and regulations. Instead, a dealer, under the GCA's scheme, continues to retain absolute discretion to deny the sale to a prospective purchaser at any point – even if a NICS background check contains no disqualifying information – based on concerns related to the customer's behavior and/or statements. Responsible dealers carefully train their employees that they must not simply fill out required forms and run background checks but must also exercise good judgment in denying sales to individuals when circumstances are presented that a person is a danger to himself or others. Responsible dealers will make clear that sellers must err on the side of caution; if there is any concern a firearm will be misused to harm oneself or another, it should not be sold. For example, responsible firearms dealers routinely refused sales to persons appearing intoxicated or not in control of their faculties.

I do not believe that the law, regulations, and specific directions from lawful authority could be any clearer to all FFLs than, "you should not transfer a firearm if you know or have reasonable cause to believe the transferee is prohibited." In this matter, Walmart Store managers at 45485 Miramar Way, California, Maryland, knew that Jacob Mace was being treated for mental disorders and had made threats of suicide and yet took no action to prohibit Mace from purchasing a firearm at that store in direct violation of both state law, and a duty of reasonable care. No doubt Walmart's in-action in this matter resulted in the death of Jacob Mace on November 15, 2019.

## III.    Firearms Industry Sources and Standards Available to FFLs Concerning Suicide Prevention

Since suicide with firearms is so prevalent in the United States and rising, I found an abundance of sources of information that Walmart or any FFL can seek for assistance in developing 'best practices' for not selling firearms to persons who are suspected of being at-risk for suicide. The nation's largest suicide prevention organization the American Foundation for Suicide Prevention (AFSP) is dedicated to using evidence-based

approaches to help save as many lives as possible through their Project 2025, a nationwide initiative to reduce the annual rate of suicide in the U.S. 20 percent by 2025.[15] Project 2025 identifies four critical areas – firearms, emergency departments, healthcare systems and correctional institutions – through which they feel can save the most lives in the shortest amount of time.[16]

The AFSP states that by educating firearms owners about suicide prevention has the potential to save more than 9,000 lives by 2025, if implemented nationwide. By educating the firearms-owning community about suicide risk, safe storage and removing access to lethal means (including firearms) when someone is at risk, they believe can reduce the rate of suicide and save lives.[17] Suicide is a major public health issue, and remains the 10th leading cause of death in the U.S. It's important to note that:

Half of all suicides in the U.S. are by firearm,
Nearly two thirds of all firearms-related deaths in the U.S. are suicides, and,
85 – 90 percent of suicide attempts with a firearm are fatal.

Recognizing that nearly two-thirds of all firearms deaths are by suicide, The National Shooting Sports Foundation (NSSF) (the Firearm Industry Trade Association) and the American Foundation for Suicide Prevention (AFSP) joined together and developed a Suicide Prevention Toolkit to help firearms retailers, shooting range operators and customers understand risk factors and warning signs related to suicide, know where to find help and encourage secure firearms storage options. NSSF asks retailers and ranges to participate in this program because doing so can help save lives.[18] It is my opinion that the AFSP-NSSF program represents a good baseline from which responsible dealers should build best practices, but it does not represent a ceiling as to all safeguards that need to be implemented.

---

[15] American Foundation for Suicide Prevention (AFSP), https://afsp.org/firearms-and-suicide-prevention 1/22/23
[16] Ibid.
[17] Ibid.
[18] Ibid.

This joint effort advises, "By participating in the AFSP-NSSF Suicide Prevention Program, you will be connected to a nationwide effort developed by AFSP called Project 2025, which seeks to reduce the annual U.S. suicide rate by 20 percent by the year 2025. It is an effort that NSSF fully supports. We encourage that your staff read the Welcome Letter and view several short videos providing an introduction to this program.  The AFSP-NSSF Suicide Prevention Toolkit contains the following:

Welcome Letter (download/print)
Tent Card
Window decal
Suicide Prevention brochure (for customers) download/print
After a Suicide brochure | download/print
Have a Brave Conversation poster
Order a free, complete toolkit online."[19]

Within the material provided is information describing which people are more at risk for suicide than others. Risk factors are characteristics or conditions that increase the chance that a person may try to take their life. I will note here that Jacob Mace was displaying many of the risk factors and suicide warning signs described in the AFSP-NSSF material. The Risk Factors include Health Factors: Depression, substance use problems, mood changes, etc., Environmental Factors: stressful life events, relationship problems, access to firearms, etc., Historical Factors: attempting suicide previously. The Warning Signs include: If a person 'talks' about killing themselves, 'talks' about feeling hopeless, etc., Their behavior that may signal risk such as, increase use of drugs or alcohol, visiting or calling people to say goodbye, etc., Displaying one or more of the following moods: depression, humiliation, relief/sudden improvement. The training material advises that the 'at-risk' individual showing such behavioral signs should be questioned directly about suicide and encouraged to seek help. Talking about suicidal

---

[19] National Shooting Sports Foundation (NSSF) (the Firearm Industry Trade Association) and the American Foundation for Suicide Prevention (AFSP) Suicide Prevention Partnership, https://www.nssf.org/safety/suicide-prevention/nssf-afsp-partnership/, downloaded January 2023.

thoughts and showing concern will not put someone at greater risk. Finally, such individuals should not have access to any firearms.

Experts advise that no one takes their life for a single reason. We all have mental health, just as we all have physical health, and conditions such as depression, anxiety and substance use problems – especially when unaddressed – increase the risk of suicide. That risk is greater when a firearm is present and accessible. Temporarily removing lethal means from someone in suicidal crisis greatly reduces the likelihood of that person dying by suicide, because it gives at-risk individuals something they crucially need: time and space. Research shows that most people in suicidal crisis who don't have easy access to a lethal suicide method will not simply find another way to kill themselves. Removing access to firearms and other lethal means allows time for both the moment of intense suicidal crisis to pass, and for someone to intervene with potentially lifesaving mental health support and resources.[20]

The signs of suicidal behavior that Jacob Mace was displaying and had communicated to Walmart employees were well-known to both Walmart employees and management at the Walmart Store, 45485 Miramar Way, California, Maryland. It would have been Walmart management's duty and obligation to immediately place Mr. Mace on the store's blacklist and deny him access to the purchase of firearms or ammunition under the industry standard outlined by the NSSF-AFSP program. Failing to deny the sale of a firearm to Jacob Mace directly resulted in his acquisition of a firearm and subsequent suicide by that firearm.

## IV.    Intelligent and Ethical Conduct – FFL Due Diligence

Federal Firearm Licensees (FFLs) should conduct their business in the same manner that intelligent and ethical businesspeople conduct business, especially those who deal in products that are inherently dangerous. Common sense, business savvy, and

---

[20] Ibid.

professionalism dictate the institution of quality business practices and are found throughout the spectrum of the business community. The following are the fundamental practices that every FFL should implement to reduce the potential of criminals and other prohibited persons from acquiring firearms that are germane to this matter.

These safeguards could include, but are not limited to:

(a) Keeping current of all laws and regulations as well as best business practices involved with the business of dealing in firearms. Successful businesspeople study and know their industry and clientele. Being conscientious always is not only good for public safety but for profitability.

(b) Designing detailed written store practices and processes that follow the spirit and intent of the laws and regulations to deter the sale of firearms to prohibited persons under state or federal law.

(c) Independent of any state or federal laws, implement best business practices to keep guns out of the hands of individuals where common sense and circumstantial evidence indicate that they pose an unreasonable risk of harm to themselves or others – including, but not limited to, training all employees that they can and must exercise discretion to deny the sale of an individual who is displaying signs of suicidal ideation regardless of whether or not that individual is prohibited under federal or state law.

(d) Conduct annual evaluations of store practices and processes to continually improve their application to meet the ever-changing challenges criminals and others employ to purchasing firearms.

(e) Conduct annual risk assessments to ensure the safe handling and storage of firearms and ammunition to deter criminals and terrorists from acquiring firearms or ammunition from theft. Follow safety and security protocols supplied by ATF and the firearms industry for reducing vulnerability to theft/loss and personal injury.

(f) Studying each firearm sold that was later used in crime or suicide and traced by ATF back to their store or obtained to determine if any laws were violated and/or if their business practices could be improved to eliminate firearm sales to prohibited or otherwise dangerous persons.

(g) Training employees fully and continually in the knowledge of all laws and regulations (State and Federal) as well as best practices to be employed to keep guns out of the hands of prohibited purchasers. Testing employees periodically to ensure that the training administered was sufficiently understood to enable practices to be properly implemented.

(h) Maintaining open and frequent dialogue with law enforcement authorities. Instead of only speaking with law enforcement for the purpose of transmitting information for a Brady Check, immediately inform them of activities at the time suspicious purchasers are in the establishment. Because lives are at stake, FFLs should always err on the side of notification to law enforcement if there is a concern a purchaser may be breaking the law and/or may be intending to misuse a firearm to harm himself or another. Early notification provides law enforcement with an opportunity to examine the purchaser's actions instead of a crime scene and/or the tragic misuse of a firearm. The National Instant Check System (NICS) provides a perfect opening for this to occur. It is common for the instant check to take more than a day to finalize.  Asking the purchaser to return when the check has been completed provides time to contact law enforcement and further scrutinize the sale. For a person who is contemplating suicide, providing this time is literally the difference of life or death.

Because of firearm violence that has occurred at various Walmart Stores across the country and as well as firearms violence in general that occurs in Americans' daily lives, Walmart executives are not unaware of the effects of firearms accessibility to prohibited persons. On February 28, 2018, Walmart issued a Statement on Firearms Policy[21]:

---

[21]Walmart Corporate Policies, https://corporate.walmart.com/newsroom/2018/02/28/walmart-statement-on-firearms-policy.

"In light of recent events, we've taken an opportunity to review our policy on firearm sales. Going forward, we are raising the age restriction for purchase of firearms and ammunition to 21 years of age. We will update our processes as quickly as possible to implement this change.

In 2015, Walmart ended sales of modern sporting rifles, including the AR-15. We also do not sell handguns, except in Alaska where we feel we should continue to offer them to our customers. Additionally, we do not sell bump stocks, high-capacity magazines, and similar accessories. We have a process to monitor our eCommerce marketplace and ensure our policies are applied.

We take seriously our obligation to be a responsible seller of firearms and go beyond Federal law by requiring customers to pass a background check before purchasing any firearm. The law would allow the sale of a firearm if no response to a background check request has been received within three business days, but our policy prohibits the sale until an approval is given.

We are also removing items from our website resembling assault-style rifles, including nonlethal airsoft guns and toys. Our heritage as a company has always been in serving sportsmen and hunters, and we will continue to do so in a responsible way."

This policy statement was followed by additional measures announced by Walmart CEO Doug McMillon on September 3, 2019. CEO McMillon stated that Walmart has made a commitment to make retail industry safer as a whole and called for the "nation's leaders to move forward and strengthen background checks and to remove weapons from those who have determined to pose an imminent danger."[22]

---

[22] Statement of Walmart CEO McMillon concerning firearm policies, https://www.ibtimes.com/what-are-walmarts-new-gun-ammunition-policies-2821498 - 9/3/19.

I also found within the guidelines and training materials supplied by Walmart that it is now the policy of the company that, "If any associate has any reason to believe the customer might use the firearm to harm themselves or others, it is appropriate to refuse the sale of the firearm to that customer."[23] In addition, it is policy within the Walmart corporation practices with regard to the sale of firearms that sales associates are to examine the driver's license of the purchaser against the denied file to see if the person had previously been denied a sale at Walmart based on concerns in re: straw purchasing.[24] This coincides with a list of individuals who would not be permitted to purchase firearms at Walmart that goes beyond those categories prohibited by statute. This is not an unusual practice at gun stores, or for that matter at other types of retail establishments and is based on an individual's past behavior at the store. A Walmart co-worker provided Jacob Mace's direct manager with credible information that Mace was having a mental crisis and contemplating suicide and requesting that his name be placed on the store's 'Blacklist' prohibiting the sale of firearm. Jacob Mace was never placed on the store's 'Blacklist' despite the manager indicating that he would "take care of it." The manager of the sporting goods department also had prior knowledge of Mace's mental illness and suicidal thoughts. Walmart also has as the policy and procedures for its sales associates to follow when selling firearms that once a firearm is identified for purchaser the associate, and later manager approving the sale, should ask appropriate questions as to the reason for wanting to purchase the firearm(s).[25] This is done to possibly uncover facts that point to a person attempting to illegally purchase a firearm(s) and part of best practice technique recommended by the firearms industry.

I found, within the documents supplied, that none of these policies and procedures were followed by Walmart managers or employees with regard to the sale of a shotgun to Jacob Mace on November 15, 2019. I also did not see any training materials specifically regarding persons with mental health crises dated prior to the 2019 sale. It is highly likely

---

[23] Walmart Document Production – Firearm Policy and Training
[24] Ibid.
[25] Ibid.

that had they followed the company's policies and practices Jacob Mace would have been denied the shotgun that was used to take his life.

American citizens demand that companies selling dangerous products methodically follow government laws and regulations. Repeatedly, the nation has seen that when laws and regulations that were devised to protect the public from harm are not followed innocent citizens' lives are compromised. We have further seen that even if relevant laws are followed, recklessly providing guns to individuals telegraphing that they may harm themselves or others leads to preventable tragedies. If Walmart had trained all employees and management that sell firearms of the dangers of selling firearms to persons who are known or reasonably believed to have mental issues and such sales should be immediately stopped. Further, Walmart has devised an internal 'blacklist' to stop the sale to at least some parties who may not show up as prohibited on a NICS background check. If Mace would have been added to such a blacklist Mace would not have killed himself with a shotgun sold to him by the Walmart Store, 45485 Way, California, Maryland.

**V. Walmart's Knowledge and Lack of Due Diligence**

Based on the materials provided to me at this time, the following outlines the information that was available to Walmart management and employees at the Store located at 45485 Way, California, Maryland concerning Jacob Mace's mental condition. The crux of this matter relies on the proverbial questions of 1) what did Walmart management and employees know concerning Jacob Mace's mental condition and suicidal tendencies; 2) when did they know this information; and 3) what did they do or not do to prevent Mace's access to a firearm and ammunition located within and sold at the store:

- ❖ In February 2018, Jacob Mace began working for the Walmart Store, 45485 Way, California, Maryland as a part-time employee for nine months as a maintenance worker.[26]

---

[26] Walmart employment records.

❖ In February 2019, Jacob Mace returned to work for the Walmart Store, 45485 Way, California, Maryland as a part-time employee as a maintenance worker supervised by Brennan Jones until his death on November 15, 2019.[27]

❖ From February 2019 until November 15, 2019, Jacob Mace informed fellow employees at the Walmart Store, 45485 Way, California, Maryland, that he was suffering with a variety of mental health problems to include depression and suicidal thoughts, had been admitted to a hospital for attempted suicide, and was seeking mental health treatment for which he received medication. These fellow workers included, but not limited to, Jennifer Krebs, Joel Barr, Hannah Werner, and Christina O'Shea. Mace also began drinking alcohol around this time.

❖ On or about October 31, 2019, and until November 15, 2019, Jacob Mace experienced an acute mental health crisis that lasted sixteen (16) days until his death. During this time period, Mace missed several days of work and presented letters to his Walmart supervisor, Brennan Jones, documenting his hospital visits. Mace also had discussions with Jones that mental health issues caused hospital visits. Jones instructed Mace to contact the suicide hotline.

❖ On November 9, 2019, Mace, after being released from hospital care, forwarded a text message to Christina O'Shea, friend and co-worker at the Walmart Store, 45485 Way, California, Maryland. In this text message, Mace advised Ms. O'Shea that he "feels broken" and felt "crippling" depression all week long. He wrote that he had one suicide attempt since being released and the "I just get discouraged every time I fail and each time more determined to succeed next time." O'Shea replied back to Mace and asked how he planned to try and kill himself? Mace replied, "slit writs" – "buy a gun." O'Shea took a screen shot of the text message Mace forwarded to her and transmitted that message within thirty minutes to Mace's Walmart supervisor, Brennan Jones, with an accompanying request for Mace to be 'blacklisted' from buying a firearm at the Walmart Store. Jones advised O'Shea that he would take care of it. No action was taken to place Mace name any such 'blacklist'.

---

[27] Ibid.

❖ On November 12, 2019, Jacob Mace transmitted a Facebook message to a co-worker, Eric McLaughlin at the Walmart Store, 45485 Way, California, Maryland, inquiring about an inexpensive single shot, 20-gauge shotgun. McLaughlin advises he is the employee at the store that manages the sale of firearms or as he states is the store's 'gun guy'. McLaughlin knew very little of Mace on a personal level.

❖ On November 15, 2019, Jacob Mace reported to work at the Walmart Store, 45485 Way, California, Maryland for his shift at 7:00 AM. At this time, Mace made arrangements with McLaughlin, who was working the firearms counter, to purchase a firearm at the Walmart Store, 45485 Way, California, Maryland. Mace asked McLaughlin what single shot shotgun was the cheapest and went through all the legal procedures for purchasing a firearm and box of shotgun ammunition. McLaughlin advised that during that process Mace did no display any 'red flag' signs that would cause him concern to deliver or sell the firearm to him. Part of the purchasing process at Walmart is a requirement that a store manager also approve the purchase as well as walk the purchaser to their vehicle with the firearm. Asset Manager, Ida Randall, both approved the sale and walked Mace to his vehicle at this time to complete the process. Neither McLaughlin nor Randall asked Mace any screening questions concerning his wanting to purchase the shotgun as suggested by NSSF industry protocols on suicide prevention. Such questions are required in situations where, as here, Walmart had actual or constructive knowledge of Mace's suicidal tendencies.

❖ On November 15, 2019, Jennifer Lee Krebs, a Walmart employee at the 45485 Way, California, Maryland store, observed Jacob Mace walking out of the Walmart Store at approximately 10:00 AM accompanied by a store manager carrying a gun box. Since Krebs is familiar with recent suicide attempts and suicide statements that had been made within the last month by Mace and the fact that he had been diagnosed with borderline personality disorder and depression she was highly concerned. Police did locate a bottle of "Fireball" liquor in his vehicle after his body had been found. When Mace did not return from his lunch break, Ms. Krebs was even more concerned and took action to locate him to include calling 911 for law enforcement assistance and notification.

❖ On November 15, 2019, after the sale of the shotgun in question to Jacob Mace and law enforcement had been notified of him missing, Eric McLaughlin was spoke with his direct manager, Renard Mackall. Mackall advised McLaughlin that Jacob Mace was missing and had made suicidal threats as well as being treated for mental illness. Mackall stated, "why did we sell him the gun?" "I wish I was there, I would have never sold him the gun". McLaughlin advised law enforcement that he was never told of Mace's mental condition or suicidal threats and if he was so informed, he would not have sold him the firearm.

❖ On November 15, 2019, deputies from the St. Mary's County Sheriff's Office investigating the suicide death of Jacob Mace, interviewed Brennan Jones, the Walmart's direct manager of Jacob Mace, at the Walmart Store, 45485 Way, California, Maryland. Mr. Jones advised the investigating deputy sheriff upon being shown the text message transmitted to him by Walmart employee Christina O'Shea on November 12, 2019, where Mace stated that he planned to kill himself by 'slitting writs' or 'buy a gun' and requesting that Mace be "blacklisted" from purchasing a firearm at the Walmart Store that it was hearsay, and he could not "blacklist" him (Mace) on someone else's word. Jones also advised the deputy that he was concerned that Walmart would be liable for this death occurring.

❖ On November 15, 2019, at noon, just hours after purchasing a shotgun at the Walmart Store, 45485 Way, California, Maryland, Jacob Mace's body was found by the St. Mary's County Sheriff's Office in his vehicle. At 12:07 PM, Jacob Mace was pronounced dead. Cause of death was later determined to be a shotgun a self-inflicted shotgun wound.

## VI. Conclusion

I believe this matter is very straight forward and the facts speak for themselves:

- Walmart aided and abetted Mace's unlawful possession of a shotgun in violation of Maryland law because it had actual or constructive knowledge that Mace had been a) diagnosed with a mental illness,

b) had a history of harmful acts directed towards himself others, and (c) intended to use the firearm to take his own life.

- Walmart negligently entrusted the shotgun to Mace in violation of its duty of reasonable care as embodied in industry suicide prevention standards and common sense.

- Walmart failed to appropriately train its employees that they had discretion to deny firearms sales to individuals for any reason – including concerns regarding a gun being misused in an act of self-harm or a crime – even if not legally prohibited and that such discretion must be exercised to deny a sale if an employee has any reason to suspect that an individual may use a firearm to harm himself or others.

- That Walmart employees and management at the store located at 45485 Way, California, Maryland, knew before and on November 15, 2019, that Jacob Mace, Walmart employee, was suffering from acute mental illness that included hospital admittance, suicide attempts and verbal mentioning of committing suicide and took no action to prohibit the sale of a firearm to him to include placing his name on any 'Blacklist" to prohibit such sales or advising the person managing the firearms sales.

- That on November 15, 2019, the Walmart Store, located at 45485 Way, California, Maryland negligently sold a firearm to Jacob Mace, knowing or having reasonable cause to believe that he was prohibited from such a purchase or possession because he was mentally ill and a history of harm to himself or others.

- On November 15, 2019, Jacob Mace committed suicide with a firearm bought at the Walmart Store located at 45485 Way, California, Maryland.

- It is more likely than not that if Walmart had implemented reasonable and responsible policies to comply with Maryland law and its duty of reasonable care, Mace would not have had access to the firearm

and/or Walmart would have called law enforcement and given them an opportunity to intervene/question Mace and offer him mental health services.

I have concluded and it is my opinion that Walmart management at the store located at 45485 Way, California, Maryland knew or should have known that Jacob Mace was a danger to himself or others and should have but did not take any action to prohibit his access and acquisition of firearms from the store. The negligent in-action by store management caused the death of Jacob Mace on November 15, 2019.

*Note: My findings are preliminary and subject to being amended or modified when and if I receive other important materials such as: depositions, Walmart Company documents, and other relevant documents for analysis. Due to the discovery schedule set by the Court, I have not been able to review all transcripts from the depositions of all of the witnesses and have had to rely on my review of witness statements to the police and other sources. I reserve the right to modify or supplement my opinions after an opportunity to review deposition transcripts from these witnesses and if other materials or evidence become available as discovery continues. I also reserve the right to review and analyze the findings of other experts who may later submit opinions and provide updated or modified opinions thereafter.*

I submit this report subject to revision if so, required by the provision of further information or additional documents.

Date: 2/13/2023

Joseph J. Vince, Jr.

**MATERIALS RELIED UPON:**

Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., State Laws and Published Ordinances – Firearms, ATF P 5300.5.

Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., FFL Newsletter, Federal Firearms Licensees Information Service provided by the Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., 1989, Volume 2.

Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., FFL Newsletter, Federal Firearms Licensees Information Service provided by the Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Washington, D.C., June 2021.

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, 1994 Firearms Enforcement Investigative Report (1995).

Glenn L. Pierce, et al., Report to the U.S. Department of Treasury, Bureau of Alcohol, Tobacco and Firearms, Office of Enforcement, Washington, DC, The Identification of Patterns in Firearms Trafficking: Implications for Focused Enforcement Strategies (1995).

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, 1996 Firearms Enforcement Report (1996).

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, Youth Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 17 Communities (1997).

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, A Progress Report: Gun Dealer Licensing and Illegal Gun Trafficking (1997).

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, Dec. 1997 - Dec. 1998 CGAB (ATF Crime Gun Analysis Branch) Shots.

Bureau of Alcohol, Tobacco and Firearms, U. S. Department of the Treasury, FFL Newsletter, Volume 2, September 1999, page 1, an article titled "NICS Enrollment by Licensees", https://www.atf.gov/publications/newsletters/index.html.

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, Safety and Security Information for FFLs (1998) (revised 2006).

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, Operation Snapshot – An Analysis of the Retail Regulated Firearms Industry, 1998 32.

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, Crime Guns Trace Analysis Reports: The Illegal Youth Firearms Market in 27 Communities (1999).

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, The Youth Crime Gun Initiative Performance Report (1999).

Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Justice Department, Washington, D.C., FFL Newsletter, November 2009, page 1.

Bureau of Alcohol, Tobacco, Firearms and Explosives, ATF Fact Sheet, Public Affairs Division, Washington D.C., 2014.

Pierce, Glenn L., Anthony A. Braga, Raymond R. Hyatt Jr., and Christopher S. Koper, "Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy," Justice Quarterly, Vol. 21, No. 2, 2004. (At https://www.tandfonline.com/doi/abs/10.1080/07418820400095851?tab=permissions&scroll=top)

Pierce, Glenn, Braga Anthony, Wintemute, Garen, Dolliver, Matthew, New Approaches to Understanding and Regulating Primary and Secondary Illegal Firearms, United States Department of Justice, 2007-IJ-CX-0030, January 2013.

U.S. Department of the Treasury and U.S. Department of Justice, Gun Shows: Brady Checks and Crime Gun Traces (1999)

U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Commerce in Firearms in the United States (2000)

U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Following the Gun: Enforcing Federal Laws Against Firearms Traffickers (2000)

U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Crime Gun Trace Reports (1999) National Report (2000)

U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms (ATF) Press Release, Treasury, ATF Release Firearms Report, Gun Trafficking Actions, Feb. 4, 2000.

Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, Memorandum to Secretary Summers, From Director, re: New Firearms Regulatory Initiatives, Feb. 4, 2000.

U.S. Department of Justice, Federal Firearms Regulations Reference Guide, Bureau of Alcohol, Tobacco, Firearms & Explosives, 2005, ATF Publication 5300.4.

U.S. Department of Justice, Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy (2001) 33 2001-02.

U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Firearms Commerce in the United States 2002 – Crime Gun Trace Reports (2000) National Report.

FFL Newsletter, (Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, Washington, D.C.) Vol. 2, 1989; FFL Newsletter, (Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, Washington, D.C.) Vol. I, 1992, Aug 1996; FFL Newsletter, Aug 1997 FFL Newsletter; Aug 1998 Newsletter; Feb 1999 Newsletter; December 2002 newsletter; August 2004 FFL Newsletter; February 2005 FFL Newsletter; August 2005 ATF Newsletter; March 2006 ATF FFL Newsletter; November 2008 FFL Newsletter.

Don't Lie for the Other Guy video and materials, National Shooting Sports Foundation.

American Foundation for Suicide Prevention (AFSP), https://afsp.org/firearms-and-suicide-prevention 1/22/23.

State of Maryland Code Ann., Public Safety 5-205(b)(6)

State of Maryland Code Ann., Health-General 10-101-(i)(2)

State of Maryland Code Ann., Criminal Pro 4-204

National Shooting Sports Foundation (NSSF) (the Firearm Industry Trade Association) and the American Foundation for Suicide Prevention (AFSP) Suicide Prevention Partnership,        https://www.nssf.org/safety/suicide-prevention/nssf-afsp-partnership/, downloaded January 2023.

St. Mary's County Sheriff's Department, Maryland – Incident and Supplemental Reports (written and audio), Case Number: 01-19-065285.

Jacob Mace's Medical Records

Walmart's Answers to Interrogatories and Document Production

Walmart                            Corporate                            Policies, https://corporate.walmart.com/newsroom/2018/02/28/walmart-statement-on-firearms-policy.

Statement    of    Walmart    CEO    McMillon    concerning    firearm    policies, https://www.ibtimes.com/what-are-walmarts-new-gun-ammunition-policies-2821498    - 9/3/19.