LOS RANCHOS GUN SHOP

6621 4th Street NW
Los Ranchos, NM 87107

(505) 345-4276
Fax (505) 345-7507
www.losranchosguns.com

February 13, 2023

*VIA email at ksullivan@salsburysullivanlaw.com*

Kevin P. Sullivan, Esq.
SALSBURY SULLIVAN LLC
100 North Charles Street, Suite 900
Baltimore, MD 21201

**RE:** *Kayla Brady, et al. v. Walmart, Inc., et al.*
Case No. 8:21-cv-01412-CBD

Mr. Sullivan.

I have been asked to review certain case materials and provide an opinion concerning the sale of a shotgun to the decedent, Jacob Mace on November 15, 2019.

The undersigned is the owner of Maccabee Guns, LLC, a New Mexico limited liability company doing business as Los Ranchos Gun Shop, located at 6621 4th Street, NW, Los Ranchos de Albuquerque, New Mexico 87107-6112. The store is a federally licensed firearms dealer and has operated under the current ownership since January 1, 2015. The information reviewed in connection with this opinion is based on my experience and the information provided to me by letter signed (electronically) by Rebecca J. Wachter, paralegal for the law firm of Salsbury Sullivan LLC and dated December 19, 2022, a copy of which is attached hereto as Exhibit A.

For reasons more fully explained below, and based upon my knowledge of firearms law and the facts presented here, I have concluded as follows:

1. Management members at Walmart were aware of decedent's mental health status and suicidal ideations prior to the date of sale of the firearm to Mace.
2. Management had agreed to blacklist or otherwise prohibit Mace from acquiring a firearm by at least November 9, 2019.
3. Walmart failed to communicate such status to its gun counter associate or the management employee completing the sale on November 15, 2019.
4. Had such communication taken place, as it should have been, the sale of a firearm from Walmart to Mace would not have been allowed to proceed and be completed.
5. Such failure was an abrogation of its duty that Walmart owed to Mace, because of the likelihood such firearm would be used in the commission of a foreseeable suicide.

Prior to detailing my opinion, it is instructive to consider an overview of the legal context under which a firearm may be transferred. Please note that I only discuss federal laws and regulations;

PLAINTIFF'S EXHIBIT 16

states and localities may impose different requirements. I do not, for example, address the Maryland law discussed in the Complaint. Licensed dealers like Walmart are obligated to comply with all relevant state and local laws in their jurisdiction when transferring firearms. My summary also only lists the most salient federal laws and regulations applicable in 2019. Additional restrictions may apply in unique circumstances and Congress recently passed gun legislation which added new limitations on firearms sales.

**Background Checks**

***Applicable Laws and Regulations:*** 18 U.S.C. § 922(t); 27 CFR §§ 478.102, 478.124.

Federal law requires that licensees conduct a National Instant Criminal Background Check System (NICS) background check for every transfer of a firearm to a non-licensee unless the transferee qualifies for one of the exceptions listed in 18 U.S.C. 922(t)(3). Some States, known as point of contact (POC) States, conduct NICS background checks for some or all firearms transfers. For purposes of this analysis and for the firearm acquired on the date in question, the FBI conducts the NICS background checks.

The NICS check ensures that any person who purchases a firearm from you may lawfully receive firearms. A NICS check MUST be conducted, in this case, before the sale or trade of a firearm from a licensee to a buyer.

Failure to conduct a background check has a significant impact on public safety. A dealer could be fined or have its license suspended or revoked if it fails to do so pursuant to 18 U.S.C. 922(t)(5).

**Exceptions to the NICS Background Check**

***Applicable Laws and Regulations:*** 18 U.S.C. § 922(t); 27 CFR §§ 478.102(d), 478.131, 478.134.

A dealer is not required to conduct a NICS check in certain limited situations, such as:

1. The sale or transfer of a firearm where the transferee presents a valid State permit/license purchase or carry a firearm from the State in which your licensed premises is located that meets the requirements under 18 U.S.C. 922(t)(3) (See ATF's Permanent Brady Permit Chart);

2. The transfer of a firearm to another FFL (including collectors when transferring a curio & relic firearm);

3. The return of a repaired firearm to the person from whom it was received;

4. The sale of a firearm to a law enforcement officer for official use if the transaction meets the specific requirements of 27 CFR 478.134;

5. The transfer of a replacement firearm of the same kind and type to the person from whom a firearm was received; or,

6. The transfer of a firearm that is subject to the National Firearms Act (NFA) if the person who will receive the firearm was subject to a background check as part of the NFA approval process. Persons who have undergone a background check during the NFA application process are listed on the approved NFA transfer form. Note: The ATF Form 4473 must be completed prior to the transfer of a NFA firearm to a non-licensee.

NOTE: A licensee may not allow an individual who is a prohibited person to receive or possess firearms or ammunition, including persons employed by the licensee. ATF encourages licensees to conduct background checks on their employees on a regular interval (e.g., on an annual basis) to ensure prohibited employees do not possess firearms or ammunition. However, licensees may not use the NICS system for these checks, unless in connection with a firearms transfer.

**Prohibited Transfers**

***Applicable Laws and Regulations:*** 18 U.S.C. § 922(d), (g); 27 CFR § 478.99

A dealer may not sell or otherwise dispose of a firearm to a person other than the actual buyer or transferee. If a person has given the dealer reason to believe he or she is not the actual buyer or transferee, and the transaction must be stopped. The transaction must also be stopped if the person answers:

"No" to the question on ATF Form 4473 (5300.9)[1] that asks:

- "Are you the actual transferee/buyer of the firearm(s) listed on this form?"

A dealer may not sell or otherwise dispose of a firearm or ammunition to any person if the dealer knows or has reasonable cause to believe is prohibited from shipping, transporting, possessing or receiving a firearm.

Importantly, for purposes of this opinion, if a person has given the dealer reason to believe he or she is prohibited, the transaction must be stopped. In connection with completing the 4473, if the person answers:

---

[1] References in this letter are to the ATF Form 4473 (5300.9) in effect in November 2019 (revision date October 2016). The Form was revised in 2022 to be in accord with changes made pursuant to Public Law 117-159 (June 25, 2022). The new Form 4473 was revised in December 2022), and mandatory use is required as of April 1, 2023 although the form may be used currently.

"Yes" to a question on the ATF Form 4473 (5300.9) that asks:

- "Are you under indictment or information in any court for a **felony**, or any other crime for which the judge could imprison you for more than one year?"
- "Have you ever been convicted in any court of a **felony**, or any other crime for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation?"
- "Are you a fugitive from justice?"
- "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance?"
- "Have you ever been adjudicated as a mental defective **OR** have you ever been committed to a mental institution?"
- "Have you ever been discharged from the Armed Forces under dishonorable conditions?"
- "Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner?"
- "Have you ever been convicted in any court of a misdemeanor crime of domestic violence?"
- "Have you ever renounced your United States citizenship?"
- "Are you an alien **illegally** or **unlawfully** in the United States?"

**– OR –**

"Yes" to the question on the ATF Form 4473 (5300.9) that asks:

- "Are you an alien who has been admitted to the United States under a nonimmigrant visa?"

**-AND-**

"No" to the question on the ATF Form 4473 (5300.9) that asks:

- "If you are such an alien do you fall within any of the exceptions stated in the instructions?"

The sale or transfer a firearm or ammunition to persons prohibited from receiving or possessing firearms or ammunition as described below. The instructions on the ATF Form 4473 (5300.9) provide definitions and/or possible exceptions, notwithstanding the purchaser's responses.

1. **Straw Purchaser:** A "straw purchaser" is a person who is not the "actual buyer" of the firearm; that is, a person who obtains a firearm for another person. If a dealer suspects that a transaction is a straw purchase, or there are suspicious circumstances surrounding the potential sale, the sale or transfer of the firearm cannot be completed.

2. **Person Under Indictment or Information:** Any person who is under indictment or information for a felony, or any other crime punishable by imprisonment for a term exceeding one year, in any Federal, including a General Court-Martial, State or local court. An information is a formal accusation of a crime verified by a prosecutor. A member of the Armed Forces must answer "Yes" to the applicable question if charged with an offense that is referred to a General Court-Martial.

3. **Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding 1 Year:** Any person who has been convicted in any Federal court, including a General Court-Martial, State or local court of a felony, or any other crime punishable by imprisonment for a term exceeding one year.

   **EXCEPTIONS:** A person is not prohibited from receiving or possessing a firearm if that person: (1) has been convicted of any Federal or State offense pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices; or (2) has been convicted of a State misdemeanor punishable by imprisonment of two years or less. A person convicted of a felony or other crime for which the judge could have imprisoned the person for more than one year is not prohibited from receiving or possessing a firearm if, under the law of the jurisdiction in which the conviction occurred, the person has been pardoned, the conviction has been expunged or set aside, or the person has lost and regained civil rights (the right to vote, sit on a jury, and hold public office) AND the law of the convicting jurisdiction does not prohibit the person from receiving or possessing firearms.

4. **Fugitive from Justice:** Any person who has fled from any State to avoid prosecution for a felony or a misdemeanor; or any person who leaves the State to avoid giving testimony in any criminal proceeding. The term also includes any person who knows that misdemeanor or felony charges are pending against such person and who leaves the State of prosecution.

5. **Unlawful Drug User or Drug Addict:** Any person who is an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802). The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational

purposes under State law.

6. a. **Person Adjudicated as a Mental Defective:** Any person found by a court, board, commission, or other lawful authority, as a result of marked subnormal intelligence, or mental illness, incompetency, condition or disease, to be: (1) a danger to himself or to others; or (2) lacking the mental capacity to contract or manage his own affairs. This term shall include: (1) a finding of insanity by a court in a criminal case; and (2) those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility.

   b. **Person Committed to a Mental Institution:** Any person formally committed to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

   **EXCEPTION:** Under the NICS Improvement Amendments Act of 2007, a person who has been adjudicated as a mental defective or committed to a mental institution in a State proceeding is not prohibited by the adjudication or commitment if the person has been granted relief by the adjudicating/committing State pursuant to a qualifying mental health relief from disabilities program. Also, a person who has been adjudicated as a mental defective or committed to a mental institution by a department or agency of Federal Government is not prohibited by the adjudication or commitment if either: (a) the person's adjudication or commitment was set-aside or expunged by the adjudicating/committing agency; (b) the person has been fully released or discharged from all mandatory treatment, supervision, or monitoring by the agency; (c) the person was found by a court, board, commission, or other lawful authority to no longer suffer from the mental health condition that served as the basis of the initial adjudication/commitment; (d) the adjudication or commitment, respectively, is based solely on a medical finding of disability, without an opportunity for a hearing by a court, board, commission, or other lawful authority, and the person has not been adjudicated as a mental defective consistent with section 922(g)(4) of title 18, United States Code; or (e) the person was granted relief from the adjudicating/committing agency pursuant to a qualified mental health relief from disabilities program. This exception to an adjudication or commitment by a federal department or agency does not apply to any person who was adjudicated to be not guilty by reason of insanity, or based on lack of mental responsibility, or found incompetent to stand trial, in any criminal case or under the Uniform Code of Military Justice.

7. **Person Dishonorably Discharged from the Military:** Any person separated from the Armed Forces resulting from a dishonorable discharge or a dismissal adjudged by a General Court-Martial. The term does not include any other discharge or separation.

8. **Person Subject to a Qualifying Restraining Order:** Any person who is subject to a court order that: (A) was issued after a hearing of which the person received actual notice and had an opportunity to participate; (B) restrains such person from harassing, stalking or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury. An "intimate partner" of a person is: the spouse or former spouse of the person, the parent of a child of the person, or an individual who cohabitates or has cohabited with the person.

9. **Person Convicted of a Misdemeanor Crime of Domestic Violence:** Any person convicted of an offense that is a misdemeanor under Federal, State, or tribal law and has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim. The term includes all misdemeanors that have as an element the use or attempted use of physical force or the threatened use of a deadly weapon (e.g., assault and battery), including military convictions, if the offense is committed by one of the defined parties.

   **EXCEPTIONS:** A person is not considered convicted of a misdemeanor crime of domestic violence unless: (1) the person was represented by counsel in the case or knowingly and intelligently gave up the right to counsel; and (2) where the jurisdiction provides for a jury trial, the case was tried by a jury, or the person knowingly and intelligently waived the right to a trial jury by guilty plea or otherwise. A person convicted of a misdemeanor crime of domestic violence is not prohibited from receiving or possessing a firearm if, under the law of the jurisdiction in which the conviction occurred, the person has been pardoned, the conviction has been expunged or set aside, or the person has lost and regained civil rights (the right to vote, sit on a jury, and hold public office) AND the law of the convicting jurisdiction does not prohibit the person from receiving or possessing firearms.

   A current or former member of the military who has been convicted of a violation of the Uniform Code of Military Justice that included, as an element, the use of force against a person as identified in the instructions pertaining to misdemeanor crimes of domestic violence must answer "Yes" to the applicable question. This may include a qualifying offense that was referred to a Special or General Court-Martial.

10. **Person who has Renounced U.S. Citizenship:** Any person who, having been a citizen of the United States, renounced his or her citizenship either before a diplomatic or consular officer in a foreign state pursuant to 8 U.S.C. § 1481(a)(5); or before an officer designated by the Attorney General when the United States is in a state of war pursuant to

8 U.S.C. § 1481(a)(6). The term does not include any renunciation of citizenship reversed as a result of administrative or judicial appeal.

11. a. **Aliens Illegally or Unlawfully in the United States:** Any person, not a citizen or national of the United States, unlawfully in the United States (i.e., not in a valid immigrant, nonimmigrant, or parole status). Includes aliens who unlawfully entered the United States without inspection and authorization by an immigration officer; a nonimmigrant who illegally remains in the United States after his or her authorized period of stay has expired; an alien whose parolee status has expired or has been terminated; or an alien under an order of deportation, exclusion, removal, or voluntary departure.

    b. **Aliens Admitted to the United States under a Nonimmigrant Visa:** Any person, not a citizen or national of the United States, admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. § 1101(a)(26)). An alien admitted to the United States under a nonimmigrant visa includes, among others, persons visiting the United States temporarily for business or pleasure, persons studying in the United States who maintain a residence abroad, and certain temporary foreign workers.

    **EXCEPTIONS:** The term admitted under a nonimmigrant visa does NOT include immigrant aliens, also known as lawful permanent residents, who are issued a permanent resident card ("green card") or other documentation of permanent resident status, nor aliens legally admitted to the United States pursuant to either the Visa Waiver Program or regulations otherwise exempting them from visa requirements. An alien admitted to the United States under a nonimmigrant visa is generally prohibited from shipping, transporting, possessing or receiving firearms, unless he or she is: (1) admitted to the United States for lawful hunting or sporting purposes; (2) in possession of a hunting license or permit lawfully issued in the United States; (3) an official representative of a foreign government who is either accredited to the United States Government or the Government's mission to an international organization having its headquarters in the United States; (4) an official of a foreign government or a distinguished foreign visitor who has been so designated by the Department of State; (5) a foreign law enforcement officer of a friendly foreign government entering the United States on official law enforcement business; (6) an official representative of a foreign government who is en route to or from another country to which the alien is accredited; or (7) granted a waiver from the Attorney General of the United States.

12. **Sale in Violation of State Law or Published Ordinance:** A dealer may not sell or deliver a firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of a state law or published ordinance applicable at the place of sale, delivery, or other disposition.

**Age Restrictions**

***Applicable Laws and Regulations:*** 18 U.S.C. § 922(b)(1), (x); 27 CFR § 478.99(b).

Licensees may not sell or deliver a firearm or ammunition to a person who the licensee knows or has reasonable cause to believe is less than 18 years of age, and may not sell or deliver a firearm other than a rifle or shotgun - or ammunition for other than a rifle or shotgun - to a person who the licensee knows or has reasonable cause to believe is less than 21 years of age. However, if State law or local ordinances establish a higher minimum age for the purchase or disposition of firearms, the licensee must observe the higher age requirement.

A firearm frame or receiver is not a rifle or shotgun and may not be sold or transferred to a person less than 21 years of age.

**Dealer Discretion**

There are other reasons a dealer may choose to refuse to go forward with a sale, regardless of the customer's 4473 responses or approval from NICS. As described above, a suspected straw purchase would be grounds for refusing to complete the background check or proceed with the transfer.

Other criteria might be the prospective purchaser's acknowledgement that he or she was under indictment for a felony or was convicted of a felony, being a fugitive from justice, unlawful user of marijuana or a depressant, other stimulants or narcotic drugs. Similarly, if the person is known to have been or reasonably suspected of being adjudicated as mentally defective or discharged from the armed forces under dishonorable conditions, or under a restraining order or been convicted in a court of a misdemeanor crime of domestic violence.

More importantly, for purposes of this case, if the firearms dealer has knowledge that the purchaser intends to purchase the firearm for the purpose of harming himself or others, the sale must not proceed, regardless of any determination under the NICS background check system. Walmart has an independent duty to prevent dangerous parties who may misuse a firearm to harm themselves or others from gaining access to a firearm in a retail sale.

In the store I own, we implemented a procedure and train our employees to inquire of a guest on a number of topics, primarily in the areas of firearms knowledge, safety and intended use. While our primary concern focuses on potential straw purchases, it provides us an opportunity to discuss with the guest operation of the firearm, safety concerns and determine if they are possibly under the influence of an intoxicant or may be a danger to themselves or others. Two of our sales associates have experience through prior employment at a store that operated a range facility, and we have incorporated their knowledge and experience into our awareness training. Situations in which a sales associate encounters potential grounds for denying or deferring a sale are reviewed by myself and the store manager, and communicated to all employees to minimize the possibility of the same individual or third party attempting to circumvent our procedure by attempting to purchase from a different sales person.

The issue is not in a specific statute but is well established in the industry. There is no affirmative duty on a dealer to sell or transfer a firearm to a potential customer. Dealers can refuse a sale or service to a potential customer for almost any reason or no reason. A noted exception is if the refusal is predicated on the basis of unlawful discrimination. Such an action would be subject to a separate civil matter, depending on applicable state or federal law. However, such an action appears outside of the aegis of the ATF.

**NICS Action**

Under federal law, before a federally licensed firearm retailer (FFL) may transfer a firearm to an individual, the retailer must conduct a background check through the Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS) to determine if the individual is prohibited by law from receiving firearms. The response from NICS comes in terms of a proceed or denial. In some cases, the background check results in a notification that the retailer must delay the transaction for three full business days before completing the transaction. This gives NICS more time to research the individual attempting to make the purchase.

The process of subsequent action by NICS or appeal processes are not in question in this present matter.

**Relevant Facts Presented**

Many of the relevant facts appear in the St. Mary's County Sheriff's Office Incident Report collected subsequent to the incident on November 15, 2019.

1. Decedent's mother, Debra Marie McCreary advised the reporting officer that decedent had suffered from mental health issues since age nine. She reported that he was diagnosed with depressive disorder and borderline personality disorder, which she noted was regulated medically. Decedent's health status appears to be corroborated by his wife, Kayla Marie Brady.
2. During November 2019, Brady reported several incidents of hospitalizations for mental health reasons. She noted that that Mace had attempted suicide by cutting his arm. In at least one incident, McCreary transported Mace to the hospital.
3. On November 8, a Petition for Emergency Evaluation was filed, and Mace was taken to MedStar St. Mary's Hospital. Deputy Forinash prepared the Petition and noted that Mace admitted to being depressed, anxious and had personality disorder. The deputy also noted thoughts of suicide and that he owned a firearm but that his mother had taken possession of it.
4. In a separate case (01-19-064174), Mace continued to report suicidal ideations. His prescriptions were noted as Zoloft and Wellbutrin, and that he was under a treatment plan with a therapist.
5. Christina O'Shea, an employee at Walmart and friend of Mace indicated in an interview with law enforcement of November 15, that she spoke with co-manager

Brennon Jones on Saturday, November 9, notifying him that Mace was suicidal and intended to purchase a firearm from Walmart to kill himself. O'Shea asked Jones to place Mace on a "blacklist" so that he could not purchase a firearm from Walmart. Jones indicated that he would "take care of it."

6. Mace purchased a Hatfield/UTAS-USA 20 gage shotgun on November 15, 2019. In connection with that purchase, he completed an ATF Form 4473. For purposes of this review, the application appears to be complete and was processed through the NICS background check system.
7. Mace missed time from work due to his hospitalizations. Walmart was aware of the absences and the reason for those absences.
8. On November 15, 2019, the sheriff's department responded to a death investigation at the parking lot of Hobby Lobby in California MD a deputy went into the Walmart nearby to retrieve video surveillance of the victim purchasing the firearm and ammunition from earlier in the day. A detective and deputy made contact with Ida "Lettie" Randall, who was the Asset Protection Manager. Mace, who was also an employee at Walmart, purchased a firearm that morning from Walmart during his lunch break. Officers reviewed video surveillance of the counter where the transaction took place.
9. Ms. Randall was able to locate the camera and timeframe of the transaction. The victim approached the counter alone at 0939 hours and spoke with the Sporting Goods Department Manager, Eric McLaughlin. The deputy observed the victim to be calm in demeanor. The victim handed the manager his ID, who entered the information into the computer. The manager placed a call and then turned the computer towards the victim, to continue with completing information for the application process. While the victim entered information into the computer, Mr. McLaughlin, the department manager, walks away from the counter and returned with a long brown cardboard box containing the firearm. Ida "Lettie" Randall arrived at the counter and verified the information on the screen with the victim's license. The application was submitted for a background check and returned by the system as approved. Ms. Randall then proceeded to the adjacent register and inserted a key to unlock the system, to complete the transaction. Once the victim completed payment for the firearm and ammunition, Ms. Randall and the victim left the counter. Per Walmart policy, Ms. Randall escorted the gun out of the store to the curb, where she handed it over to the victim, in the parking lot.
10. Walmart policy: Walmart requires a manager review the Form 4473 prior to processing. In addition, upon receiving a proceed from NICS, the trigger lock is removed from the firearm and the package taped. A salaried manager or a support manager carries the firearm out of the store and hands it to the customer.
11. Brady stated she had not received contact from Mace but was highly concerned due to recent attempts Mace had made on his life. Brady elaborated that law enforcement had come out at least twice recently to complete an Emergency Evaluation of Mace however there had been other incidents which were handled by friends and family dial had gone undocumented. When questioned as to what may be contributing to Mace's current state of mind, Brady advised that she and Mace had recently had significant marital issues and furthermore at approximately

this same time last year Mace's grandfather had passed away which had a significant impact on him.

12. While the deputy was speaking with Krebs and Brady, a close friend of Mace's, Joel Steven Barr (Barr) arrived at the scene following correspondence with Krebs. Barr stated he was familiar with the situation and recent attempts Mace had made on his own life. Barr stated he was first alerted that something was wrong this morning after receiving a strange text message from Mace. Barr had a message from Mace which read: "I feel broken. I've been to the hospital, called the suicide hotline twice, been taken to the ER twice, discharged twice, and had to say goodbye to the girl I love. I've felt crippling depression all week and have been suicidal all week I've had I attempt since I got out of the hospital and I just get more discouraged every' time I fail. Each time more determined to succeed next time. I try talking about my feelings but talking doesn't help. Nothing helps. I just want it all to end. Goodbye."
13. During law enforcement interviews with Eric McLaughlin (the sales associate who sold the firearm to Mace) confirmed that the manager of the sporting goods department, Renard Mackell, told him that "everybody knew not to sell a gun" to Mace. McLaughlin indicated that he and Randall had no prior knowledge regarding any potential sale or restrictions applicable to Mace. McLaughlin noted that he was regarded as the "gun guy" at Walmart. He had a working relationship with Mace and the two would speak about gun issues over the years they both worked at Walmart together.
14. At no time during the sale did Ms. Randall mention any knowledge of any management decision to refuse a sale of a firearm to Mace.
15. Barr, Krebs and Brady all advised that Mace had made between 3 and 4 attempts on his life within the last month alone. All parties advised that Mace had attempted to take his own life using a gun however the weapon failed and his mother subsequently removed the gun from his possession. All parties advised that Mace's behavior had become increasingly more alarming based upon his statements made to friends and family indicative of plotting his own death and making suicidal statements All parties advised they had come together to encourage Mace to seek help, having contacted Police to respond, having taken Mace to hospital their selves and encouraging him to speak with a psychiatrist.
16. Krebs advised Mace had been diagnosed with Depression and Borderline Personality Disorder.
17. McCreary indicated that she had removed Mace's gun earlier on or about November 1, 2019 after he threatened suicide.
18. Krebs informed officers that Mace was drinking alcohol at work on the morning of November 19, 2019. At the time of his demise, toxicology reports reflect ethanol as reflected in TRC Blood (0.06%), urine (0.03%) and vitreous (0.05%).
19. In addition, drug testing reflected use of Buproprion, Sertraline and Desmethylsertraline. These drugs, individually or in combination are non-narcotic and typically prescribed as an anti-depressant.

**Discussion**

**Federal Issues**

As for the truthfulness of responses, I note that Mace responded that he was not an unlawful user of, or addicted to . . . any controlled substance." It does not appear from any of the materials provided that the medications he was using as an antidepressant were anything other than as prescribed.

There is some question regarding Mace's consumption of alcohol prior to his purchase of the shotgun. It is clear that he had consumed alcohol prior to his suicide. McLaughlin noted no unusual issues in connection with the sale.

In running the 4473 through NICS, McLaughlin acted in accordance with Walmart policy, and stated that he had no reason to question the sale at any time up to and including delivery of the firearm in the parking lot.

In the conversation between Mace and McLaughlin, McLaughlin appeared to have engaged in due inquiry regarding the sale. His knowledge of Mace through work and prior discussions suggested to him that nothing was out of the ordinary in connection with the sale and purchase. Moreover, Mace had acquired a firearm previously. To McLaughlin, this was an ordinary sale and there were no concerns.

**Store Issues**

Walmart uses a best practices safeguard, requiring a manager to review the Form 4473 for completeness. In addition, the manager is responsible to escort the gun and the purchaser out of the store before turning over possession. In this case, the management employee, Ida "Lettie" Randall, provided that review and turned over possession of the firearm to Mace after leaving the building.

*Company Knowledge*. While McLaughlin and Randall did not appear to have any knowledge of Mace's mental health status or suicidal concerns, the record is replete with members of Walmart employees and management having direct knowledge of Mace's mental health struggles, prior suicide attempts and suicidal ideations.

Christina O'Shea, an employee at Walmart and friend of Mace indicated in an interview with law enforcement of November 15, that she spoke with co-manager Brennon Jones and texted him on Saturday, November 9, notifying him that Mace was suicidal and intended to purchase a firearm to end his life. O'Shea asked Jones to place Mace on a "blacklist" to prohibit Mace from purchasing a firearm at Walmart. Jones indicated that he would "take care of it."

The manager of the sporting goods department knew about Mace's mental health struggles and suicidal ideations. During law enforcement interviews with Eric McLaughlin, McLaughlin confirmed that his manager, Renard Mackell, told him that "everybody knew not to sell a gun" to

Mace. McLaughlin indicate that he had no prior knowledge regarding any potential sale or restrictions applicable to Mace. McLaughlin noted that he was regarded as the "gun guy" at Walmart. He had a working relationship with Mace and the two would speak about gun issues over the years they both worked at Walmart together.

McLaughlin reported that there was nothing in Mace's demeanor that caused him pause in connection with this transaction. This responsibility typically falls to the sales associate in connection with a firearm transaction. Obvious signs of distraction, intoxication or any disqualifying acts, such as the use of a firearm for a criminal act, would have been grounds for an immediate decision to stop the transaction.

While there is evidence that certain members of management were aware of Mace's suicide attempts or threats, the materials provided provide no evidence that this knowledge was communicated outside of a select group of management employees.

Also troubling, an assurance was made that Mace would be "blacklisted" to prevent him from acquiring a firearm at Walmart.

The records do not reflect any training regarding Walmart training its employees as to the degree of discretion they could exercise in connection with a sale. Had Walmart trained its employees to share information regarding such discretion generally, and "blacklisted" individuals specifically, then this shooting would not have occurred.

Walmart's knowledge of Mace's state of mind created a duty to act and to deny any attempted purchase of a firearm by Mace. The failure to notify McLaughlin and Randall, who were directly involved in the sales transaction leading to Mace's ability to leave with a gun that day, had a direct causal relationship to providing the means by which Mace committed suicide a short time later.

If you have additional questions regarding this opinion, feel free to contact me.

Please note: Due to the discovery schedule set by the Court, I have not been able to review any transcripts from the depositions of witnesses and have had to rely on my review of witness statements to the police and other sources. I reserve the right to modify or supplement my opinions after an opportunity to review deposition transcripts from these witnesses and if other materials or evidence become available as discovery continues. I also reserve the right to review and analyze the findings of other experts who may later submit opinions and provide updated or modified opinions thereafter.

Very truly yours,

Mark C. Abramson

Cc: Erin Davis, Esq.
Brady, United Against Gun Violence
840 First Street NE, Suite 400
Washington, DC 20002
edavis@bradyunited.org