# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (SOUTHERN DIVISION)

KAYLA M. BRADY, et al.            *

              Plaintiffs        *

        v.                *        Civil Case No. 8:21-cv-01412-AAQ

WALMART INC., et al.              *

             Defendants        *

## MEMORANDUM OPINION AND ORDER

This is a case concerning a Walmart store's sale of a firearm to a man, Jacob Mace, who was experiencing a mental health crisis and subsequently ended his life using that firearm. Kayla Brady, the surviving spouse of Mr. Mace; together with Mr. Mace's mother, Debra McCreary; Mr. Mace's father, Mark Mace; and Mr. Mace's two minor children (collectively, "Plaintiffs"), allege that Walmart Inc. and its subsidiary Wal-Mart Stores East, LP ("Walmart" or "Defendants") were negligent in selling the firearm to Mr. Mace. Pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 70. The Motion has been fully briefed, and a hearing is not necessary under this Court's Local Rules. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons discussed below, the Court will deny Defendants' Motion.

## BACKGROUND

### I.    Factual Background

#### A.  Mr. Mace's Employment at Walmart

Jacob Mace worked as a part-time maintenance associate at the Walmart Supercenter in California, Maryland ("the California store"), from March 2018 through May 2019 and again from

September 2019 until his death in November 2019. *See* ECF No. 70-9, at 1, 3–4; ECF No. 79, at 4. As a maintenance associate, Mr. Mace was responsible for cleaning the store. *See* ECF No. 70-6, at 5. Mr. Mace's direct supervisor was Front End Coach Cybil Smith, who in turn was supervised by Brennan Jones, Co-Manager and "second in command" of the California store. ECF No. 79, at 11; ECF No. 70-9, at 3. During his tenure at Walmart, Mr. Mace became close friends with several of his coworkers, including Joel Barr, Jennifer Krebs, and Christina O'Shea. *See* ECF No. 70-14, at 3; ECF No. 70-15, at 3–4; ECF No. 70-16, at 5.

### B. Walmart's Policies and Procedures Governing Firearm Sales

As one of approximately 1,800 Walmart stores holding a federal firearms license, the California store was required to follow federal and state laws as well as Walmart's own policies and procedures governing firearm sales. *See* ECF No. 70-1, at 3; ECF No. 70-4, at 1. Walmart's "foundational policy for firearms and ammunition sales" is "OP-16," a "national policy that applies to all Walmart stores that sell firearms." ECF No. 70-1, at 3 (citing ECF No. 70-3, at 3–4). Under OP-16, a Walmart employee can sell firearms only if they are a salaried member of management or a Sporting Goods Department associate, "undergo enhanced background screening," and "attend an initial training program, followed by annual training thereafter." *Id.* (citing ECF No. 70-4, at 2).

In November 2019, Walmart followed a three-step process for firearm sales. *See id.* at 4. First, a qualified associate would obtain the customer's government-issued identification and check it against the "denied" folder, a physical folder of files containing documentation of that store's previous firearm sale denials.[1] *See id.*; ECF No. 70-3, at 15–17. If the store had previously

---

[1] Per OP-16, whenever an associate refused to sell a firearm, the associate was required to document the reason for their decision and attach that documentation to the customer's Form 4473, described *infra*. *See* ECF No. 70-1, at 4 (quoting ECF No. 70-4, at 13); ECF No. 70-3, at 15–16.

denied a firearm sale to that customer, or if the customer's last name or home address matched that of someone else whom the store had previously denied a firearm sale — indicating a potential straw purchase[2] — the associate would terminate the transaction.  *See* ECF No. 70-1, at 4–5.  Second, the customer would complete the "appropriate section" of Form 4473, which the Bureau of Alcohol, Tobacco, Firearms and Explosives requires and, in addition to asking for basic information about the customer, "asks questions to determine whether the sale is prohibited" by federal law, including "whether the customer has ever been adjudicated mentally defective or committed to a mental institution."[3]  *Id.* at 5.  Third, the associate would complete the remainder of the Form 4473 and then use the customer's information to complete an electronic check, including an FBI background check and a screen of Walmart's internal database to ensure that neither the customer nor anyone sharing the customer's last name or home address had been denied a firearm sale at any other Walmart store.  *See id.* at 5–6; ECF No. 70-3, at 18–21.  If the FBI background check results revealed that the sale could proceed and the screen of Walmart's database was clear, OP-16 then required a salaried member of management to approve and finalize the transaction.  *See* ECF No. 70-1, at 5–6; ECF No. 70-3, at 31.  After approving the sale, the salaried member of management would, per OP-16, escort the customer out of the store before handing over the firearm.  *See* ECF No. 70-1, at 6; ECF No. 70-3, at 31.

---

[2] A straw purchase occurs when a customer buys a firearm for another person who cannot legally purchase a firearm.  *See, e.g.*, ECF No. 70-4, at 12.  Such purchases are prohibited by federal law. *See id.*  The purchase of a firearm "as a gift for someone who otherwise could legally purchase the firearm" is not a straw purchase.  *Id.*

[3] The Court recognizes that this terminology can be stigmatizing.  Accordingly, this Opinion and Order employs terminology consistent with the recommendations of the National Alliance on Mental Health whenever possible.  *See* Nat'l All. on Mental Illness, *Your Language Matters* (2015), https://www.naminh.org/wp-content/uploads/2018/09/NAMI-Language-Matters.pdf; *see also Words Matter*, Ctr. for Addiction & Mental Health, https://www.camh.ca/en/today-campaign/help-and-resources/words-matter (last visited May 2, 2024).

By November 2019, Walmart had also enacted at least three policies or mechanisms for preventing firearm sales to customers at risk of harming themselves or others.  To start, while OP-16 allowed an associate to deny a firearm sale for any non-discriminatory reason, it specifically instructed associates that they should deny the sale of a firearm to a customer if they had "any reason to believe the customer might use the firearm to harm themselves or others."  ECF No. 70-1, at 4 (quoting ECF No. 70-3, at 32); *see* ECF No. 70-3, at 6.  No one could override an associate's decision to deny a firearm sale.  ECF No. 70-1, at 4 (citing ECF No. 70-3, at 32).  Additionally, in October 2018, Walmart's corporate home office — where the company's "Global Investigations," "Insider Threat," and "Alcohol, Tobacco, and Firearms Compliance" teams are housed — adopted a "block list," to which "select associates" could add the names of individuals to prevent them from buying firearms from Walmart, even if the three-step process would otherwise authorize the sale.  ECF No. 70-1, at 6.  Specifically, if a customer's name was on the block list, then during the electronic check described above, Walmart's system "would indicate that the sale should be denied."  *Id.* at 6–7.  Initially, only a limited number of Walmart employees knew about the block list, and Walmart did not have any "written policies or procedures related to the 'block list'" until March 2020.  *Id.* at 7.  However, according to Walmart's corporate designee, Nicholas Colucci, Walmart's "violence[-]free workplace policy" required managers, upon learning that an individual was at imminent risk of harming themselves or others, to report such knowledge to the market asset protection manager.  *See* ECF No. 79-18, at 17–18.  This reporting process was intended to get information regarding individuals who posed a threat to themselves or others to Walmart's threat management team, *see id.*, members of which had the ability to add individuals to the block list, *see* ECF No. 70-3, at 25.

### C.  Mr. Mace's Mental Health Crisis

Mr. Mace had experienced depression and suicidal thoughts since childhood and was formally diagnosed with major depressive disorder and borderline personality disorder in June of 2019.  *See* ECF No. 3, at 10.  He talked about his mental illness and suicidal ideation with at least five other Walmart employees.  *See* ECF No. 79-2, at 2–3; ECF No. 79-4, at 4; ECF No. 79-9, at 8–9; ECF No. 79-12, at 4; ECF No. 79-13, at 3.  One such employee was Assistant Store Manager Renard Mackell, who approached Mr. Mace at some point in 2019[4] upon noticing that Mr. Mace seemed frustrated.  *See* ECF No. 79-9, at 2–3, 8.  During this conversation, Mr. Mace shared that "he had had some previous mental health issues," *id.* at 8, including that he had previously attempted suicide, but he stated that "things were getting better for him," *id.* at 9.

According to Plaintiffs, on October 31, 2019, Mr. Mace began to experience an "acute mental health crisis."  ECF No. 79, at 5.  Mr. Mace was admitted to the hospital on November 1, 2019, after his sister discovered him engaging in self-harm, and he was discharged on November 3, 2019.  *See id.*; ECF No. 79-11, at 18.  As a result, Mr. Mace was absent from his scheduled shifts on November 1, 2, and 3.  *See* ECF No. 70-9, at 3.  Plaintiff McCreary, Mr. Mace's mother, claims that after leaving Mr. Mace at the hospital on November 1, she drove to the California store and told a manager that Mr. Mace was in the hospital, though she did not share the reason for his hospitalization.  *See* ECF No. 70-1, at 14; ECF No. 70-12, at 32–33.  Because Walmart's hourly associates report absences through a call-out line and a third-party administrator manages all health-related information pertaining to associate absences, including doctor's notes and other documentation, Defendants allege that an individual store does not know specific details about an

---

[4] Mr. Mackell could not remember the exact date of this encounter, but he testified that it occurred in 2019 and more than a month before Mr. Mace's death.  *See* ECF No. 79-9, at 8–9.

associate's absence beyond which of several general options the associate selected as the reason for their absence.  *See* ECF No. 70-1, at 7–8.

Between November 3 and November 9, 2019, Mr. Mace went to the hospital for mental health treatment two more times.  On November 6, Mr. Mace's therapist recommended that he seek inpatient treatment after he told her that he was experiencing suicidal thoughts.  *See* ECF No. 79, at 5; ECF No. 70-18, at 2–3.  Mr. Mace's friend and Walmart coworker Joel Barr drove him to the hospital, and Mr. Mace was discharged a few hours later.  *See* ECF No. 79, at 5.  The next day, November 7, Mr. Mace's sister called the police because Mr. Mace was indicating that he was going to harm himself.  *Id.*  The police took Mr. Mace to the hospital "as an emergency petition," ECF No. 70-21, at 2, and he was again discharged after a few hours, ECF No. 79, at 5.

On the morning of November 9, 2019, Mr. Mace sent a text message (the "goodbye message") indicating that he planned to end his life to several of his Walmart coworkers and friends.  *See id.* at 5–7.  Ms. O'Shea received this message while she was working at the California store, and she called for help over the intercom.  *Id.* at 7.  Kristin Wagner, Department Manager for Grocery Pickup and Ms. O'Shea's supervisor, responded to Ms. O'Shea's call.  *See* ECF No. 70-1, at 21; ECF No. 79-4, at 7; ECF No. 70-24, at 3–4.  Ms. O'Shea told Ms. Wagner that she was receiving text messages from Mr. Mace indicating that he was suicidal.  *See* ECF No. 70-1, at 21; ECF No. 79, at 7.  From there, Ms. O'Shea's and Ms. Wagner's — and, correspondingly, Plaintiffs' and Defendants' — versions of events differ slightly, though the pertinent facts are consistent across both accounts.   Ms. Wagner advised Ms. O'Shea to call the police's nonemergency line and request a welfare check on Mr. Mace.  *See* ECF No. 70-1, at 21; ECF No. 79-4, at 7.  Ms. O'Shea was hesitant to call the police because she felt that doing so would betray Mr. Mace's trust, *see* ECF No. 79-4, at 8, so — according to Ms. Wagner — the two went to the

store's back office to consult a manager, *see* ECF No. 79-5, at 3.  Mr. Jones, the store's "second in command," ECF No. 79, at 11, was present, and Ms. Wagner explained the situation to him and shared her recommendation that Ms. O'Shea call the nonemergency line, with which Mr. Jones agreed, *see* ECF No. 79-5, at 3; ECF No. 70-8, at 4–5.

After calling the nonemergency line, Plaintiffs allege Ms. O'Shea continued to exchange text messages with Mr. Mace throughout the morning and early afternoon.  *See* ECF No. 79, at 7. At one point, Ms. O'Shea asked Mr. Mace exactly what he was planning to do, and he responded: "Slit wrists.  Buy a gun."  ECF No. 79-4, at 8.  Plaintiffs allege that Ms. O'Shea took a screenshot of this exchange and sent it to Mr. Jones, and that Mr. Jones then approached Ms. O'Shea.  *See id.* at 10-12.  During the course of that conversation, Ms. O'Shea allegedly expressed her concern about Mr. Mace's intent to buy a firearm, and she asked whether there was a list that Walmart could put Mr. Mace's name on to prevent him from doing so.  *See id.* at 9; ECF No. 79-7, at 4–5. According to Plaintiffs, Mr. Jones responded that he would "take care" of it.  ECF No. 79, at 9 (quoting ECF No. 79-4, at 8).

Shortly thereafter, and prior to Mr. Mace's death, Mr. Jones discussed the situation with two other members of Walmart's management team.  Specifically, Mr. Jones spoke with Beverley Madden, the Market Human Resources Manager, about Ms. O'Shea's concern that Mr. Mace was going to harm himself and asked what he should do.  *See* ECF No. 70-8, at 6–7; ECF No. 70-10, at 3, 15–16.  Mr. Jones also asked Ms. Madden whether there was any list that Mr. Mace could be placed on to prevent him from buying a firearm from Walmart.  *See* ECF No. 70-8, at 6–7.  Ms. Madden responded that there was no such list in existence, *id.* at 7, and advised Mr. Jones to have a conversation with Mr. Mace to see how he was doing, ask if he needed anything, and make sure he was aware of Walmart's Employee Assistance Program, "Resources for Living," *see* ECF No.

70-10, at 12–14, 20.  Ms. Madden recommended that Mr. Jones engage in small talk and ask general questions — such as "How's work going?  How's the family?" — explaining that since Mr. Jones had received the information about Mr. Mace's suicidal ideation secondhand, it was "literally speculation and . . . may or may not be true."  *Id.* at 14; *see also* ECF No. 70-1, at 22. After consulting with Ms. Madden, Mr. Jones reported the incident to Tim Crowley, Manager of the California store.  *See* ECF No. 79, at 10 (citing ECF No. 79-7, at 8–9); ECF No. 79-7, at 9 (stating that Mr. Jones told Mr. Crowley "everything that had occurred" on November 9 and asked whether there was "anything else that could be done").

After Mr. Mace sent the "goodbye message," he was again admitted to the hospital for three days, from November 9 through November 12, 2019.  *See* ECF No. 70-25, at 3.  Ms. O'Shea informed Ms. Wagner and, allegedly, Mr. Jones that Mr. Mace had been hospitalized.  *See* ECF No. 79-4, at 15–16; ECF No. 79-5, at 5.  After Mr. Mace returned to work on November 13, Mr. Jones saw him on the sales floor and asked how he was doing.  *See* ECF No. 70-1, at 26; ECF No. 70-8, at 11–13.  According to Defendants, Mr. Mace shared that he was experiencing some family issues but said that he was "fine," ECF No. 70-1, at 26 (quoting ECF No. 70-8, at 12), and Mr. Jones "offered [him] some words of encouragement" and reminded him about Resources for Living, *id.*

### D.  Mr. Mace's Purchase of a Shotgun from Walmart

On the afternoon of November 12, 2019, after Mr. Mace was discharged from the hospital, he initiated a Facebook Messenger conversation with Eric McLaughlin, Sporting Goods Department Manager, about buying a shotgun from Walmart.  *See* ECF No. 70-1, at 24–25.  Mr. McLaughlin had sold Mr. Mace a shotgun approximately one year earlier, *id.* at 24, but Ms. McCreary removed the shotgun from his home sometime after October 31, 2019, *see* ECF No. 70-

8

12, at 23, 26; ECF No. 70-13, at 28–30.  Mr. Mace asked Mr. McLaughlin whether Walmart sold "single shot shotguns" and how much the "cheapest one" cost, explaining that he wanted to buy one for his wife, Ms. Brady, to get her "back into shooting and hunting."  ECF No. 70-1, at 25. Ms. Brady saw this exchange and thereafter "had a very serious talk" with Mr. Mace about not buying the gun.  ECF No. 70-11, at 9.

On November 15, 2019, Mr. Mace clocked in for his shift at Walmart just before 7:00 A.M. *See* ECF No. 70-1, at 28.  Around 9:30 A.M., Mr. Mace clocked out for his lunch break, *see* ECF No. 3, at 12, and at 9:39 A.M., he approached Mr. McLaughlin at the firearms counter to buy the shotgun he had asked about, *see* ECF No. 70-1, at 28.  After verifying that Mr. Mace was not on the clock — since Walmart employees cannot buy firearms while on the clock — Mr. McLaughlin started the transaction.  *See id.*  All of the required checks and screens, including Mr. Mace's responses on the Form 4473, indicated that the sale could proceed; accordingly, Mr. McLaughlin sent the transaction for a manager's approval, and Ida "Lettie" Randall, the store's Asset Protection Manager, went to the firearms counter to finalize the transaction.  *See id.* at 28–29.  The three chatted throughout the process, and according to Mr. McLaughlin and Ms. Randall, Mr. Mace seemed like his "normal" self.  ECF No. 70-1, at 29 (quoting ECF No. 70-6, at 19); *see* ECF No. 70-27, at 8–10, 14–16.  Ms. Randall verified that the sale could proceed, then retrieved the shotgun. *See* ECF No. 70-1, at 29–30.  Mr. McLaughlin rang up the sale, which included ammunition that Mr. Mace purchased along with the shotgun, and Ms. Randall escorted Mr. Mace out of the store. *See id.* at 30.

On their way out of the store, Mr. Mace and Ms. Randall passed Mr. Mace's friend and coworker Ms. Krebs, who was coming into the store.  *See id.*  Mr. Mace had texted Ms. Krebs

earlier that morning because he wanted her to drink with him,[5] so Ms. Krebs "knew something was wrong" and expressed concern when she saw him leaving Walmart with the shotgun.  ECF No. 70-15, at 11; *see* ECF No. 70-1, at 30.  Mr. Mace told Ms. Krebs that the shotgun was a Christmas present for Ms. Brady, and the two of them walked to Mr. Mace's car together.  *See* ECF No. 70-15, at 14–16.  Ms. Krebs then went into Walmart to shop, but she and Mr. Mace continued to exchange text messages, some of which began to worry her.  *See id.* at 23–24.  Ms. Krebs called 911 and then called Ms. Brady to say she was coming to pick her up.  *See* ECF No. 70-1, at 32.  The two began to search for Mr. Mace, and when Mr. Mace's sister and mother received word that he was missing, they started to look for him as well.  *See id.* at 32–33.

Shortly after 12:00 P.M. on November 15, 2019, St. Mary's County police officers found Mr. Mace's body inside his truck, which was parked in the parking lot of the Laurel Glen Shopping Center.  *See* ECF No. 70-30, at 2; ECF No. 70-31, at 2–3; ECF No. 84-5, at 1.  The officers determined that Mr. Mace had died from a self-inflicted gunshot wound, using the shotgun he had purchased that morning from Walmart.  *See* ECF No. 70-30, at 2; ECF No. 70-31, at 2–3.

## II.   Procedural History

Plaintiffs filed suit in Prince George's County Circuit Court alleging that Walmart's sale of the shotgun to Mr. Mace, despite Walmart's actual or constructive knowledge that Mr. Mace was experiencing a mental health crisis and suicidal ideation, was negligent (Counts I and II), led

---

[5] Ms. Krebs testified that when she saw Mr. Mace, she did not observe any signs that he was drunk. *See* ECF No. 70-15, at 19.  Mr. McLaughlin and Ms. Randall similarly testified that during the course of the sale, they did not observe any indication that Mr. Mace was intoxicated or had been drinking.  *See* ECF No. 70-6, at 20; ECF No. 70-27, at 14–15.  Walmart's state-specific guide regarding firearm sales in Maryland instructs associates not to sell a firearm to a customer who "appears to be intoxicated," ECF No. 70-1, at 4, but Plaintiffs do not allege that Walmart violated this policy or provide any evidence that Defendants knew Mr. Mace was drinking on the morning of November 15.

to a separate claim for negligent entrustment (Count III), and created a public nuisance (Count IV). *See* ECF No. 3, at 13, 16–19.  On June 7, 2021, Defendants removed the case to this Court.  ECF No. 1.

On September 27, 2021, Defendants moved for judgment on the pleadings, arguing among other things that the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. §§ 7901–7903, barred Plaintiffs' claims, and that none of the PLCAA's exceptions were applicable.  *See* ECF No. 31-1, at 6.  Defendants separately argued that even if the PLCAA did not bar Plaintiffs' claims, their claims as alleged failed as a matter of law.  *See id.* at 12–16.  On October 25, 2021, Plaintiffs filed their response, arguing chiefly that the PLCAA did not apply to this case, but alternatively, if it did, the PLCAA was unconstitutional.  *See* ECF No. 34, at 4, 28.  On December 27, 2021, the United States intervened for the limited purpose of defending the constitutionality of the PLCAA but took no position as to the applicability of the PLCAA or its exceptions to this case. *See* ECF No. 38; ECF No. 40, at 1.  On April 29, 2022, this case was assigned to the undersigned's chambers for all further proceedings.

On July 28, 2022, the Court granted, in part, and denied, in part, Defendants' Motion for Judgment on the Pleadings.  ECF No. 43.  The Court could not conclude, at that stage of the proceedings, that the PLCAA barred Plaintiffs' lawsuit, but even if it did, the Court concluded that the lawsuit could proceed under the PLCAA's predicate exception.  *See Brady v. Walmart Inc.*, No. 8:21-cv-1412-AAQ, 2022 WL 2987078, at *3–4, *6 (D. Md. July 28, 2022).  While the Court concluded that the PLCAA's negligence *per se* exception was inapplicable, it found that the PLCAA's negligent entrustment exception may apply to Plaintiffs' lawsuit, but ultimately did not decide the issue.  *See id.* at *10–12.  Further, the Court concluded that Plaintiffs had sufficiently stated their negligence claims to survive a motion for judgment on the pleadings.  *See id.* at *12–

16.  However, the Court found that Plaintiffs had failed to state a valid claim for public nuisance under Maryland law and dismissed that count of their Complaint.  *See id.* at *17.

On December 4, 2023, Defendants filed a Motion for Summary Judgment.  ECF No. 70. Plaintiffs filed a Response in Opposition on January 19, 2024, ECF No. 79, to which Defendants replied on March 1, 2024, ECF No. 84.  Because Plaintiffs, in their Opposition to Defendants' Motion for Summary Judgment, renewed their constitutional challenge to the PLCAA, the United States filed a Notice on March 1, 2024, renewing its arguments in defense of the PLCAA's constitutionality.  *See* ECF No. 85, at 2–3.

## STANDARD OF REVIEW

The Court will grant a motion for summary judgment only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If there are factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then the Court must deny the request for summary judgment.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue of material fact.  Fed. R. Civ. P. 56(a); *Pulliam*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the nonmoving party. *See Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).  "A party who bears the

burden of proof on a particular claim must factually support each element of his or her claim." *Scott v. United States*, No. PJM-06-2777, 2007 WL 3020185, at *1 (D. Md. Feb. 23, 2007).  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *See Anderson*, 477 U.S. at 256–57.  "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility."  *U.S. EEOC v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 437 (D. Md. 2020) (citing *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002)).

## ANALYSIS

Defendants move for summary judgment on five different grounds.  First, Defendants argue that the PLCAA bars Plaintiffs' lawsuit, which they claim is a qualified civil liability action that does not fall under any of the PLCAA's exceptions.  *See* ECF No. 70-1, at 38–39; ECF No. 84, at 2–3.  Second, Defendants argue that Mr. Mace was negligent with respect to both his purchase and use of the gun and that Ms. Brady, Ms. McCreary, and Mark Mace failed to exercise reasonable care to prevent Mr. Mace's purchase of the gun, and therefore their contributory negligence bars Plaintiffs' claims.  *See* ECF No. 70-1, at 55, 57–58.  In the course of asserting a contributory negligence defense, Defendants also claim that Plaintiffs cannot establish proximate cause because suicide is a superseding intervening act that breaks the chain of causation.  *See id.* at 50.  Defendants add that the last clear chance doctrine cannot save Plaintiffs' claims because any "negligence on the part of Walmart occurred sequentially *before* [Mr.] Mace's own final conduct."  *Id.* at 53.  Third, Defendants claim that Walmart complied with federal and state law in

selling the gun to Mr. Mace on November 15, 2019, and that Walmart did not owe any additional duty to prevent Mr. Mace's suicide. *See id.* at 59, 62. Fourth, Defendants argue that Plaintiffs' negligent entrustment claim fails as a matter of law because Walmart lacked control over the gun and Mr. Mace's use of it, and because Mr. Mace's suicide was not foreseeable. *See id.* at 47–48, 64. Fifth, Defendants claim that the Maryland Workers' Compensation Act provides the exclusive remedy for Plaintiffs' claims. *Id.* at 65. The Court addresses each of Defendants' arguments in turn below.

## I.   Protection of Lawful Commerce in Arms Act

### A.   Qualified Civil Liability Action

The PLCAA bars qualified civil liability actions in federal and state courts. 15 U.S.C. § 7902(a). For the purpose of the PLCAA, a "qualified civil liability action" is:

> [A] civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party.

*Id.* § 7903(5)(A). Even if an action satisfies this general definition, however, it may proceed if it falls under one of six enumerated exceptions. *See id.* § 7903(5)(A)(i)–(vi).

Defendants argue that the present lawsuit is a qualified civil liability action because Plaintiffs' claims arise out of the "criminal or unlawful misuse" of a firearm. ECF No. 70-1, at 39 (quoting 15 U.S.C. § 7903(5)(A)). Specifically, Defendants claim that Mr. Mace failed to obtain written permission from the owner of the property on which he discharged the gun, as required in St. Mary's County under Maryland law. *Id.* (citing Md. Code Ann., Crim. Law § 4-108(a) (West 2024)). In support of this claim, Defendants submit an incident report from the St. Mary's County Sheriff's Office identifying the location of Mr. Mace's death as a parking lot in St. Mary's County.

*See* ECF No. 70-31, at 2.  The incident report also lists the items found in Mr. Mace's truck at the location of his death, and Defendants, in their Motion for Summary Judgment, noted that any "written permission" from the property owner was not among these items.  ECF No. 70-1, at 39 (citing ECF No. 70-31, at 2–5).  Plaintiffs responded that Defendants had not "present[ed] any admissible evidence confirming who owns the land where [Mr.] Mace discharged the firearm" and thus had not shown that Mr. Mace's discharge of the firearm was criminal or unlawful.[6]  ECF No. 79, at 19.  Defendants then submitted, as supplemental evidence attached to their Reply, the declaration of Alton R. Brown III, Vice President of Shanri Holdings Corporation, which owns the Laurel Glen Shopping Center and parking lot where Mr. Mace discharged the gun.  ECF No. 84-5, at 1.  Mr. Brown, who also served as the Property Manager for the Laurel Glen Shopping Center on November 15, 2019, *id.*, stated that "[n]o person," including Mr. Mace, "has ever been authorized, verbally or in writing, to discharge a firearm on the property of the Laurel Glen Shopping Center," *id.* at 2.  Plaintiffs have not offered any arguments or evidence to rebut Mr. Brown's declaration.

Based on the evidence presented, there is no genuine dispute that Mr. Mace did not have the requisite permission to discharge a gun in the parking lot of the Laurel Glen Shopping Center. Accordingly, the Court concludes that this is a qualified civil liability action.

### B. Exceptions

Plaintiffs argue that even if their lawsuit constitutes a qualified civil liability action, it may proceed under two of the PLCAA's exceptions: the predicate exception, set forth in 15 U.S.C. § 7903(5)(A)(iii), and the negligent entrustment exception, set forth in 15 U.S.C. § 7903(5)(A)(ii).

---

[6] Plaintiffs also argue that suicide is not a crime under Maryland law.  ECF No. 79, at 19.  Under Maryland law, however, acts committed in the course of a suicide can still be criminal.  *See* Md. Code Ann., Crim. Law § 3-101.1(b).

*See* ECF No. 79, at 20–21.  For the reasons discussed below, the Court finds that Plaintiffs have put forth sufficient evidence to establish genuine issues of fact regarding the applicability of each of these exceptions.   Thus, the Court does not reach Plaintiffs' arguments regarding the constitutionality of the PLCAA.

### i.  Predicate Exception

Under the PLCAA's predicate exception, a manufacturer or seller of a firearm may be held liable in a qualified civil liability action if it "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm" that is the subject of the lawsuit.  15 U.S.C. § 7903(5)(A)(iii).  Plaintiffs claim that by selling a gun to Mr. Mace on November 15, 2019, Walmart, "either directly or as an accomplice," knowingly violated section 5-205(b)(6) of the Public Safety Article of the Maryland Code, ECF No. 79, at 20, which prohibits a person who "suffers from a mental disorder . . . and has a history of violent behavior against the person or another" from possessing certain firearms, Md. Code Ann., Pub. Safety § 5-205(b)(6) (West 2024).[7]  Defendants argue that to establish a knowing violation of section 5-205(b)(6), Plaintiffs must show not only "that Walmart managers knew

---

[7] Defendants claim that Plaintiffs also allege a violation of section 4-204 of the Criminal Procedure Article of the Maryland Code, which they state "prohibits someone from 'us[ing] a firearm in the commission of a crime of violence.'"  ECF No. 70-1, at 40 (alteration in original).  This provision prescribes where and under what circumstances an accessory before the fact may be charged, tried, convicted, and sentenced for a crime.  *See* Md. Code Ann., Crim. Proc. § 4-204 (West 2024). Plaintiffs cite this provision only in their Complaint and for the proposition that "[a]n individual who aids and abets another's unlawful possession of a firearm with actual or constructive knowledge that such an individual is disqualified is equally responsible, as an accessory, for any direct statutory violations by the disqualified possessor."  ECF No. 3, at 6.  The language Defendants quote appears in section 4-204 of the Criminal Law Article of the Maryland Code.  *See* Md. Code Ann., Crim. Law § 4-204(b) (West 2024).  Plaintiffs have not alleged a violation of this provision; indeed, as noted above, Plaintiffs argue that suicide is not a crime under Maryland law. ECF No. 79, at 19.  Thus, the Court will only address Defendants' arguments regarding the alleged violations of section 5-205(b)(6).

about the facts that should have prevented the sale, but also that they knew the sale was taking place," yet no Walmart manager allegedly had this knowledge.  ECF No. 84, at 4–5; *see also* ECF No. 70-1, at 41.  Additionally, Defendants argue that even if Walmart knowingly violated any predicate statute, the violation was not "a proximate cause of the harm for which relief is sought," ECF No. 70-1, at 44 (quoting 15 U.S.C. § 7903(5)(A)(iii)), because "an act of suicide breaks the chain of proximate causation," *id.*, subject to one exception: when the defendant "cause[d] the mental state that led to the decedent's suicide," *id.* at 52; *see also* ECF No. 84, at 5, 9–12.  Finally, Defendants argue that section 5-205(b)(6) is not a predicate statute because it is not "'applicable to the sale or marketing of' firearms."  ECF No. 70-1, at 45 (quoting 15 U.S.C. § 7903(5)(A)(iii)).  Plaintiffs argue that because this Court previously considered and rejected all three of Defendants' arguments, pursuant to the law of the case doctrine, the Court should decline to revisit and disturb its prior rulings.  *See* ECF No. 79, at 20–21.

To start, the "law-of-the-case doctrine recognizes that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  The doctrine "is a 'practice of courts,' 'not a limit to their power,'" *Westmoreland v. Prince George's County*, No. TDC-14-0821, 2016 WL 5720706, at *9 (D. Md. Sept. 30, 2016) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)), and it "poses no bar to the assessment of past holdings based on a different procedural posture" where the subsequent development of facts "expands the court's inquiry," *Graves*, 930 F.3d at 318.  Although, as Defendants note, the law of the case doctrine is "not an ironclad rule," ECF No. 84, at 10 (citing *Chase v. Dep't of Pub. Safety & Corr. Servs.*, No. ELH-18-2182, 2020 WL 1914811, at *11 n.5 (D. Md. Apr. 20, 2020)), "courts should be 'loath[]' to revisit settled decisions

of law absent 'extraordinary circumstances,'" *Chase*, 2020 WL 1914811, at *12 (quoting *Christianson*, 486 U.S. at 817). "Such extraordinary circumstances include (1) when a trial has resulted in substantially different evidence; (2) there has been a change in controlling legal authority that has made a contrary decision of law applicable to the issue; or (3) the prior decision was clearly erroneous or would result in manifest injustice." *Westmoreland*, 2016 WL 5720706, at *9 (citing *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)).

Thus, to the extent that Defendants challenge the Court's prior resolutions of questions of law, the Court will decline to revisit these decisions absent extraordinary circumstances. In its opinion on Defendants' Motion for Judgment on the Pleadings, this Court decided three issues of law that Defendants, in arguing that Plaintiffs' claims do not satisfy the predicate exception, challenge. First, the Court held that the scienter required to establish a knowing violation of section 5-205(b)(6) is knowledge "or . . . reasonable cause to believe that Mr. Mace was prohibited from possessing a firearm under Maryland law." *Brady*, 2022 WL 2987078, at *9. Second, the Court held that "whether a suicide may be an intervening cause is ultimately a case-specific inquiry dependent on the facts alleged, and later proven, in an individual case," and that a defendant may be liable even if it did not cause the mental state leading to the decedent's suicide. *Id.* at *16. Third, the Court held that section 5-205(b)(6) is applicable to the sale of firearms. *Id.* at *8. Because the Court decided these issues as a matter of law, any newly discovered evidence does not alter the above conclusions.

Further, although Defendants cite three cases from this Court in support of their argument that suicide is a superseding intervening cause for which Walmart can be held liable only if it

caused the mental state leading to Mr. Mace's suicide,[8] *see* ECF No. 70-1, at 50–52, 54 (citing *Young v. Swiney*, 23 F. Supp. 3d 596 (D. Md. 2014); *McDougald v. Spinnato*, No. ELH-17-2898, 2019 WL 1226344 (D. Md. Mar. 15, 2019); *Est. of Morris v. Goodwin*, No. DKC 13-3383, 2015 WL 132617 (D. Md. Jan. 8, 2015)), these cases are distinguishable and do not represent a change in controlling legal authority. Critically, in all three cases, the plaintiffs alleged that the defendants had caused the mental state resulting in the decedents' suicides — not that the defendants had knowledge of the decedents' preexisting mental illness and, in light of such knowledge, acted negligently.[9] *See Young*, 23 F. Supp. 3d at 617–18 (quoting expert opinion offered by plaintiff that "based upon a reasonable degree of psychological certainty . . . the suicide of Joseph Russell

---

[8] Defendants claim that a defendant may also be liable for a decedent's suicide if a special relationship existed between the defendant and the decedent, but since Plaintiffs do not allege that any special relationship existed between Walmart and Mr. Mace, that exception is inapplicable here. ECF No. 70-1, at 54 n.23 (citing *Brady*, 2022 WL 2987078, at *16 n.8).

[9] In *Estate of Morris v. Goodwin*, No. DKC 13-3383, 2015 WL 132617 (D. Md. Jan. 8, 2015), the "crux" of the plaintiffs' allegations was that the defendants' extramarital relationship caused the decedent — who was the wife of one of the defendants — "to fall into a state of depression, ultimately culminating in her death." *Id.* at *8; *see also id.* at *7, *10. The Court, ruling on one defendant's motion to dismiss and the plaintiffs' motion to amend the complaint and for entry of default against the other defendant, found that the plaintiffs' allegations failed to "support a plausible inference" that any of the defendants' actions caused the decedent's mental state, *id.* at *9; *see also id.* at *1, *7, and further, the Court could not identify any legally cognizable "wrongful act" in the plaintiffs' complaint, *id.* at *7–8. Thus, the Court concluded that the plaintiffs had failed to state a claim for wrongful death. *Id.* at *7.

*McDougald v. Spinnato*, No. ELH-17-2898, 2019 WL 1226344 (D. Md. Mar. 15, 2019), involved a wrongful death claim arising out of the decedent's death from a self-inflicted gunshot wound while in police custody. *See id.* at *1, *3. There, the plaintiffs alleged that two officers, during their interrogation of the decedent, "generat[ed] [a] visible change in [the decedent's] demeanor," which led the decedent to end his life. Amended Complaint & Demand for Jury Trial for Monetary Damages for Violation of Plaintiff's C.R. ¶ 69, *McDougald v. Spinnato*, No. ELH-17-2898, ECF No. 22. The Court, ruling on the defendants' motion to dismiss, held that this allegation was sufficient to state a claim for wrongful death "under the theory that [the decedent's] suicide was a direct result of [the interrogating officers'] actions." *McDougald*, 2019 WL 1226344, at *23; *see id.* at *2.

Young, the decedent, was directly and proximately caused by the psychosis he sustained as a result of the automobile accident of June 16, 2010, which is the subject of this action"); *McDougald*, 2019 WL 1226344, at \*23; *Est. of Morris*, 2015 WL 132617, at \*8, \*10.   Moreover, all three decisions predate *Baker v. State*, No. 2469, 2021 WL 3052916 (Md. Ct. Spec. App. July 20, 2021), in which the Maryland Court of Special Appeals explained that a defendant may be liable for a decedent's suicide if the suicide "might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation." *Id.* at \*4 (quoting *Sindler v. Litman*, 887 A.2d 97, 112 (Md. Ct. Spec. App. 2005)). As the Court explained in its Opinion on Defendants' Motion for Judgment on the Pleadings, the Court does not disagree that *Sindler v. Litman*, 887 A.2d 97 (Md. Ct. Spec. App. 2005), remains good law in Maryland — and thus, this Court has not hesitated to apply it in other cases — but a close reading of the decision, as well as subsequent case law, make clear that it does not preclude all negligence claims arising out of a decedent's suicide unless a plaintiff alleges that a defendant's conduct caused the decedent's mental state. *See Brady*, 2022 WL 2987078, at \*13–16.

Finally, Defendants have not shown that the Court's rulings on these issues were clearly erroneous or would result in manifest injustice.   As courts in the Fourth Circuit have explained, a decision does not satisfy this ground "by being just maybe or probably wrong," but rather must be "dead wrong." *Ogunsula v. Md. State Police*, No. ELH-20-2568, 2022 WL 3290713, at \*12 (D. Md. Aug. 11, 2022) (quoting *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 258 (4th Cir. 2018)).   Defendants, however, essentially reiterate the arguments from their Motion for Judgment on the Pleadings and express disagreement with the Court's analysis. *See* ECF No. 70-1, at 45–46, 52; ECF No. 84, at 4–5.   The Court, therefore, will not disturb its rulings on these issues of law.

While the Court maintains its prior decisions regarding what Plaintiffs must show to establish their claims, the law of the case doctrine does not constrain the Court's review of whether Plaintiffs have made the requisite showing to survive summary judgment.  In response to Defendants' arguments, Plaintiffs must present sufficient evidence that Defendants knew or had reasonable cause to believe that Maryland law prohibited Mr. Mace from possessing a firearm and that Mr. Mace's suicide was not a superseding intervening cause.  The Court finds that Plaintiffs have established genuine disputes of material fact regarding both issues.

First, Plaintiffs have established a genuine dispute of material fact as to whether Defendants knew or had reasonable cause to believe that Mr. Mace had a "mental disorder" and history of self-harm such that he was prohibited from possessing a firearm under section 5-205(b)(6).  Md. Code Ann., Pub. Safety § 5-205(b)(6).  Section 5-205(b)(6) defines "mental disorder" to mean "a mental illness that so substantially impairs the mental or emotional functioning of an individual as to make care or treatment necessary or advisable for the welfare of the individual or for the safety of the person or property of another."  Md. Code Ann., Health–Gen. § 10-101(i)(2) (West 2024).  Since "[a] corporation can act only through its agents," *Hecht v. Resol. Tr. Corp.*, 635 A.2d 394, 405 (Md. 1994) (citing *Md. Tr. Co. v. Nat'l Mechs. Bank*, 63 A. 70, 78 (Md. 1906)), for the purpose of determining whether Defendants knew that Mr. Mace had a "mental disorder" and history of self-harm, "notice to an officer or agent is notice to the corporation 'where the officer or agent in the line of his duty "ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation,"'" *id.* (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 580 (Tex. 1963)); *see also Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 773 (4th Cir. 1995) ("[U]nder the rule of imputation the principal is chargeable with the knowledge the agent has acquired, whether the agent communicates it or

21

not."). "This 'rule of imputation' generally applies unless it can be shown that 'the agent's interests are sufficiently adverse to the principal's interests.'" *Tobacco Tech., Inc. v. Taiga Int'l N.V.*, 626 F. Supp. 2d 537, 551 (D. Md. 2009) (quoting *Martin Marietta Corp.*, 70 F.3d at 772).

Plaintiffs have provided evidence that at least five Walmart managers had knowledge of Mr. Mace's suicidal ideation in or around November of 2019. Specifically, Ms. O'Shea testified that on November 9, 2019, she sent Mr. Jones, Co-Manager of the California store, a screenshot of Mr. Mace's "goodbye message," ECF No. 70-16, at 20, including Mr. Mace's statement that he was planning to "Slit wrists. Buy a gun," ECF No. 70-8, at 18. Although Mr. Jones testified that he did not remember receiving this message, *id.* at 2–3, he testified that before Mr. Mace's death, he had a conversation with Ms. O'Shea in which she expressed concern that Mr. Mace was going to harm himself, ECF No. 79-7, at 3. Ms. O'Shea testified that during this conversation, she told Mr. Jones that Mr. Mace was planning to buy a gun. *See* ECF No. 79, at 9 (citing ECF No. 79-4, at 13). Mr. Jones testified that he relayed Ms. O'Shea's concerns to Ms. Madden, the Market Human Resources Manager, ECF No. 70-8, at 6–7, who likewise testified that prior to Mr. Mace's death, she believed she had a conversation with Mr. Jones "regarding concerns about [Mr. Mace] being suicidal," ECF No. 79-8, at 5. Mr. Jones also testified that he was "pretty sure" he discussed this incident with Mr. Crowley, Manager of the California store, ECF No. 79-7, at 8, though Mr. Crowley testified that prior to Mr. Mace's death, he was not aware that Mr. Mace had experienced mental health issues or attempted suicide, ECF No. 70-26, at 5. Additionally, Mr. Mackell, Assistant Store Manager of the California store, testified that at some point in 2019 — at least one month before Mr. Mace's death, though he did not state exactly when — he had a conversation with Mr. Mace in which Mr. Mace shared that he had experienced mental health issues and had previously attempted suicide. ECF No. 79-9, at 8–9. Finally, Ms. Wagner, Department Manager

for Grocery Pickup at the California store, testified that Ms. O'Shea told her that Ms. O'Shea was receiving messages from Mr. Mace indicating that he was suicidal, ECF No. 70-24, at 4, and Ms. Wagner testified that at some point after learning about these messages but before Mr. Mace's death, she learned that Mr. Mace was "in a mental health institution," ECF No. 79-5, at 5.  Ms. O'Shea also testified that she informed Mr. Jones, again after the November 9 incident but before Mr. Mace's death, that Mr. Mace had been hospitalized.  *See* ECF No. 79-4, at 15–16.

Plaintiffs have also presented evidence that, pursuant to Walmart policy, these managers could or should have reported their knowledge of Mr. Mace's suicidal ideation further up the chain of command.  Mr. Colucci, whom Walmart designated to testify on its behalf pursuant to Federal Rule of Civil Procedure 30(b)(6), testified that he believed that, as part of Walmart's violence-free workplace policy, if a manager learned that an associate was at imminent risk of harming themselves or others, the manager would be required to report such information to the market asset protection manager.  *See* ECF No. 79-18, at 17–18.  The purpose of this reporting requirement, according to Mr. Colucci, was to ensure that information regarding an associate's imminent risk of harm would ultimately get to Walmart's threat management team, *see id.*, which had the capability to add the associate's name to a list and "block any potential [firearm] transactions to that individual," *id.* at 16.

Defendants argue that none of the testimony cited above can establish a knowing violation of section 5-205(b)(6) on Walmart's part.  Defendants claim that no one on Walmart's management team had knowledge of Mr. Mace's suicidal ideation or hospitalizations in November of 2019.  ECF No. 70-1, at 41.  Defendants argue that even if Mr. Jones did receive Mr. Mace's "goodbye message" from Ms. O'Shea, he "had no way of verifying . . . that the text message came from [Mr.] Mace," and moreover, Mr. Jones spoke with Mr. Mace after this incident and Mr. Mace

said that he was "fine."  *Id.*  Regardless of whether Mr. Jones actually saw the "goodbye message," though, he testified, as discussed above, to having knowledge in November of 2019 that Mr. Mace was experiencing suicidal ideation.  *See* ECF No. 79-7, at 3.  Given the conflicting evidence, the Court cannot determine as a matter of law that Mr. Jones did not have knowledge that Mr. Mace had a "mental disorder" barring him from possessing a firearm under section 5-205(b)(6).  Additionally, Defendants argue that the conversation between Mr. Mackell and Mr. Mace does not indicate that Mr. Mace had a qualifying "mental disorder," since the conversation occurred "months" before Mr. Mace's suicide and Mr. Mace stated that "he was doing better."  ECF No. 70-1, at 42.  Yet Mr. Mackell testified that on the day of Mr. Mace's death, he told Mr. McLaughlin that given his knowledge of Mr. Mace's prior suicide attempts, he never would have sold Mr. Mace the gun.  ECF No. 79-9, at 10.  Defendants also claim that Ms. Wagner's knowledge cannot be imputed to Walmart because she was not a "salaried" member of management.  *See* ECF No. 84, at 4 n.4.  The relevant test for imputation of knowledge, however, is whether the officer or agent "ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation," *Hecht*, 635 A.2d at 405 (quoting *Int'l Bankers*, 368 S.W.2d at 580), and according to Mr. Colucci's testimony, a "manager" who "believe[d] that an individual [was] contemplating suicide or harm to others" had "a responsibility to report" that belief, ECF No. 79-18, at 13.  Mr. Colucci did not state that this responsibility was limited to "salaried" members of management.

Additionally, Defendants argue that because the managers Plaintiffs have identified did not participate in the sale of the gun to Mr. Mace or know that the sale was taking place, any knowledge they had of Mr. Mace's suicidal ideation is insufficient to establish a knowing violation of section 5-205(b)(6).  *See* ECF No. 84, at 4–5.  As discussed above, however, the Court previously determined that Plaintiffs need only show that Defendants knew or had reasonable cause to believe

that Mr. Mace was prohibited from possessing a firearm under section 5-205(b)(6).  *See Brady*, 2022 WL 2987078, at *9.  As the Court explained, the PLCAA provides a non-exhaustive list of scenarios to which the predicate exception applies, including "any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition [under federal law]."  *Id.* (alteration in original) (quoting 15 U.S.C. § 7903(5)(A)(iii)(II)).  Nonetheless, even if they must demonstrate that the sale was "knowing," Plaintiffs have presented sufficient evidence to create a genuine issue of material fact regarding this matter, as well.  As noted above, Mr. McLaughlin sent the transaction for a manager's approval, and Ms. Randall, the store's Asset Protection Manager, went to the firearms counter to finalize the transaction.  *See* ECF No. 70-1, at 28–29.  In arguing to the contrary, Defendants claim that the same individual or individuals who were aware of Mr. Mace's mental state must also have been aware of the sale of the firearm.  *See* ECF No. 84, at 4–5.  Defendants fail to cite any support for this assertion, and their argument contradicts principles of agency law, which allow the imputation to a corporation of knowledge of multiple facts even if the facts originate from different sources.  *See, e.g.*, *Helton v. AT&T Inc.*, 709 F.3d 343, 356 (4th Cir. 2013) ("[A]n ERISA plan administrator can be charged with knowledge of information acquired by its employees in the scope of their employment and the contents of its books and records."); 3 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 790 (2023) ("The knowledge necessary to adversely affect the corporation does not have to be possessed by a single corporate agent; the cumulative knowledge of several agents can be imputed to the corporation.").

Viewing the facts in the light most favorable to Plaintiffs, there is a genuine dispute of material fact regarding whether Defendants knew or had reasonable cause to believe that Mr. Mace was prohibited from possessing a firearm under Maryland law in November of 2019. The resolution of these disputes requires credibility determinations that are "not appropriate" for a court to make on summary judgment. *Ecology Servs.*, 447 F. Supp. 3d at 452. Moreover, regardless of whether any employee at the California store actually knew about the block list, the evidence presented indicates that Walmart had a policy in place — the violence-free workplace policy — that was intended to transmit information regarding imminent risks to the personnel who did know about the block list. *See* ECF No. 79-18, at 16–18. Because Walmart expected managers to communicate their knowledge of any imminent risks of harm, any such knowledge managers are found to have had can be imputed to Walmart, regardless of whether they actually communicated it through the proper channels. *See Martin Marietta Corp.*, 70 F.3d at 773.

Plaintiffs have also presented sufficient evidence to create a genuine issue of material fact as to whether any violation by Defendants of section 5-205(b)(6) was the proximate cause of Mr. Mace's death. Under Maryland law, a defendant's conduct is the proximate cause of a plaintiff's injury when it is "(1) a cause in fact, and (2) a legally cognizable cause." *Kiriakos v. Phillips*, 139 A.3d 1006, 1021 (Md. 2016) (quoting *CR–RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 195 (2012)). Analysis at the first step, causation in fact, involves "the threshold inquiry of 'whether [the] defendant's conduct actually produced an injury.'" *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009) (quoting *Peterson v. Underwood*, 264 A.2d 851, 855 (Md. 1970) (emphasis omitted)). Analysis at the second step, legally cognizable cause, "consider[s] whether the actual harm to a litigant falls within a general field [of danger] that the actor should have anticipated or expected." *Kiriakos*, 139 A.3d at 1021 (second alteration in original) (quoting

*Pittway Corp.*, 973 A.2d at 787).  The primary consideration at this step is "whether the injuries were a foreseeable result of the negligent conduct," *id.* (quoting *Pittway Corp.*, 973 A.2d at 788), and if multiple acts or omissions were found to be a cause-in-fact of the injuries, the foreseeability analysis must consider whether any intervening act or omission was a superseding cause of the injuries, *Pittway Corp.*, 973 A.2d at 788–89.  An intervening act or omission is a superseding cause, such that it absolves the defendant of liability, if it is so "'unusual' and 'extraordinary' . . . that [it] could not have been anticipated by the original tortfeasor." *Id.* at 789 (quoting *McGowans v. Howard*, 197 A.2d 915, 918 (Md. 1964)); *see also, e.g.*, *Collins v. Li*, 933 A.2d 528, 567 (Md. Ct. Spec. App. 2007) (explaining that an "intervening act does not become a superseding cause if the party committing the initial act should have realized that one would subsequently so act" (citing Restatement (Second) of Torts § 447 (Am. L. Inst. 1965))).  The proximate cause analysis is generally reserved for the trier of fact and "becomes a question of law" only "in cases where reasoning minds cannot differ." *Segerman v. Jones*, 259 A.2d 794, 806 (Md. 1969); *see also Caroline v. Reicher*, 304 A.2d 831, 835 (Md. 1973) ("[U]nless the facts admit of but one inference . . . the determination of proximate cause . . . is for the jury."); *Collins*, 933 A.2d at 548 ("[O]rdinarily, the question of whether causation is proximate or superseding is a matter to be resolved by the jury.").

Defendants present no argument regarding cause in fact, arguing instead that Mr. Mace's suicide is a superseding cause that breaks any chain of causation between Walmart's sale of the gun and Mr. Mace's death.  On this point, Defendants reiterate their arguments from their Motion for Judgment on the Pleadings that, under *Sindler v. Litman*, 887 A.2d 97 (Md. Ct. Spec. App. 2005), suicide is a superseding cause, subject to two limited exceptions, such that Walmart can be

held liable only if its conduct affirmatively caused the mental state leading to Mr. Mace's suicide.[10] *See* ECF No. 70-1, at 50–52, 54. As discussed above, the Court, in ruling on Defendants' Motion for Judgment on the Pleadings, rejected these arguments and held that whether a suicide is a superseding cause depends on the facts of each case. *Brady*, 2022 WL 2987078, at *16.

Although Defendants offer additional caselaw to support their argument that suicide is a superseding cause subject to only two exceptions, none of this dictates the per se rule for which Defendants argue. First, Defendants cite *Johnstone v. City of Albuquerque*, 145 P.3d 76 (N.M. Ct. App. 2006), for the proposition that "subject to the exceptions recognized in *Sindler*, '[g]enerally, suicide is an independent intervening cause of death that is not foreseeable and absolves a defendant of civil liability.'" ECF No. 84, at 11 n.9 (alteration in original) (quoting *Johnstone*, 145 P.3d at 81). The court in *Johnstone* stated that there are "two *main* exceptions to this general rule," *Johnstone*, 145 P.3d at 81 (emphasis added) — not two and only two. Indeed, the court indicated that whether an act of suicide breaks the causal chain and absolves a defendant of liability depends on whether the suicide was foreseeable. *See id.* at 83 ("An intervening force is a superseding cause if the intervening force was not foreseeable at the time of the primary negligence." (quoting *Sindler*, 887 A.2d at 111)); *see also id.* at 81–82 ("We look at what Defendant knew at the time his firearm was available for [his stepdaughter, who used the gun to end her life] to take." *Id.* at 81.).

Defendants also rely on *Chalhoub v. Dixon*, 788 N.E.2d 164 (Ill. App. Ct. 2003). *See* ECF No. 84, at 11 n.9. In that case, an Illinois appellate court held that, under Illinois law, an adult's

---

[10] Defendants concede that they may also be liable for Mr. Mace's suicide if there was a special relationship between Walmart and Mr. Mace, *see* ECF No. 70-1, at 54 n.23 (citing *Eisel v. Bd. of Educ.*, 597 A.2d 447, 450 (Md. 1991)), but, as noted above, Plaintiffs do not allege that any special relationship existed, *see id.* (citing *Brady*, 2022 WL 2987078, at *16 n.8).

suicide, using his stepfather's gun, was a superseding cause absolving the stepfather of liability for negligence. *See Chalhoub*, 788 N.E.2d at 165, 168. As the court in *Chaloub* emphasized, plaintiff in that case had "not alleged that [the decedent] was mentally unstable." *Id.* at 168. Further, unlike here, however, the plaintiff-estate failed to show that the stepfather knew or should have known that his stepson was in possession of the gun, as the stepson had replaced the gun, which the stepfather had previously wrapped in a t-shirt and placed behind some shoes on a closet shelf, with hammers.[11] *See id.* at 166, 168.

Finally, Defendants cite *Rollins v. Wackenhut Services, Inc.*, 703 F.3d 122 (D.C. Cir. 2012), *see* ECF No. 84, at 11 n.9, which held that an employer was not liable in negligence for its employee's death by suicide, wrought with a gun issued by the employer, because the employee's suicide was a superseding cause, *see Rollins*, 703 F.3d at 125–26, 128. Again, in contrast to the facts here, the plaintiff in *Rollins* did not allege that the employer knew or should have known that the employee was suicidal; although the employee had been discharged from military service after being hospitalized for psychosis, the employer did not obtain his military service record in the course of its background screenings. *See id.* at 125. Further, while the *Rollins* court cited *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439 (7th Cir. 2009), for the proposition that "most . . . jurisdictions to address the firearms question . . . adhere to the 'traditional rule' that suicide is an intervening, intentional act that breaks the chain of causation," *Rollins*, 703 F.3d at 128 (quoting *Johnson*, 588 F.3d at 443), it omitted that court's qualifying statement: courts in those jurisdictions "generally allow for potential liability . . . when additional circumstances concomitant" with an

---

[11] Notably, the primary case relied on by the *Chalhoub* court in coming to this conclusion declined to follow previous decisions holding that suicide is a superseding cause as a matter of law and instead examined whether the suicide at issue was reasonably foreseeable to the defendants. *See Kleen v. Homak Mfg. Co.*, 749 N.E.2d 26, 30–31 (Ill. App. Ct. 2001).

individual's obtainment of a firearm "lead to an objectively reasonable inference" that the individual will use the firearm to end their life, *Johnson*, 588 F.3d at 443.  In sum, the cases relied on by Defendants "do nothing to abrogate binding caselaw addressing *Maryland* law" and "are not . . . analogous to this one on their facts."  ECF No. 84, at 11 (regarding cases cited by Plaintiffs).

While Defendants devote most of their briefing to expressing disagreement with the Court's legal analysis, they also argue that "undisputed" facts support their argument that Walmart's sale of the gun to Mr. Mace did not proximately cause his death.  ECF No. 70-1, at 53. First, Defendants note that Mr. Mace told Mr. McLaughlin and Ms. Randall that he was buying the gun as a gift for Ms. Brady.  *Id.*  Second, Defendants claim that "no one in Walmart management" or involved in the sale was "aware of [Mr.] Mace's recent suicidal ideation and depression."  *Id.*  Defendants also suggest that no one in Walmart management knew about Mr. Mace's hospitalizations, since a third-party administrator handled that information.[12]  *See id.* at 7, 54.

Based on the evidence presented, the Court finds that there are genuine disputes of fact as to whether Walmart realized or should have realized that Mr. Mace was likely to use the gun to end his life.  As discussed above, three managers — Mr. Jones, Ms. Madden, and Ms. Wagner — testified to having knowledge of Mr. Mace's suicidal ideation around November 9, 2019.  *See* ECF No. 79-7, at 3; ECF No. 79-8, at 5; ECF No. 70-24, at 4.  Mr. Jones also testified that he reported this information to Mr. Crowley, ECF No. 79-7, at 8–9, though Mr. Crowley denies having any knowledge of Mr. Mace's suicidal ideation prior to Mr. Mace's death, ECF No. 70-26, at 5.

---

[12] Defendants also argue that it is "undisputed" that Walmart did not cause the mental state that led to Mr. Mace's suicide, ECF No. 70-1, at 54, and the Court finds that there is no dispute of fact on this point.  As discussed above, however, Defendants need not have caused Mr. Mace's mental state in order to be liable for his death by suicide.

Additionally, Ms. Wagner testified to learning prior to Mr. Mace's death that he was hospitalized after the November 9 incident.  ECF No. 79-5, at 5.  While Mr. Mackell testified to learning about Mr. Mace's mental health history and prior suicide attempts earlier in 2019, ECF No. 79-9, at 8–9, he also testified to telling Mr. McLaughlin that, given this knowledge, he would never have sold Mr. Mace a gun, *id.* at 10.  Finally, Ms. O'Shea testified that she informed Mr. Jones and Ms. Wagner that Mr. Mace was planning to buy a gun to act on his suicidal ideation.  *See* ECF No. 70-16, at 18, 20.  Thus, the Court cannot conclude that, as a matter of law, Mr. Mace's suicide was so unforeseeable as to constitute a superseding cause.  *See, e.g.*, *Knight v. Wal-Mart Stores, Inc.*, 889 F. Supp. 1532, 1540–41 (S.D. Ga. 1995) (holding, on motion for summary judgment, that factual issues regarding employees' knowledge of decedent's mental illness precluded the court from concluding that decedent's suicide, using gun purchased from defendant, was a superseding cause).

In sum, given the factual disputes regarding whether Walmart knowingly violated section 5-205(b)(6) and whether any such violation was a proximate cause of Mr. Mace's death, there is sufficient evidence for Plaintiffs' lawsuit to proceed under the predicate exception.

### ii.  Negligent Entrustment Exception

The PLCAA also excepts actions for negligent entrustment from its definition of "qualified civil liability action."  15 U.S.C. § 7903(5)(A)(ii).  The PLCAA defines "negligent entrustment" as:

> [T]he supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others.

*Id.* § 7903(5)(B).  Since the PLCAA does not "create a public or private cause of action or remedy," *id.* § 7903(5)(C), the Court must look to Maryland law to determine whether Plaintiffs have

presented sufficient evidence to support a claim for negligent entrustment.  *See Prescott v. Slide Fire Sols., LP*, 410 F. Supp. 3d 1123, 1132–33 (D. Nev. 2019); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1225 (D. Colo. Mar. 27, 2015); *Bryant-Bush v. Shawnee Gun Shop, Inc.*, No. 09-00397-CV-W-REL, 2011 WL 13177539, at *3 (W.D. Mo. Mar. 29, 2011).

   Maryland courts have adopted the doctrine of negligent entrustment as stated in section 390 of the Restatement (Second) of Torts, which provides:

> One who supplies directly or through a third person a chattel for use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

*Broadwater v. Dorsey*, 688 A.2d 436, 439 (Md. 1997) (quoting Restatement (Second) of Torts § 390).  To establish a negligent entrustment claim under Maryland law, a plaintiff must prove three elements: "(1) [t]he making available to another a chattel which the supplier (2) knows or should have known the user is likely to use in a manner involving risk of physical harm to others (3) the supplier should expect to be endangered by its use."  *Mackey v. Dorsey*, 655 A.2d 1333, 1337 (Md. Ct. Spec. App. 1995) (quoting *Wright v. Neale*, 555 A.2d 518, 522 (Md. Ct. Spec. App. 1989), *rev'd on other grounds*, 585 A.2d 196 (Md. 1991)).  Maryland courts have stated that "the principal features of the tort lie in the knowledge of the supplier concerning the dangerous propensities of the entrustee and in the foreseeability of harm."  *Kahlenberg v. Goldstein*, 431 A.2d 76, 83 (Md. 1981); *accord Woolridge v. Abrishami*, 163 A.3d 850, 868 (Md. Ct. Spec. App. 2017); *Herbert v. Whittle*, 517 A.2d 358, 361 (Md. Ct. Spec. App. 1986).

   Defendants argue that the negligent entrustment exception does not apply because Walmart did not have control over the gun at the time of Mr. Mace's suicide and Mr. Mace's suicide was not foreseeable.  ECF No. 70-1, at 47.  Relying on *Broadwater v. Dorsey*, 688 A.2d 436 (Md.

1997), Defendants contend that a supplier cannot be liable for negligent entrustment if it did not have "the right to permit or prohibit use of the chattel at the time of the accident," ECF No. 70-1, at 47, and once Mr. Mace's purchase of the gun was complete, Walmart had no ability to control his use of it, *see id.* at 48. Additionally, as Defendants claim with respect to applicability of the predicate exception, "no one in Walmart management or involved in the sale of the shotgun had knowledge of [Mr.] Mace's recent suicidal ideation and depression," and therefore Walmart could not have reasonably foreseen that Mr. Mace would use the gun to end his life. *Id.*[13]

As this Court previously explained, "there is significant cause to question whether *Broadwater* prohibits a finding that a seller of a firearm negligently entrusted a firearm." *Brady*, 2022 WL 2987078, at *12. Specifically, in its opinion on Defendants' Motion for Judgment on the Pleadings, the Court found that *Valentine v. On Target, Inc.*, 727 A.2d 947 (Md. 1999), had called into question *Broadwater*'s applicability beyond the automobile context, and that courts outside of Maryland had also called *Broadwater* into question. *See Brady*, 2022 WL 2987078, at *11. Additionally, the Court found *Broadwater* inconsistent with section 390 of the Restatement (Second) of Torts. *See id.* at *11–12. However, the Court did not ultimately decide whether Plaintiffs' claims satisfied the negligent entrustment exception. *Id.* at *12.

Although Defendants disagree with this Court's analysis, the Court maintains that, under Maryland law, ongoing control is not a necessary element of a negligent entrustment claim outside of the automobile context. To start, Maryland's highest court has explicitly stated that the doctrine

---

[13] Defendants also argue that the enactment of section 5-207 of the Public Safety Article of the Maryland Code, which imposes liability on sellers for certain firearm sales, indicates that Maryland law regarding negligent entrustment did contain an ongoing control requirement, *see* ECF No. 84, at 7–8 (referencing Md. Code Ann., Pub. Safety § 5-207 (West 2024)); otherwise, the new law "would have been surplusage," *id.* at 8. Contrary to Defendants' claim, section 5-207 — unlike the tort of negligent entrustment — imposes criminal liability, and thus is not "surplusage." *See* Md. Code Ann., Pub. Safety § 5-207(d).

of negligent entrustment "imposes no requirement of . . . control of another's conduct." *Kiriakos*, 139 A.3d at 1032; *see also id.* ("The illustrations in Section 19 include a classic example of negligent entrustment.  They also include providing a child with access to a dangerous instrument, such as a gun.").  Additionally, most jurisdictions to have addressed the issue in the firearms context have concluded that a sale does not preclude a negligent entrustment claim.  *See Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 326 n.6 (Mo. 2016) (en banc) (citing cases); *see also Minnesota v. Fleet Farm LLC*, 679 F. Supp. 3d 825, 846 (D. Minn. 2023) (denying motion to dismiss negligent entrustment claim against firearms dealer for sales of firearms to straw purchasers); *Shirley v. Glass*, 308 P.3d 1, 4–5, 9 (Kan. 2013) (affirming denial of summary judgment on negligent entrustment claim against pawn shop and owners for selling gun to straw purchaser).  Notably, all of these jurisdictions relied on section 390 of the Restatement (Second) of Torts in determining that the negligent entrustment doctrine encompasses firearm sales.[14]  Moreover, contrary to Defendants' suggestion that section 390 was intended to apply to sellers only if they retained control over the firearm or directed the buyer as to its use, *see* ECF No. 84,

---

[14] *See Fleet Farm*, 679 F. Supp. 3d at 846; *Ireland v. Jefferson Cnty. Sheriff's Dep't*, 193 F. Supp. 2d 1201, 1229 (D. Colo. 2002); *Knight*, 889 F. Supp. at 1539; *Est. of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 394–95, 395 n.92 (Alaska 2013); *Kitchen v. K-Mart Corp.*, 697 So. 2d 1200, 1208 (Fla. 1997); *Shirley v. Glass*, 241 P.3d 134, 145 (Kan. Ct. App. 2010), *aff'd in part, rev'd in part on other grounds*, 308 P.3d 1; *Delana*, 486 S.W.3d at 324–25; *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1064 (N.Y. 2001); *First Trust Co. of N.D. v. Scheels Hardware & Sports Shop, Inc.*, 429 N.W.2d 5, 8 (N.D. 1988); *Rains v. Bend of the River*, 124 S.W.3d 580, 596–97 (Tenn. Ct. App. 2003); *Bernethy v. Walt Failor's, Inc.*, 653 P.2d 280, 283 (Wash. 1982) (en banc).  One case cited in *Delana — Morin v. Moore*, 309 F.3d 316 (5th Cir. 2002) — relied on Texas appellate court caselaw, *id.* at 324 (citing *Kennedy v. Baird*, 682 S.W.2d 377, 379 (Tex. App. 1984)), which in turn relied on section 390 of the Restatement (Second) of Torts, *Kennedy*, 682 S.W.2d at 379.  However, *Morin* was effectively overruled by the Texas Supreme Court's decision in *In re Academy, Ltd.*, 625 S.W.3d 19 (Tex. 2021), which explained that Texas had not adopted section 390 because its lack of a control requirement was inconsistent with the state's recognition of the tort of negligent entrustment.  *Id.* at 31.

at 7, in none of these decisions was there any evidence (or requirement in the courts' holdings) of such control or direction.

Defendants do not identify any caselaw requiring ongoing control in the context of firearm sales, and the one case Plaintiffs identify is distinguishable.  In *In re Academy, Ltd.*, 625 S.W.3d 19 (Tex. 2021),[15] the Supreme Court of Texas held that the plaintiffs could not pursue a claim against a firearms dealer under the negligent entrustment exception to the PLCAA because "no viable cause of action exists under Texas law for negligent entrustment based on a sale of chattel." *Id.* at 31; *see id.* at 22–23.  In so ruling, however, the court noted that Texas — unlike Maryland — had not adopted section 390 of the Restatement (Second) of Torts because its lack of a control requirement was inconsistent with the policy underlying the tort of negligent entrustment as recognized in the state.  *See id.* at 31.  The Court has identified just one other decision holding that firearms dealers cannot be liable for negligent entrustment due to their lack of control over the firearm once sold.  *See Ceriale v. Smith & Wesson Corp.*, Nos. 99 L 5628, 98 L 13465, 98 L 6684, 2001 WL 34136081, at *3–4 (Ill. Cir. Ct. Jan. 17, 2001).  Yet neither that decision, nor the Supreme Court of Illinois decision on which it relied, mentioned section 390.  *See id.* at *4 (citing *Zedella v. Gibson*, 650 N.E.2d 1000, 1003 (Ill. 1995)).  Indeed, the Supreme Court of Illinois relied on the theory of negligent entrustment set forth in section 308 of the Restatement (Second) of Torts — which refers to a "thing or . . . an activity which is under the control of the actor."  *Zedella*, 650 N.E.2d at 1003 (quoting Restatement (Second) of Torts § 308).  The overwhelming weight of authority thus indicates that section 390 applies to sellers, including firearms dealers, with no requirement that the seller exercised any ongoing control.

---

[15] Defendants cite *In re Academy*, but only for the proposition that in determining whether the PLCAA's negligent entrustment exception applies to a plaintiff's claims, courts must look to state law.  *See* ECF No. 70-1, at 46 (citing *In re Acad.*, 625 S.W.3d at 30).

Plaintiffs have presented sufficient evidence to establish a claim for negligent entrustment under Maryland law.  First, it is undisputed that Walmart sold the shotgun to Mr. Mace.  *See, e.g.*, ECF No. 70-1, at 28–30; ECF No. 79, at 4–5; ECF No. 70-29, at 12 (sales receipt).  Second, there are genuine issues of fact regarding whether Defendants knew or should have known that Mr. Mace was likely to use the shotgun in a manner involving risk of physical harm.  On this element, Maryland courts have explained that "if the circumstances suggested that further inquiry was appropriate and, despite such circumstances, the entrustor failed to make a reasonable investigation, the entrustor may be liable."  *Moore v. Myers*, 868 A.2d 954, 967 (Md. Ct. Spec. App. 2005) (quoting *Herbert v. Whittle*, 517 A.2d at 362).  As discussed above, there are disputes of fact as to whether members of Walmart's management team had knowledge of Mr. Mace's suicidal ideation and hospitalizations around November of 2019 and thus whether his use of the shotgun to end his life was foreseeable.  Further, even on the undisputed facts regarding managers' knowledge of Mr. Mace's "goodbye message," a reasonable juror could find that "further inquiry" into Mr. Mace's wellbeing upon his return to work "was appropriate."  Specifically, although Mr. Jones and Ms. Wagner indirectly inquired into Mr. Mace's wellbeing, *see* ECF No. 70-8, at 11–12; ECF No. 79-5, at 2, there is no evidence that Defendants made any further inquiry to determine whether Mr. Mace was still at risk of harming himself.  Third, and for the same reasons discussed with respect to the second element, there are genuine issues of fact as to whether Defendants should have expected Mr. Mace himself to be endangered by his use of the shotgun — in other words, whether Mr. Mace was a "foreseeable victim."  *Moore*, 868 A.2d at 968.  Therefore, whether Plaintiffs have established the second and third elements of a negligent entrustment claim are questions for the jury.

Because the Court concludes that a firearms dealer need not retain control over the firearm to be liable for negligent entrustment under Maryland law, and because Plaintiffs have presented sufficient evidence to establish a claim for negligent entrustment, Plaintiffs' lawsuit may also proceed under the negligent entrustment exception.

## II.      Contributory Negligence

Defendants argue that even if they were negligent, Plaintiffs' claims are barred by the contributory negligence of both Mr. Mace and the Plaintiffs.  "Contributory negligence is the neglect of the duty imposed" on all people "to observe ordinary care for their own safety." *Campfield v. Crowther*, 249 A.2d 168, 172 (Md. 1969).  Contributory negligence is an affirmative defense for which the defendant bears the burden of proof.  *See, e.g.*, *Balt. & Ohio R.R. Co. v. Plews*, 278 A.2d 287, 293 (Md. 1971).  The essential question in determining whether a plaintiff was contributorily negligent is "whether the plaintiff took appropriate precautions to protect his [or her] own interests."  *Konig v. Ames*, No. ELH-20-3038, 2021 WL 1561518, at *5 (D. Md. Apr. 21, 2021) (alteration in original) (quoting *Kassama v. Magat*, 792 A.2d 1102, 1110 (Md. 2002)). In determining whether a plaintiff was contributorily negligent, courts should make all inferences "that may be fairly deduced from the evidence" in the plaintiff's favor.  *Balt. & Ohio R.R. Co.*, 278 A.2d at 293 (quoting *Balt. Transit Co. v. State ex rel. Castranda*, 71 A.2d 442, 447 (Md. 1950)).  In Maryland, if a plaintiff was contributorily negligent, the plaintiff's recovery is completely barred.  *See, e.g.*, *id.*; *Harrison v. Montgomery Cnty. Bd. of Educ.*, 456 A.2d 894, 898 (Md. 1983) ("[A] plaintiff who fails to observe ordinary care for his [or her] own safety is contributorily negligent and is barred from all recovery, regardless of the quantum of a defendant's primary negligence.").  Relatedly, in a wrongful death action, if the decedent is found to have been

contributorily negligent, then the survivors are barred from recovery. *See Dehn v. Edgecombe*, 834 A.2d 146, 167–69 (Md. Ct. Spec. App. 2003), *aff'd*, 865 A.2d 603 (Md. 2005).

Whether a plaintiff was contributorily negligent is typically "a question of fact for the jury to resolve." *Woolridge*, 163 A.3d at 864. "Only when no reasonable person could find in favor of the plaintiff on the issue of contributory negligence should the trial court take the issue from the jury." *Id.* (quoting *McQuay v. Schertle*, 730 A.2d 714, 721 (Md. Ct. Spec. App. 1999)).

Even if a plaintiff was contributorily negligent, however, they may be able to recover damages pursuant to the doctrine of last clear chance. The last clear chance doctrine permits recovery when: "(i) the defendant is negligent; (ii) the plaintiff is contributorily negligent; and (iii) the plaintiff makes 'a showing of something new or sequential, which affords the defendant a fresh opportunity (of which he fails to avail himself) to avert the consequences of his original negligence.'" *Carter v. Senate Masonry, Inc.*, 846 A.2d 50, 54 (Md. Ct. Spec. App. 2004) (quoting *Burdette v. Rockville Crane Rental, Inc.*, 745 A.2d 457, 469 (Md. Ct. Spec. App. 2000)). Thus, "[f]or the doctrine to apply, the acts of the respective parties must be sequential and not concurrent." *Burdette*, 745 A.2d at 469. The theory underlying the last clear chance doctrine "is that 'if the defendant has the last clear opportunity to avoid the harm, the plaintiff's negligence is not a "proximate cause" of the result.'" *Woolridge v. Price*, 966 A.2d 955, 961 (Md. Ct. Spec. App. 2009) (quoting *Burdette*, 745 A.2d at 468).

**A. Mr. Mace**

Defendants argue that three of Mr. Mace's actions render him contributorily negligent. First, Defendants claim that Mr. Mace's purchase of the gun was contributorily negligent, explaining that given his suicidal ideation and recent suicide attempts, as well as his experience with guns — including his completion of a gun course — he "should have known that he could

not lawfully possess a firearm."  ECF No. 70-1, at 55.  Second, Defendants claim that Mr. Mace "made affirmative misrepresentations on Form 4473" regarding his mental health that led Walmart to approve his purchase of the firearm when it otherwise would not have.  *Id.* at 56.  Specifically, Defendants — citing the deposition testimony of one of Plaintiffs' expert witnesses — argue that Mr. Mace was dishonest in responding that he had not been involuntarily committed to a "mental institution."  *Id.* (citing ECF No. 70-33, at 2–3).  Third, Defendants claim that Mr. Mace's act of ending his life was itself contributorily negligent.  ECF No. 84, at 12.

Plaintiffs respond that Mr. Mace was not contributorily negligent as a matter of law, and contributory negligence is an issue for the jury to decide.  *See* ECF No. 79, at 30–32.  Plaintiffs note that Defendants do not cite any caselaw to support their argument that Mr. Mace was contributorily negligent by purchasing a firearm when he knew that he was suicidal, and they claim that if this argument were successful, it would provide sweeping immunity for wrongful sales of firearms.  *See id.* at 30–31.  Additionally, Plaintiffs argue that Mr. Mace did not make any misrepresentations on the Form 4473 because none of his hospitalizations were involuntary.  *See id.* at 31.

In determining whether Mr. Mace's purchase and use of the gun were contributorily negligent, it is necessary to consider Mr. Mace's mental state and its impact on his ability to exercise due care for his own safety.  The Court is not aware of any Maryland caselaw addressing the appropriate standard of care for a plaintiff or decedent with a mental illness or cognitive disability.  However, this Court previously stated that in determining whether an adult decedent who had Down syndrome was contributorily negligent, "the finder of fact must take into account [the decedent's] cognitive disabilities," since there was "a question as to whether his acts . . . were truly voluntary or were simply the result of his disability."  *Est. of Saylor v. Regal Cinemas, Inc.*,

No. WMN-13-3089, 2016 WL 4721254, at *15 (D. Md. Sept. 9, 2016), *aff'd sub nom. Est. of Saylor v. Rochford*, 698 F. App'x 72 (4th Cir. 2017) (per curiam); *see id.* at *1. Additionally, the "majority view" among states that have directly addressed the issue is that a person with a mental illness "should be required only to exercise such care as he or she is capable of exercising; this is the standard of care of a person of like mental capacity under similar circumstances." *Dodson v. S.D. Dep't of Hum. Servs.*, 703 N.W.2d 353, 358 (S.D. 2005); *see also Birkner v. Salt Lake County*, 771 P.2d 1053, 1060 (Utah 1989) (explaining that "[i]n contrast to the use of an objective standard in cases of primary negligence, the majority of courts have adopted a more compassionate stance regarding the contributory negligence" of people with mental illnesses, under which "lesser degrees" of mental illness than insanity "should be considered by the jury in determining whether the plaintiff was contributorily negligent"); *Champagne v. United States*, 513 N.W.2d 75, 79 (N.D. 1994) (explaining that a person experiencing suicidal ideation "often [has] a mental illness that diminishes the [person's] ability to act reasonably for self-protection and well-being").

The Court cannot conclude, as a matter of law, that Mr. Mace was contributorily negligent. First, there are genuine disputes of material fact as to whether Mr. Mace made an affirmative misrepresentation on the Form 4473. Plaintiffs contend that "committed to a mental institution," for purposes of the Form 4473, concerns only involuntary hospitalizations, *see* ECF No. 79, at 31, and one of Defendants' expert witnesses, Judyth LeDoux, agrees with Plaintiffs' interpretation, *see* ECF No. 70-32, at 80; *see also* ECF No. 70-1, at 34 (discussing Ms. LeDoux's determination that "[Mr.] Mace was not federally prohibited from buying a firearm under the 'adjudicated mentally defective' or 'committed to a mental institution' prohibitors").[16] Section

---

[16] Although Plaintiffs claim that one of their expert witnesses, Mark Abramson, "testified that [Mr.] Mace did not make any misrepresentations on Form 4473," ECF No. 79, at 31, Mr. Abramson did not explicitly state that Mr. Mace had not made a misrepresentation on the form.

478.11 of Title 27 of the Code of Federal Regulations defines "committed to a mental institution," as used on the Form 4473, as "[a] formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority" and explains that the term "does not include a person in a mental institution for observation or a voluntary admission to a mental institution." 27 C.F.R. § 478.11; *see id.* § 478.124 (prescribing use of Form 4473). If a regulation is unambiguous, then "its plain language controls." *Romero v. Barr*, 937 F.3d 282, 291 (4th Cir. 2019) (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 193 (4th Cir. 2009)). Because the regulatory definition of "committed to a mental institution" explicitly and unambiguously excludes voluntary admissions, the Court concludes that if all of Mr. Mace's hospitalizations were voluntary, then he did not make a misrepresentation on his Form 4473. However, it is unclear from the evidence presented whether some of Mr. Mace's hospitalizations were voluntary or involuntary. For instance, Ms. McCreary testified that when Mr. Mace was in tenth grade, she "had him admitted to the hospital['s] . . . behavioral health unit." ECF No. 70-12, at 13. Additionally, one of Plaintiffs' expert witnesses, Joseph J. Vince, Jr., testified that Mr. Mace falsely represented that he had not been involuntarily "committed to a mental institution." ECF No. 70-33, at 2–3. However, it is not clear from the evidence before the Court on what he based this conclusion. Defendants provide only an excerpt of Mr. Vince's deposition testimony in which he vaguely references an occasion when police transported Mr. Mace to a mental health facility. *See id.* at 2 ("I don't think he voluntarily went in when the police took him there."). Plaintiffs, in turn, provide little clarity, only stating without support that Mr. Vince, in

---

Rather, after explaining that a federal firearms licensee has a duty to do certain things, including to prevent making a sale to someone who "had made an affirmative statement in his 4473 that was not correct," ECF No. 79-17, at 3–4, Mr. Abramson stated that he was "not saying that happened in this case," *id.* at 4.

testifying as such, misunderstood the admission as involuntary.  ECF No. 79, at 31.  While a court may consider an expert's opinion, expert testimony must have a reliable foundation, as opposed to being based on belief or speculation.  *See Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017).  Moreover, neither Defendants nor Plaintiffs present any evidence regarding how Mr. Mace's mental state may have affected the voluntariness of his actions.  *Cf. Est. of Saylor*, 2016 WL 4721254, at *15 (stating that, in light of the decedent's cognitive disability, there was "a question as to whether his acts . . . were truly voluntary").  Accordingly, based on the present record, the Court cannot determine, as a matter of law, whether Mr. Mace breached "the standard of care of a person of like mental capacity under similar circumstances."  *Dodson*, 703 N.W.2d at 358.

### B.  Plaintiffs Brady, McCreary, and Mark Mace

Defendants argue that Plaintiffs Brady, McCreary, and Mark Mace were contributorily negligent in two ways.  First, Defendants argue that Plaintiffs Brady, McCreary, and Mark Mace were contributorily negligent because they were aware of Mr. Mace's "mental condition and suicidal ideation in the weeks before his death but failed to tell Walmart after becoming aware that he might try to buy a firearm there."  ECF No. 70-1, at 57.  Defendants specifically note that Ms. Brady testified to reading Mr. Mace's Facebook Messenger exchange with Mr. McLaughlin about purchasing a shotgun, yet did not talk to Mr. McLaughlin or anyone else about this conversation.  *See id.* (citing ECF No. 70-11, at 9).  Citing Mr. McLaughlin's deposition testimony, Defendants claim that if he had known that Mr. Mace was experiencing suicidal ideation, he would not have sold Mr. Mace the gun.  *Id.* (citing ECF No. 70-6, at 30).  Second, Defendants argue that Plaintiffs' failure to seek an Extreme Risk Protective Order, which would have prevented Mr. Mace from buying a firearm, was contributorily negligent as well.  *Id.* at 57–58.

In response, Plaintiffs argue that Defendants have not established that any of them were contributorily negligent as a matter of law and, again, that the issue of contributory negligence is for the jury to decide.  *See* ECF No. 79, at 32–33.  Plaintiffs claim that there was no need for them to report Mr. Mace's suicidal ideations to Walmart since at least five managers already had knowledge of such.  *See id.*  Further, Plaintiffs claim that they did not provide Mr. Mace with a firearm and took actions to try to prevent him from harming himself — including removing a firearm from his home, contacting authorities when he indicated that he was going to harm himself, and taking him to the hospital on several occasions — and they had no "legal duty" to seek an Extreme Risk Protective Order.  *Id.* at 33.  Plaintiffs add that even if Ms. Brady, Ms. McCreary, and Mark Mace were contributorily negligent, the wrongful death claims of Mr. Mace's minor children would survive since Defendants have not argued that they were contributorily negligent. *Id.* at 33 n.6.

As an initial matter, Plaintiffs need not have breached any duty in order to be contributorily negligent.  As the Maryland Court of Appeals has explained, although "primary negligence and contributory negligence are often thought of as simply opposite sides of the same coin, there is one difference between them which seems of significance here," which "is that primary negligence involves a breach of duty owed to another," while "contributory negligence involves a failure to take proper precautions for one's own safety." *Baltimore County v. State ex rel. Keenan*, 193 A.2d 30, 37 (Md. 1963).

Nonetheless, the Court cannot conclude as a matter of law that any of the plaintiffs were contributorily negligent.  There are issues of fact as to whether Plaintiffs Brady, McCreary, and Mark Mace took such "proper precautions" or acted unreasonably.  For instance, Ms. Brady testified that she "had a very serious talk" with Mr. Mace about not purchasing a second gun after

she saw his conversation with Mr. McLaughlin. ECF No. 70-11, at 9. Additionally, Ms. McCreary testified that while Mr. Mace was hospitalized, she, Mr. Mace, and Ms. Brady spoke with a social worker about obtaining a protective order to prevent Mr. Mace from having access to weapons, but she assumed that the hospital would handle the matter. *See* ECF No. 79-11, at 15. Finally, as described above, Plaintiffs testified that they took numerous actions to prevent Mr. Mace from harming himself. *See* ECF No. 79, at 33. Accordingly, there is a reasonable dispute of fact as to whether Plaintiffs were contributorily negligent. *See Waterman v. Batton*, 294 F. Supp. 2d 709, 712–13, 738 n.57, 739 (D. Md. 2003) (concluding that defendants had failed to establish contributory negligence as a matter of law on the part of plaintiffs, who were parents of adult who was killed by police officers while in a manic state, noting that "in the days leading up to [the decedent's] death the plaintiffs monitored his condition and made plans to seek medical treatment once it became apparent that this was appropriate," *id.* at 738 n.57), *rev'd on other grounds*, 393 F.3d 471 (4th Cir. 2005).

## C. Last Clear Chance

Plaintiffs also argue that even if they or Mr. Mace were contributorily negligent, their claims may proceed under the last clear chance doctrine. *See* ECF No. 79, at 31–32, 34. According to Plaintiffs, Walmart, by handing over the gun to Mr. Mace, committed the last negligent act. *Id.* at 32. Defendants, on the other hand, argue that the last clear chance doctrine is inapplicable because Walmart's alleged negligence "occurred temporally *before* [Mr.] Mace's own final conduct." ECF No. 84, at 13.

The court is unable to determine whether the last clear chance doctrine applies at this stage. As described above, the last clear chance doctrine applies only if Defendants were negligent, Mr. Mace or Plaintiffs were contributorily negligent, and any contributorily negligent acts occurred

before Defendants' last negligent act.  Based on the evidence presented, however, the Court is not able to decide any of these elements as a matter of law.

## III.    Walmart's Duty to Mr. Mace

Plaintiffs also advance a claim for wrongful death against Defendants, which they ground in allegations that Walmart negligently "failed to appropriately train and supervise [its] employees."[17]   ECF No. 3, at 16.   There are four elements of a wrongful death claim under Maryland law:

> (1) [T]he victim's death; (2) that the victim's death was proximately caused by the negligence of the defendant; (3) that the victim's death resulted in injury to the plaintiff, who falls within the category of beneficiaries defined by the statute; and (4) that the claim is brought within the applicable statutory period.

*Osunde v. Lewis*, 281 F.R.D. 250, 260 (D. Md. 2012) (citing Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* 396 (4th ed. 2008)).  To establish a wrongful death claim, therefore, Plaintiffs must in turn prove that Defendants were negligent.   Under Maryland law, a claim for negligent training or supervision, "like any negligence action, requires the plaintiff to prove the existence of four elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury; and (4) the injury proximately resulted from the defendant's breach." *Jones v. State*, 38 A.3d 333, 343 (Md. 2012); *accord Marrick Homes LLC v. Rutkowski*, 161 A.3d 53, 65 (Md. Ct. Spec. App. 2017) ("Critically, the elements of negligent supervision are identical to the elements of a general negligence claim.").

---

[17] Plaintiffs also purport to bring a "survival" action against Defendants.  ECF No. 3, at 17. However, a survival action is not a separate cause of action but rather "the *mechanism* by which an estate brings a claim that the decedent could have asserted had he survived." *Mang v. City of Greenbelt*, No. DKC 11-1891, 2012 WL 115454, at *8 (D. Md. Jan. 13, 2012).

With respect to Plaintiffs' wrongful death claim, the parties dispute whether Walmart owed Mr. Mace any duty.  "Whether a legal duty exists is a question of law, to be decided by the court." *Pendleton v. State*, 921 A.2d 196, 204 (Md. 2007).  In determining whether a tort duty exists or should be recognized, Maryland courts generally assess seven factors: (1) the "foreseeability of harm to the plaintiff"; (2) "the degree of certainty that the plaintiff suffered the injury"; (3) "the closeness of the connection between the defendant's conduct and the injury suffered"; (4) "the moral blame attached to the defendant's conduct"; (5) "the policy of preventing future harm"; (6) "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach"; and (7) "the availability, cost and prevalence of insurance for the risk involved."  *Eisel*, 597 A.2d at 452 (quoting *Village of Cross Keys, Inc. v. U.S. Gypsum Co.*, 556 A.2d 1126, 1131 (Md. 1989)); *accord Kennedy Krieger Inst., Inc. v. Partlow*, 191 A.3d 425, 451 (Md. 2018) (describing these as "the seven classic factors that [the Maryland Court of Appeals] has time and time again used in determining the existence of a duty under the common law"); *Kiriakos*, 139 A.3d at 1033–34.  Maryland courts have stated that "[w]here the failure to exercise due care creates risks of personal injury, 'the principal determinant of duty becomes foreseeability.'"  *Patton v. U.S. Rugby Football*, 851 A.2d 566, 571 (Md. 2004) (quoting *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 760 (Md. 1986)); *see also Eisel*, 597 A.2d at 452 ("Foreseeability is the most important variable in the duty calculus . . . ." (citing *Ashburn v. Anne Arundel County*, 510 A.2d 1078, 1083 (Md. 1986))).  Although "foreseeability is often considered among the most important" of the seven factors, "its existence alone does not suffice to establish a duty under Maryland law."  *Patton*, 851 A.2d at 571 (quoting *Remsburg v. Montgomery*, 831 A.2d 18, 26 (Md. 2003)).

Defendants argue that Plaintiffs cannot establish the breach of any duty Walmart owed to Mr. Mace.  Defendants do not address the seven-part framework.  Instead, relying solely on an unpublished Fourth Circuit decision, Defendants claim that because Plaintiffs have not alleged the existence of any special relationship between Walmart and Mr. Mace, Walmart had no duty to prevent Mr. Mace's suicide.  *See* ECF No. 70-1, at 59 (citing *Trapnell v. United States*, 131 F.3d 136, 1997 WL 768581, at *1 (4th Cir. 1997) (per curiam) (unpublished table decision)).  Thus, according to Defendants, Walmart owed no duty to Mr. Mace beyond what is required by federal and state laws governing firearm sales, with which they complied.  *Id.* at 62.

Plaintiffs respond that Walmart, as a federally licensed firearms dealer, owed Mr. Mace the same duty "it owes to all potential purchasers of firearms," which is to not sell a firearm when it knows or has reason to believe that the firearm might be used to harm the purchaser or someone else.  ECF No. 79, at 35.  That duty, Plaintiffs claim, existed regardless of whether there was any special relationship between Walmart and Mr. Mace.  *See id.* at 35–37.  Plaintiffs then argue that all of the factors Maryland courts analyze to determine whether a tort duty exists are satisfied in this case.  *See id.* at 37–38.

As this Court previously stated, because Plaintiffs claim that Defendants acted negligently by selling Mr. Mace a firearm, no special relationship is required.  *Brady*, 2022 WL 2987078, at *16 n.8.  Rather, in accordance with Maryland law, the Court will apply the seven-part framework to determine whether Defendants had a duty not to sell Mr. Mace a firearm when they knew or had reason to believe that he might use it to harm himself.

### A.  Foreseeability of the Harm

In determining whether a duty exists, a court's assessment of foreseeability "involves a prospective consideration of the facts existing at the time of the negligent conduct."  *Est. of*

*Madden v. Sw. Airlines, Co.*, No. 1:21-cv-00672-SAG, 2021 WL 2580119, at *4 (D. Md. June 23, 2021) (quoting *Henley v. Prince George's County*, 503 A.2d 1333, 1341 (Md. 1986)). Additionally, as stated above, while "foreseeability is perhaps most important among [the seven] factors, it alone does not justify the imposition of a duty." *Id.* (quoting *Kiriakos*, 139 A.3d at 1034).

As discussed in more detail above, Plaintiffs have produced sufficient evidence to create genuine issues of fact regarding the foreseeability of Mr. Mace's suicide. At the time Walmart sold the gun to Mr. Mace, at least three Walmart managers — Mr. Jones, Ms. Madden, and Ms. Wagner — knew that Mr. Mace had expressed intent to harm himself just six days earlier. *See* ECF No. 79-7, at 3; ECF No. 79-8, at 5; ECF No. 70-24, at 4. Additionally, Mr. Jones testified that he was "pretty sure" he reported the November 9 incident to Store Manager Mr. Crowley that same day. ECF No. 79-7, at 8; *see id.* at 9. Another manager, Mr. Mackell, stated that given his knowledge of Mr. Mace's mental health history, he would never have sold Mr. Mace a gun. ECF No. 79-9, at 10; *see also* ECF No. 79-10, at 2. Based on this evidence,[18] and viewing the facts in the light most favorable to Plaintiffs, Mr. Mace's suicide was foreseeable to Defendants. *Cf. Eisel*, 597 A.2d at 449, 452 (finding that student's suicide was foreseeable where the student's friends

---

[18] Defendants claim in their Reply that "Plaintiffs have presented no admissible evidence that [Mr.] Mace's suicide was foreseeable." ECF No. 84, at 16. However, Defendants directly challenge the admissibility of only one piece of evidence: Ms. McCreary's deposition testimony regarding conversations she had with Mr. Mace. *See id.* at 1 n.1 (citing ECF No. 79-11, at 21) (describing this testimony as "inadmissible hearsay"); ECF No. 79-11, at 21 (testifying that Mr. Mace told Ms. McCreary that he had previously talked to Mr. Jones and Mr. Crowley about his suicidal ideations and that they had "made him call the suicide hotline from work"). Regardless of the admissibility of this portion of Ms. McCreary's deposition testimony, there is sufficient other evidence of Walmart managers' knowledge of Mr. Mace's suicidal ideation to create fact issues regarding the foreseeability of Mr. Mace's suicide.

allegedly reported the student's suicidal ideations to their school counselor).  Thus, this factor weighs in favor of recognizing a duty.

### B.  Degree of Certainty of Injury

Courts have taken two different approaches to assessing the second factor, the degree of certainty that the plaintiff suffered the injury.  Some courts have simply asked whether the injury actually occurred.  *See, e.g.*, *Kennedy Krieger*, 191 A.3d at 451–52; *Kiriakos*, 139 A.3d at 1034; *Eisel*, 597 A.2d at 453.  Other courts have viewed this factor as "functionally, a causal inquiry" that asks "how certain [it is] that [the defendant's] actions would cause [the plaintiff's] injuries." *Est. of Madden*, 2021 WL 2580119, at *5 (citing *Sumo v. Garda World*, No. 1010, 2017 WL 2962819, at *5 (Md. Ct. Spec. App. July 12, 2017)).  Under this second approach, "the defendant's conduct must be reasonably certain to lead to the plaintiff['s] injuries in the abstract."  *Id.*

Viewing the facts in the light most favorable to Plaintiffs, there is a high degree of certainty under either approach that Mr. Mace suffered an injury.  First, as Plaintiffs note, it is "one hundred percent" certain that Mr. Mace suffered the injury — namely, dying by suicide using the gun Walmart sold him.  ECF No. 79, at 38; *see Eisel*, 597 A.2d at 453.  Second, the Court finds it reasonably certain that selling a gun to an individual who, less than one week earlier, had expressed his intention to end his life by cutting his wrists or using a gun would lead to that individual using the gun to end his life.  As other courts have explained, this is the reasoning underlying waiting periods for firearm purchases.  *See, e.g.*, *Sogo v. Garcia's Nat'l Gun, Inc.*, 615 So. 2d 184, 185–86 (Fla. Dist. Ct. App. 1993) (per curiam); *see also Waiting Periods for Firearm Purchases*, Am. Acad. of Pediatrics (2024), https://www.aap.org/en/advocacy/state-advocacy/waiting-periods-for-firearms-purchases.  Additionally, one of Plaintiffs' experts, Dr. Craig J. Bryan, testified that an individual experiencing even a low level of suicidal ideation is likely to die by suicide if they have

access to a highly lethal method, such as a gun.  *See* ECF No. 79-22, at 7–8.  Even OP-16,

Walmart's "foundational policy for firearms and ammunition sales," ECF No. 70-1, at 3,

recognizes the risk of providing a firearm to an individual experiencing suicidal ideation,

instructing associates to refuse a firearm sale if they have "any reason to believe the customer

might use the firearm to harm themselves," *id.* at 4 (quoting ECF No. 70-3, at 32); *see* ECF No.

70-3, at 6.  Therefore, this factor also weighs in favor of finding a duty.

### C.  Closeness of Connection Between Conduct and Injury

Courts have described the third factor, the closeness of the connection between the

defendant's conduct and the injury suffered, as a "proximate cause element."  *Kennedy Krieger*,

191 A.3d at 453 (quoting *Kiriakos*, 139 A.3d at 1034); *accord Est. of Madden*, 2021 WL 2580119,

at *5.  In assessing this factor, courts consider "whether, across the universe of cases of the type

presented, there would ordinarily be so little connection between breach of the duty contended for,

and the allegedly resulting harm, that a court would simply foreclose liability by holding that there

is no duty."  *Kiriakos*, 139 A.3d at 1034–35 (quoting *Eisel*, 597 A.2d at 454).  Analysis of this

factor also requires consideration of "the nature of the risk."  *Est. of Madden*, 2021 WL 2580119,

at *5 (citing *Kiriakos*, 139 A.3d at 1035).  Specifically, "as the magnitude of the risk increases, the

closeness of the connection is relaxed such that a duty to a larger class of persons may be imposed

where the risk is of death or personal injury."  *Id.* (citing *Kiriakos*, 139 A.3d at 1035).

Here, the Court finds a sufficient connection between Defendants' sale of the shotgun to

Mr. Mace and his subsequent suicide, particularly in light of the nature of the risk.  To start,

because the risk at issue here "is death or personal injury, a close connection . . . is not required."

*Kiriakos*, 139 A.3d at 1035.  Nonetheless, the closeness of the connection is, as indicated above,

reflected in Walmart's own policy governing firearm sales, which instructs associates to refuse a

firearm sale if they have "any reason to believe the customer might use the firearm to harm themselves," ECF No. 70-1, at 4 (quoting ECF No. 70-3, at 32); *see* ECF No. 70-3, at 6, as well as in Walmart's creation of the block list.  The closeness of the connection is also supported by Maryland law, which prohibits the sale of certain firearms to individuals with a mental illness and history of self-harm.  *See* Md. Code Ann., Pub. Safety § 5-207(c)(6); *Kiriakos*, 139 A.3d at 1034–35 (noting "the legislative recognition in Maryland that underage people have a diminished ability to handle alcohol and may expose themselves and others to harm" in finding a "sufficient connection" between defendant's provision of alcohol to an underage individual and injury to a pedestrian whom the individual subsequently struck while driving under the influence); *Eisel*, 597 A.2d at 450, 453–54 (finding sufficiently close connection between school's failure to inform student's parents of student's suicidal ideation and student's subsequent suicide, citing the "policy manifested" by Maryland's Youth Suicide Prevention School Programs Act that "others, including the schools, have the potential to intervene effectively").  This factor, therefore, weighs in favor of imposing a duty.

### D.  Moral Blame

The standard for evaluating the fourth factor, the moral blameworthiness of the defendant's conduct, "is not evidence of 'intent to cause harm'" but rather "the reaction of persons in general to the circumstances."  *Kiriakos*, 139 A.3d at 1035 (quoting *Eisel*, 597 A.2d at 455).  Essentially, courts ask: "Is it the sense of the community that an obligation exists under the circumstances?"  *Eisel*, 597 A.2d at 455.

Viewing the facts in the light most favorable to Plaintiffs, Defendants' conduct was "morally blameworthy."  Again, as evidenced in Walmart's policy governing firearm sales, Defendants recognized the danger of putting a firearm in the hands of someone experiencing

suicidal ideation.  While Defendants had a mechanism — the block list — for ensuring that an individual believed to be at risk of harming themselves or others could not purchase a gun from Walmart, either managers responsible for reporting their knowledge of Mr. Mace's suicidal ideation up the chain of command failed to do so, or Defendants failed to inform management of their reporting requirements and effectively implement the block list.  *See* ECF No. 79-18, at 15–18.  Maryland law reflects an understanding that firearms dealers should not sell firearms to individuals who might use the firearm to harm themselves.  *See* Md. Code Ann., Pub. Safety § 5-207(c)(6); *cf. Kiriakos*, 139 A.3d at 1035 (concluding that the "general public" would find an adult's conduct in "not only permitt[ing] but facilitat[ing]" an underage individual's "drinking on his property to the point of intoxication" morally blameworthy, noting that Maryland law imposes liability on adults who allow underage drinking on their property); *Eisel*, 597 A.2d at 455 (citing the Youth Suicide Prevention School Programs Act in finding evidence of "a community sense that there should be intervention based on emotional indicia of suicide").  Thus, the moral blameworthiness of Defendants' conduct weighs in favor of recognizing a duty here.

### E.  Policy of Preventing Future Harm

The purpose of the fifth factor, the policy of preventing future harm, is to "consider[] whether imposition of a duty would help prevent future harm by providing 'a strong incentive to prevent the occurrence of the harm.'"  *Est. of Madden*, 2021 WL 2580119, at *6 (quoting *Kiriakos*, 139 A.3d at 1036).  As with several of the other factors discussed above, Maryland courts have looked to relevant state legislation in assessing this factor and then concluding that prevention of the harm at issue was an important public policy.  *See Kiriakos*, 139 A.3d at 1036; *Eisel*, 597 A.2d at 453–54.

This factor also weighs in favor of imposing a duty.  Recognizing a duty here would incentivize firearms dealers to implement and utilize measures, such as the block list, designed to keep firearms out of the hands of individuals who pose a risk of harm to themselves or others.  *See, e.g.*, *Est. of Madden*, 2021 WL 2580119, at *6 (concluding that imposing a duty on employers to implement adequate COVID-19 safety protocols at in-person employee gatherings "would incentivize employers to take minimum precautions against the spread of COVID-19 to employees and their families via the implementation of minimum safety procedures that most companies, including [defendant], already ostensibly embrace").  Additionally, Maryland law evidences that preventing individuals who are at risk of suicide from obtaining firearms is an important public policy, *see* Md. Code Ann., Pub. Safety §§ 5-205(b)(6), 5-207(c)(6), and again supports imposition of a duty here, *see Kiriakos*, 139 A.3d at 1036 (citing Maryland law imposing liability on adults who provide alcohol to underage persons in finding a "'strong incentive to prevent the occurrence of the harm' that befell a victim like [plaintiff]" (quoting *Matthews v. Amberwood Assocs. Ltd. P'ship*, 719 A.2d 119, 132 (Md. 1998))); *Eisel*, 597 A.2d at 453 ("The General Assembly has made it quite clear that prevention of youth suicide is an important public policy, and that local schools should be at the forefront of the prevention effort.").

### F.  Burden on Defendants and Consequences to the Community

To analyze the sixth factor, courts generally balance the risk of harm against the extent of the burden to the defendant and the consequences to the community of imposing a duty.  *See, e.g.*, *Kennedy Krieger*, 191 A.3d at 454; *Kiriakos*, 139 A.3d at 1036; *Eisel*, 597 A.2d at 455.  A defendant's existing practices are relevant in determining the extent of the burden.  *See Est. of Madden*, 2021 WL 2580119, at *6.  Additionally, in assessing the consequences to the community, courts have considered the effect on the "field of potential liability."  *Id.*  Where the magnitude of

potential harm is great, "even a relatively remote possibility" of the harm occurring may be sufficient to tip the scales "in favor of duty." *Eisel*, 597 A.2d at 455.

In this case, the risk of harm outweighs the burden on Defendants.  To start, the magnitude of the potential harm — death or personal injury — is great.  *See id.* ("[T]he consequence of the risk is so great that even a relatively remote possibility of a suicide may be enough to establish duty."); *Kiriakos*, 139 A.3d at 1036 ("The consequences of underage drinking are great — such that the burden on [an adult] of denying youths access to alcohol hardly warrants discussion."). Additionally, Walmart already created a mechanism, the block list, to prevent sales of firearms to individuals who might use the firearm to harm themselves, and according to Walmart's corporate designee, utilization of the block list requires only that managers report the name of an individual believed to be at risk of self-harm up the chain of command such that the individual's name can be added to the list.  *See* ECF No. 79-18, at 15–18.  If that individual then tries to purchase a gun from a Walmart store, the "electronic check" associates already conduct, ECF No. 70-3, at 21, will display a message instructing the associate to deny the sale, *see id.* at 26.  Thus, recognizing a duty here would impose minimal additional burden on Defendants, *see Est. of Madden*, 2021 WL 2580119, at *6 (finding "little 'additional' burden" where imposition of a duty would require defendant to follow safety protocols to protect its employees that it had "already embraced . . . with regard to its customers"), and certainly would not require Walmart employees to "become mental health experts," as they argue, ECF No. 84, at 16.

The risk of harm here also outweighs any potential consequences to the community.  One important consideration on this point is whether imposition of a duty would "significantly expand the field of potential liability," particularly to "expansive new classes of third-party plaintiffs." *Est. of Madden*, 2021 WL 2580119, at *6.  However, there is minimal risk of significantly

expanding liability in this case.  For one, imposing a duty on Defendants here would not significantly expand the field of liability to new classes of third-party plaintiffs.  Plaintiffs argue that Defendants owed a duty to Mr. Mace — not to a third party.  *See* ECF No. 79, at 38.  By extension, this duty would encompass other customers seeking to purchase firearms from Walmart, to whom Walmart already owes duties under federal and state law.  *See* ECF No. 70-1, at 62. Further, contrary to Defendants' suggestion, recognizing a duty here would not render Walmart liable for suicides where the decedent used "any other implements" — such as a "box cutter," "rope," "knife," or "Drano" — purchased at Walmart.  *Id.* at 61–62.  Unlike these everyday products that have many non-dangerous uses, firearms are inherently dangerous.  *Cf. McGuiness v. Brink's Inc.*, 60 F. Supp. 2d 496, 499 (D. Md. 1999) ("[U]sing a car to run someone down is not what one normally does with a car.  However, while shooting someone may not be what everyone with a firearm does, [it is] arguably the intended usage of the instrumentality.").  Likely for this very reason, Walmart's own policy governing firearm sales allows associates to deny a firearm sale on any non-discriminatory basis.  *See* ECF No. 70-3, at 32 ("Walmart has the right to refuse to sell a firearm for non-discriminatory reasons to anyone at any time."); ECF No. 79-18, at 6–7. Defendants have not identified any other potential consequences to the community.

Balancing the significant risk of harm against the minimal burden on Defendants and lack of adverse societal impacts, this factor weighs in favor of recognizing a duty.

### G.  Insurance for the Risk

With respect to the seventh and final factor, the availability, cost, and prevalence of insurance for the risk at issue, Plaintiffs claim that "Walmart has insurance" but provide no support for this claim.  ECF No. 79, at 38.  Given the lack of evidence regarding this factor, the Court

cannot determine whether it weighs in favor of or against imposing a duty.  *See, e.g.*, *Kiriakos*, 139 A.3d at 1037; *Sumo*, 2017 WL 2962819, at *6.

In sum, of the six factors the Court was able to assess, all weigh in favor of imposing a duty on Defendants.  Therefore, the Court concludes that Defendants had a common law duty not to sell a firearm to Mr. Mace when they knew or had reason to believe that he might use the firearm to harm himself.

## IV.    Negligent Entrustment

Plaintiffs also advance a claim for negligent entrustment.  ECF No. 3, at 18.  Defendants, incorporating by reference their arguments with respect to the PLCAA's negligent entrustment exception, again claim that Walmart did not negligently entrust the shotgun to Mr. Mace because it lacked control over the shotgun at the time of Mr. Mace's suicide and Mr. Mace's suicide was not foreseeable.  *See* ECF No. 70-1, at 64.  As discussed above, continuing control is not a necessary element of a negligent entrustment claim under Maryland law, and Plaintiffs have presented sufficient evidence regarding the foreseeability of Mr. Mace's suicide such that their claim for negligent entrustment survives summary judgment.

## V.    Maryland Workers' Compensation Act

The Maryland Workers' Compensation Act ("WCA") requires employers to provide compensation to a covered employee "for an accidental personal injury sustained by the covered employee," Md. Code Ann., Lab. & Empl. § 9-501(a)(1) (West 2024), or to the dependents of the covered employee if the employee dies as a result of an "accidental personal injury," *id.* § 9-501(a)(2)(i).  "The WCA provides the exclusive remedy to an employee for an injury or death arising" both "out of and in the course of employment." *McCullough v. Liberty Heights Health & Rehab. Ctr.*, 830 F. Supp. 2d 94, 99 (D. Md. 2011) (citing, inter alia, Md. Code Ann., Lab. & Empl.

§ 9-509 (West 2024)); *see Calvo v. Montgomery County*, 185 A.3d 146, 153–54 (Md. 2018) ("A claimant who seeks compensation [under the WCA] must prove that the injury 'both arose out of *and* in the course of the employment.'" (quoting *Montgomery County v. Wade*, 690 A.2d 990, 994 (Md. 1997))).

An injury arises "out of employment if it results from the nature, conditions, obligations, or incidents of the employment." *Garrity v. Injured Workers' Ins. Fund*, 37 A.3d 1053, 1057 (Md. Ct. Spec. App. 2012) (quoting *Barnes v. Children's Hosp.*, 675 A.2d 558, 563 (Md. Ct. Spec. App. 1996)).  Maryland's highest court has "adopted the positional risk test to determine if an injury arose out of employment," *Calvo*, 185 A.3d at 154, under which "[a]n injury arises out of the employment if it would not have occurred *but for* the fact that the conditions and obligations of the employment placed [the employee] in the position where he [or she] was injured," *id.* (alterations in original) (quoting *Livering v. Richardson's Rest.*, 823 A.2d 687, 692 (Md. 2003)). The positional risk test is thus concerned with the injury's "causal origin." *Wade*, 690 A.2d at 994; *see also Montgomery County v. Maloney*, 226 A.3d 824, 835 (Md. Ct. Spec. App. 2020) ("Determining whether an injury arises out of employment is a question of causation.").

"An injury arises in the course of employment 'when it occurs during the period of employment at a place where the employee reasonably may be in the performance of his duties and while he is fulfilling those duties or engaged in doing something incident thereto.'" *Garrity*, 37 A.3d at 1057 (quoting *Barnes*, 675 A.2d at 564).  For an injury to "arise in the course of employment," it must "arise 'within the time and space boundaries of the employment, and in the course of an activity whose purpose is related to the employment.'" *Maloney*, 226 A.3d at 837 (quoting *Wade*, 690 A.2d at 995).  Whereas the out-of-employment requirement "focuses on the

*existence* of a connection between the injury and the injured worker's employment," the in-the-course-of-employment requirement "is concerned with the *strength* of that connection." *Id.* at 838.

Generally, the questions of whether an injury arose out of and in the course of employment are mixed questions of law and fact. *Calvo*, 185 A.3d at 153. If there are no disputes as to the facts or the inferences to be drawn from them, however, the Court may decide the questions as a matter of law. *Id.*

Defendants argue that the WCA preempts Plaintiffs' tort claims because Mr. Mace's injury arose out of and in the course of his employment. *See* ECF No. 70-1, at 64–66. Defendants cite *King Waterproofing Co. v. Slovsky*, 524 A.2d 1245 (Md. Ct. Spec. App. 1987), for the proposition that "lunch breaks or coffee breaks can be considered 'in the course of employment' because they fit within the 'personal comfort doctrine,' which holds that breaks are work-related because they benefit both employer and employee." ECF No. 70-1, at 65 (citing *Slovsky*, 524 A.2d at 1248–49). Since Mr. Mace was on his lunch break when he purchased the gun and used it to end his life, Defendants claim that his injury occurred in the course of his employment.[19] *See id.* at 65–66; ECF No. 84, at 17. Additionally, Defendants argue that to determine whether a worker's suicide arose out of and in the course of their employment, Maryland courts apply a "proximate cause test," under which "'proximate cause' means that the result could have been caused by the accident, and that there has not intervened, between the accident and the result, any other efficient cause." ECF No. 70-1, at 65 (quoting *Young v. Hartford Accident & Indem. Co.*, 492 A.2d 1270,

---

[19] According to Defendants, Plaintiffs argue that "the injury to [Mr.] Mace occurred when Walmart sold him the firearm." ECF No. 84, at 17. On the Court's read, Plaintiffs claim that the injury occurred when "[Mr.] Mace us[ed] the shotgun to take his life." ECF No. 79, at 38; *see also id.* at 40 ("[Mr. Mace's] suicide was not an 'accidental injury' that would be covered by the [WCA]."); *id.* at 42–43 ("The bottom line here is that [Mr.] Mace was not engaging in a work-related activity or an activity incidental to his job duties at the time of his suicide. . . . The Maryland's [sic] Workers' Compensation Act does not apply to [Mr.] Mace's suicide.").

1274 (Md. 1985)).  Thus, according to Defendants, if the Court finds that Walmart's sale of the gun to Mr. Mace was the proximate cause of his death, then the WCA bars Plaintiffs' claims.  *Id.* Finally, Defendants claim that "any knowledge that Walmart allegedly had regarding [Mr.] Mace's suicide attempts and hospitalizations for suicidal ideation . . . arose through [Mr.] Mace's status as a Walmart employee."  ECF No. 84, at 17.

Plaintiffs respond that Mr. Mace's suicide did not arise out of or in the course of his employment because it did not occur while he was "engaged in employment duties or something incident to those duties."  ECF No. 79, at 39.  In support of their argument, Plaintiffs note that Walmart employees are not "on the clock" during their lunch break and have the freedom to choose how they use their time, *id.* at 40 (citing ECF No. 79-7, at 13; ECF No. 79-8, at 4), and "it is the exception, not the rule, that an injury during a break is considered work-related," *id.*  Mr. Mace's suicide does not fall under this exception, according to Plaintiffs, because Mr. Mace "was not injured while attending to a quick personal comfort that would rejuvenate him for work."  *Id.* at 42.  Because Mr. Mace's suicide "was a deviation from any work-related activity," *id.*, Plaintiffs argue that the WCA is inapplicable, *id.* at 43.

To start, the Court disagrees with Defendants' broad reading of *Slovsky*.  Although the court in that case did hold that a worker's injuries, sustained when he was hit by a car while walking to a restaurant to get food and drink during a twenty-minute break, were compensable under the WCA, the court was careful to limit its holding.  *See Slovsky*, 524 A.2d at 1246, 1249–50.  The court explained that while injuries sustained during trips away from and back to the worksite for the purpose of getting lunch are generally not compensable under the "going and coming rule," the rule did not apply to the break at issue, which was not "a lunch (or dinner) break, but, rather, a break of shorter duration, more in the nature of a coffee break."  *Id.* at 1248.  Still, the court

refrained from "announc[ing] an all-purpose 'coffee break rule,' since there are too many variables that could affect the result," including the length of the break — with a longer coffee break being more analogous to a lunch break — and "whether the employee's activity during [the break] constituted a substantial personal deviation." *Id.* at 1248–49 (quoting 1 Arthur Larson, *Workmen's Compensation Law* § 15.54, at 4-116.38 to .40 (1985) (footnotes omitted)).  In finding that the break at issue fell outside of the going and coming rule, the court placed significant weight on the fact that employees "customarily" used the break to leave the worksite and obtain food and drink — just as the worker was doing when he was injured — and that if the employer had not "encourag[ed]" its employees to do so, it had "at least acquiesced in the practice."  *Id.* at 1249. The court concluded its opinion by "caution[ing]" that it was not "stat[ing] . . . a general rule for injuries sustained during off-premises coffee breaks," and that "[a]s with all cases . . . , the determination as to whether injuries sustained during off-premises coffee breaks arise 'out of' and 'in the course of' employment must be made on a case-by-case basis."  *Id.* at 1250.

Applying the positional risk test, the Court concludes that Mr. Mace's suicide did not arise out of his employment.  Mr. Mace did not need to be an employee to buy a gun at Walmart, and he did not buy the gun in his capacity as an employee.  As Mr. Jones and Ms. Madden testified, Walmart employees cannot buy firearms when they are on the clock.  *See* ECF No. 79-7, at 12–13; ECF No. 79-8, at 4.  While it is undisputed that Mr. Mace was on his lunch break when he used the gun to end his life, as discussed above, the court in *Slovsky* made clear that injuries sustained during lunch breaks generally are not covered by the WCA.  *See Slovsky*, 524 A.2d at 1248.  Additionally, as Plaintiffs note, the facts here bear "no resemblance" to those in *Slovsky*, ECF No. 79, at 41, as there is no indication that Walmart employees customarily used their lunch breaks in the manner that Mr. Mace did on November 15 or that Walmart either encouraged or

acquiesced in such use.  Moreover, Defendants do not provide any reason why Mr. Mace needed to buy the gun during his lunch break — as opposed to some other time when he was off the clock — and Mr. Mace left Walmart's premises before using the gun.  Therefore, the court cannot conclude that Mr. Mace's suicide would not have occurred but for the conditions and obligations of his employment with Walmart.  *See Prince George's County v. Proctor*, 142 A.3d 592, 594–95 (Md. Ct. Spec. App. 2016) (concluding that off-duty police officer's injuries, sustained when he jumped off of his porch while leaving his house to retrieve his police cruiser from a repair facility, did not arise out of his employment because it could not "reasonably be said that, but for the need to retrieve his police cruiser, [the officer] would not be at his home on his day off stepping through the front door onto his front porch").

Defendants' attempt to buttress their argument with the claim that Walmart's alleged knowledge of Mr. Mace's hospitalizations and suicidal ideation arose out of his "status as a Walmart employee," ECF No. 84, at 17, conflates Walmart's allegedly negligent conduct of selling a gun to Mr. Mace when it had such knowledge with the actual injury: Mr. Mace's suicide.  That Walmart allegedly had knowledge of Mr. Mace's hospitalizations and suicidal ideation and failed to sufficiently act on this knowledge does not establish that Mr. Mace's suicide would not have occurred but for the conditions and obligations of his employment.

The Court also concludes that Mr. Mace's suicide did not occur in the course of his employment.  As stated above, Mr. Mace was on his lunch break, during which time he was off the clock and free to do "whatever [he] want[ed]."  ECF No. 79-7, at 13; *see In re Amey*, No. 2048, 2023 WL 2567894, at *2 (Md. App. Ct. Mar. 20, 2023) (indicating that the more control an employee has over what they can do during a break, the less work related the break is). Additionally, the injury did not occur at a place where Mr. Mace could reasonably be in the

performance of his duties.  Since, as a maintenance associate, Mr. Mace's responsibility was to clean the store, he needed to be in the store in order to perform his duties.  *See* ECF No. 70-9, at 3; ECF No. 70-6, at 5.  After buying the gun, however, Mr. Mace left Walmart's premises and drove to the parking lot of a different shopping center, where he discharged the gun.  *See* ECF No. 70-13, at 37–38.  *Compare* ECF No. 70-31, at 3 (identifying the location where officers found Mr. Mace's truck as "a parking lot located at 45315 Alton Lane"), *with* ECF No. 70-32, at 77 (identifying the address of the Walmart Supercenter in California, Maryland, as "45485 Miramar Way").  For the same reasons, the injury did not occur while Mr. Mace was fulfilling any job duties or doing something incident thereto.  *Cf. Blake Constr. Co. v. Wells*, 225 A.2d 857, 859, 862 (Md. 1967) (holding that death by carbon monoxide asphyxiation of night watchman, who was found in his car with a friend toward the end of his shift, was not a "natural incident of the job he was employed to perform," *id.* at 862, even though he could have partially performed his job duties from his car); *Coates v. J.M. Bucheimer Co.*, 218 A.2d 191, 192–93 (Md. 1966) (holding that injury sustained by employee when, during a work break, she left her building to look at a new lounge in a building under construction did not arise out of and in the course of her employment because the activity was a "not inconsequential" deviation from her employment).

Finally, in arguing that the WCA bars Plaintiffs' claims if the Court determines that Walmart's sale of the gun to Mr. Mace proximately caused his death, Defendants again conflate Walmart's allegedly negligent conduct with the actual injury.  As indicated in the language Defendants quote — "courts apply 'a proximate cause test to the relationship between the death and the *accidental injury*,'" ECF No. 70-1, at 65 (emphasis added) (quoting *Young*, 492 A.2d at 1274) — to be covered by the WCA, a worker's suicide must have been caused by an initial work-related injury, *see Young*, 492 A.2d at 1275 (finding a sufficient "causal nexus" between plaintiff's

initial injuries, which resulted from a workplace assault, and her subsequent suicide attempt); *Baber v. John C. Knipp & Sons*, 163 A. 862, 863, 865 (Md. 1933) (stating that plaintiff, who sought to recover under WCA after her husband's suicide, needed to prove "first, an accidental personal injury to her husband; and, second, that such injury was the proximate cause of his death," *id.* at 865); *see also Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 758–61 (D. Md. 2011) (discussing circumstances under which Maryland courts have found that a worker's suicide was covered by the WCA). Here, Mr. Mace's suicide is the only injury alleged. Thus, the proximate cause test Defendants reference is inapplicable.

Because there are no disputes of fact relevant to the determination of whether Mr. Mace's injury arose out of and in the course of his employment, the Court concludes as a matter of law that the WCA does not bar Plaintiffs' claims. *See, e.g.*, *Austin v. Thrifty Diversified, Inc.*, 543 A.2d 889, 892 (Md. Ct. Spec. App. 1988) ("The only issue disputed is whether the decedent's death resulted from an injury 'arising out of and in the course of' his employment. That issue is one of law and, as such, is to be resolved by the court." (citing *Knoche v. Cox*, 385 A.2d 1179, 1184 (Md. 1978))).

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is, hereby, denied.

So ordered.

Date: May 20, 2024 

_____/s/_____
Ajmel A. Qureshi
U.S. Magistrate Judge