**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **KAYLA M. BRADY, et al.** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civil Case No. 8:21-cv-01412-AAQ** |
| **WALMART INC., et al.,** | * | |
| **Defendants.** | * | |

* * * * * * * * * * * * *

**PLAINTIFFS' CONSOLIDATED MOTIONS IN LIMINE**
**TO EXCLUDE TESTIMONY AND EXHIBITS FROM TRIAL**

Plaintiffs, by their undersigned counsel, respectfully move in limine to preclude Defendants from introducing evidence and testimony concerning: the underlying reasons for Mr. Mace's mental health crisis; expert testimony about issues that are not in dispute; testimony that is critical of the mental health professionals who treated Mr. Mace before his death; lay witness testimony that Mr. Mace would have found another way to commit suicide had Defendants not sold him the gun; and testimony about miscellaneous personal incidents involving Mr. Mace and his family that are not relevant to the issues for the jury to decide. For the reasons described below, Plaintiffs' consolidated motion in limine should be granted.

## BACKGROUND

Jacob Mace was an employee of the Walmart store in California, Maryland from September 2019 until his untimely death on November 15, 2019. On November 15, 2019, Walmart associate, Eric McLaughlin, sold Mr. Mace a firearm and ammunition during Mace's lunch break. Shortly after the sale, Mr. Mace used the firearm to take his life.

Before the sale occurred, a Walmart co-worker and a friend of Mr. Mace, Christina O'Shea, alerted one of the Walmart store managers, Brennan Jones, that Mr. Mace had suicidal ideations and that he had the specific intention of committing suicide with a firearm. O'Shea asked Jones to take steps to ensure that Mr. Mace would not be able to purchase a firearm from Walmart. Although Jones said he would take care of it, he did not. This resulted in Mr. Mace's unrestricted purchase of a shotgun from the Walmart store where he worked. After purchasing the shotgun, Mr. Mace drove to a nearby parking lot, loaded the shotgun with ammunition, and committed suicide. Mr. Mace was found dead in his truck less than two hours after he purchased the shotgun. He died of a self-inflicted gunshot wound to his head.

Mr. Mace had a long history of mental health struggles. Six days before his death, on November 9, 2019, Mr. Mace sent a "goodbye" text message to several of his Walmart co-workers, including Joel Barr, Christina O'Shea, Jennifer Krebs, and an individual named "Cory." O'Shea was working at Walmart when she received the text. She started crying when she read it and immediately got on the intercom at Walmart to ask Walmart manager Brennan Jones to come over as soon as possible. Jones did not come to talk to O'Shea for several hours. However, another Walmart manager, Kristin Wagner, approached O'Shea after she got on the Walmart intercom. O'Shea expressed her concerns about Mr. Mace's intent to commit suicide showed Wagner the "goodbye message."

Mr. Mace and O'Shea continued to exchange text messages throughout the morning and early afternoon of November 9. At 12:50pm, Mr. Mace texted O'Shea about his suicide plan to "slit wrists, buy a gun." O'Shea also told Wagner about Mr. Mace's plan to buy a gun, and she showed Wagner the text message. O'Shea also informed Wagner that Mace had recently sought

mental health treatment at St. Mary's Hospital and Calvert Health Center. O'Shea also took a screenshot of the text message from Mace and texted it to Brennan Jones.

Jones is a senior member of Walmart's management team. At the time, Jones was the co-manager of the store and was second in charge. Only Tim Crowley, the head store manager, was above Jones. When Jones finally approached O'Shea on November 9 after her intercom message, O'Shea relayed to Jones her concerns about Mr. Mace's intent to purchase a firearm and commit suicide. O'Shea explained the importance of making sure Mr. Mace could not purchase a firearm at Walmart. O'Shea also informed Jones that Mace had been hospitalized recently.

O'Shea explained all this to Jones because she thought Walmart kept a "blacklist" of individuals who should not be sold a firearm, and she wanted Mr. Mace's name put on the list. In response to O'Shea's request to put Mr. Mace on a list to make sure he was not sold a firearm, Jones responded, "I will take care of it." O'Shea expected Jones would put Mr. Mace on a blacklist and discuss the issue with other members of management.

Jones did speak with other members of Walmart's management team prior to Walmart's sale of the firearm to Mr. Mace on November 15. Jones spoke with one of Walmart's human resource managers, Beverly Madden, about Mr. Mace's suicide threats. Jones also relayed his discussion with O'Shea to the head store manager, Tim Crowley. Neither Jones nor any of the other Walmart managers placed Mr. Mace on any blacklist, nor did they tell anyone at Walmart not to sell Mr. Mace a firearm.

Other managers at Walmart also knew about Mace's suicidal ideations. Renard Mackell was the manager of the sporting goods department at Walmart. Mr. Mace previously told Mackell about his mental health issues and that he had previously attempted suicide. Mackell testified in his deposition that he would not have sold Mace the firearm on November 15. Beyond Crowley

(top Walmart manager), Jones (second in command), Mackell (sporting goods manager), Wagner (grocery pickup manager), Madden (human resource manager), there is evidence that other members of Walmart management also knew of Mr. Mace's mental health history. O'Shea testified that she told her department manager, "Tabby," about Mr. Mace's suicidal ideations the week before his death. Mr. Mace also informed his mother that he had multiple discussions with Walmart management about his mental health struggles and hospitalizations and that they directed him on more than one occasion to call the suicide hotline.

Although members of Walmart's management team provided conflicting deposition testimony about Walmart's policies relating to the sale of firearms, the polices themselves—as well as Walmart's corporate designee—confirmed that Walmart had policies that allowed any associate or manager to deny the sale of a firearm to anyone for any, non-discriminatory reason and that a firearm should not be sold to an individual if it is suspected that the individual will use the firearm to harm himself or others. Although these policies existed, the witness testimony at deposition has consistently confirmed that: (i) Walmart's training did not include any reference to selling firearms to individuals suffering from a mental health crisis or suicidal ideation; and (ii) it is not encouraged to inquire as to the reasons a potential buyer wishes to purchase a firearm.

Walmart also has a national policy about blacklisting certain individuals from purchasing firearms. The policy requires a manager who believes someone is contemplating suicide or self-harm to report those details in real time to a market asset protection manager and Walmart's emergency operations center. From there, the information should be reported to Walmart's corporate "ATF Compliance Group," who can then place the individual on the blacklist. When asked about how the process is supposed to work at the store level, Walmart's corporate designee indicated that Crowley (head store manager) would be a better person to explain. Crowley,

however, testified that he was not even aware that such a list even existed. Jones (second in command) also testified that Walmart maintained no such a list. The human resource manager, Madden, testified similarly.

In other words, the evidence will show that Walmart maintains a corporate policy that directs the managers within its stores to report concerns of suicidal ideation up the chain of command so that an individual can be added to a blacklist and prohibited from purchasing a gun, but Walmart's head manager and second in command at the California, Maryland Walmart had never even heard of such a policy.

Plaintiffs are Mace's surviving spouse (Kayla Brady), mother (Debra McCreary), father (Mark Mace), and Mace's two minor children. Plaintiffs allege that Walmart Inc. and its subsidiary Wal-Mart Stores East, LP were negligent in selling the firearm to Mace and negligently entrusted Mace with the firearm with actual or constructive knowledge that Mace intended to use the firearm to commit suicide.

Walmart previously filed a motion for summary judgment arguing, among other things, that (i) Plaintiffs' claims were barred by the Protection of Lawful Commerce in Arms Act ("PLCAA"), 15 U.S.C. §§ 7901-7903, (ii) Plaintiffs' claims were barred by contributory negligence, (iii) Plaintiffs' claims otherwise fail because Plaintiffs cannot establish that Walmart owed a legal duty to Mace, and (iv) Walmart did not negligently entrust the firearm to Mace. The Court denied the motion. The Court found that Plaintiffs put forth sufficient evidence to establish genuine issues of material fact regarding the applicability of two PLCAA exceptions, the predicate exception and negligent entrustment exception. The Court also found that neither Plaintiffs nor Mace were contributorily negligent as a matter of law. The Court further found that Walmart owed a duty not to sell a firearm to Mace when they knew or had reason to believe he might use the

firearm to harm himself. Finally, the Court found that Plaintiffs established sufficient evidence to sustain a claim for negligent entrustment.

**RELEVANT LEGAL STANDARDS**

The Court has the authority to use in limine rulings on evidentiary issues to shield the jury from unfairly prejudicial or irrelevant evidence before it is actually offered. *See Changzhou Kaidi Elec. Co. v. Okin Am., Inc.*, 102 F. Supp. 3d 740, 745 (D. Md. 2015) (Blake, J.) (citing *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). "The primary purpose of an in limine ruling is to streamline the case for trial and to provide guidance to counsel regarding evidentiary issues." *Adams v. NVR Homes, Inc.*, 141 F. Supp. 2d 554, 558 (D. Md. 2001). "A district court … has 'broad discretion' in deciding a motion in limine." *Fulton v. Nisbet*, No. 2:15-4355-RMG, 2018 WL 565265, at *1 (D.S.C. Jan. 25, 2018) (citation omitted); *see also Malone v. Microdyne Corp.*, 26 F.3d 471, 480 (4th Cir. 1994) (noting that a trial court's evidentiary rulings are reviewed for an abuse of discretion).

Federal Rule of Evidence 402 provides that relevant evidence is admissible and "[i]rrelevant evidence is not admissible." Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Not all relevant evidence is admissible, however. Evidence that is otherwise "relevant" may be excluded "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Further, a "trial judge has broad discretion in the matter of the exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*,

370 U.S. 31, 34 (1962). The trial judge must serve as the "gatekeeper," screening expert and fact "evidence to ensure that it is not only relevant, but reliable." *General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). The admissibility of "expert" testimony is a question of law governed by Rule 702 of the Federal Rules of Evidence, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" only if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Where expert testimony is unhelpful for the trier of fact, it should be excluded. *See Planned Parenthood of Cent. N.J. v. Verniero*, 22 F. Supp. 2d 331, at 338 (D.N.J. 1998) (explaining that "[t]he helpfulness of the expert testimony … controls the rule") (citing *United States v. Downing*, 753 F.2d 1224, 1235 (3rd Cir.1985) (internal quotation marks omitted)).

## ARGUMENT

There are a number of categories of anticipated evidence and testimony that should be excluded from this trial because the evidence is not relevant, not helpful to the jury, would confuse the issues, or mislead the jury. Each topic is address in turn below.

### I. The Court should preclude the testimony of Defendants' expert Ronald Means, M.D., and should preclude the introduction of evidence concerning the underlying reasons for Mr. Mace's mental health crisis because these subjects are not relevant to the disputed issues in this case.

Defendants designated Ronald F. Means, M.D. as an expert witness in this matter. Dr. Means is a forensic psychiatrist. He apparently was designated to offer a single, limited opinion. His five-page report contains only one opinion that is set forth in the final sentence of his report:

> To a reasonable degree of medical certainty, based upon the records reviewed, the primary, acute stressor for exacerbated depression around the time of Mr. Mace's death was family and marital discord.

*See* Report of Ronald Means, M.D., attached as **Exhibit 1**, at 5.

Defendants presumably designated Dr. Means because they believed that Plaintiffs could only pursue negligence claims if they alleged that Defendants caused Mr. Mace's depressed mental state that led to his suicide. This belief is misplaced. This Court has twice rejected Defendants' position on this issue, in denying (in part) Defendants' Motion for Judgment on the Pleadings (ECF No. 42) and in denying Defendants' Motion for Summary Judgment (ECF No. 86). Most recently, in its Memorandum Opinion denying Defendants' Motion for Summary Judgment, this Court properly concluded that: "a close reading of the decision [in *Sindler v. Litman*], as well as subsequent case law, make clear that it does not preclude all negligence claims arising out of a decedent's suicide unless a plaintiff alleges that a defendant's conduct caused the decedent's mental state." ECF No. 86, Memorandum Opinion Denying Defendants' Motion for Summary Judgment, at 20. As this Court explained, a defendant "may be liable for a decedent's suicide if the suicide might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation." *Id.* (internal quotations omitted).

Here, Plaintiffs do not allege that Defendants caused Mr. Mace's depressed mental state. Rather, Plaintiffs allege that Defendants' sale of the firearm to Mr. Mace, with knowledge of his suicidal intent, was negligent and proximately caused his death. Because Plaintiffs do not allege that Defendants' caused Mr. Mace's depressed mental state, the opinion of Dr. Means—that is, that Mr. Mace's family, and not Defendants, caused his depression—is irrelevant. Dr. Means's opinion does not make any fact in dispute more or less probable. *See* Fed. R. Evid. 401. Nor will Dr. Means's opinion help the jury understand the evidence or determine a fact in issue. *See* Fed. R. Evid. 702. Dr. Means' opinion, if permitted to be offered, will only confuse the jury about what the actual issues in dispute are in this case. *See* Fed. R. Evid. 403.

For these reasons, Dr. Means's opinion that it was Mr. Mace's family and not Defendants that caused Mr. Mace's depressed mental state should be precluded from evidence. Because this is the only opinion offered by Dr. Means, his testimony should be excluded entirely.

## II. The Court should preclude the testimony of Defendants' experts Judyth LeDoux and Scott Braum because the opinions on which they intend to testify are not relevant and are not helpful to the jury in determining a fact in issue.

The opinions of Defendants' experts Judyth LeDoux and Scott Braum should be excluded because they are not relevant to any disputed issues and because permitting them to offer their opinions would confuse the issues, mislead the jury, and waste time.

Ms. LeDoux is an independent consultant, having retired as an ATF Director of Industry Operations. She intends to offer opinions "as it applies to compliance only with the Federal Firearm Law and Regulations when conducting a firearm transfer." *See* Report of Judyth LeDoux, attached as **Exhibit 2**, at 5. Ms. LeDoux's report explains that she will offer the following opinions:

(i) "[T]he [firearm] transaction [with Mr. Mace] was completed lawfully with no error or discrepancies made on behalf of the FLL (Walmart #1981)," *id.* at 6;

(ii) "[T]he firearm transaction was lawful and did not violate federal law" because the Walmart employees who sold the gun to Mr. Mace—Eric McLaughlin and Ida Randall—did not have personal knowledge of Mr. Mace's mental illness, nor did they believe that Mr. Mace was intoxicated or otherwise prohibited from possessing the firearm, *id.* at 9-10;

(iii) Mr. Mace "was not federally prohibited under the 'adjudicated mentally defective' or 'committed to a mental institution' prohibitor and could lawfully purchase and possess firearms and ammunition," *id.* at 14; and

(iv) Mr. Mace was "eligible to lawfully purchase a long gun or handgun from any licensed firearm's dealer in the State of Maryland" because neither Eric McLaughlin and Ida Randal believed that Mr. Mace was intoxicated or was displaying erratic behavior, and because Mr. Mace passed the NICS background check; *id.* at 16.

Mr. Braum's proposed opinions are similar. His report explains that he is an attorney and an expert in field of the retail sale of firearms and the standards applying to those sales. Mr. Braum intends to offer opinions about "the standard of care owed by a federally licensed firearms retailer to customers who may potentially be experiencing suicidal ideation and/or similar issues" and "the common practices among federally licensed firearms retailers with respect to sales/potential sales to customers who might possibly be experiencing suicidal ideation." *See* Report of Scott Braum, attached as **Exhibit 3**, at 2 (Introduction). The crux of Mr. Braum's opinions relate to steps that a Walmart employee who sells firearms should take if he or she personally observes a customer acting in a way that would raise suspicions that the customer had suicidal ideations or intended to harm himself. Mr. Braum points out that the particular Walmart employees who sold the gun to Mr. Mace—Eric McLaughlin and Ida Randall—were not personally aware of Mr. Mace's suicidal ideations or threats of suicide, nor did they observe anything suspicious about Mr. Mace when he was purchasing the firearm. Mr. Braum explains that "neither Mr. McLaughlin nor Ms. Randall possessed any information that should have caused them to stop the sale of the gun to Mr. Mace." *Id.* at 11.

The opinions intended to be offered by Ms. LeDoux and Mr. Braum do not have any bearing on facts that are of consequence in determining this action and are therefore not relevant. There is no dispute that Mr. Mace was not federally prohibited from purchasing a firearm due to him being "adjudicated mentally defective" (he was not) or "committed to a mental institution" (again, he was not). There is also no dispute that Mr. Mace passed the NICS background check. There also is no dispute that Eric McLaughlin and Ida Randall were not *personally* aware of Mr. Mace's suicidal ideations or his mental health crisis. Nor is there a dispute about whether Mr. Mace was exhibiting outward signs to Mr. McLaughlin or Ms. Randall during the sale of the

firearm, which would have required them to take immediate action to stop the sale. That is not what this case is about and it is not what the jury will be asked to determine.

The factual dispute here centers around what information was known to Defendants' *managers* about Mr. Mace's suicidal ideations and whether that knowledge is imputed to Defendants, such that Defendants should have taken steps to prevent the firearm sale to Mr. Mace. *See* ECF No. 86, Memorandum Opinion Denying Defendants' Motion for Summary Judgment, at 21-23. This Court specifically held that because "a corporation can act only through its agents, for the purpose of determining whether Defendants knew that Mr. Mace had a 'mental disorder' and history of self-harm, notice to an officer or agent is notice to the corporation where the officer or agent in the line of his duty ought, and could reasonably be expected, to act upon or communicate the knowledge to the corporation." *Id.* at 21 (citing cases; internal citations and quotation marks omitted). This Court further explained that "Plaintiffs have also presented evidence that, pursuant to Walmart policy, [Defendants'] managers could or should have reported their knowledge of Mr. Mace's suicidal ideation further up the chain of command" and that those managers had the ability to "ensure that information regarding an associate's imminent risk of harm would ultimately get to Walmart's threat management team" so the associate's name could be added to a list to block a potential firearm transaction. *Id.* at 23.

This Court has unequivocally rejected Defendants' claim that they can escape liability simply because Mr. McLaughlin and Ms. Randall were not personally aware of Mr. Mace's intention to commit suicide. There is no utility whatsoever in Ms. LeDoux or Mr. Braum offering opinions about Defendants' compliance with federal firearms laws and the fact that Mr. McLaughlin and Ms. Randall did not personally observe any red flags or irregularities when Mr. Mace was buying the shotgun that he used to end his life on November 15, 2019. This type of

"expert" testimony is especially useless where Mr. McLaughlin and Ms. Randall are both available and are expected to testify in this trial. The proposed opinions of Ms. LeDoux or Mr. Braum are not relevant and should be excluded.

In fact, with regard to the disputed issue that is at the heart of this case—that is, whether the actual knowledge of Defendants' managers of Mr. Mace's intention to commit suicide should be imputed to Defendants—Mr. Braum expressly disclaimed offering any opinion on this subject. In his report, Mr. Braum explained:

> I have in my possession many documents about information that certain Walmart employees may have had with respect to Mr. Mace's mental health issues. **I am not, however, a corporate/HR/employee care professional, so I have not studied them in detail**. **They do not play any significant role in my opinions in this matter, because there is no reasonable dispute that such employees of Walmart who were not involved in selling Mr. Mace the gun had information that was not known to Mr. McLaughlin or Ms. Randall**. For all purposes of this report, I assume such, and Plaintiffs and their experts presumably agree.

*See* Exhibit 3 at 10 (emphasis added). Since Mr. Braum is expressly *not* offering an opinion about a critical disputed issue for the jury to resolve, it is hard to understand how his testimony could be relevant.

Permitting either Ms. LeDoux or Mr. Braum to offer opinions about matters that are not reasonably in dispute also runs afoul of Rule 702 of the Federal Rules Evidence. An expert may offer an opinion only if "the expert's scientific, technical, or other specialized knowledge *will help the trier of fact to understand the evidence or to determine a fact in issue*." Fed. R. Evid. 702 (emphasis added). Where expert testimony is unhelpful for the trier of fact, it should be excluded. *See Verniero*, 22 F. Supp. 2d 331, at 338. Here, the opinions of Ms. LeDoux and Mr. Braum will not help the jury understand the evidence or any disputed issue of fact. Even if arguably relevant, this testimony creates the danger of confusing the issues, misleading the jury, and wasting time.

*See* Fed. R. Evid. 403. Accordingly, the Court should exclude the opinions and testimony of Ms. LeDoux and Mr. Braum.[1]

**III. The Court should preclude any testimony or evidence that is critical of the mental health professionals who treated Mr. Mace because there is no admissible evidence or defense theory that a different course of treatment would have prevented Mr. Mace's suicide.**

Plaintiffs anticipate that Defendants will attempt to solicit testimony from Plaintiff Debra McCreary (Mr. Mace's mother) and Mr. Mace's mental health/suicide expert, Dr. Craig Bryan, criticizing Mr. Mace's mental health care providers. This testimony should be precluded as irrelevant and because it would confuse the issues and mislead the jury.

The following exchange occurred during the deposition of Ms. McCreary:

Q. Can you tell me how the loss of Jake affected you.

A. I think it's made me more determined to change the mental health system in America. Our system failed my son.

Q. In what way?

A. He repeatedly went to the hospital asking for help and they turned him away.

Q. Do you have any criticism of the care that he received or perhaps did not receive --

Mr. Sullivan: Objection.

Q. May I finish asking my question -- in the month prior to his passing.

Mr. Sullivan: Objection.

A. I have criticism of the system. There was – there were communication failures.

---

[1] Nor can there be any argument that the opinions of Ms. LeDoux or Mr. Braum are somehow relevant to the existence of Defendants' duty. This Court has already held, as a matter of law, "that Defendants had a common law duty not to sell a firearm to Mr. Mace when they knew or had reason to believe that he might use the firearm to harm himself." ECF No. 86, Memorandum Opinion Denying Defendants' Motion for Summary Judgment, at 56.

Q. What were communication failures you are referencing?

A. His individual psychiatrist was also the hospital psychiatrist. His individual psychiatrist claims that he was not informed of Jake's trips to the emergency room saying that he was suicidal.

Q. Who is that?

A. Dr. McGraw. He claims he was not informed. And he claims had he been informed, Jake would have been inpatient each and every time he showed up.

Q. Did you have a discussion with Dr. McGraw about this?

A. Yes.

Q. When did that discussion happen?

A. Several weeks after Jake died.

Q. And Dr. McGraw said that had he been informed that Jake had come to the hospital, he would have admitted him?

A. Correct.

Q. Involuntarily?

A. No. Jake was asking to be admitted voluntarily.

Q. Did Dr. McGraw give you any indication of what the communication failure was?

A. My understanding is the way the system is supposed to work is when someone goes to the emergency room saying they have suicidal ideation, the medical doctor clears them to make sure they are medically okay. Then the social worker does a screening. The social worker then reaches out to the psychiatrist and talks about if the patient needs to be admitted. Somewhere between the social worker and Dr. McGraw, it wasn't getting communicated that one of his current active patients was in there for suicidal ideation.

Q. Have you or anyone else made any claim against the provider, either Calvert or St. Mary's?

A. No.

Q. Have you made any claim arising from their treatment of Jake prior to his passing?

A. No.

Q. Is there a reason why not?

Mr. Sullivan: Objection. To the extent that answering that question would require you to divulge information that you learned from your lawyer, you should not answer. If there are other reasons, then feel free to answer.

A. I'm not going to answer.

Q. Just to clarify, you're not answering because that information was provided to you by an attorney?

A. Correct.

Q. Did the thought cross your mind before you engaged an attorney?

Mr. Sullivan: Objection. You can answer that question.

A. Oh, yes.

Q. And why was it that you had thought to potentially pursue a claim before you retained an attorney against Jake's mental health providers?

A. Because the system didn't work. Dr. McGraw claimed that he didn't even know that Jake had been admitted to Calvert, despite the fact that St. Mary's sent him, and he was the staff psychiatrist at St. Mary's.

*See* Excerpt of Deposition of Debra McCreary, attached as **Exhibit 4**, at 134-38.

Ms. McCreary is not an expert witness. She is also not a psychiatrist, and she is not qualified to offer opinions relating to the actions or inactions of Mr. Mace's mental health care providers. Even if she were qualified, her testimony criticizing the health care system in America does not make any fact at issue in this case more or less probable. Any criticisms Ms. McCreary has towards Mr. Mace's mental health care providers are therefore irrelevant and should be precluded from the evidence in this case.

During the deposition of Dr. Bryan, counsel for Defendants solicited testimony that Dr. Bryan was critical of Calvert Health Center for having Mr. Mace "contract for safety" as opposed to attempting to use some of the "newer techniques" for treating suicidal patients. *See* Excerpt of Deposition of Craig Bryan, attached as **Exhibit** 5, at 18-22. Dr. Bryan's testimony on this issue is a bit confusing in that his notes identify Calvert Health Center's use of a "contract for safety" as "below the standard of care," but then he goes on to explain that "the majority of medical professionals" still use contracts for safety but that there are "newer" techniques that that he "hopes" "in the future" will become the new practice. Regardless, Dr. Bryan certainly did not offer an opinion that any action or inaction by Calvert Health Center caused or contributed to Mr. Mace's death. Defendants likewise did not designate an expert to offer this opinion.

Dr. Bryan's criticism is not relevant because it does not make any fact at issue more or less probable and it will not help the jury understand an issue or determine a fact at issue. If Defendants' counsel was permitted to question Dr. Bryan about his criticisms of Mr. Mace's mental health care providers, it will only lead to confuse and mislead the jury. Plaintiffs have not asserted any claims against Mr. Mace's mental health care providers and Defendants have not asserted any third-party claims in this matter. Such testimony is irrelevant and should not be heard by the jury.

## IV. The Court should preclude the testimony of any lay witness concerning the purported certainty of Mr. Mace's suicide had Mr. Mace not obtained a gun from Walmart.

During discovery in this case, Defendants advanced a theory that Mr. Mace would have found a way to end his own life regardless of whether Defendants had sold the shotgun to him on November 15, 2019. But Defendants have not designated any experts to offer an opinion along these lines. Instead, Defendants attempted to elicit testimony from lay witnesses during their

depositions concerning the purported certainty or inevitability of Mr. Mace's suicide. For example, during the deposition of Christina O'Shea, defense counsel and Ms. O'Shea had the following exchange (over the objections of Plaintiffs' counsel):

> Q. Did you get a sense that there was going to be anything stopping Jake from doing what he ultimately planned to do?
>
> Mr. Sullivan: Objection.
>
> A. When he had brought up that he knew, with growing up with his mom, he knew what therapists wanted to hear and stuff, I told him, I was like, "They're not going to be able to help unless you're real with them," and he didn't really say anything and that's when I kind of realized that he didn't want the therapists to help him. I don't know if that makes sense.
>
> Q: It does. Put another way, you had mentioned that folks were putting up speed bumps. Was your suggestion there that he was going to do what he planned to do regardless of anything that got in his way?
>
> Mr. Sullivan: Objection.
>
> A. The level that he was at, yes.
>
> Q: So, if it hadn't been for a firearm purchase at Walmart, you didn't have a sense that he would not have pursued some other plan to end his life?
>
> Mr. Sullivan: Objection.
>
> A. I could tell you that he would have found a way that was only violent towards himself and would not have put anybody else at harm.
>
> Q: So, in other words, you're saying that he would have found another way?
>
> Mr. Sullivan: Objection.
>
> Q. That was a yes, Tina?
>
> A Yes.

*See* Excerpt of Deposition of Christina O'Shea, attached as **Exhibit** 6, at 122-24.

Ms. O'Shea is not an expert witness. She is not qualified to express an opinion that Mr. Mace would have found some other way to commit suicide if Defendants had not sold the gun to

him. Opinions concerning Mr. Mace's complex psychological state and the likelihood of Mr. Mace committing suicide require an expert witness with specialized knowledge, training, and a proper foundation for such a conclusion. *See* Fed. R. Evid. 701 (providing that lay witness opinion testimony cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702"); *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) ("Rule 701 permits lay witnesses to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived. This rule, however, generally does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." (internal quotations and citations omitted)).

Moreover, Ms. O'Shea's opinion that Mr. Mace would have found a different way to commit suicide constitutes inadmissible speculation. *See United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015) (explaining that personal knowledge is required for witness testimony and that "witnesses are not permitted to speculate, guess, or voice suspicions") (quoting 27 Charles Alan Wright et al., Federal Practice & Procedure, Evidence § 6023 (2d ed. 2007)). Allowing Ms. O'Shea—or any other lay witness—to offer opinions about Mr. Mace's state of mind or the likelihood of a future suicide would, in essence, be a medical opinion offered by someone who is not qualified. Accordingly, this kind of testimony should be excluded.

## V. The Court should preclude the introduction of testimony, evidence, or argument from counsel regarding miscellaneous alleged incidents that are not relevant to the issues in this case and would be unfairly prejudicial, misleading, and confusing to the jury if admitted.

During the depositions in this case, Defendants' counsel explored a number of topics and alleged incidents with witnesses that are not relevant to the issues to be decided by the jury and, even if arguably relevant, would be unfairly prejudicial, misleading, and confusing if admitted.

For the reasons explained below, testimony and evidence concerning the following topics should be excluded:

1. Evidence relating to Mr. Mace applying for life insurance in the Spring of 2019, and the insurance carrier denying his application. Mr. Mace applying for life insurance around the time he found out he was having a child does not make any fact that is of consequence more or less probable, especially where the application was denied and no life insurance was in place when Mr. Mace died. This evidence is not relevant to any issue for the trier of fact.

2. Testimony regarding Plaintiff Mark Mace's (Mr. Mace's father) alleged infidelity to Plaintiff Debra McCreary (Mr. Mace's mother) during their marriage, resulting in their divorce. These allegations are not relevant to any issue for the jury to decide and would serve only to malign and disparage Mark Mace in front of the jury.

3. Testimony concerning an alleged incident at the Walmart store where Mr. Mace worked where Debra McCreary required Mr. Mace to hide his face inside of his hoodie. This incident does not bear upon any disputed factual issue and is not relevant. Permitting testimony about this would serve only to vilify Ms. McCreary in front of the jury.

4. Disparaging comments, testimony, and criticism of Plaintiff Kayla Brady (Mr. Mace's wife) for going shopping shortly after Mr. Mace's death, suggesting that her decision to shop for her soon-to-be-born son was inappropriate. This testimony should be excluded as irrelevant. Whether Ms. Brady went shopping after Mr. Mace's suicide does not make any fact that is of consequence more or less probable. Even if this evidence has some minimal probative value, it should be excluded because of the danger of unfair prejudice and misleading the jury.

5. Descriptions and characterizations of Ms. McCreary's demeanor and behavior at Mr. Mace's celebration of life, including opinions that she was not sufficiently distressed about

Mr. Mace's suicide. Testimony along these lines is speculative, not relevant, and improper. The manner in which people process their grief is personal and unique. It would be irrelevant and would constitute improper speculation for another individual to characterize the manner in which Ms. McCreary grieved the loss of her son.

6. Testimony and allegations concerning Mr. Mace inappropriately communicating with another woman in the weeks prior to his death. Whether the personal issues between Mr. Mace and Ms. Brady contributed to Mr. Mace's mental health crisis and motivated him to end his life does not have any relevance to the issues in this case. The underlying reason for Mr. Mace's mental health crisis does not matter in determining whether Defendants were negligent in selling the firearm to him. The issue for the jury is whether Defendants knew Mr. Mace was suicidal and whether Defendants took appropriate steps. The reason for his suicidal ideation is not relevant. Allowing testimony along these lines would merely disparage Mr. Mace and would unfairly invite the jury to despise Mr. Mace.

7. Testimony that Kayla Brady or Nicole Mace (Mr. Mace's sister) were critical of Mr. Mace for having mental health struggles and suicidal ideations. This testimony is not relevant and would serve to disparage Ms. Brady and Ms. Mace in front of the jury.

8. Testimony that Debra McCreary previously questioned the paternity of Mr. Mace's first son, Christopher, which was subsequently established. This testimony should be excluded because it is entirely irrelevant to the issues in this trial. The only purpose of eliciting this testimony would be to cause the jury to dislike Ms. McCreary, which is improper.

It is difficult to predict what other extraneous factual topics and incidents Defendant might seek to introduce during this trial. But the issues in this case are narrow. And the testimony and evidence presented to the jury should match the issues that are in dispute, while providing

appropriate context where needed. Defendants should not be permitted to malign or disparage Mr. Mace or his family and any such testimony should be excluded.

**CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiffs' motions in limine and exclude the evidence and testimony described above.

Respectfully submitted,

*/s/ Kevin Sullivan*

Kevin Sullivan, Fed. Bar No. 27506
Sullivan Law, LLC
323 W. Camden Street, Suite 700
Baltimore, MD 21201
(443) 909-1450
kps@kpsullivanlaw.com

Anatoly Smolkin, Fed. Bar No. 18618
Gallagher LLP
218 N. Charles Street, Suite 400
Baltimore, MD 21201
(410) 347-1334
asmolkin@gallagherllp.com

*Attorneys for Plaintiffs*

Dated: December 8, 2025