**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | | |
|---|---|---|
| **KAYLA M. BRADY, et al.** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **vs.** | * | **Case No.** 8:21-cv-01412-AAQ |
| | * | |
| **WALMART INC.,** | * | |
| | * | |
| **Defendant.** | * | |

******

**MEMORANDUM OPINION AND ORDER**

This is a case concerning a Walmart store's sale of a firearm to its employee, Jacob Mace, who was experiencing a mental health crisis and subsequently ended his life using that firearm. Kayla Brady, Mr. Mace's surviving spouse, together with Mr. Mace's mother, Debra McCreary, Mr. Mace's father, Mark Mace, and Mr. Mace's two minor children, G.M. and C.C. (collectively, "Plaintiffs"), allege that Walmart Inc. was negligent in selling the firearm to Mr. Mace. Following an eleven-day jury trial in this case, the jury returned a verdict in favor of Plaintiffs Debra McCreary, Mark Mace, G.M., and C.C. ECF No. 155. Pending before the Court is Defendant Walmart's Renewed Motion for Judgement as a Matter of Law or in the Alternative Motion for a New Trial, ECF No. 162, as well as Plaintiffs' Opposition to Walmart's Combined Post-Trial Motion for Judgement on the Evidence or in the Alternative Motion for a New Trial, and Plaintiffs' Cross-Motion for a New Trial as to Kayla Brady, ECF No. 177. Also before the Court is Defendant's Consent Motion for Remittitur to Reduce Jury Award and to Enter Judgment in Accordance with Maryland Court's and Judicial Proceedings Article Section 11-108. ECF No.

160. The motions have been fully briefed, and a hearing is not necessary under this Court's Local Rules. *See* Loc. R. 105.6 (D. Md. 2025).

Although the parties and the Court have spent years and countless pages discussing the case, in some ways, the case is a simple one. It turns on whether a senior Walmart store official credibly stated, at trial, that he did not review a text message stating that the decedent intended to harm himself with a firearm. The jury, reasonably so, did not believe the Walmart official. Accordingly, it found Defendant liable. Despite Defendant's many arguments, it is not the Court's place to overturn this credibility determination.

For the reasons stated above and discussed further below, the Court denies Defendant's Motion for Judgment on the Evidence or in the Alternative Motion for a New Trial. Specifically, as to Defendant's Motion for Judgment on the Evidence related to the jury's award of lost wages, and damages for loss of household services to G.M., the Court denies the Motion without prejudice. The Court denies with prejudice Plaintiffs' Motion for a New Trial as to Kayla Brady, and grants Defendant's Consent Motion for Remittitur.

## BACKGROUND

### I. Pretrial Proceedings

Plaintiffs initially filed suit in Prince George's County Circuit Court alleging that Walmart's sale of the shotgun to Mr. Mace despite Walmart's actual or constructive knowledge that Mr. Mace was experiencing a mental health crisis and suicidal ideation, was negligent (Counts I and II), constituted negligent entrustment (Count III), and created a public nuisance (Count IV). *See* ECF No. 3, at 13, 16–19. Plaintiffs brought the negligence claim as both a wrongful death action on behalf of Mr. Mace's surviving wife, parents, and children, *id.* at 16, and a survival action, on behalf of the personal representative of Mr. Mace's estate, Kayla Brady, *id.* at 17. On

June 7, 2021, Defendant removed the case to this Court. ECF No. 1. On April 29, 2022, this case was assigned to the undersigned's chambers for all further proceedings.

On July 28, 2022, the Court granted, in part, and denied, in part, Defendant's Motion for Judgment on the Pleadings, ECF No. 31-1. ECF No. 43. The Court could not conclude, at that stage of the proceedings, that the Protection of Lawful Commerce in Arms Act ("PCLAA"), 15 U.S.C. §§ 7901–7903, barred Plaintiffs' lawsuit, but even if it did, the Court concluded that the lawsuit could proceed under the PLCAA's predicate exception. *See Brady v. Walmart Inc.* (*Brady I*), No. 8:21-cv-1412-AAQ, 2022 WL 2987078, at *3–4, *6 (D. Md. July 28, 2022). While the Court concluded that the PLCAA's negligence *per se* exception was inapplicable, it found that the PLCAA's negligent entrustment exception may apply to Plaintiffs' lawsuit but ultimately did not decide the issue. *See id.* at *10–12. Further, the Court concluded that Plaintiffs had sufficiently stated their negligence claims to survive a Motion for Judgment on the Pleadings. *See id.* at *12–16. However, the Court found that Plaintiffs had failed to state a valid claim for public nuisance under Maryland law and dismissed that count of their Complaint. *See id.* at *17.

On May 20, 2024, the Court denied Defendant's Motion for Summary Judgement, ECF No. 70. ECF No. 86. The Court found that the case was a qualified civil liability action that the PLCAA barred. *Brady v. Walmart Inc.* (*Brady II*), No. 8:21-cv-1412-AAQ, 2024 WL 2273382, at *7 (D. Md. May 20, 2024). The Court concluded, however, that the predicate and negligent entrustment exception might apply to the case. *Id.* at *8. Regarding the predicate exception, the Court found that Plaintiffs had established a genuine dispute of material fact as to whether Defendant knew or had reasonable cause to believe that Mr. Mace had a "mental disorder" and a history of self-harm such that he was prohibited from possessing a firearm under section 5-205(b)(6) of the Public Safety Article of the Maryland Code, *id.* at *10–12, and whether any

violation of this statute was the proximate cause of Mr. Mace's death, *id.* at *12. Regarding the negligent entrustment exception, the Court held that under Maryland law, ongoing control is not a necessary element of a negligent entrustment claim in the specific context of this case, *id.* at *16, and Plaintiffs presented sufficient evidence to establish a claim for negligent entrustment, *id.* at *17.

In assessing Plaintiffs' negligence claim, the Court found that "Defendant[] had a common law duty not to sell a firearm to Mr. Mace when [it] knew or had reason to believe that he might use the firearm to harm himself." *Id.* at *25. The Court could not conclude, as a matter of law, that Mr. Mace and Plaintiffs Brady, McCreary, and Mark Mace were contributorily negligent. *Id.* at *18–19. Finally, the Court concluded as a matter of law that the Maryland Workers' Compensation Act does not bar Plaintiffs' claims because Mr. Mace's injury did not arise out of and in the course of his employment. *Id.* at *28.

On May 29, 2024, Defendant moved the Court to certify its Memorandum Opinion and Order denying Defendant's Motion for Summary Judgement for interlocutory appeal to the U.S. Court of Appeals for the Fourth Circuit. ECF No. 87. The Court denied the Motion on December 11, 2024, finding that although whether the PLCAA preempts Plaintiffs' state claims involves controlling questions of law, ECF No. 91, at 4–7, there is not a substantial difference of opinion among courts regarding PLCAA's predicate and negligent entrustment exceptions, *id.* at 7–11, and an immediate appeal would not materially advance the ultimate termination of this litigation, *id.* at 11–13.

On January 13, 2025, the Court held a scheduling conference to set a schedule for trial and all pre-trial filings. ECF Nos. 94, 95. The Court ordered: 1) a three-week jury trial to proceed on January 5, 2026; 2) that a pre-trial conference be held December 22, 2025; 3) that the parties submit

all pretrial filings including motions in limine, stipulations of fact, proposed voir dire, proposed jury instructions, and proposed verdicts, on or before December 8, 2025; and 4) that the parties file any *Daubert* motions on or before March 3, 2025, any opposition by April 4, 2025, and any replies by April 25, 2025. ECF No. 94.

On March 3, 2025, Defendant filed a Motion to Exclude or Limit Plaintiffs' Experts Joseph J. Vince Jr., Mark Chad Abramson, and Dr. Craig J. Bryan. ECF No. 96. While not excluding the experts from testifying, the Court found the reports of Mr. Vince and Mr. Abramson impermissibly offered legal conclusions and precluded them from testifying to those conclusions. ECF No. 101, at 12–14. Similarly, Dr. Bryan was prohibited from testifying to matters outside his expertise, such as whether the gun sale to Mr. Mace was proper. *Id.* at 15–16.

On December 22, 2025, the Court held a pretrial conference. ECF No. 122. The Court discussed three matters during the conference: 1) the parties' Motions in Limine; 2) the parties' proposed verdict forms; and 3) the parties' proposed jury instructions. First, the Court resolved the parties' Motions in Limine and responses, ECF Nos. 111, 115, 119, 120, 121. Plaintiffs largely agreed to exclude evidence or testimony that Defendant moved to exclude, subject to some exceptions detailed in their Response, ECF No. 120, which the Court adopted with one additional caveat. ECF No. 127, at 1. Additionally, the Court granted, in part, and denied, in part, Plaintiffs' Motions in Limine, ECF No. 115. *Id.* at 1–2.

Second, the Court largely adopted Defendant's proposed verdict form, ECF No. 110-1. However, in adopting the proposed form, the Court eliminated question 3 which asked the jury if Mr. Mace's suicide was a "superseding intervening cause of the Plaintiffs' damages." ECF No. 110-1, at 1. The Court explained that question 3 was duplicative of question 2, asking the jury whether "Defendant's negligence proximately caused the Plaintiffs' damages." *See id.*; ECF No.

127, at 2; *see also Brady II*, 2024 WL 2273382, at *12 (considering whether any "intervening act or omission was a superseding cause of the injuries" as part of the proximate cause analysis). The Court agreed to amend the jury instruction on proximate cause to provide instruction on whether suicide is a superseding, intervening cause. ECF No. 127, at 2; *see* ECF No. 147, at 29 (Jury Instruction No. 25 – Intervening/Superseding Cause).

Plaintiffs objected to including questions on whether Mr. Mace negligently contributed to his death or assumed the risk of his injuries on the verdict form because they are duplicative of the proximate cause question. *See* ECF No. 110-1, at 3 (questions number 6 and 7). The Court found that as affirmative defenses, contributory negligence and assumption of risk, are not duplicative of the proximate cause question because a jury could find that Defendant was negligent and that Mr. Mace negligently contributed to his own death or assumed the risk of his injuries. However, the Court reserved ruling on whether question 7—asking the jury whether Mr. Mace assumed the risk of his injuries—should be included on the Form. ECF No. 127, at 2. The Court overruled Plaintiffs' objections to including similar questions related to whether Plaintiffs Brady, McCreary, and Mark Mace were contributorily negligent. *See* ECF No. 110-1, at 4 (questions numbers 9, 12, 15); *see also Brady II*, 2024 WL 2273382, at *12 (holding "[t]here are issues of fact as to whether Plaintiffs Brady, McCreary, and Mark Mace took . . . 'proper precautions' or acted unreasonably").

Finally, at the pretrial conference, the Court rejected Defendant's proposed Jury Instruction No. 22, ECF No. 108-1, at 24, because it contradicted the Court's prior holding that under Maryland law, "ongoing control is not a necessary element of negligent entrustment claim outside the automobile context." *See Brady II*, 2024 WL 2273382, at *16. The Court also rejected Defendant's proposed Jury Instruction No. 27, ECF No. 108-1, at 29, on proximate cause and suicide as similarly contradicting the Court's previous holding that under Maryland law, a

negligence claim arising out of a decedent's suicide does not require a plaintiff to allege and prove that defendant's conduct caused the decedent's mental state. *See Brady I*, 2022 WL 2987078, at *13–16; *Brady II*, 2024 WL 2273382, at *9. The Court granted leave for Plaintiffs to propose a jury instruction on PLCAA if filed by the end of the day on December 22, 2025, which the Plaintiffs did. ECF No. 123.

On December 29, 2025, the Court entered an order regarding voir dire, ECF No. 124, which was amended on December 31, 2025, with the Court's order on the issues related to the pretrial conference, ECF No. 127. On December 31, 2025, the parties stipulated to dismissal with prejudice of named Defendant Wal-Mart Stores East, L.P., leaving only Defendant Walmart, Inc. ECF No. 126. The Court approved the stipulation on January 2, 2026. ECF No. 128.

## II. Facts Presented at Trial

An eleven-day jury trial began on January 5, 2026. Plaintiffs called six fact witnesses: Sergeant Taylore Nauman, the St. Mary's County police officer who investigated Mr. Mace's death; Mr. Brennan Jones, Mr. Mace's supervisor and the second-in-command at the Walmart store where Mr. Mace worked; Mr. Mark Mace, Plaintiff and Mr. Mace's father; Ms. Deborah McCreary, Plaintiff and Mr. Mace's mother; Ms. Kayla Brady, Plaintiff, Mr. Mace's surviving spouse, and mother of his child, G.M.; and Mr. Eric McLaughlin, Sporting Goods Department Manager at the California store in 2019 and the person who sold Mr. Mace the shotgun.

Additionally, Plaintiffs called four expert witnesses. Two experts, Joseph Vince, Jr., a professor at Mount St. Mary's University and former U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agent, and Mark Abramson, owner and operator of a retail firearms store with a federal firearms license, offered opinion testimony relating to Walmart's sale of the firearm to Mr. Mace. Dr. Craig Bryan, PsyD., ABPP, a clinical psychologist and professor at the

University of Vermont, offered opinion testimony explaining how or why Mr. Mace might have acted differently had Walmart not sold him the firearm on November 15, 2019. Dr. Thomas Borzilleri, an economist who testified to the calculation of two types of Plaintiffs' economic damages: 1) economic support that Mr. Mace's wife and surviving children would have had access to had he not died; and 2) the economic value of the household services Mr. Mace would provide over the course of his life.

During Plaintiffs' case-in-chief, both parties designated portions of the deposition transcripts of Walmart's corporate designees, Mr. Nicholas Colucci and Mr. Timothy Crowley, which counsel read for the jury. Ms. Christina O'Shea, a Walmart employee who was friends with Mr. Mace and who exchanged text messages with him about his mental health crisis, was unable to testify at trial, and as a result, the parties agreed to designate portions of her deposition transcript which counsel read to the jury.

Defendant called four fact witnesses: Ms. Jennifer Krebs, Walmart employee and Mr. Mace's friend; Ms. Kristen Wagner, Department Manager for Grocery Pick Up at the California store and Ms. O'Shea's supervisor; Mr. Renard Mackell, Assistant Store Manager of the California store and Mr. McLaughlin's direct supervisor; and Ms. Ida Randall, Asset Protection Manager of the California store.

Defendant called three expert witnesses. Two of Defendant's experts are firearms sales experts: Ms. Judyth LeDoux, a former ATF inspector, and Mr. Scott Braum, an attorney who advises federal firearms licensees. Ms. LeDoux specifically testified to: 1) the procedure for obtaining an extreme risk protective order under Maryland's red flag laws which allows courts to temporarily prevent the sale of firearms to individuals who are at risk of harming themselves or others; and 2) whether Walmart's sale to Mr. Mace followed federal firearms laws and regulations.

Dr. Ronald Means, a psychiatrist and professor at the University of Maryland and Johns Hopkins University, testified to the factors that contributed to Mr. Mace's depression.

Additionally, during Defendant's case, both sides designated portions of Ms. Nicole Sherwood's deposition transcript which counsel read to the jury. Ms. Sherwood is the mother of Mr. Mace's son, C.C.

**A. Mr. Mace's Employment at Walmart**

Jacob Mace worked as a part-time maintenance associate at Walmart Store No. 1981, in California, Maryland, from March 2018 through May 2019 and again from September 2019 to the time of his death on November 15, 2019. *See* ECF No. 118, at 9. Mr. Mace's direct supervisor was Front End Coach Ms. Cybil Smith, who in turn was supervised by Mr. Brennan Jones, Co-Manager and "second in command" of the California store. ECF No. 135, at 8:4–9:4. In November 2019, Mr. Timothy Crowley, store manager, was the highest-ranking employee in the California store. *Id.* During his tenure at Walmart, Mr. Mace became close friends with several of his coworkers, including Joel Barr, Jennifer Krebs, and Christina O'Shea.

**B. Walmart's Policies and Procedures Governing Firearm Sales**

Because the California store sold firearms, it was required to hold a federal firearms license, and follow all federal and state laws, as well as Walmart's own policies and procedures governing firearm sales. Walmart's "foundational policy for firearms and ammunition sales" is "OP-16," a "national policy that applies to all Walmart stores that sell firearms." *See* Pls. Trial Ex. 4 (Walmart OP 16). Under OP-16, a Walmart employee can sell firearms only if they are a salaried member of management or a Sporting Goods Department associate that receives training in firearm sales. In 2019, the training for those authorized to sell firearms involved, first completing computer-based training modules and pre- and post-training assessments, followed by the trainee shadowing

an experienced manager. An experienced manager would observe new Sporting Goods Department associates completing firearms sales before they would be allowed to work at the firearms counter alone.

In November 2019, Walmart followed a three-step process for firearm sales. First, a qualified associate would obtain the customer's government-issued identification and check it against a physical folder containing documentation of the individual store's previous firearm sale denials from the past year. If the store had previously denied a firearm sale to that customer, or if the customer's last name or home address matched that of someone else to whom the store had previously denied a firearm sale, indicating a straw purchase,[1] the associate would terminate the transaction. Second, the customer would use a computer to complete Section A of ATF Form 4473, which in addition to asking basic information about the customer, asks questions to determine if federal law prohibits the sale. *See* Pls. Trial Ex. 14. Question 11F on the form asks, "Have you ever been adjudicated as a mental defective OR have you ever been committed to a mental intuition?" *Id.* The form goes on to define "committed to a mental institution" as:

> A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

[1] A straw purchase is prohibited by federal law and occurs when a customer buys a firearm for another person who cannot legally purchase a firearm, *see Brady II*, 2024 WL 2273382, at *1 n.2. The purchase of a firearm "as a gift for someone who otherwise could legally purchase the firearm" is not a straw purchase. *Id*. Both parties agree that Mr. Mace's purchase of the shotgun from Walmart on November 15, 2019, was not a straw purchase. ECF No. 118, at 10.

*Id.* Third, the associate would complete the remainder of Form 4473 and submit the information, through Walmart's computerized system, for an FBI background check, also known as the National Instant Criminal Background Check System (NICS). If the NICS background check results provide that the sale can proceed, OP-16 required a salaried member of management to approve and finalize the transaction. Under Maryland's red flag laws, family members can petition Maryland courts for an extreme risk protective order to temporarily remove firearms and prevent the sale of firearms to individuals who are at immediate risk of harming themselves or others. Ms. LeDoux testified that if a court issued an extreme risk protective order, that order would appear on an individual's NICS background check and they would be prevented from purchasing a firearm. After approving the sale, the salaried member of management would, per OP-16, escort the customer out of the store before handing over the firearm.

By November 2019, Walmart had at least three policies or mechanisms for preventing firearms sales to customers at risk of harming themselves or others. First, while a salaried manager must approve every gun sale, OP 16 provides that an associate can refuse to sell a firearm for any non-discriminatory reason and that decision cannot be overridden by management. *See* Pls. Trial Ex. 4, at 4. Elsewhere, OP 16 states that "if an associate has any reason to believe the customer might use the firearms to harm themselves or others, it is appropriate to refuse the sale." Walmart employees had conflicting interpretations of these sections of OP-16. Mr. Jones, the California store's second in command, and Mr. Mace's supervisor, testified that under Walmart's policy, if Walmart knows that the customer is having a mental health crisis and is suicidal, it can still sell a gun to that person, but the associate also has discretion to refuse the sale. ECF No. 135, at 8:10–25, 44:13–46:3. When asked if Walmart should deny a sale to a person it knows to be suicidal, Mr. Jones responded, "No." *Id.* at 46:6–8. Walmart's corporate designee, Nicholas Colucci,

interpreted the policy differently. He testified that it is his belief, "that this policy instructs associates, if they believe that a person is potentially considering self-harm or harming others, that they should refuse the sale."

Eric McLaughlin, Sporting Goods Manager[2] at the California store, testified to exercising the discretion OP-16 provides Walmart associates to deny an individual a gun for mental health reasons. He described recognizing the name of a customer who wanted to purchase a gun as the brother of a former colleague who had mentioned that he had struggled with his mental health. After excusing himself from the counter and confirming via phone call to his former colleague that the customer was indeed her brother and he should not obtain a gun, Mr. McLaughlin told the customer he could not sell him a gun.

In October 2018, Walmart's corporate home office rolled out a new system to sell firearms which included an additional procedure to block an individual from purchasing a firearm from Walmart. Specifically, the new system included the capability for limited personnel to add names to a block list, a list of individuals who Walmart believes are at imminent risk of self-harming or harming others. If a customer's name is on the block list, then during the electronic check described above, Walmart's system would indicate the sale should be denied. When viewing the denial, the Sporting Goods Department associate or manager would not see the reason for the denial. The threat management team, based in Walmart's corporate office, determines whether an individual should be added to the block list. According to Mr. Colucci, if a manager at a Walmart store becomes aware of an individual who is an imminent threat to harm himself or others, Walmart's "violence[-]free workplace policy" requires that manager to report that individual to

---

[2] Although Mr. McLaughlin's job title included "manager," he was an hourly employee and not a salaried manager authorized to approve and finalize firearms sales.

the store's market asset protection manager, who makes a report to the threat management team. This reporting process intends to get information regarding individuals who pose a threat to themselves or others to Walmart's threat management team, members of which have the ability to add individuals to the block list. Mr. Colucci also testified that Mr. Crowley would be in a better position to discuss how that reporting works; however, Mr. Crowley, the California store manager, first learned about the block list during his deposition in this case. The block list was not part of the training for store managers. As a result, neither Mr. Jones nor Mr. McLaughlin had been trained on the block list.

Mr. Braum testified that no federal or state law required Walmart to maintain a block list; however, Mr. Vince and Mr. Abramson both testified that it is common industry practice to utilize a procedure, like a block list or blacklist, that informs all gun store employees of any individual the store determines should be prohibited from purchasing a firearm. Neither expert could find any mention of block lists or blacklists in the training and policy materials Walmart provides its employees. None of the materials Mr. Vince reviewed indicated that Walmart had put Mr. Mace on a block list.

Additionally, both Plaintiffs' firearm experts found Walmart's policies lacking when it came to selling firearms to customers with mental health concerns. In both Mr. Vince's and Mr. Abramson's expert opinions, Walmart's training for its employees was inadequate because it did not encompass any training on what to do if an associate or manager learns someone is at risk of hurting themselves. Ms. LeDoux and Mr. Braum testified that it is not typical for federal firearms licensees to have policies specifically related to mental health and implementing such policies would be difficult because gun sellers are not mental health professionals.

### C. Mr. Mace's Mental Health Crisis[3]

Mr. Mace had experienced depression and suicidal thoughts since childhood. Mr. Mace started therapy for anxiety in fourth grade. At the end of middle school, he began self-harming by cutting himself. Mr. Mace attempted suicide by hanging when he was twelve years old. Mr. Mace was eventually diagnosed with borderline personality disorder, which Dr. Bryan testified meant that he had recurring suicidal thoughts and often overreacted to stressful situations.

Mr. Mace continued to experience mental illness in adulthood. Ms. Brady was aware of his mental health condition; both went to the same therapist. He also talked about his mental illness and suicidal ideation with his friends who worked at Walmart, including Christina O'Shea, Jennifer Krebs, and Joel Barr. In addition, at some point in 2019, several months before his death, Renard Mackell, Assistant Store Manager and direct supervisor of Mr. McLaughlin, approached Mr. Mace because he seemed frustrated. During this conversation, Mr. Mace shared that he had some mental health issues, including that he had previously attempted suicide, but stated that things were getting better for him.

#### i. Mr. Mace's First Hospitalization and Subsequent Emergency Room Visits

On October 31, 2019, Mr. Mace began to experience an acute mental health crisis. At the time, he was living in a townhouse with Ms. Brady, who was pregnant with Mr. Mace's son, G.M. On the evening of October 30, 2019, Ms. Brady discovered that Mr. Mace had been inappropriately texting his Walmart co-worker, Ms. Hannah Werner. The next day, Ms. Brady, Mr. Mace's sister,

[3] The Court recognizes that this terminology can be stigmatizing. Accordingly, this Opinion employs terminology consistent with the recommendations of the National Alliance on Mental Health whenever possible. *See* Nat'l All. on Mental Illness, *Your Language Matters* (2015), https://www.naminh.org/wp-content/uploads/2018/09/NAMI-Language-Matters.pdf; *see also Words Matter*, Ctr. for Addiction & Mental Health, https://www.camh.ca/en/today-campaign/help-and-resources/words-matter (last visited Aug. 6, 2026).

Ms. Nicole Mace, and some of Mr. Mace's friends confronted Mr. Mace and he admitted to having an inappropriate texting relationship with Ms. Werner. That night, Mr. Mace locked himself in the bathroom of the townhouse, refused to come out, cut himself, and expressed suicidal thoughts. Ms. McCreary took Mr. Mace to St. Mary's Hospital and Mr. Mace was voluntarily admitted on the morning of November 1, 2019. Mr. Mace told the doctor he had attempted suicide.

After taking Mr. Mace to the hospital, Ms. McCreary removed a shotgun and sharp objects from Mr. Mace's house. She also went to Walmart and told a manager that Mr. Mace was in the hospital. As a result, he would not be able to work his shifts that weekend, but he would bring in substantiating paperwork when he returned to work. Ms. McCreary did not know the name of the manager with whom she spoke.

On November 2, 2019, the treating staff at St. Mary's held a family meeting, which, along with Mr. Mace, included Ms. McCreary, Ms. Brady, and Ms. Nicole Mace. The purpose of the meeting was to put into place a safety plan to help Mr. Mace manage any future mental health crises. The plan included putting the suicide hotline number into Mr. Mace's phone and instructing him to call it if he experienced another mental health crisis. In addition to the suicide hotline, the safety plan encouraged Mr. Mace to designate individuals he would call for help.

On November 3, 2019, Mr. Mace was discharged from St. Mary's Hospital and Ms. McCreary took him to Walmart to drop off his prescriptions and medical documentation excusing him from missing work. While Mr. Mace was in the store, Ms. O'Shea saw him with his hoodie up over his head. She testified to telling him, "You're too handsome to hide your face." Ms. McCreary responded by saying something along the lines of, "No, he needs to hide that face." Ms. McCreary denies stating such.

On November 4, 2019, the day after Mr. Mace was discharged, he purchased a boxcutter from Walmart but did not tell Ms. Brady or Ms. McCleary about it. Two days later, on November 6, 2019, Mr. Mace's therapist told him he needed to go to the hospital. His friend Mr. Barr took him to the emergency department at St. Mary's Hospital on November 6, 2019, but he was not admitted. Sometime late in the evening on October 7, or early in the morning on October 8, 2019, Mr. Mace again went to the emergency department for suicidal ideation but was not admitted.

During this period, Mr. Mace was still navigating a tumultuous family life. At some point during the period after his first discharge from the hospital, Ms. Nicole Mace downloaded an app on Mr. Mace's phone to track Mr. Mace's communications and determine whether he was continuing to communicate with Ms. Werner. Also, during this week, Ms. Brady learned that Mr. Mace had continued to communicate with Ms. Werner. To stop this communication, Ms. Brady turned off his phone for about an hour. During this hour, he was unable to make calls, including to the suicide prevention hotline.

Dr. Means testified that based on his experience as a forensic psychiatrist, the most significant contributing factor to Mr. Mace's acute suicidal state was his family discord, in particular his perceived infidelity and the criticisms from his family about that perceived infidelity. Dr. Means did not find that Mr. Mace's employment at Walmart was a contributing factor to his depression.

### ii. The "Goodbye Message" and Mr. Mace's Second Hospitalization

At 10:55 a.m. on the morning of November 9, 2019, six days before his death, Mr. Mace sent a "goodbye message" via text to several of his Walmart co-workers, including Christina O'Shea. The message read:

> I feel broken. I've been to the hospital, called the suicide hotline twice, been taken to the ER twice, discharged twice, and had to say goodbye to the girl I love. I've felt crippling depression all week. I've had 1 attempt sense [sic] I got out of the hospital and I just get more discouraged every time I fail. Each time more determined to succeed next time. I try talking about my feelings but talking doesn't help. Nothing helps. I just want it all to end. Goodbye.

*See* Pls. Trial Ex. 1. Ms. O'Shea was working at Walmart when she received the text, and she called for Mr. Jones on the intercom. Instead, her team lead, Kristen Wagner, responded to the call and advised Ms. O'Shea to call the police nonemergency line. Ms. O'Shea was initially wary of calling the police because she felt it was a betrayal of Mr. Mace's trust. Ms. Wagner and Ms. O'Shea both consulted Mr. Jones and he told them to call the non-emergency number, ECF No. 135, at 31:2–15, which they did at approximately noon.

That day, Ms. O'Shea continued to message Mr. Mace, asking him exactly what he was planning to do. At around 12:50 p.m., after police had picked him up, Mr. Mace responded to her question: "Slit wrists. Buy a gun." In her deposition, Ms. O'Shea testified that she took a screenshot of this exchange and sent it to Mr. Jones at 1:21 p.m. *See* Pls. Trial Ex. 2. Mr. Jones testified at trial that he did not receive Ms. O'Shea's text with the screenshot of Mr. Mace's message. ECF No. 135, at 10:20–11:2. His trial testimony differed from his deposition testimony in which he said he did not remember whether or not he received the text. *Id.* at 11:3–15:2. During his trial testimony on January 7, 2026, Mr. Jones testified that he remembered more of the events of November 2019 now than he did on the date of his deposition, March 8, 2023. *Id.* at 19:8–

22:20. When asked how he was able to do that, he said, "just reading the information," and "just going over the events of that time." *Id.* When asked what specifically he reviewed, he testified that he reviewed his own testimony and that refreshed his recollection that he did not receive the screenshot of Mr. Mace's text. *Id.*

After sending the screenshot, Ms. O'Shea told Mr. Jones about her concern that Mr. Mace would attempt to purchase a gun from Walmart. Ms. O'Shea asked Mr. Jones whether there was a list Walmart could put Mr. Mace's name on to prevent him from purchasing a firearm. ECF No. 135, at 18:17–25. Ms. O'Shea was not trained in Walmart's firearms sales policy. Mr. Jones remembers Ms. O'Shea expressing concern that Mr. Mace was suicidal but does not remember her expressing concern that Mr. Mace would purchase a gun from Walmart. *Id.* at 17:23–18:7. Ms. O'Shea testified that Mr. Jones told her he would "take care of it." Mr. Jones denies he said this. *Id.* at 18:23–19:24.

Shortly thereafter, but prior to Mr. Mace's death, Mr. Jones discussed the situation with two other members of Walmart's management team. Mr. Jones called Beverly Madden, a human resources manager at Walmart, and recounted his conversation about Mr. Mace. ECF No. 135, at 23:23–18. He testified at trial that he asked Ms. Madden if a list existed that would prohibit Mr. Mace from buying a gun from Walmart. *Id.* at 23:19–24:2. Ms. Madden told him there was no such list. *Id.* Mr. Jones also reported the conversation with Ms. O'Shea to Mr. Crowley, store manager of the California store. *Id.* at 29:9–17.

After Ms. O'Shea called 911 on November 9, 2019, police went to Mr. Mace's house to conduct a wellness check and drive him to St. Mary's Hospital where he was voluntarily admitted. At some point that day or early the next morning, Mr. Mace was transferred to Calvert Hospital. During this hospitalization, his treating mental health providers changed his safety plan so that Ms.

Brady, Ms. Nicole Mace, and Ms. McCreary were no longer listed as contacts for Mr. Mace to call if he was experiencing a mental health crisis. Instead, Mr. Mace's handwritten safety plan included Ms. O'Shea, his cousin, Danielle, and Mr. Jones. Def. Trial Ex. 41, at 6. Ms. Krebs explained that those in Mr. Mace's safety plan knew that Mr. Mace was suicidal and would pick up the phone at any time if he needed to talk to someone during a mental health crisis. Before being discharged, on November 12, 2019, he had a family meeting with Ms. Brady and a social worker. Calvert Hospital discharged Mr. Mace on November 12, 2019. During this period when Mr. Mace was repeatedly going to the hospital, Ms. Brady, Ms. McCreary, and Mr. Mark Mace did not seek an extreme risk protective order for Mr. Mace.

Ms. O'Shea testified that between November 9, 2019, and when Mr. Mace returned to work, she told Mr. Jones that Mr. Mace was in the hospital. Mr. Jones denied knowing that police had taken Mr. Mace to the hospital but was aware that police had found him after Ms. O'Shea called the non-emergency line. ECF No. 135, at 30:21–31:1. Mr. Jones testified that because a third-party service called Sedgwick handles all health-related information pertaining to Walmart associate absences, Walmart store managers do not know the specific details regarding an associate's absence. *Id.* at 60:4–22.

After Mr. Mace returned to work following his hospitalization, Mr. Jones approached him and asked him how he was doing. *Id.* at 31:17–33:4, 80:14–83:5. Mr. Jones said that Mr. Mace responded that he was fine. *Id.* During the interaction, Mr. Mace mentioned that his wife had caught him cheating and Mr. Jones offered some words of encouragement. *Id.* Mr. Mace told Mr. Jones that human resources had contacted him about Resources for Living, Walmart's employee assistance program, but said he did not need it because he just had a bad day. *Id.* Mr. Mace did not mention his hospitalization or any suicidal ideation. *Id.* at 80:14–83:5

### D. Mr. Mace's Purchase of a Shotgun from Walmart

Mr. Mace owned and operated guns at multiple points throughout his life. Mr. Mark Mace purchased a firearm for Mr. Mace when he was a minor and took him hunting and shooting. In 2018, Mr. McLaughlin, the Sporting Goods Department Manager, sold Mr. Mace a shotgun from Walmart. Ms. McCreary took this gun after his November 1, 2019, admission to the hospital for suicidal ideation and self-harm.

On the afternoon of November 12, 2019, after Mr. Mace was discharged from the hospital, he initiated a Facebook Messenger conversation with Mr. McLaughlin about buying a shotgun from Walmart. *See* Pls. Trial Ex. 18. Mr. Mace asked Mr. McLaughlin whether Walmart sold "single shot shotguns" and how much the "cheapest one" cost, explaining that he wanted to buy one for Ms. Brady, to get her "back into shooting and hunting." *See id*. Ms. Brady testified that she saw this exchange and told Mr. Mace now was not a good time for him to purchase a gun. She did not contact Walmart or Mr. McLaughlin to let them know that Mr. Mace should not have a firearm because of his mental health condition.

On November 15, 2019, at around 9:30 a.m., during a break from work, Mr. Mace approached Mr. McLaughlin at the firearms counter to buy the shotgun he had messaged him about. Mr. McLaughlin verified that Mr. Mace had clocked out, as Walmart employees cannot buy firearms while on the clock. As part of the process of purchasing the firearm, Mr. Mace filled out ATF Form 4473. Pl. Trial Ex. 14. Mr. Mace checked the "No" box next to Question 11F, asking whether he had ever been involuntarily committed. *Id.* Mr. Mace's background check came back clear with no indications he could not purchase a gun. Ms. Ida Randall, the store's Asset Protection Manager, went to the firearms counter and approved the sale. Mr. Mace also bought ammunition for the firearm. *See* Pls. Trial Ex. 15. According to both Mr. McLaughlin and

Ms. Randall, Mr. Mace seemed normal—nothing about his behavior indicated he was experiencing a mental health crisis.

Ms. Randall escorted Mr. Mace out of the store before handing him the gun he had purchased. On their way out of the store, Mr. Mace and Ms. Randall passed Mr. Mace's friend and coworker Ms. Krebs, who was coming into the store. Ms. Krebs, who had received the "goodbye message" on November 9, 2019, asked him why he had purchased the gun to which he replied it was a gift for Ms. Brady. Ms. Krebs did not believe Mr. Mace and called Ms. Brady to tell her to take away the gun when Jake was on his lunch break. At some point later that morning, after Mr. Mace's friends had been unable to find him, Ms. Krebs drove around with Ms. Brady to search for him. They did not find him before learning that Mr. Mace died from a self-inflicted gunshot wound.

Sergeant Taylore Nauman, a St. Mary's County police officer, investigated Mr. Mace's death. She arrived at the scene, the parking lot adjacent to Walmart, at approximately 12:37 p.m. on November 15, 2019. She found Mr. Mace dead inside the vehicle. As part of her investigation, Sgt. Nauman went to Walmart that day and interviewed two of Mr. Mace's co-workers: Ms. O'Shea and Mr. McLaughlin. Ms. O'Shea showed Sgt. Nauman the text she received from Mr. Mace specifically mentioning that he would commit suicide by either slitting his wrist or buying a gun. Ms. O'Shea also showed Sgt. Nauman a text message she sent Mr. Jones, which included a screenshot of Mr. Mace's text. Pls. Trial Ex. 2. Sgt. Nauman observed Ms. O'Shea screenshotting her previous text message to Mr. Jones and emailing the text message screenshot to her. Ms. O'Shea told Sgt. Nauman that she had a conversation with Mr. Jones and asked that Mr. Mace be put on the blacklist or block list. Ms. O'Shea recounted that Mr. Jones said he would take care of it.

Sgt. Nauman also interviewed Mr. McLaughlin. *See* Pls. Trial Ex. 42-C (recording of part of Sgt. Nauman's interview with Mr. McLaughlin). In the recorded interview, Mr. McLaughlin said that when he heard that Mr. Mace was missing, he went to his manager, Mr. Mackell, and told him that he had sold a gun to Mr. Mace that morning and now he was missing. *Id.* Mr. Mackell responded that "Everybody knew [about Mr. Mace's mental health]. Why did we sell him a gun?" and that he wished he had been there because he never would have sold Mr. Mace a gun. *Id.* In the recording, Mr. McLaughlin also stated that, "I am the gun guy," and if management had told "the person in charge of the guns," that Walmart cannot sell Mr. Mace a gun, Mr. McLaughlin would have told his staff not to sell Mr. Mace a gun. *Id.* Mr. McLaughlin admitted to being emotional during the interview; however, his assessment of the situation on November 15, 2019, was consistent with his testimony at trial.

On November 15, 2019, Sgt. Nauman also spoke with Mr. Jones. She asked him about the text message Ms. O'Shea had sent him and about the block list. Mr. Jones responded that he could not do anything about it because Ms. O'Shea's report was "hearsay." Sgt. Nauman testified that Mr. Jones did not deny receiving the text message from Ms. O'Shea and having a conversation with Ms. O'Shea about Mr. Mace, nor did he deny he had the ability to put someone on the block list. Mr. Jones denies this characterization of the conversation: he alleges that he told Sgt. Nauman that there was no block list and "anything else is hearsay." ECF No. 135, at 24:6–12.

Mr. Vince reviewed the sale of the shotgun to Mr. Mace on November 15, 2019, and based on his experience and expertise, he testified that Walmart managers had the ability to stop the firearms sale to Mr. Mace by employing the block list. Mr. Vince further testified that a firearm dealer always has the discretion to stop a firearm sale. This includes instances where a purchaser successfully fills out ATF Form 4473 and the NICS background check contains no disqualifying

information. Mr. Abramson had a similar assessment of the November 15, 2019, firearm sale. Based on his expertise, he noted that Walmart's employees would not need to know the reason why Mr. Mace was on the block list, just that Walmart could not sell him a firearm.

Dr. Bryan testified that based on his experience as a clinical psychologist and his expertise in suicide prevention, the sale of the firearm was a direct contributor to Mr. Mace's death. He reached this conclusion because, in his opinion, amongst people who desire to commit suicide, there must additionally exist a capability to act upon suicidal urges. According to Dr. Bryan, research into suicide and suicide prevention show that capability, or access to lethal means, is more important than desire and, as a result, is more directly related to death. Firearms are a highly lethal suicide method with ninety to ninety-five percent of those who use a gun to attempt suicide dying from the gunshot wound. Other methods of attempting suicide are less lethal; for example, only two to five percent of those who attempt suicide by cutting die from that method. Additionally, according to Dr. Bryan, access to a firearm affects a suicidal person's mental state: the person will see suicide as a likelihood and their mood state destabilizes, making it easy for them to overreact to stressful situations.

If the sale had not occurred, Dr. Bryan testified that current research on suicide indicates that Mr. Mace was not likely to have attempted to purchase a gun at a different store or attempted another means of committing suicide. Dr. Bryan explained that when people are experiencing an acute risk episode, they lock in on a particular method of suicide, and are unable to solve problems, often defaulting to methods that are familiar to them. "Means substitution" or switching from one method of suicide to another is highly unusual and, furthermore, most other methods of suicide are not as lethal as firearms. Accordingly, Dr. Bryan concluded that research indicates that, more likely than not, if Walmart had not sold Mr. Mace the gun, Mr. Mace would still be alive.

**E. Economics Expert Testimony**

Mr. Mace graduated from high school in 2014. At the time of his death, he was attending the College of Southern Maryland and was six credits shy of earning his associate's degree in mechanical engineering. In November of 2019, he was not taking any classes because the classes he needed to graduate were not being offered that semester. He had expressed to his mother his desire to transfer to a four-year college and earn a bachelor's degree in mechanical engineering after he completed his associate's degree.

Mr. Mace's employment history included working for a lawn service company, working as a maintenance worker for a Catholic church, a school, and Walmart. Mr. Mace only worked for the church and school for a few months before his employment was terminated. At the time Mr. Mace died, he was working part-time at Walmart and made approximately $21,000 a year. Ms. Brady testified that Mr. Mace actively contributed to household chores, including cleaning, doing laundry, doing dishes, taking out trash, working on their car, buying groceries, setting up furniture, driving Ms. Brady – who could not drive, doing yard work, and taking care of their two cats. Mr. Mace also would take care of his child, C.C., which included watching him, cooking for him, taking him to the park, and driving him and his mother. Mr. Mace provided $300 a month to C.C.'s mother, Ms. Sherwood, for child support. Witnesses agreed that Mr. Mace planned on supporting both of his children financially.

Plaintiffs' economics expert, Dr. Borzilleri, testified to the calculation of two types of economic damages that Plaintiffs could recover: 1) the economic support that Mr. Mace's wife and surviving children would have had access to had he not died; and 2) the economic value of the household services Mr. Mace would provide over the course of his life. ECF No. 170, at 18:9–18. Dr. Borzilleri did not offer an opinion on the likelihood Mr. Mace would have obtained an

associate's degree or what jobs he could have obtained with this degree. *Id.* at 13:25–14:3, 19:7–13. Related to the first category of damages, Dr. Borzilleri calculated that had Mr. Mace never attained an associate's degree, based on the approximately $21,000 per year income he was earning at the time of his death, the loss of economic support to Mr. Mace's family was $720,675 if he stopped working at age sixty-two, $762,943 if he stopped working at age sixty-seven, and $781,157 if he stopped working at age seventy. *Id.* at 27:2–15. If he had obtained an associate's degree, Dr. Borzilleri testified the family's lost income would amount to $1,498,059 if he worked to age sixty-two, $1,587,619 if he worked to age sixty-seven, and $1,624,678 if he stopped working at age seventy. *Id.* at 29:10–16. Dr. Borzilleri did not calculate a specific number for the loss of financial support for Mr. Mace's two children. *Id.* at 56:4–23 ("What I got is a number that has to be allocated between the plaintiffs."). Dr. Borzilleri calculated the amounts based on the assumption that Mr. Mace was working full time at the time he died, and the totals would likely be higher if he had known that Mr. Mace was only working part time. *Id.* at 68: 4–20. The calculation assumes that Ms. Brady and Mr. Mace would remain married for the rest of their lives. *Id.* at 54:18–20.

Related to the second category of damages, Dr. Borzilleri calculated that the cost of replacement services from the loss of Mr. Mace would be $909,594 for 48.6 years of lost services. *Id.* at 43:1–9, 59:21–50:1. To calculate this category of damages, Dr. Borzilleri used the American Time Use Survey which provides rough approximations for the value of work of an average man of Mr. Mace's age. *Id*. at 43:11–47:16. Dr. Borzilleri testified that this estimation, the Dollar Value of a Day, is more accurate than attempting to calculate the value based on a witness's memory of the work Mr. Mace did for Ms. Brady and G.M. *Id.* Dr. Borzilleri did not include C.C. in his loss of household services calculation. *Id.* at 69:1–11. The calculation assumed that Mr.

Mace would provide these services to Ms. Brady for the rest of her life. *Id.* at 54:18–20, 67:19–21.

## III. Jury Verdict

The case was submitted to the jury on January 21, 2026, and on January 22, 2026, the jury returned its verdict. ECF No. 155. The jury found by a preponderance of the evidence that Defendant was negligent, that Defendant's negligence proximately caused the Plaintiffs' damages, that Defendant negligently entrusted the firearm to Mr. Mace, and Defendant knowingly violated a Maryland statute applicable to the sale of the firearm and the violation was a proximate cause of Plaintiffs' damages. *Id.* at 1–2. The jury also found by a preponderance of the evidence that Mr. Mace did not contribute to his own death, nor did he assume the risk of his injuries. *Id.* at 2. The jury found by a preponderance of the evidence that Ms. Brady negligently contributed to the death of Mr. Mace. *Id*. at 3. The jury found by a preponderance of the evidence that neither Ms. McCreary nor Mr. Mark Mace negligently contributed to the death of Jacob Mace and rewarded each $1,760,000 in noneconomic damages. *Id.* at 3–4. The jury awarded $948,000 in lost wages, $818,635 in lost services, and $2,060,000 in noneconomic damages to Mr. Mace's surviving minor son, G.M. *Id.* at 5. The jury awarded $632,000 in lost wages, $90,959 in lost services, and $2,440,000 in noneconomic damages to Jacob Mace's surviving minor son, C.C. *Id.* The total amount of damages awarded to Plaintiffs McCreary, Mark Mace, G.M., and C.C. is $10,509,594 consisting of $2,489,594 in economic damages and $8,020,000 in non-economic damages. ECF No. 177, at 8.

## IV. Pre- and Post-Verdict Motions

On January 12, 2026, before Plaintiffs' economic expert, Dr. Borzilleri, testified, Defendant moved to exclude portions of his testimony as confusing to the jury and prejudicial.

*See* ECF No. 167, at 3:9–25. Specifically, Defendant moved for the following opinion testimony to be excluded: 1) the value of the loss of household services that Mr. Mace would have provided over the course of his lifetime because Dr. Borzilleri did not have evidence of the types of services Mr. Mace provided, and instead relied on the American Time Use survey, *id.* at 7:9–9:17; 2) the loss of earnings if Mr. Mace had obtained an associate's degree, because he had not obtained an associate's degree at the time he died, *id.* at 11:24–12:15; and 3) the value of Mr. Mace's fringe benefits that he would have gotten from his employer over the course of his lifetime, based on their speculative nature, *id.* at 13:25–15:4. The Court denied Defendant's motion citing cases within this Court and other federal courts that admitted expert testimony based on the Dollar Value of a Day report. *See Thibodeaux v. Sterling*, No. 8:17-cv-01352-PWG, 2020 WL 4286874, at *6 (D. Md. July 27, 2020); *Herkso v. United States*, No. 13-CV-3255 (JLC), 2016 WL 6126561, at *11 (S.D.N.Y. Oct. 20, 2016) (collecting cases). The Court noted that Walmart's arguments went to the weight of the evidence, not its admissibility and noted that Walmart's counsel could cross-examine Dr. Borzilleri based on these concerns. *See Thibodeaux*, 2020 WL 4286874, at *6 ("Defendant's arguments [to exclude expert testimony based on Dollar Value of a Day report] go to weight rather than admissibility . . . and they may argue these points during trial."). Alternatively, Defendant argued that all of Dr. Borzilleri's testimony should have been excluded because he calculated a total amount of loss of household services and loss of earnings for everyone, not broken down by how much each minor and Ms. Brady would receive. *See* ECF No. 167, at 12:11–13:13. The Court held that this again went the weight of the evidence and that Defendant could raise this issue in its cross-examination of Dr. Borzilleri. *Id.* at 13:14.

At the close of Plaintiffs' case, Defendant raised a Motion for Judgement on the Evidence, under Federal Rule of Civil Procedure 50(a), ECF No. 127, and on January 13 and 14, 2026, the

Court heard argument on Defendant's Motion. First, Walmart argued that it was entitled to judgment on the evidence as to Plaintiffs' survival cause of action, because Plaintiffs failed to offer evidence that Mr. Mace experienced fear and apprehension before his death. ECF No. 137, at 2. The Court held that the key question was whether Plaintiffs put forward evidence that Mr. Mace experienced emotional distress because of Walmart's breach of duty, the provision of the firearm. ECF No. 172, at 4:16–5:12, 6:20–23 ("We're talking about . . . whether or not [Mr. Mace] suffered emotional distress as a result of the provision of the firearm."). Plaintiffs argued that Dr. Bryan's testimony included evidence that something in a suicidal person's mind changes when they are provided with the lethal means to complete the act and based on that evidence a jury could make reasonable inferences that between his purchase of the gun and suicide, Mr. Mace experienced fear and apprehension. *Id.* at 7:15–9:9. On January 20, 2026, the Court dismissed Plaintiffs' Count II, Mr. Mace's estate's survival action, because Plaintiffs had provided no evidence from which a jury could reasonably conclude that he was suffering fear and apprehension before harming himself.

Second, Walmart argued in its Rule 50(a) Motion that the evidence Plaintiffs presented established that Mr. Mace assumed the risk of dying by suicide with the firearm he purchased from Walmart. ECF No. 137, at 7; ECF No. 171, at 108:23–109:4. To prove the assumption of risk defense, the Defendant must show that Mr. Mace "had knowledge of the risk of danger, appreciated the risk, and voluntarily confronted the danger." ECF No. 171, at 20:17–21:1 (citing *Odenton Dev. Co. v. Lamy*, 575 A.2d 1235, 1240 (Md. 1990)). The Court expressed concern that if a jury found both that Mr. Mace experienced fear and emotional distress, as related to the survival action, and found that Mr. Mace did not have knowledge or appreciation of the risk, related to Defendant's affirmative defense, the verdict would be inconsistent because to experience fear and

apprehension, Mr. Mace would have had to have some knowledge that he would suffer some harm. *Id.* at 22:4–21. Ultimately, the Court found that whether Mr. Mace assumed the risk of his injuries was a question for the jury and denied the motion. *Id.* at 30:25–31:4; *see also id.* at 21:2–11 (citing *Schroyer v. McNeal*, 592 A.2d 1119, 1123 (Md. 1991)). The Court found sufficient evidence for a jury to find that Mr. Mace's did not "voluntarily" confront the danger of purchasing a gun. Specifically, Dr. Bryan's testimony—that when individuals are having an acute suicidal crisis, they have tunnel vision, lock in on a method of suicide, and are unable to problem solve—put in dispute whether Mr. Mace acted voluntarily. *See id.* at 31:5–33:12.

Defendant also moved for judgment because allegedly: 1) Mr. Mace and Plaintiffs Brady, McCreary, and Mark Mace were contributorily negligent, ECF No. 137, at 9–13; 2) Walmart owed no additional duty to Mr. Mace beyond what is required by federal and state law, *id.* at 14–20; 3) Plaintiffs failed to establish proximate cause, *id.* at 20–25; 4) the PLCAA bars all of Plaintiffs' causes of action, *id.* at 25–35; and 5) Walmart did not negligently entrust the firearm to Mr. Mace because it did not have control of the firearm at the time of Mr. Mace's suicide, *id*. at 35–36. The Court rejected these arguments as conflicting with the Court's prior orders. *See* ECF No. 172, at 39:3–4; *see also Brady I*, 2022 WL 2987078, at *6–12, *13, *16 n.8; *Brady II*, 2024 WL 2273382, at *8–12, *15–16, *17–20, *21–25. The Court held that Ms. O'Shea's testimony created a factual dispute as to whether Walmart's management knew that Mr. Mace was suicidal and had a history of self-harm. ECF No. 172, at 39:3–41:18.

At the conclusion of Defendant's case, Plaintiffs raised a Motion for Judgement as a Matter of Law on Contributory Negligence and Assumption of Risk or, in the alternative, Motion to Strike from Jury Instructions and Verdict Form. ECF No. 142. Citing caselaw from outside of Maryland and Restatement (Second) of Torts § 449, Plaintiffs argued that because the acts which Mr. Mace's

mental illness allegedly caused him to commit were the very foreseeable acts which makes Defendant's conduct negligent, these same acts cannot, as a matter of law, constitute contributory negligence or assumption of risk. ECF No. 174, at 5:6–9; ECF No. 142, at 5. In response, Defendant argued that the cases on which Plaintiffs relied were distinguishable because each involved a special relationship between the decedent and the defendant requiring the defendant to take reasonable care to prevent the decedent's suicide, whereas here, Walmart did not have a duty to prevent Mr. Mace's suicide. ECF No. 174, at 13:3–16:4. The Court held that because the duty Walmart owed Mr. Mace was not to prevent his suicide, but rather not to sell him a gun if it knew or had reason to know he might use the gun to harm himself, *see* ECF No. 147, at 25, contributory negligence and assumption of risk are applicable defenses in Maryland.

In addition, at the close of Defendant's case, Plaintiffs argued that Defendant presented no evidence that any of the Plaintiff family members' conduct caused Mr. Mace's suicide. ECF No. 174, at 7:7–8:19. Plaintiffs argued Dr. Bryan was the only expert to testify to causation and Dr. Means' testimony that family discord can lead to increased depression, and suicidality did not establish that the family caused Mr. Mace's death. *Id*. The Court denied the Motion because whether the plaintiff family members were contributorily negligent was a question of fact for the jury. *Id.* at 27:22–28:17, 36:16–19.

At the close of its case, Defendant renewed its Motion for Judgement on the Evidence. *Id.* at 35:20–36:5. The Court denied the renewed Motion because no additional evidence changed the Court's initial rulings. *Id.* at 36:6–11. During the pre-charge conference, the Court also heard argument on the Proposed Jury Instructions and the Verdict Sheet. ECF Nos. 143, 144.

On February 9, 2026, Defendant filed a Consent Motion for Remittitur to Reduce Jury Award and to Enter Judgment in Accordance with Maryland Court's and Judicial Proceedings

Article Section 11-108. ECF No. 160. Also on February 9, 2026, Defendant filed a Combined Post-Trial Motion for Judgment on the Evidence, or, in the alternative, Motion for a New Trial. ECF No. 162. On March 27, 2026, Plaintiffs filed their Opposition to Walmart's Combined Post-Trial Motion for Judgement on the Evidence, or in the alternative, Motion for a New Trial and Plaintiffs' Cross-Motion for a New Trial as to Kayla Brady. ECF No. 177. On April 17, 2026, Defendant filed its Reply in Support of its Combined Post-Trial Motion. ECF No. 181.

## LEGAL STANDARDS

Defendant has moved for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(b) or, in the alternative, for a New Trial under Federal Rule of Civil Procedure 59. ECF No. 162. Plaintiffs also move for a new trial as to Ms. Brady. ECF No. 177, at 57.

### I. Rule 50(b) Motion for Judgment as a Matter of Law

Rule 50(b) motions revolve around the sufficiency of the evidence presented at trial. As explained by the Fourth Circuit:

> A trial court may grant judgment as a matter of law when it finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the non-moving party. A court, however, may not disturb the verdict where there was sufficient evidence for a reasonable jury to find in the non-movant's favor. A trial court may not appropriately enter [JMOL] unless it concludes, after consideration of the record as a whole in the light most favorable to the non-movant, that the evidence presented supports only one reasonable verdict, in favor of the moving party.

*Dotson v. Pfizer, Inc.*, 558 F.3d 284, 292 (4th Cir. 2009) (internal quotation marks and citations omitted) (alteration in original); *see also Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir. 1996) ("Because federal courts do not directly review jury verdicts, constrained, as we are, by the Seventh Amendment, the [proponent of a JMOL motion] bears a hefty burden in establishing that the evidence is not sufficient to support the [jury's findings]."). If a renewed motion under Rule

50(b) is properly presented to the court, the court may "(1) allow judgment on the verdict, if the jury returned a verdict, (2) order a new trial, or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b).

The Court "must grant judgment as a matter of law when 'there is no legally sufficient evidentiary basis' for the verdict." *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir. 2001) (citation and internal quotation marks omitted). In considering a motion under Rule 50, the court is "compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them." *Id.* (quoting *Price*, 93 F.3d at 1250). Indeed, "[i]n determining whether the evidence supports only one reasonable verdict, [courts] refrain from making credibility determinations or weighing the evidence, as these are jury functions, not those of a judge." *Reaching Hearts Int'l, Inc. v. Prince George's County*, 368 F. App'x 370, 372 (4th Cir. 2010) (internal quotations and citations omitted). The court must view the evidence "in a light most favorable to the non-moving party (and in support of the jury's verdict) and [it must] draw[] every legitimate inference in that party's favor." *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 610 (4th Cir. 2021) (*Int'l Ground Transp. v. Mayor of Ocean City*, 475 F.3d 214, 218–19 (4th Cir. 2007)). The court may grant the motion only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)).

## II. Rule 59(a) Motion for New Trial

Rule 59(a)

> require[s] district courts to set aside the verdict and grant a new trial where (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 268 (4th Cir. 2021) (citations and quotation marks omitted). Motions for new trial under Rule 59(a) are "'governed by a different standard' than a Rule 50(b) motion." *Harris v. Wormuth*, 669 F. Supp. 3d 477, 500 (D. Md. 2023) (quoting *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)). Unlike a Rule 50(b) motion, in considering a Rule 59(a) motion, a district court "may weigh evidence and assess credibility." *Id.* (quoting *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994)). A new trial is appropriate based on erroneous jury instructions if "there is a reasonable probability that the erroneous instruction affected the jury's verdict." *BMG Rights Mgmt. (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293, 305 (4th Cir. 2018). "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Snoeyenbos v. Curtis*, 60 F.4th 723, 732–34 (4th Cir. 2023) (quoting *United States v. Park*, 421 U.S. 658, 674 (1975)).

### III. Law of the Case Doctrine

The "law-of-the-case doctrine recognizes that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). The doctrine "is a 'practice of courts,' 'not a limit to their power,'" *Westmoreland v. Prince George's County*, No. TDC-14-0821, 2016 WL 5720706, at *9 (D. Md. Sept. 30, 2016) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)), and it "poses no bar to the assessment of past holdings based on a different procedural posture" where the subsequent development of facts "expands the court's inquiry," *Graves*, 930 F.3d at 318. Although the law of the case doctrine is "not an ironclad rule," *Chase v. Dep't of Pub. Safety & Corr. Servs.*,

No. ELH-18-2182, 2020 WL 1914811, at *11 n.5 (D. Md. Apr. 20, 2020)), "courts should be 'loath[]' to revisit settled decisions of law absent 'extraordinary circumstances,'" *Chase*, 2020 WL 1914811, at *12 (quoting *Christianson*, 486 U.S. at 817). "Such extraordinary circumstances include (1) when a trial has resulted in substantially different evidence; (2) there has been a change in controlling legal authority that has made a contrary decision of law applicable to the issue; or (3) the prior decision was clearly erroneous or would result in manifest injustice." *Westmoreland*, 2016 WL 5720706, at *9 (citing *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999)). To the extent that Defendant and Plaintiffs challenge the Court's prior resolutions of questions of law, the Court will decline to revisit these decisions absent extraordinary circumstances.

## ANALYSIS

### I. Walmart's Post-Trial Motion for Judgment on the Evidence or a New Trial

Defendant makes seven arguments in its renewed Motion for Judgment on the Evidence or a New Trial: 1) Walmart complied with all relevant duties as a matter of law, ECF No. 162, at 3–16, 2) Plaintiffs have failed to establish proximate cause, *id.* at 16–21; 3) the PLCAA bars all of Plaintiffs' causes of action, *id.* at 21–34; 4) Walmart did not negligently entrust the firearm to Mr. Mace, *id.* at 34; 5) the formulation of Walmart's duty would have required Walmart to violate the Americans with Disabilities Act, *id.* at 35–37; 6) the jury's award of economic damages to Mr. Mace's minor children is not supported by the evidence, *id.* at 37–43; and 7) incorrect evidentiary rulings prejudiced the trial outcome, *id.* at 44–47.

#### A. As a Matter of Law, Walmart Owed a Common Law Duty to Mr. Mace.

The jury found by a preponderance of the evidence that Defendant was negligent. ECF No. 155, at 2. Defendant moves for judgment in its favor because as a matter of law it argues it complied with all duties it owed Mr. Mace. ECF No. 162, at 7. Specifically, Defendant makes

five related claims: 1) Walmart did not have a special relationship with Mr. Mace, foreclosing any duty; 2) the formulation of Walmart's duty to Mr. Mace was erroneous; 3) Walmart complied with all relevant state and federal firearms sale laws; 4) the jury instruction on duty of care was incorrect and prejudicial; and 5) the Court erred in failing to give a supplemental jury instruction on the standard for contributory negligence. *Id.* at 7–15.

These arguments all center on a common theme: Defendant's actions are exempted from traditional negligence duty analysis because suicide is different. *See, e.g.*, *id*. at 8 ("Walmart once more urges the Court to revisit its analysis in determining a duty could exist under the facts alleged by Plaintiffs and reiterates that a duty can only exist where the breach of an underlying duty causes the decedent to become suicidal, or where a special relationship exists."). The Court has already rejected this argument. *See Brady I*, 2022 WL 2987078, at *13–16; *Brady II*, 2024 WL 2273382, at *9–10. Maryland law does not provide blanket immunity to firearms retailers if their negligence causes someone's suicide. *See Sindler v. Litman*, 887 A.2d 97, 111–12 (Md. Ct. Spec. App. 2005) (holding a party can be liable for negligently causing someone's suicide). This Court, following the lead of Maryland courts, reviewed the evidence to determine whether, under the circumstances of this case, Walmart owed Mr. Mace a duty of care. *See Brady II*, 2024 WL 2273382, at *20–25. The Court found Walmart did owe Mr. Mace a duty of care if it "knew or had reason to know he might use the firearm to harm himself." ECF No. 147, at 25. Defendant is unable to point to additional case law or trial evidence that requires the Court to revisit this prior holding. *Westmoreland*, 2016 WL 5720706, at *9 (citing *Aramony*, 166 F.3d at 661).

Plaintiffs' wrongful death claim is grounded in allegations that Walmart negligently "failed to appropriately train and supervise its employees." ECF No. 3, at 16. There are four elements to a wrongful death claim under Maryland law:

> (1) [T]he victim's death; (2) that the victim's death was proximately caused by the negligence of the defendant; (3) that the victim's death resulted in injury to the plaintiff, who falls within the category of beneficiaries defined by the statute; and (4) that the claim is brought within the applicable statutory period.

*Osunde v. Lewis*, 281 F.R.D. 250, 260 (D. Md. 2012) (citing Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* 396 (4th ed. 2008)). In Maryland, a claim for negligent training or supervision, "like any negligence action, requires the plaintiff to prove the existence of four elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury; and (4) the injury proximately resulted from the defendant's breach." *Jones v. State*, 38 A.3d 333, 343 (Md. 2012); *accord Marrick Homes LLC v. Rutkowski*, 161 A.3d 53, 65 (Md. Ct. Spec. App. 2017) ("Critically, the elements of negligent supervision are identical to the elements of a general negligence claim.").

There are two broad categories in which defendants in Maryland can be held liable for negligence that results in suicide:

> One is when a party's conduct actually causes the suicide, and the other is when, because of a "special relationship," a party breaches a duty to prevent a foreseeable suicide. While the same general principles of tort law apply to the two categories, the analysis is different. In the first category, the focus is on the existence of a duty, and in the second category, the focus is on causation, assuming a duty and breach of that duty.

*Brady I*, 2022 WL 2987078, at *14 (quoting *Sindler v. Litman*, 887 A.2d 97, 111–12 (Md. Ct. Spec. App. 2005)). The Court has already held that this case falls into the first category, because "Plaintiffs make clear that they are alleging that Defendant[] affirmatively caused the death of Mr. Mace." *See id*. at *16–17, *16 n.8. Plaintiffs do not allege that a special relationship existed between Mr. Mace and Walmart, and therefore the second category of cases is not relevant to this matter. *Id*.

Whether Defendant owed a duty to Mr. Mace "[i]s a question of law to be decided by the court." *Pendleton v. State*, 921 A.2d 196, 204 (Md. 2007). The Court determined that Walmart owed a legal duty to Mr. Mace and instructed the jury that:

> Duty is an obligation to conform to a particular standard of conduct toward another. In this case, I have already ruled as a matter of law, that the Defendant owed a duty not to sell a firearm to Jacob Mace if it knew or had reason to know he might use the firearm to harm himself. Therefore, the question of the existence of a duty is not for you to consider.

ECF No. 147, at 25 (Jury Instruction No. 21). Following the lead of Maryland courts, in finding that Walmart owed a duty to Mr. Mace, this Court considered seven-factors: (1) the "foreseeability of harm to the plaintiff"; (2) "the degree of certainty that the plaintiff suffered the injury"; (3) "the closeness of the connection between the defendant's conduct and the injury suffered"; (4) "the moral blame attached to the defendant's conduct"; (5) "the policy of preventing future harm"; (6) "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach"; and (7) "the availability, cost and prevalence of insurance for the risk involved."[4] *Eisel*, 597 A.2d at 452 (quoting *Vill. of Cross Keys, Inc. v. U.S. Gypsum Co.*, 556 A.2d 1126, 1131 (Md. 1989)); *accord Kennedy Krieger Inst., Inc. v. Partlow*, 191 A.3d 425, 451 (Md. 2018) (describing these as "the seven classic factors that [the Maryland Court of Appeals] has time and time again used in determining the existence of a duty under the common law"); *Kiriakos*, 139 A.3d at 1033–34. *See also Brady II*, 2024 WL 2273382, at *20–25 (analyzing the seven factors and finding Walmart owed a duty of care to Mr. Mace).

[4] The seventh factor—the availability, cost, and prevalence of insurance for the risk at issue—was not considered by the Court as the Plaintiffs presented no evidence on this issue. *See Brady II*, 2024 WL 2273382, at *25. Despite this, the Court recognizes a duty because the other six factors weigh in favor of it. *See id*.

Maryland courts have stated that "[w]here the failure to exercise due care creates risks of personal injury, 'the principal determinant of duty becomes foreseeability.'" *Patton v. U.S. Rugby Football*, 851 A.2d 566, 571 (Md. 2004) (quoting *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 760 (Md. 1986)); *see also Eisel*, 597 A.2d at 452 ("Foreseeability is the most important variable in the duty calculus . . . ." (citing *Ashburn v. Anne Arundel County*, 510 A.2d 1078, 1083 (Md. 1986))). Although "foreseeability is often considered among the most important" of the seven factors, "its existence alone does not suffice to establish a duty under Maryland law." *Patton*, 851 A.2d at 571 (quoting *Remsburg v. Montgomery*, 831 A.2d 18, 26 (Md. 2003)).

**1. Maryland Law Requires the Court to Engage in the Traditional Negligence Duty Analysis.**

Walmart again tries to limit the scope of the first category of cases in which defendants in Maryland can be held liable for negligence that results in suicide to only those cases in which the defendant caused the decedent's mental state. ECF No. 162, at 7; *see also* ECF No. 31-1, at 12 (making the same argument in Defendant's Motion for Judgment on the Pleadings); ECF No. 70-1, at (making the same argument in Defendant's Motion for Summary Judgement). Defendant's argument relies on two misinterpretations of Maryland case law. First, Defendant argues that the seven-factor test the Court applied to determine whether Walmart owed a duty to Mr. Mace is only properly used to determine the "existence of a special relationship." ECF No. 162, at 8. Second, Defendant asserts that Maryland's adoption of a general rule determining suicide to be a superseding, intervening cause means Walmart can only be liable if a special relationship exists between Walmart and Mr. Mace or if Walmart caused Mr. Mace's mental state. *Id.* at 7. The first argument is clearly contrary to Maryland law. *See Kennedy Krieger*, 191 A.3d at 451. The second has already been rejected by this Court. *See Brady I*, 2022 WL 2987078, at *14–16; *see also Westmoreland*, 2016 WL 5720706, at *9 (holding that a court will only overturn its prior holdings

in extraordinary circumstances). Defendant presents no additional case law that requires the Court to overturn its prior holdings.

Neither of Defendant's arguments compel the Court to conclude that Defendant did not owe a duty to Mr. Mace. First, Maryland law does not require the existence of a special relationship to establish a common law duty. The Maryland Supreme Court recently reiterated that Maryland follows traditional tort law principles in determining whether a common law duty exists. *Kennedy Krieger*, 191 A.3d at 450. When the case is about risk of personal injury, as is the case here, "the focus is less on whether a direct or special relationship existed between the plaintiff and defendant, and more on the foreseeability of the harm to the plaintiff." *Id*. "Although a special relationship certainly may be the basis for a duty of care, duty can be established in other ways," specifically, by considering "the seven classic factors" that Maryland courts have "time and time again used in determining the existence of a duty under the common law." *Id.* Defendant incorrectly argues that the seven factors in *Eisel* may only be used to determine the existence and scope of a special relationship. ECF No. 162, at 3–4. When discussing the seven factors, the court in *Eisel* quoted from its decision in *Village of Cross Keys, Inc. v. U.S. Gypsum Co.*, 556 A.2d 1126, 1131 (Md. 1989), which involved a construction defect dispute between a condominium association and developers, absent any special relationship. *Eisel*, 597 A.2d at 452 (quoting *Village of Cross Keys*, 556 A.2d at 1131). Thus, this Court correctly relied on the seven factors that have been considered by numerous Maryland cases to determine whether a duty existed outside of the "special relationship context." *See Brady II*, 2024 WL 2273382, at *20–25 (considering the seven factors in determining that Walmart owed Mr. Mace a duty of care); *see also, e.g.*, *Kiriakos*, 139 A.3d at 1006 ("Our decision is consonant with the classic factors we use to decide questions of duty under the common law: [listing seven factors]"); *Warr v. JMGM Grp.,*

*LLC*, 70 A.3d 347, 354 (Md. 2013) ("Duty, however is not assumed, but is generally determined by examining a number of factors, to include: [listing seven factors]."); *Kennedy Krieger*, 191 A.3d at 450–55 (considering the seven factors in determining that a medical research institute owed a duty of care to a non-participant five-year-old child living in the same house as a two-year-old child participating in a lead abatement study, separate from the discussion of whether a special relationship existed).

Second, *Sindler* requires the Court to apply traditional tort law principles in determining whether a duty exists. Disagreeing with the Court's interpretation, Defendant contends under *Sindler*, if there is no special relationship, the defendant is only liable if it caused the decedent's mental state. ECF No. 162, at 18–19. Under the Defendant's proposed interpretation of Maryland law, it does not matter if the facts of the case demonstrate that the suicide was foreseeable, a defendant can never be held liable if its conduct does not fall into these narrow exceptions. As explained in the Court's previous holdings, this argument misreads *Sindler*, *see Brady I*, 2022 WL 2987078, at *13–16, and conflicts with Maryland law on proximate cause and superseding acts, *see Collins v. Li*, 933 A.2d 528, 567 (Md. Ct. Spec. App. 2007) (explaining that an "intervening act does not become a superseding cause if the party committing the initial act should have realized that one would subsequently so act" (citing Restatement (Second) of Torts § 447)).

Defendant correctly observes that *Sindler* adopted the "majority rule," operative in many states, that "generally suicide is an independent superseding act or, in any event, not proximately caused by the negligent act, which precludes imposing liability on a third party for the suicide of another." ECF No. 162, at 16 (quoting *Sindler*, 887 A.2d at 109). That said, *Sindler* did not define all the specific circumstances in which a defendant may be held liable for suicide. *See Brady I*, 2022 WL 2987078, at *13. The *Sindler* court, analyzing whether defendant was liable to the

surviving spouse of a motor vehicle collision victim who ultimately died by suicide, recognized "an important exception to the general rule that suicide is a superseding, intervening act in any event, that the negligent act was not the legal or proximate cause of the suicide." *Id.* (citing *Sindler*, 887 A.2d at 117). As an example, the *Sindler* court observed that where the negligent conduct caused delirium or insanity of another, like the facts of the case suggested, the negligent actor could be liable for suicide. *Id*. Again, despite Defendant's assertions, nothing in the *Sindler* decision limits liability for causing a decedent's suicide to only this one example. Rather, "the specific dispute in *Sindler* was limited to whether the court should adopt a per se rule [that a party may not seek relief against a defendant for the suicide of a third party] and second, if it did not, whether the court should specifically adopt Restatement (Second) of Torts § 455 ("Restatement § 455") pursuant to which a defendant may be held liable if it causes the insanity of a third party who commits suicide." *Id*. (citing *Sindler*, 887 A.2d at 109).

The *Sindler* court's recognition of a general rule related to suicide and one example of an exception to this general rule based on the facts of the case in no way absolves this Court of its responsibility to engage with the facts of the instant case to determine whether a duty exists. *See Kennedy Krieger*, 191 A.3d at 450. Nor does it give the Court permission to take away a disputed question of fact from the jury. *See Caroline*, 304 A.2d at 835 ("[U]nless the facts admit of but one inference . . . the determination of proximate cause . . . is for the jury."). As this Court has already observed, Maryland law requires courts to engage in traditional negligence duty analysis to determine if Walmart owed Mr. Mace a common law duty of care, even though Maryland courts recognize a general rule that suicide is often a superseding, intervening cause. *See Brady I*, 2022 WL 2987078, at *14–16; *Sindler*, 887 A.2d at 112 (observing that Restatement (Second) Torts § 455 is "simply a statement of proximate cause in a specific context").

This Court's reading of *Sindler* is consistent with the Maryland Court of Special Appeals decision in *State v. Baker*, No. 2469, 2021 WL 3052916 (Md. Ct. Spec. App. July 20, 2021) (unpublished opinion). In that case, the Maryland Court of Special Appeals affirmed that evidence showing the suicidal intent of the purchaser of Fentanyl laced with heroine should not be admitted in a case where the purchaser died from an overdose. *Baker*, 2021 WL 3052916, at *1–2. In reaching this conclusion, the court found that although *Sindler* stood for the proposition that an act of suicide may be considered an independent, superseding act, in situations where the connection between the defendant's negligent act and the victim's suicide is not actually broken, the defendant is not relieved of liability. *Id.* at *4 (holding that a defendant might be criminally liable for gross negligence for a suicide "if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation."); *see also Brady I*, 2022 WL 2987078, at *14 (quoting *Baker*, 2021 WL 3052916, at *4).

Defendant contends that the Court cannot rely on *State v. Baker*, because it is an unpublished criminal case making an evidentiary ruling, and therefore not precedential nor applicable in this context. ECF No. 162, at 22, 22 n.6. The Court has previously addressed the fact that *Baker* is a criminal case, noting that "[g]iven the higher standard required to find an individual grossly negligent, as opposed to merely civilly negligent, it is clear that *Baker* is equally applicable here." *Brady I*, 2022 WL 2987078, at *15 (citing *Pagotto v. State*, 732 A.2d 920, 925 (Md. Ct. Spec. App. 1999)). The Court uses *Baker* as an example of Maryland courts engaging in the typical proximate cause fact analysis consistent with *Sindler*. Unlike other Maryland cases where the plaintiffs argued that the facts fall into one of the two common exceptions to the general rule on suicide, *see, e.g.*, *McDougald v. Spinnato*, No. ELH-17-2898, 2019 WL 1226344, at *23

(D. Md. Mar. 15, 2019) (plaintiff arguing that decedent prisoner who committed suicide had a special relationship with defendant officers because he was in custody and that defendant officers caused decedent's mental state), in *Baker*, the facts are much more analogous to the instant case—defendant provided the decedent with a lethal means of committing suicide which the State argues caused decedent's death, *see Baker*, 2021 WL 3052916, at *1. The only other court to analyze *Baker* applied a similar analysis to that applied by this Court. Like this Court, the Colorado Supreme Court in *People v. Beverly* relied on the same traditional proximate cause analysis used by *Sindler* and *Baker* to determine that suicide is the kind of "'abnormal' behavior" that at "least in some circumstances," "we should not expect defendants to foresee" and therefore, a "purchaser's suicide by intentional overdose may sever the causal connection between a defendant's sale of drugs and a purchaser's death." *People v. Beverly*, 568 P.3d 398, 407 (Colo. 2025). The court went on to note, however, that a reasonable jury might conclude that a purchaser's suicide was reasonably foreseeable if the defendant "was aware, or should have been aware, of the purchaser's suicidal tendencies." *Id.* at 407–08. Ultimately, the Colorado Supreme Court held that whether suicide constitutes an intervening cause is a fact question for the jury. *Id.* ("[W]e decline to declare the purchaser's suicidal intent is categorically irrelevant to [the Colorado statute's] proximate cause analysis because proximate cause is, at its core, a fact-based determination. When that determination requires deciding whether a purchaser's suicide constitutes an intervening cause, a reasonable jury may reach different conclusions under different circumstances."). That is precisely what this Court did in allowing the jury to determine whether suicide was a superseding, intervening cause of Mr. Mace's death. *See Brady II*, 2024 WL 2273382, at *11.

While *State v. Baker* is not binding authority, *see* Md. Rule 1-104, the Court does not need to rely on *Baker* to demonstrate that Maryland courts engage in traditional tort law analysis where a defendant's negligent action allegedly causes a decedent's suicide. As this Court previously noted, "to accept Defendant['s] argument, would [be] in essence, [to] adopt a per se rule—that a defendant is never liable for causing the suicide of a third party so long as they do not meet a singular exception." *Brady I*, 2022 WL 2987078, at *15. The Court in *Sindler* expressly rejected such a per se rule, *see* 887 A.2d at 108–09, and the basis for this reflexive rule has since further decreased given Maryland's subsequent decriminalization of suicide, *see* Md. Code Ann., Crim. Law § 3-101.1.

Additionally, the jury found by a preponderance of the evidence that Walmart knowingly violated a Maryland statute prohibiting a person who "suffers from a mental disorder . . . and has a history of violent behavior against [himself]" from possessing a rifle or a shotgun. ECF No. 155, at 2; ECF No. 147, at 30. Based on the "statute or ordinance" rule, plaintiff can make out a prima facie case in a negligence action by showing: 1) "the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff," and 2) "that the violation proximately caused the injury complained of" which is determined by whether the plaintiff is "within the class of persons sought to be protected," and the "harm suffered is of a kind which the drafters intended the statute to prevent." *Polakoff v. Turner*, 869 A.2d 837, 847 (Md. 2005) (quoting *Brooks v. Lewin Realty III, Inc.*, 835 A.2d 616, 621–22 (Md. 2003)); *see also Brady I*, 2022 WL 2987078, at *15. "Where there is evidence that the violation of the statute proximately caused the plaintiff's injury, evidence of such violation is sufficient evidence to warrant the court in submitting the case to the jury on the question of the [defendant's] negligence." *Polakoff*, 869 A.2d at 847 (internal citation and quotation marks omitted). Plaintiffs meet these requirements.

The statute prohibiting shotgun possession for someone with a mental disorder and a history of violence against themselves is designed to protect those with mental disorders from using a highly lethal means of suicide for self-harm. Mr. Mace is precisely the person that the statute contemplated and the harm he suffered, dying of a self-inflicted gun wound, is the type of harm the law was meant to protect. As this Court noted, "[o]ther courts, outside of Maryland, have held that the violation of a similar statute supports a finding that a negligence claim could proceed." *Brady I*, 2022 WL 2987078, at *15. *See Sogo v. Garcia's Nat'l Gun, Inc.*, 615 So. 2d 184, 187 (Fl. Dist. Ct. App. 1993) (reversing trial court's dismissal of plaintiff's claim that defendant was negligent in selling the firearm to the decedent by suicide in violation of state ordinance which required a waiting period of three days); *Crown v. Raymond*, 159 Ariz. 87, 764 P.2d 1146, 1149–50 (Ariz. Ct. App. 1988) (reversing grant of summary judgement to defendant firearm seller who violated state statute requiring parental consent before selling a firearm to a minor: "[I]n enacting the statute, the legislature declared that injury to themselves or others is foreseeable when guns are sold to minors without their parents' knowledge or consent.").

Defendant argues that its reading of *Sindler* is correct because it is consistent with "similar Maryland case law dealing with a duty to protect third parties from injury caused by other third parties." ECF No. 162, at 8 (citing *Remsburg v. Montgomery*, 831 A.2d 18, 30 (Md. 2003); *Warr v. JMGM Grp., LLC*, 70 A.3d 347, 355 (Md. 2013)).[5] Defendant argues that "under the analysis

[5] Defendant also cites *Rollins v. Wackenhut Services, Inc.*, 703 F.3d 122 (D.C. Cir. 2012), ECF No. 162, at 9–10, but this Court has already held *Rollins* is distinguishable from the instant case, *see Brady II*, 2024 WL 2273382, at *13.

In addition, in its Reply, Defendant cites *McDougald v. Pow*, No. No. SAG-17-2898, 2020 WL 6450281, at *4–5 (D. Md. Nov. 3, 2020), to again argue that there are only two exceptions to the general rule on suicide. ECF No. 181, at 11. However, as the Court previously noted, this case is not binding and is distinguishable from the instant case because, there, plaintiff argued that

set forth in *Warr*, it makes no sense that a 'special relationship' would be required to impose a duty on Walmart if Mace had bought the gun and killed someone else, but no such 'special relationship' would be required if Mace killed himself." *Id.* at 9. Defendant critiques the Court for allegedly extending negligence law, *see* ECF No. 162, at 15 (arguing the Court articulated a "new and limitless duty"), but here Walmart is asking the Court to do just that—by extending Maryland case law generally requiring a special relationship to find a duty to protect the public from injury caused by a third party to this situation where there are only two parties, *see id.* at 8–9. The courts in *Warr* and *Remsburg* considered whether a defendant has a duty "to the general public" for an injury caused by a third party, "absent the existence of a special relationship." *Warr*, 70 A.3d at 355; *Remsburg*, 831 A.2d at 26–27. Here, Mr. Mace was not a member of the "general public," he was an employee known to the managers of Walmart to be suicidal, and he was not a "third party," but the very party injured by Walmart when it sold him the gun. Therefore, the causal link between Walmart's actions and Mr. Mace's injury is much stronger than that between a defendant and an unrelated plaintiff injured by a third party. As the Restatement (Second) of Torts and Maryland's proximate cause law makes clear, "the intervening act [of a third party] does not become a superseding cause if the party committing the initial act should have realized that one would subsequently so act[.]" *Collins*, 933 A.2d at 567 (citing Restatement (Second) Torts § 447). Here, the jury reasonably concluded that Walmart should have realized, based on Mr.

---

defendant police officers caused the decedent's mental state, or in the alternative, that they had a special relationship because he was in a custodial setting. *See Brady II*, 2024 WL 2273382, at *9 (citing the related case *McDougald v. Spinnato*, No. ELH-17-2898, 2019 WL 1226344, at *23 (D. Md. Mar. 15, 2019)); *see also Spinnato*, 2019 WL 1226344, at *23 ("Plaintiff repeatedly alleges the existence of a 'special relationship' between [decedent] and [defendant officers]"). Therefore, the Court did not consider whether liability existed outside of those two exceptions. Here, Plaintiffs allege neither of these fact patterns, prompting this Court to engage in the traditional negligence duty analysis.

Jones's knowledge of Mr. Mace's suicidality, that selling a gun to him would result in his using the gun to harm himself. *See* ECF No. 135, at 18:5–21 (Mr. Jones testifying that he remembered Ms. O'Shea telling him that Mr. Mace was suicidal, planned to harm himself, and should be added to a block list).

Far from supporting Walmart's reading of *Sindler*, the court's decision in *Warr* is consistent with this Court's approach to negligence duty analysis. In finding that the defendant, a bar, was not liable for the injuries caused by an intoxicated patron's drunk driving, the court in *Warr* did not hold that defendants can never be liable for harm to third parties absent a special relationship. Rather the court observed two general rules—Maryland does not recognize dram shop liability and typically, there is no duty to control a third person's conduct to prevent the personal harm of another, unless a special relationship exists. 70 A.3d at 355. In making these observations, the court acknowledged that there is no "blanket immunity" for bars that excuses courts from analyzing the specific facts of the case to determine if the harm was foreseeable. *Id.* at 354, 358–59. Citing the traditional seven factor test used by this Court, the court in *Warr* found that it is not foreseeable that someone who is drinking will drive. *Id.* at 354 ("It is simply not a given that imbibing alcohol and driving are coextensive."). The court acknowledged that where a defendant bar causes a patron's intoxicated driving, it could be liable for the harm to a third party. *Id*. at 354–55. The court gave the example of a tavern owner placing an intoxicated customer in a horse drawn sleigh he was unable to operate and starting the horses. *Id.* (citing *State v. Hatfield*, 78 A.2d 754, 755 (Md. 1951)). The court found that the tavern owner "would have undertaken a duty of care to the injured third party"—not because the dealer caused the customer's intoxication—but because he knew that the customer could not safely drive and put him in the sleigh anyway. *Id.*

Unlike the tenuous causal relationship between serving alcohol to a patron who then drives intoxicated, *see id.* at 354, the jury reasonably concluded that suicide is the "natural and foreseeable result" of providing a gun to someone known to be suicidal, *id.* at 355. Plaintiffs' expert, Dr. Bryan, testified that, for those who desire suicide, access to lethal means, like a firearm, is the most important factor in determining whether they will die by suicide. Firearms are a highly lethal means of suicide, with ninety to ninety-five percent of people who use a gun to attempt to take their life dying of a gun injury. Walmart selling a gun to someone it knew to be suicidal, and therefore, unable to use the gun safely, is much more akin to a purveyor of alcohol placing a patron it knew to be incapable of safely driving in a transport and starting it because the harm is foreseeable and the injury is more certain. *See Hatfield*, 78 A.3d at 755 ("We may assume, without deciding, that on such facts the defendant would be 'guilty of an actional wrong independently of any statute', not however, for making the driver drunk by selling him liquor, but for placing him bodily, in a state of unconsciousness, in the sleigh and starting the horses." (citing *Dunlap v. Wagner*, 85 Ind. 529, 529–30 (1882)); *Est. of Madden v. Sw. Airlines, Co.*, No. 1:21-cv-00672-SAG, 2021 WL 2580119, at *5 (D. Md. June 23, 2021) (holding that in analyzing the "degree of certainty of injury" of the seven factor test, "the defendant's conduct must be reasonably certain to lead to the plaintiff['s] injuries in the abstract").

Maryland law is consistent with other jurisdictions that recognize the general rule on suicide and its common exceptions but still engage in the traditional proximate cause analysis even when the facts do not neatly fit into one of the common exceptions. *See Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 443 (7th Cir. 2009) ("Courts in these states generally allow for potential liability only when additional circumstances concomitant with the improper purchase led to an objectively reasonable inference that the buyer will commit suicide."). For example, the Court of

Appeals of Tennessee acknowledged that Tennessee's courts, like other state and federal courts, have "consistently recognized that the independent intervening cause doctrine may properly be invoked in cases involving self-inflicted injury or death" and these jurisdictions "have noted common exceptions." *Rains v. Bend of the River*, 124 S.W.3d 580, 593–94 (Tenn. Ct. App. 2003) (collecting cases). Noting these common exceptions, the court nevertheless went on to analyze whether a firearms retailer could be held liable to the parents of an eighteen-year-old who died by suicide after the retailer sold him ammunition despite laws prohibiting those under twenty-one from making that purchase. *Id.* at 586, 594–95. The court found the retailer not liable, not because the facts of the case did fit neatly in one of the common exceptions, but because under traditional proximate cause analysis, it was not foreseeable that sale of ammunition to an underage customer would result in his death by suicide. *Id.* at 594–95. Nothing about the customer's behavior during the interaction indicated he was experiencing a mental health crisis, and unlike Walmart in this case, plaintiffs provided no evidence that the retailer had knowledge of the customer's mental health history. *Id*. ("[W]ith regard to the sale of ammunition to underage buyers, sellers should, in the absence of suspicious conduct or demeanor, be held to foresee only the sorts of misuse or mishandling of ammunition that result from the purchaser's being too young to appreciate the danger of the ammunition"). The Supreme Court of Tennessee cited *Rains* approvingly in noting that despite the general rule that suicide is typically a superseding, intervening cause, provided the decedent's suicide was a reasonably foreseeable probability naturally resulting from the defendant's conduct, a defendant can be held liable for its negligence. *Cotten v. Wilson*, 576 S.W.3d 626, 647 (Tenn. 2019); *see also Ramsey v. Cocke County*, No. E2016–02145–COA–R3–CV, 2017 WL 2713213, at *6 (Tenn. Ct. App. June 23, 2017) (unpublished) (recognizing common exceptions inapplicable but nevertheless declining to apply the suicide rule because "a factfinder

could reasonably conclude that it is foreseeable that [the decedent] would follow through with her threats to commit suicide."); *Smith v. Pfizer, Inc.*, 688 F. Supp. 2d 735, 749 (M.D. Tenn. 2010) ("Because it is at least a question of fact whether [the decedent's] suicide is an intervening [superseding] cause, the court will not dismiss the plaintiff's claims for lack of proximate cause.").

Defendant argues that it owed no duty of care to Mr. Mace because Walmart management had no knowledge of Mr. Mace's suicidal ideation and hospitalizations. ECF No. 162, at 10. The jury had sufficient evidence to reject these arguments. As discussed above, Ms. O'Shea's testimony that six days before Mr. Mace bought a gun from Walmart, she texted Mr. Jones a screenshot of Mr. Mace's text message describing his plan to commit suicide, "slit wrists, buy gun," and asked whether he could be placed on a block list to prevent him from purchasing a firearm is sufficient evidence that Walmart had knowledge that Mr. Mace was suicidal. *See* Pls. Trial Ex. 2; ECF No. 135, at 18:5–21. Additionally, Mr. Jones testified to asking Ms. Madden in human resources whether such a list existed, indicating that Ms. O'Shea did in fact convey her concern that Mr. Mace would purchase a firearm from Walmart. ECF No. 135, at 23:19–24:2. The fact that Mr. Jones knew that Mr. Mace was suicidal is further supported by Sgt. Nauman's testimony that she saw the text message from Ms. O'Shea to Mr. Jones on Ms. O'Shea's phone during her investigation the day Mr. Mace died, and on that day, Mr. Jones did not deny receiving the text message. Because Walmart expected managers to communicate their knowledge of any imminent risks of harm, any such knowledge managers are found to have had can be imputed to Walmart, regardless of whether they actually communicated it through the proper channels. *See Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 773 (4th Cir. 1995) ("[U]nder the rule of imputation the principal is chargeable with the knowledge the agent has acquired, whether the agent communicates it or not."). That Mr. Jones now denies receiving Ms. O'Shea's message does

not mean, as Walmart contends, that the jury could not find that Walmart had this knowledge. *See Reaching Hearts Int'l, Inc.*, 368 F. App'x at 372 (noting that making credibility determinations and weighing the evidence "are 'jury functions, not those of a judge'" (quoting *Reeves*, 530 U.S. at 150)).

In a footnote, Defendant asserts that even if it did owe "some common law duty", Walmart did not breach it because Mr. Jones "made appropriate inquiry of [Mr. Mace] following a third-party report of alleged suicidal ideation (occurring outside of work)[,] . . . Mr. Mace denied intention to hurt himself[,]" and Mr. Jones suggested calling the police non-emergency line to conduct a wellness check on Mr. Mace. *Id.* at 11 n.2. Walmart's duty was specifically articulated to the jury in Jury Instruction No. 21: Walmart had a duty not to sell a firearm to Mr. Mace "if it knew or had reason to know he might use the firearm to harm himself." ECF No. 147, at 25. Evidence Mr. Jones took steps to assist Mr. Mace by encouraging Ms. O'Shea to call the non-emergency line and asking after Mr. Mace's well-being does not prevent the jury from finding that Walmart breached its duty. That Mr. Jones acted in this way is evidence that he indeed knew or had reason to know that Mr. Mace was suicidal. Plaintiffs' firearms experts testified that it is common in the industry to use block lists, yet Walmart failed to train its managers to use its block list and failed to place Mr. Mace on it. Therefore, a reasonable jury could find that Walmart breached its duty of care.

For the foregoing reasons, the Court again rejects Defendant's invitation to circumvent the traditional negligence duty analysis that Maryland law requires.

### 2. The Court's Formulation of Walmart's Duty to Mr. Mace Was Based on Maryland Case Law.

The Court found, as a matter of law, that Defendant owed a duty not to sell a firearm to Mr. Mace "if it knew or had reason to know he might use the firearm to harm himself." ECF No. 147, at 25. Defendant argues that the Court erroneously formulated Walmart's duty of care to Mr. Mace because: 1) "the term 'might use' is not sufficient reasonable certainty to impose a duty of care and could apply to limitless scenarios;" 2) "there was no imminence component to risk of harm, such that duty would extend indefinitely;" 3) "while the term 'firearm' is used, this duty would seemingly apply to any number of highly lethal chattels retailers could sell . . . ;" 4) "state and federal legislatures have seen fit to prescribe specific laws regulating firearm sales, and express Maryland public policy cautions against common law regulation of merchants;" and 5) "the jury received no guidance on what knowledge sufficed, and whether contrary indications (such as Mace denying he was suicidal before the sale occurred) could have any effect on the duty of care." ECF No. 162, at 11.

The Court's formulation of Walmart's duty to Mr. Mace applied the facts of the case to the seven factors Maryland courts consider when determining if there is a common law duty. *See Brady II*, 2024 WL 2273382, at *21–25. The Court instructed the jury based on its analysis, consistent with Maryland law and, therefore, denies Walmart's motion.

#### a. Mr. Mace's Suicide Was Reasonably Certain and Foreseeable to Support the Court's Formulation of Walmart's Duty of Care.

Applying the seven-factor test, this Court found that Mr. Mace's death was sufficiently foreseeable and reasonably certain to recognize that Walmart owed Mr. Mace a duty. In particular, the Court found that: 1) "Plaintiffs have produced sufficient evidence to create genuine issues of fact regarding the foreseeability of Mr. Mace's suicide," *id.* at *21; 2) it was reasonably certain

that "selling a gun to an individual, who less than one week earlier, had expressed his intention to end his life by cutting his wrists or using a gun would lead to that individual using the gun to end his life," *id.* at *22, and 3) there is "a sufficient connection between Defendant['s] sale of the shotgun to Mr. Mace and his subsequent suicide, particularly in light of the nature of the risk," *id.* at *23.

The evidence presented at trial supports the Court's holding. First, Plaintiffs presented sufficient evidence for a jury to conclude that Mr. Jones knew about Mr. Mace's plan to purchase a gun to act on his suicidal ideations based on Ms. O'Shea's text and conversation with Mr. Jones. *See* Pls. Trial Ex. 2; ECF No. 135, at 18:5–21. Therefore, Mr. Mace's suicide was reasonably foreseeable. *See Eisel*, 597 A.2d at 449, 452 (finding the student's suicide was foreseeable where the student's friends allegedly reported the student's suicidal ideations to their school counselor).

Second, it is "one hundred percent" certain that Mr. Mace suffered the injury—dying by suicide using the gun Walmart sold him. *See id.* at 453 (considering the degree of certainty that the plaintiff suffered the injury). Dr. Bryan testified that amongst people who desire suicide, there also needs to this capability to act upon suicidal urges and this capability—access to lethal means—is the more important factor. A gun is a highly lethal means of suicide and changes the way that a suicidal individual thinks about suicide, specifically the person will see suicide as a likelihood. Therefore, when Walmart sold a firearm to Mr. Mace, someone it knew to be planning suicide using a gun less than one week earlier, it was reasonably certain he would use it to harm himself. *See Est. of Madden*, 2021 WL 2580119, at *5 (holding that "the defendant's conduct must be reasonably certain to lead to the plaintiff['s] injuries in the abstract").

Finally, because the risk at issue here "is death or personal injury, a close connection . . . is not required." *Kiriakos*, 139 A.3d at 1035. Despite not being required, the closeness of the

connection is reflected in Walmart's own policy governing firearm sales, which instructs associates to refuse a firearm sale if they have "any reason to believe the customer might use the firearm to harm themselves." Pls. Trial Ex. 4. The closeness of the connection is also supported by Maryland law, which prohibits individuals with a mental disorder and a history of violent behavior against themselves from possession a shotgun. *See* Md. Code Ann., Pub. Safety § 5-205(b)(6); *Kiriakos*, 139 A.3d at 1034–35 (noting "the legislative recognition in Maryland that underage people have a diminished ability to handle alcohol and may expose themselves and others to harm" in finding a "sufficient connection" between defendant's provision of alcohol to an underage individual and injury to a pedestrian whom the individual subsequently struck while driving under the influence); *Eisel*, 597 A.2d at 450, 453–54 (finding sufficiently close connection between school's failure to inform student's parents of student's suicidal ideation and student's subsequent suicide, citing the "policy manifested" by Maryland's Youth Suicide Prevention School Programs Act that "others, including the schools, have the potential to intervene effectively").

Defendant asserts the Court's wording of its duty was erroneous because it failed to ensure the jury found that Mr. Mace's suicide was sufficiently "certain" and "imminent" at the time Walmart sold Mr. Mace the gun. ECF No. 162, at 11–12. Walmart's arguments are not persuasive. To start, Walmart's concern is not supported by the facts. Mr. Mace did not wait "twenty years" between communicating his plan to buy a gun to kill himself and purchasing the gun. *Id.* at 12. Instead, only six days passed between the time Walmart learned of his plans and his death. *See* Pls. Trial Ex. 2 (Mr. Mace's text message describing his plan to commit suicide dated November 9, 2019). Similarly, Mr. Mace did not wait to attempt suicide but instead used the gun to harm himself within hours of purchasing it from Walmart.

There is no explicit "imminence component" included in the Maryland Civil Pattern Jury Instructions definition of negligence, nor in Defendant's proposed instruction for the definition of negligence. *See* Maryland Civil Pattern Jury Instructions (MPJI-Cv) 19:1; ECF No. 108-1, at 24 ("Negligence is doing something that a person using reasonable care would not do, or not doing something that a person using reasonable care would do. Reasonable care means that caution, attention, or skill a reasonable person would use under similar circumstances."). As the Court explained during the pre-charge conference, whether Mr. Mace's suicide was imminent relates more to causation and breach, than whether Walmart owed Mr. Mace a duty. ECF No. 174, at 23:12–24:5. Therefore, the Court's duty and causation instructions should be read together and considered as a whole. *See Benjamin v. Sparks*, 986 F.3d 332, 347 (4th Cir. 2021) (holding that instructions should be construed as a whole, in light of the whole record). Read together, the Court did not create "an exceedingly low standard," that created an "incredibly lengthy tail liability for retailers." ECF No. 162, at 12. Instead, the Court "adequately informed the jury of the relevant issues and legal principles" including duty, breach, and causation. *Benjamin*, 986 F.3d at 347. Specifically, the Court instructed the jury that for the "Plaintiffs to recover damages, the Plaintiffs' injuries must result from and be a reasonably foreseeable consequence of the defendant's negligence." ECF No. 147, at 27 (adopting MPJI-Cv 19:10); *see also* ECF No. 108-1, at 31 (Defendant proposing MPJI-Cv 19:10). The Court also noted that "[t]he care exercised by a reasonable person varies according to the circumstances and the danger that is known or should be appreciated by a reasonable person[,]" meaning that "if the foreseeable danger increases, a reasonable person acts more carefully." ECF No. 147, at 28 (adopting MPJI-Cv 19:3); *see also* ECF No. 108-1, at 21 (Defendant proposing MPJI-Cv 19:3). The reasonable danger—that Mr. Mace would use the purchased gun to act on his plan to die by suicide—was high and therefore,

Walmart had a duty to act accordingly. *See Martin G. Imbach, Inc. v. Tate*, 100 A.2d 808, 815 (Md. 1953) (holding that what constitutes due care in a case necessarily depends on the facts of the case and varies depending on the danger of the undertaking). In addition, the Court instructed the jury that "suicide is an intervening cause if the suicide was not reasonably foreseeable at the time the defendant acted negligently." ECF No. 147, at 29; *see also Brady I*, 2022 WL 2987078, at *14–16 (finding that whether suicide is a superseding, intervening cause is a question for the jury). After being instructed, the jury found that Mr. Mace's death was reasonably foreseeable. ECF No. 155, at 1. It seems unlikely that the jury would find Mr. Mace's death by suicide "reasonably foreseeable," if it did not also conclude that the harm was reasonably certain and imminent at the time Walmart sold Mr. Mace the gun. *See BMG Rights Mgmt.*, 881 F.3d at 305 (holding that a new trial is unwarranted based on erroneous jury instructions unless "there is a reasonable probability that the erroneous instruction affected the jury's verdict").

Walmart argues that the phrase "might use" was erroneous because it does not employ the same language as the definition of "negligent entrustment" in the PLCAA and the Maryland Civil Pattern Jury Instructions (MPJI-Cv), which both use "is likely to [use]." *See* ECF No. 162, at 12. This argument ignores that the Court did instruct the jury using the MPJI-Cv instruction for the definition of negligent entrustment. *See* ECF No. 147, at 26. The jury found by a preponderance of the evidence that Walmart negligently entrusted the firearm to Mr. Mace, someone it "kn[ew] or [had] reason to know is likely . . . to use it in a manner that involves unreasonable risk of harm to himself." ECF No. 147, at 26 (adopting a modified MPJI-Cv 18:9 proposed by Defendant in ECF No. 108-1, at 27); ECF No. 155, at 1. The jury's verdict on negligent entrustment supports the Court's determination that, as a matter of law, there was a sufficient "likelihood of harm that gives rise to a duty." ECF No. 162, at 12; *see also BMG Rights Mgmt.*, 881 F.3d at 305.

**b. The Court's Formulation of Walmart's Duty Balances the Risk of Harm and the Burden to Defendant.**

In recognizing a duty of care, the Court also considered the balance of the risk of harm against the extent of the burden to the Defendant and the consequences to the community of imposing a duty. *See Brady II*, 2024 WL 2273382, at *24 (citing *Kennedy Krieger*, 191 A.3d at 454; *Kiriakos*, 139 A.3d at 1036; *Eisel*, 597 A.2d at 455). Here, the potential harm—death or personal injury—is great. *See Eisel*, 597 A.2d at 455 (holding that where the magnitude of potential harm is great, "even a relatively remote possibility" of the harm occurring may be sufficient to tip the scales "in favor of duty"). Conversely, the burden is not particularly high as Walmart already had a block list to prevent sales of firearms to individuals who might use the firearm to harm themselves, a practice commonly utilized by gun sellers in the industry. Mr. Colucci testified that the process only requires managers, such as Mr. Jones, to report the name of an individual believed to be at risk of self-harming up the chain of command, such that the individual's name can be added to the list. Once someone's name is on the block list, the electronic check that associates in the Sporting Goods Department already conduct displays a message to deny the sale. Therefore, "recognizing a duty here would impose minimal additional burden on Defendant[.]" *Brady II*, 2024 WL 2273382, at *24; *see also Est. of Madden*, 2021 WL 2580119, at *6 (finding "little 'additional' burden" where imposition of a duty would require defendant to follow safety protocols to protect its employees that it had "already embraced . . . with regard to its customers").

Despite the magnitude of the potential harm and the relative lack of burden to Walmart, Defendant makes several arguments that the Court's articulation of Defendant's duty is overly burdensome to it and other firearms merchants. First, contrary to Defendant's suggestion, the duty

the Court recognized would not render Walmart liable for suicides where the decedent used box cutters, rope, or rat poison purchased from Walmart. ECF No. 162, at 13–14. Just like alcohol is not "coextensive" with driving, it is not reasonably foreseeable that purchasing a box cutter would cause someone's suicide. *See Warr*, 70 A.3d at 354. Dr. Bryan testified that only two to five percent of people who attempt suicide through cutting die from that method, compared to ninety to ninety-five percent of people who die when attempting suicide with a firearm. Unlike these everyday products that have many non-dangerous uses, firearms are inherently dangerous. *Cf. McGuiness v. Brink's Inc.*, 60 F. Supp. 2d 496, 499 (D. Md. 1999) ("[U]sing a car to run someone down is not what one normally does with a car. However, while shooting someone may not be what everyone with a firearm does, [it is] arguably the intended usage of the instrumentality."). "Likely for this very reason, Walmart's own policy governing firearm sales allows associates to deny a firearm sale on any non-discriminatory basis." *See Brady II*, 2024 WL 2273382, at *24.

For similar reasons, Walmart's argument that its pharmacy would face increased liability based on the duty articulated by the Court is unpersuasive. ECF No. 162, at 13. Pharmacists in Maryland are governed by separate and distinct standards of care, not relevant to the facts of this case. *See, e.g.*, *People's Serv. Drug Stores, Inc. v. Somerville*, 158 A. 12, 14 (Md. 1932) (applying learned intermediary doctrine to pharmacist-patient relationship), *Hofherr v. Dart Indus. Inc*, 853 F.2d 259, 263–64 (4th Cir. 1988) ("A pharmacist or a manufacturer who advised a patient not to take a drug prescribed by a physician might easily cause death or serious injury, and we think the practice of medicine by pharmacists and pharmaceutical manufacturers is not a field in which we should even encourage them to engage, much less require it[.]"). Similarly, the negative side effects of a medication are governed by theories of strict liability, negligence, and warranty that are irrelevant to whether Walmart should have sold a gun to Mr. Mace. *See Mayor of Baltimore*

*v. Utica Mut. Ins. Co.*, 802 A.2d 1070, 1089 (holding that "Maryland has long recognized a duty on the part of sellers to warn of latent dangers attendant upon a proper use of the products they sell, where injury is foreseeable" (quoting *Dechello v. Johnson Enters.*, 536 A.2d 1203, 1207 (Md. Ct. Spec. App. 1988), *cert. denied sub nom. Albert E. Pecora Importers v. DeChello,* 541 A.2d 964 (Md. 1988)); *see also Gourdine v. Crews*, 935 A.2d 1146, 1150 (Md. Ct. Spec. App. 2007) ("With respect to prescription drugs, Maryland law recognizes the learned intermediary doctrine, which provides the manufacturers need only warn the prescribing physician and not the patient directly." (internal quotations omitted)).

The law treats firearms differently from other items sold at Walmart and as a federal firearm licensee, Walmart is required to follow federal and state firearms laws and regulations. Defendant argues that "it is not the place of the courts to regulate firearms merchants." ECF No. 162, at 13–14 (citing *Valentine v. On Target, Inc*. (*Valentine II*), 727 A.2d 947, 953 (Md. 1999)). However, Walmart fails to consider that Maryland has legislated in this area: Maryland law prohibits the possession of firearms by individuals with mental disorders and history of self-harm, indicating that this is an important public policy. *See* Md. Code Ann., Pub. Safety § 5-205(b)(6). Courts interpreting Maryland law in determining whether to recognize a common law duty of care must consider that the law reflects an understanding that firearms dealers should not sell firearms to individuals who might use the firearm to harm themselves. *See Kiriakos*, 139 A.3d at 1034–35, 1036 (noting "the legislative recognition in Maryland that underage people have a diminished ability to handle alcohol and may expose themselves and others to harm" in finding a "sufficient connection" between defendant's provision of alcohol to an underage individual and injury to a pedestrian whom the individual subsequently struck while driving under the influence); *Eisel*, 597 A.2d at 450, 453–54 (finding sufficiently close connection between school's failure to inform

student's parents of student's suicidal ideation and student's subsequent suicide, citing the "policy manifested" by Maryland's Youth Suicide Prevention School Programs Act that "others, including the schools, have the potential to intervene effectively").

The Court did not hold, as Defendant suggests, that Walmart "had a duty to institute additional policies and procedures to screen customers for mental health issues or train and supervise associates to recognize signs of suicidal ideation or mental health issues[.]" *Id.* Nor did the Court improperly "extend[] a duty to prevent an individual's suicide to laypersons, such as Walmart employees, who are not trained in mental and emotional health." ECF No. 181, at 5. Defendant's argument has already been rejected by the Court and ignores the facts of this case and its own policies. *See Brady II*, 2024 WL 2273382, at *24. The Court has not extended a duty to prevent every individual customer's suicide, particularly in situations where medical expertise would be required to determine that an individual is in a mental health crisis, nor do the facts of this case support such a duty. Rather, in recognizing Walmart's duty to Mr. Mace, this Court has determined that in situations where the jury finds that Walmart had knowledge that a person planned to attempt suicide with a gun, it should not sell a gun to that person. No specialized medical knowledge is necessary to enact that duty. As Plaintiffs' experts explained, to comply with Walmart's duty, Walmart does not need to implement additional screening or training on recognizing mental health symptoms. A Walmart manager or associate does not need medical expertise to know that if someone says they plan to kill themselves by buying a gun, that person might use the purchased gun to harm themselves. Walmart knows this because according to its own corporate designee, Mr. Colucci, Walmart's policy "instructs associates, if they believe that a person is potentially considering self-harm or harming others, that they should refuse the sale." Pls. Trial Ex. 4; *see also Est. of Madden*, 2021 WL 2580119, at *6 (holding a defendant's existing

practices are relevant in determining the extent of the burden of a duty). Mr. McLaughlin, the employee who sold Mr. Mace the gun, said he had successfully utilized this policy to deny a gun sale to someone he knew had experienced mental illness. Mr. McLaughlin did not have specialized medical training. The facts at trial suggest that Walmart did not place Mr. Mace on a block list which would have prevented his purchasing a gun, not because its managers or associates lacked training on identifying mental health symptoms, but because it failed to train its managers on how to report an employee it knew to be at risk of harming themselves.

Walmart faults the Court's articulation of its duty as being "derived from Walmart's own firearm sales policies and procedures, which was improper." ECF No. 162, at 15. The argument misinterprets the Court's analysis arriving at the duty of care. The Court did not adopt wholesale Walmart's policies or imply that it had any obligation to do so, by for example, holding that Walmart had a duty to utilize a block list. Instead, the Court considered Walmart's policies while balancing the "risk of harm against the extent of the burden to the defendant and the consequences to the community of imposing a duty"—the sixth factor of the seven-factor test. *Brady II*, 2024 WL 2273382, at *24; *see also Est. of Madden*, 2021 WL 2580119, at *6 (holding that a defendant's existing practices are relevant in determining the extent of the burden to defendant). The fact that Walmart had in place policies that could have prevented Mr. Mace from purchasing a firearm if managers had been properly trained on them indicates that recognizing a duty of care would not be a burden to Walmart. *Brady II*, 2024 WL 2273382, at *24.

Walmart's citations to *Schultz v. Bank of Am., N.A.*, 990 A.2d 1078, 1087 n.10 (Md. 2010), and *Street v. Upper Chesapeake Medical Center, Inc.*, 311 A.3d 321, 352 (Md. App. Ct. 2024) *cert. denied*, 319 A.3d 454 (Md. 2024), are not relevant here. ECF No. 162, at 15. The above-the-line text in *Schultz*, makes clear that the court was discussing "whether expert testimony is

necessary to establish the standard of care in cases involving alleged negligence by a bank." 990 A.2d at 1087. The footnote explains that violating internal guidelines would not have established the applicable standard of care because "the Bank's internal guidelines alone do not establish the reasonable commercial standards in the banking industry." *Id.* at 1087 n.10. In *Street*, the trial court erroneously adopted the defendant's internal policies as the appropriate standard of care and found as a matter of law this standard of care so conclusive that it rendered "any conflicting standard of care opinion inadmissible." *See* 311 A.3d at 352 ("[T]he trial court ruled that the standard of care for the time period by which a vascular surgeon should respond to a consult request was set by [defendant]'s internal rule."). Neither case is relevant to the situation here, where the Court allowed both sides to present expert testimony on the standard of care in the firearm industry, and where the Court considered Walmart's policies as directed by Maryland courts, but did not adopt its policies in recognizing that Walmart owed a duty of care to Mr. Mace.

For the foregoing reasons, the Court will decline to vacate the jury verdict predicated on the common law duty of care and deny Walmart's request for a new trial under a differently articulated standard of duty.

**3. Walmart's Duty of Care Is not Defined by State and Federal Firearm Sales Laws and Walmart's Claim that It Complied with Those Laws Is Incorrect.**

Walmart asserts that the scope of its duty is governed by state and federal firearm sales statutes and that it can only be liable if it violated one of those statutes. ECF No. 162, at 16. According to Walmart, the sale of the shotgun to Mr. Mace did not violate any of those statutes and, therefore, Walmart breached no duty of care. *Id*. Neither of these arguments are convincing.

First, Walmart is incorrect that it did not violate any state or federal firearms sales laws. The jury's verdict found that Walmart had "knowingly violated a Maryland Statute applicable to

the sale of the firearm and that the violation was a proximate cause of the Plaintiffs' damages." ECF No. 155, at 2. That statute—section 5-205(b)(6) of the Public Safety Article of the Maryland Code—prohibits a person who "suffers from a mental disorder . . . and has a history of violent behavior against [himself] or another" from possessing a rifle or a shotgun. Although Walmart continues to argue that its management did not know of Mr. Mace's recent suicidal ideation and hospitalization, the jury disagreed. *See* ECF No. 155. The jury's factual determination is entitled to deference, *see Lack*, 240 F.3d at 259, and there is no basis for this Court to conclude that "the evidence supports only one reasonable verdict," *Reaching Hearts Int'l, Inc.*, 368 F. App'x at 372.

Second, the Court has already rejected the argument that Walmart's duty is circumscribed by federal and state firearms sales laws. *See Brady II*, 2024 WL 2273382, at *21–25 (analyzing the seven-factors to determine if Walmart owed a duty of care); *see also Beatty v. Trailmaster Prods., Inc.*, 625 A.2d 1005, 1014 (Md. 1993) ("[C]ompliance with a statute does not necessarily preclude a finding of negligence . . . where a reasonable person would take precautions beyond the statutorily required measure."); *Leonard v. Sav-A-Stop Servs., Inc.*, 424 A.2d 336, 340 (Md. 1981) ("'[C]ompliance with a legislative enactment . . . does not prevent a finding of negligence where a reasonable man would take additional precautions.'" (quoting Restatement (Second) of Torts § 288C (1964))). That Mr. Mace did not tell Mr. McLaughlin or Ms. Randall what he intended to do with the firearm and properly filled out Form 4473 during the transaction, does not mean, as Defendant suggests, that Walmart complied with its duty of care. ECF No. 162, at 16. A reasonable jury could find Walmart had the requisite knowledge about Mr. Mace's plan to self-harm and still sold Mr. Mace a firearm.

The scope of Walmart's duty is not limited by state and federal laws, and therefore, the Court will deny Walmart's motion based on this argument.

**4. The Court Properly Instructed the Jury on Walmart's Duty, and the Instruction Was not Prejudicial to Walmart.**

The Court instructed the jury on Walmart's duty of care based on the Fifth Edition of the Maryland Civil Pattern Jury Instructions (MPJI-Cv), Maryland case law, and in large part, Defendant's own proposed instructions, ECF No. 108. *See* ECF No. 147. The Court's instructions, "construed as a whole, and in light of the whole record, . . . adequately [informed] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice" to any party. *King v. McMillan*, 594 F.3d 301, 311 (4th Cir. 2010) (quoting *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 191 (4th Cir.2003)); *see also Armacost v. Davis*, 200 A.3d 859, 883 (Md. 2019) (holding that the Maryland Court of Appeals has "advocated for the close adherence to [the] 'approved [civil] pattern instruction[s]'"). Because Defendant is unable to demonstrate areas of deviation between the jury instructions and Maryland law and Defendant cannot demonstrate that the instructions seriously prejudiced its case, the Court finds that the jury instructions provided were adequate and do not warrant a new trial. *See Hicks v. Anne Arundel County*, 637 F. Supp. 335, 343 (D. Md. 2022) ("A new trial is appropriate based on jury instructions only if the jury instruction was erroneous and 'there is a reasonable probability that the erroneous instructed affected the jury's verdict.'" (quoting *Finch v. Covil Corp.*, 388 F. Supp. 3d 593, 617 (M.D.N.C. 2019))).

Recognizing that whether Walmart owed a duty of care depended on its knowledge at the time of the sale, the Court instructed the jury:

> In this case, I have already ruled, as a matter of law, that the Defendant owed a duty not to sell a firearm to Jacob Mace *if* it knew or had reason to know he might use the firearm to harm himself. Therefore, the question of the existence of a duty is not for you to consider.

ECF No. 147, at 25 (emphasis added). Defendant argues that the instruction "deprived the jury of the ability to make" the determination about whether Walmart had knowledge. ECF No. 162, at 18.[6] However, this instruction is consistent with Maryland law that the existence of a legal duty is a question of law for the court, not the jury to decide. *See Pendleton*, 921 A.2d at 204 (collecting cases); *see also Bobo v. State*, 697 A.2d 1371, 1376 (Md. 1997) ("The existence of a duty is a matter of law to be determined by the court and, therefore, is an appropriate issue to be disposed of on motion for dismissal."); *Hemmings v. Pelham Wood LLLP*, 826 A.2d 443, 451 (Md. 2003) ("Because whether one party owed a duty to another requires a legal determination based on statutes, rules, principles, and precedents, it is ordinarily for the court rather than the jury to decide."); *Doe 1 v. World Wrestling Ent., LLC*, 811 F. Supp. 3d 706, 721 (D. Md. 2025) (applying Maryland negligence law and noting that "[w]hether a legal duty exists is a question of law to be decided by the Court").

Walmart ignores the plain language of the instruction and fails to view the instructions as a whole, rather than in isolation. The duty of care instruction communicated to the jury that to find Walmart liable for Plaintiffs' damages, the jury had to find that Walmart "knew or had reason to know," that Mr. Mace intended to harm himself with the firearm. ECF No. 147, at 25. Read

---

[6] To the extent that Walmart's concern about the Court's duty of care instruction is rooted in the fact that the verdict form did not include a separate question asking whether the jury found Walmart had the requisite knowledge, this concern is misplaced. Where the instructions are comprehensive of the elements of negligence, every element need not be included on the verdict form for the jury to reach a sound outcome. *See McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 246 (4th Cir. 2016) (denying a motion for a new trial based on the plaintiff's contention that the verdict form needed more detail when "more detail in the verdict form would not have aided the jury in reaching a sounder outcome"); *Leardini v. Charlotte-Mecklenburg Bd. of Educ.*, No. 3:09-CV-264, 2012 WL 1828897, at *3 (W.D.N.C. May 18, 2012) (holding the verdict form—which did not list all the elements of negligence—was proper because the court instructed the jury on the elements of negligence).

together with the rest of the jury instructions, including the Court's instruction on causation, foreseeable circumstances, and intervening/superseding cause, the jury was accurately instructed on the elements of negligence. *See* ECF No. 147, at 27 (adopting MPJI-Cv 19:10); ECF No. 108-1, at 31 (Defendant proposing MPJI-Cv 19:10); ECF No. 147, at 28 (adopting MPJI-Cv 19:3); ECF No. 108-1, at 21 (Defendant proposing MPJI-Cv 19:3); ECF No. 147, at 29 (modifying MPJI-Cv 19:11 to include a statement that "[s]uicide is an intervening cause if the suicide was not reasonably foreseeable at the time the defendant acted negligently"); *see also King*, 594 F.3d at 311 ("Instructions will be considered adequate if construed as a whole, and in light the whole record, [they] adequately [informed] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the existing party."); *Armacost*, 200 A.3d at 883 (holding that the Maryland Court of Appeals has "advocated for the close adherence to [the] 'approved [civil] pattern instruction[s]'").

The jury was consistent in its verdicts and found that Walmart negligently entrusted a gun to Mr. Mace who it "kn[ew] or ha[d] reason to know is likely . . . to use it in a manner that involves unreasonable risk of harm to himself[.]" ECF No. 147, at 26; ECF No. 155, at 1. By finding for Plaintiffs on the negligent entrustment claim, the jury specifically resolved the factual question Walmart claims the Court "removed from the province of the jury." ECF No. 162, at 18. For this reason, Walmart cannot demonstrate serious prejudice. *See Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1296 (4th Cir. 1995) ("Even when jury instructions are flawed, there can be no reversal unless the error seriously prejudiced the [defendant's] case."). The jury's verdict demonstrates that even if the instruction no longer included the sentence that the Court had already found a duty of care, it would not have changed the result. *See Hardin*, 50 F.3d at 1296; *Jones v. Griffey,* 104 F. App'x 840, 843 (4th Cir. 2004) (explaining that, in a diversity case, "even if the challenged

instruction is erroneous under state law, this court will not reverse unless the error seriously prejudiced the challenging party's case").

Walmart also claims that the Court's formulation of duty of care "did not instruct the jury on what level of knowledge was sufficient to impose the duty, and whether subsequent knowledge could negate the duty." ECF No. 162, at 14. However, the Court did instruct the jury on the required level of knowledge, specifically that Defendant owed a duty of care if it "knew or had reason to know" that Mr. Mace might use the firearm to harm himself. ECF No. 147, at 25. The Court also instructed the jury on how knowledge can be attributed to a corporation. *Id.* at 23. The Court's instructions did not, as Walmart suggests, "instruct[] the factfinder to disregard direct knowledge from" Mr. Mace himself that he was not at risk. ECF No. 162, at 14. Rather, the jury heard evidence that Mr. Mace told Mr. Jones he was fine after being discharged from the hospital and the jury still found that Walmart breached its duty. Viewing the evidence in the light most favorable to Plaintiffs, based on the evidence that Walmart had a block list—a common practice in the industry according to Plaintiffs' experts—but did not instruct any of its managers on how to use it and failed to include Mr. Mace on the list, the jury had sufficient evidence to make this finding. *See Reaching Hearts Int'l, Inc*, 368 F. App'x at 372 (noting that making credibility determinations and weighing the evidence "are 'jury functions, not those of a judge'" (quoting *Reeves*, 530 U.S. at 150)).

Because the jury instructions on duty of care, read alongside the rest of the Court's instructions, accurately communicated Maryland law, and Walmart cannot identify how it was prejudiced based on the instructions given, the Court denies Walmart's motion for a new trial on these grounds.

**5. The Court Correctly Rejected Walmart's Proposed Supplemental Jury Instructions Regarding Contributory Negligence and Assumption of Risk.**

The Court instructed the jury on contributory negligence and assumption of risk using modified versions of the definitions from the Maryland Pattern Civil Jury Instructions. *See* ECF No. 147, at 31 ("A plaintiff cannot recover damages if the plaintiff's negligence is a cause of the injury. In this action, the Plaintiffs cannot recover if the decedent, Jacob Mace, negligently contributed to his death.); *id.* at 32 ("A person assumes the risk of an injury if that person knows and understands, or must have known and understood, the risk of an existing danger and voluntarily chooses to encounter that danger."). During the pre-charge conference, Defendant requested that the Court's jury instructions on its affirmative defenses include a reference to what Defendant describes as an "objective standard." ECF No. 162, at 18–19. Specifically, Defendant wanted the Court to instruct the jury that "[an actor's] insanity or other mental deficiency does not relieve the act from liability for conduct which does not conform to the stand of a reasonable man under like circumstances." *Id.* at 18 (quoting *Johns Hopkins Univ. v. Bd. of Labor, Licensing & Reguls.*, 761 A.2d 350, 354 (Md. Ct. Spec. App. 2000)). Defendant contends that this instruction was necessary because the jury should be precluded from considering Mr. Mace's mental state when assessing the defenses of contributory negligence and assumption of risk. *See id.* at 19. This argument is not supported by Maryland law. Accordingly, the Court was correct in rejecting this proposed instruction. *See King*, 594 F.3d at 311 (holding that jury instructions should "adequately inform[] the jury of the controlling legal principles without misleading or confusing the jury").

To support its contention for the inclusion of an "objective standard" component to the contributory negligence and assumption of risk instructions, Walmart cites to *Johns Hopkins University v. Board of Labor, Licensing & Regulations*, which stated, as part of its analysis, that

"in civil cases . . . the actor is generally held accountable for his . . . conduct, even though that conduct is a product of a mental deficiency." ECF No. 162, at 18–19 (quoting *Johns Hopkins*, 761 A.2d at 354).

Defendant's argument is flawed for multiple reasons. First, rather than considering the appropriate standard of care for a decedent with a mental disorder, the *Johns Hopkins* court was interpreting the meaning of "misconduct" in Maryland's unemployment insurance statute. 761 A.2d at 352–54 (interpreting Md. Code Ann. Lab. & Empl. § 8-1003). Specifically, the court considered whether the fact that the claimant's bipolar disorder "caused" his actions meant he could not be disqualified from unemployment benefits based on misconduct. *Id.* at 351, 352–54. "Misconduct" is not equivalent to negligence but means "a transgression of some established rule or policy of the employer, the commission of a forbidden act, . . . or a course of wrongful conduct committed by an employee, within the scope of his employment relationship[.]" *Dep't of Labor, Licensing, & Regul. v. Hider*, 706 A.2d 1073, 1079 (Md. 1998) (quoting *Rogers v. Radio Shack*, 314 A.2d 113, 114 (Md. 1974)). The court in *Johns Hopkins*, analogizing the claimant to defendants in a negligence case who are liable despite their mental disorder, found that the claimant committed the lowest level of misconduct under the statute despite having bipolar disorder. *See Johns Hopkins*, 761 A.2d at 354. In reaching this conclusion, the court did not hold that the claimant's mental state was irrelevant to whether he committed misconduct. Rather, the court held that the claimant could be disqualified from unemployment benefits based on misconduct caused by his mental disorder, because "misconduct" —as defined under the statute—did not require intentional behavior. *See id.* at 355. Second, Defendant's argument again asks for an extension of the law. Walmart's objective standard instruction would essentially make the party's mental state irrelevant. The court's decision in *Johns Hopkins* supports no such rule. Rather, the case, at

most, simply affirms that defendants with mental disabilities can nonetheless be liable for their negligence – not that a party's mental state can never be considered. *See id.*; *see also, e.g.*, *Hudnall v. Sellner*, 800 F.2d 377, 384 (4th Cir. 1986) ("We therefore hold that under Maryland law any mental deficiency suffered by [defendant] at the time of the conduct for which the jury imposed tort liability would not relieve him of that liability."); *Cross v. Kent*, 32 Md. 581, 583 (1870) (holding a person with mental illness will be liable for any tort he may commit).

The Court has already held that "[i]n determining whether Mr. Mace's purchase and use of the gun were contributorily negligent, it is necessary to consider Mr. Mace's mental state and its impact on his ability to exercise due care for his own safety." *Brady II*, 2024 WL 2273382, at *18. While no Maryland court has addressed the appropriate standard of care for a plaintiff or decedent with a mental illness or cognitive disability, the Court based its holding on a previous decision of this Court which stated that in determining whether an adult decedent who had Down Syndrome was contributorily negligent, "the finder of fact must take into account [the decedent's] cognitive disabilities," since there was "a question as to whether his acts . . . were truly voluntary or were simply the result of his disability." *Id.* (quoting *Est. of Saylor v. Regal Cinemas, Inc.*, No. WMN-13-3089, 2016 WL 4721254, at *15 (D. Md. Sept. 9, 2016), *aff'd sub nom. Est. of Saylor v. Rochford*, 698 F. App'x 72 (4th Cir. 2017) (per curiam)). Additionally, the "majority view" among states that have directly addressed this issue is that a person with mental illness "should be required only to exercise such care as he or she is capable of exercising; this is the standard of care of a person of like mental capacity under similar circumstances." *Id.* (quoting *Dodson v. S.D. Dep't of Hum. Servs.*, 703 N.W.2d 353, 358 (S.D. 2005)); *see also Birkner v. Salt Lake County*, 771 P.2d 1053, 1060 (Utah 1989) (explaining that "[i]n contrast to the use of an objective standard in cases of primary negligence, the majority of courts have adopted a more compassionate stance regarding

the contributory negligence" of people with mental illnesses, under which "lesser degrees" of mental illness than insanity "should be considered by the jury in determining whether the plaintiff was contributorily negligent"); *Champagne v. United States*, 513 N.W.2d 75, 79 (N.D. 1994) (holding that the decedent's capacity to act "reasonably for self-protection and well-being" can be considered when determining comparative fault). The same reasoning applies to the assumption of risk defense because a suicidal person's ability to "foresee risk and take voluntary action [is] . . . less than a non-disabled adult[;]" how much less is a question of fact for the jury. *See Est. of Saylor*, 2016 WL 4721254, at *15; *see also Liscombe v. Potomac Edison Co.*, 495 A.2d 838, 843 (Md. 1985) (holding that to prevail on the defense of assumption of risk, the defendant must show the plaintiff had knowledge of the risk of danger, appreciated the risk, and voluntarily confronted the danger).

This approach to contributory negligence and assumption of risk better comports with what we know about mental illness. While "suicide is an intentional act," a suicidal person often "suffers from a mental illness that diminishes the patient's ability to act reasonably for self-protection and well-being." *Champagne*, 513 N.W.2d at 79. The Maryland legislature recognized this diminished capacity when it decriminalized suicide, Md. Code Ann., Crim. Law § 3-101.1, defined a mental disorder to include "a mental illness that so substantially impairs the mental or emotional functioning of an individual as to make care or treatment necessary or advisable for the welfare of the individual or the safety of the person[,]" Md. Code Ann. Health-Gen. § 10-101(i)(2), and prohibited those with mental disorders and a history of violence against themselves from possessing rifles or shotguns, Md. Code Ann. Pub. Safety § 5-205(b)(6). *See also Champagne*, 513 N.W.2d at 79 (considering involuntary commitment statutes in determining the standard of care for comparative fault for a decedent who died of suicide). Ultimately, the question of whether

someone who died by suicide negligently contributed to their own harm or appreciated the danger and voluntarily confronted it, is a question for the jury. *See Woolridge v. Abrishami*, 163 A.3d 850, 864 (Md. Ct. Spec. App. 2017) (holding that whether a plaintiff was contributorily negligent is typically a "question of fact for the jury to resolve."); *Est. of Saylor*, 2016 WL 4721254, at *15 (holding that how diminished a plaintiff's ability to foresee risk and take voluntary action is a question of fact for the jury).

At the same time the Court rejected Defendant's proposed addition to the contributory negligence and assumption of risk instructions, the Court also rejected Plaintiffs' proposed instructions requiring the jury "to consider Mr. Mace's mental state and its impact on his ability to exercise due care for his own safety" and that "[a] person with a mental illness should be required only to exercise such care as he or she is capable of exercising." ECF No. 177, at 30. In doing so, the Court held that the jury instructions could not define "every single contour of what 'duty' . . . or . . . 'contributory negligence' means" and allowed counsel for the parties to argue the impact of Mr. Mace's mental state in its closings. ECF No. 174, at 53:15–54:5; *see also Hardin*, 50 F.3d at 1294 ("A set of legally accurate instructions that does not effectively direct a verdict for one side or the other is generally adequate."). As the Fourth Circuit has cautioned, "district courts are often well-advised not to comment on specific evidence in their jury instructions" because "such comments may carry unacceptable risks of removing from the jury its critical task of assigning weight to the evidence presented." *Benjamin*, 986 F.3d at 350 (citing *Hardin*, 50 F.3d at 1294). The Court heeded this advice and provided the jury with neutral instructions that did not comment on the weight the jury should attach to Mr. Mace's mental state, allowing the jury to judge the evidence for themselves.

The facts of the case also support the instructions the Court provided. Defendant notes that evidence shows that Mr. Mace had previously attempted suicide and therefore understood the consequences of purchasing a firearm. Dr. Byran testified that when people are experiencing a period of acute suicide risk, they focus on a particular method of suicide and are unable to problem solve effectively. Additionally, according to the evidence Plaintiffs presented, when someone who is suicidal obtains access to a firearm, their mental state changes: the person views suicide as a likelihood, their mood state destabilizes and it becomes easy for them to overreact to stressful situations. Dr. Bryan's testimony, in combination with the other evidence, provides a sufficient basis for the jury to conclude that Mr. Mace's ability to act reasonably was diminished and, as a result, he did not "voluntarily confront[] the danger" of purchasing and using the firearm. *See* ECF No. 171, at 31:5–33:12. Accordingly, the Court did not abuse its discretion in leaving the question of contributory negligence and assumption of risk to the jury.

**B. Plaintiffs Provided Sufficient Evidence for a Jury to Find Proximate Cause and the Court's Instructions Accurately Conveyed Maryland Law.**

The jury found by a preponderance of the evidence that Defendant's negligence proximately caused the Plaintiffs' damages. ECF No. 155, at 1. Defendant argues that as a matter of law, Plaintiffs failed to establish that Defendant was the proximate cause of Mr. Mace's death, based on the previously rejected argument that suicide is always a superseding, intervening cause except when the defendant causes the decedent's mental state or a special relationship exists. ECF No. 162, at 20; *see also Brady I*, 2022 WL 2987078, at *13–16; *Brady II*, 2024 WL 2273382, at *9–10. Defendant has not presented any change in controlling authority or evidence that the prior decision was clearly erroneous to warrant revisiting this holding. *Westmoreland*, 2016 WL 5720706, at *9 (citing *Aramony*, 166 F.3d at 661).

The proximate cause analysis is generally reserved for the trier of fact and "becomes a question of law" only "in cases where reasoning minds cannot differ." *Segerman*, 259 A.2d at 806; *see also Caroline*, 304 A.2d at 835 ("[U]nless the facts admit of but one inference . . . the determination of proximate cause . . . is for the jury."); *Collins*, 933 A.2d at 548 ("[O]rdinarily, the question of whether causation is proximate or superseding is a matter to be resolved by the jury."). Under Maryland law, a defendant's conduct is the proximate cause of a plaintiff's injury when it is "(1) a cause in fact, and (2) a legally cognizable cause." *Kiriakos v. Phillips*, 139 A.3d 1006, 1021 (Md. 2016) (quoting *CR–RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 195 (2012)). Analysis at the first step, causation in fact, involves "the threshold inquiry of 'whether [the] defendant's conduct actually produced an injury.'" *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009) (quoting *Peterson v. Underwood*, 264 A.2d 851, 855 (Md. 1970) (emphasis omitted)).

Defendant presents no relevant argument on causation in fact, arguing instead that it did not cause Mr. Mace's mental state. ECF No. 162, at 23. Defendant did not need to cause Mr. Mace's mental state to have caused his suicide. *See Brady I*, 2022 WL 2987078, at *16. Walmart does not dispute that Mr. Mace used the firearm Defendant sold him to harm himself. Further, Walmart fails to contend with the evidence that had Defendant not sold Mr. Mace the firearm, he would not have harmed himself. As noted, Dr. Bryan testified that the sale of the firearm was a direct contributor to Mr. Mace's death: Among those who have suicidal ideation, the capability to act upon suicidal urges through access to lethal means is more important than the desire to attempt suicide. In addition, according to Dr. Bryan, access to a firearm changes the mentality of the suicidal person. Dr. Bryan also testified that if the sale had not occurred, current research on

suicidality indicates Mr. Mace would likely not have attempted to purchase a gun from another store or attempt another means of suicide.

Analysis at the second step, legally cognizable cause, "consider[s] whether the actual harm to a litigant falls within a general field [of danger] that the actor should have anticipated or expected." *Kiriakos*, 139 A.3d at 1021 (second alteration in original) (quoting *Pittway Corp.*, 973 A.2d at 787). The primary consideration at this step is "whether the injuries were a foreseeable result of the negligent conduct," *id.* (quoting *Pittway Corp.*, 973 A.2d at 788), and if multiple acts or omissions were found to be a cause-in-fact of the injuries, the foreseeability analysis must consider whether any intervening act or omission was a superseding cause of the injuries, *Pittway Corp.*, 973 A.2d at 788–89. An intervening act or omission is a superseding cause, such that it absolves the defendant of liability, if it is so "'unusual' and 'extraordinary' . . . that [it] could not have been anticipated by the original tortfeasor." *Id.* at 789 (quoting *McGowans v. Howard*, 197 A.2d 915, 918 (Md. 1964)); *see also, e.g.*, *Collins*, 933 A.2d at 567 (explaining that an "intervening act does not become a superseding cause if the party committing the initial act should have realized that one would subsequently so act" (citing Restatement (Second) of Torts § 447)).

Defendant focuses its argument on this second step, asserting that *Sindler* holds that that as a matter of law, suicide is an intervening, superseding cause. ECF No. 162, at 20–21. As discussed above, the Court has rejected this argument, and Defendant cites no additional case law in support of its contention. *Brady I*, 2022 WL 2987078, at *13–16; *Brady II*, 2024 WL 2273382, at *9–10. Based on Maryland law, the Court left the question of whether Mr. Mace's suicide was a superseding, intervening cause to the jury. *See Collins*, 933 A.2d at 548; ECF No. 147, at 29 (instructing the jury that "[s]uicide is an intervening cause if the suicide was not reasonably foreseeable at the time the defendant acted negligently.").

There was sufficient evidence presented at trial for a jury to find that Mr. Mace's suicide "fell within a general field of danger which should have been anticipated." *See Collins*, 933 A.2d at 567 (quoting *Stone v. Chicago Title Ins. Co. of Md.*, 624 A.2d 496, 500 (Md. 1993)). Suicide with a firearm is not "highly extraordinary." *See id.* at 569. Plaintiffs' experts testified that, because guns are often used as a lethal means of suicide, it is common industry practice to utilize a procedure like a block list to prevent the purchase of a gun by those a gun retailer knows might use it to harm themselves. Walmart had such a procedure in place but failed to train its managers on how to use it. Additionally, recognizing the danger of selling a firearm to a suicidal person, Walmart utilized a policy instructing associates to deny the sale of a firearm if they thought the purchaser might use the firearm to harm themselves. *See* Pls. Trial Ex. 4. Mr. Mace's specific injuries were also foreseeable. Viewed in the light most favorable to the Plaintiffs, the facts showed Mr. Jones knew six days before his death that Mr. Mace was suicidal, planned to buy a gun, and was hospitalized for his suicidal ideation. Because of this knowledge, the jury could find that suicide was not an intervening, superseding cause of Mr. Mace's death as Walmart should have "realized that [he] would subsequently so act" after selling him the shotgun. *See Collins*, 933 A.2d at 567 (citing Restatement (Second) of Torts § 447).

Based on its erroneous interpretation of *Sindler*, Walmart moves for a new trial asserting that the Court's Jury Instruction No. 25 on superseding/intervening causes was deficient and prejudicial. ECF No. 162, at 23–25. The Court's Instruction No. 25 largely adopts MPJI-Cv 19:11. *See* ECF No. 147, at 29. Where the Court's instruction differs from the pattern instruction, it accurately informs the jury that suicide can be an intervening cause if it was not "reasonably foreseeable." *Id.* That instruction is based on the holding in *Pittway Corp.*, which determined that in Maryland, courts "consider both the foreseeability of the harm suffered by the plaintiffs as well

as the foreseeability of intervening acts in determining superseding causation." 973 A.2d at 792 (citing *Horridge v. St. Mary's Cnty. Dep't of Soc. Servs.*, 854 A.2d 1232, 1245–46 (Md. 2004); Restatement (Second) of Torts § 442); *see also Collins*, 933 A.2d at 567 (an intervening act is not superseding if the defendant should have realized that one would subsequently so act). Here, both the harm suffered, and the potential superseding cause of the harm was Mr. Mace's suicide. The instruction correctly instructed the jury to consider the foreseeability of Mr. Mace's suicide. Read with the other instructions on foreseeability, these instructions accurately reflect Maryland law on causation. *See* ECF No. 147, at 27–28 (adopting MPJI-Cv 19:3, 19:10). The Court will therefore deny Walmart's motion for a new trial based on this instruction. *Pathways Psychosocial v. Town of Leonardtown*, 223 F. Supp. 2d 699, 707 (D. Md. 2002) (holding that a court may "grant a new trial only if the erroneous instruction is prejudicial and would result in a miscarriage of justice.").

**C. The PLCAA Does Not Bar All of Plaintiffs' Causes of Action.**

The PLCAA bars qualified civil liability actions in federal and state courts. 15 U.S.C. § 7902(a). For the purpose of the PLCAA, a "qualified civil liability action" is:

> [A] civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party.

*Id.* § 7903(5)(A). At the summary judgment stage, the Court found that there was no genuine dispute that the case was a qualified civil liability action barred under the PLCAA. *Brady II*, 2024 WL 2273382, at *7.[7] Even if the lawsuit constitutes a qualified civil liability action, it may proceed

[7] Plaintiffs maintain that the definition of qualified liability does not apply to this action and that the PLCAA is unconstitutional. ECF No. 177, at 30 n.10. The Court does not reach the

if it falls within an exception. 15 U.S.C. § 7903(5)(A). The jury found two of the PLCAA's exceptions apply to this case: the predicate exception, 15 U.S.C. § 7903(5)(A)(iii), and the negligent entrustment exception, 15 U.S.C. § 7903(5)(A)(ii). ECF No. 155, at 1–2.

**1. The Jury Had Sufficient Evidence to Find that the Predicate Exception Applies to this Case.**

Under the PLCAA's predicate exception, a manufacturer or seller of a firearm may be held liable in a qualified civil liability action if it "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm" that is the subject of the lawsuit. 15 U.S.C. § 7903(5)(A)(iii). Plaintiffs allege that Walmart knowingly violated section 5-205(b)(6) of the Public Safety Article of the Maryland Code which prohibits a person who "suffers from a mental disorder . . . and has a history of violent behavior against the person or another" from possessing certain firearms. Md. Code Ann., Pub. Safety § 5-205(b)(6). "The predicate violation PLCAA demands may come from aiding and abetting someone else's firearms offense[.]" *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 28 (2025). Accomplice liability is recognized under Maryland law. *Gilmore v. State*, No. 0631, 2016 WL 3220846, at *4 (Md. Ct. Spec. App. June 10, 2016). The jury found by a preponderance of the evidence that "Defendant knowingly violated a Maryland Statute applicable to the sale of the firearm and that the violation was the proximate cause of the Plaintiffs' damages." ECF No. 155, at 2.

Defendant argues that the predicate exception does not apply for three reasons: 1) there is no evidence that "Walmart 'knowingly' violated section 5-205(b)(6)," 2) even if Walmart had

---

constitutionality of the PLCAA because it determined that the predicate and negligent entrustment exceptions are applicable. *See Brady I*, 2022 WL 2987078, at *8.

knowingly violated the statute, such violation was not "a proximate cause of the harm for which relief is sought," and 3) the predicate exception can only be "triggered" by violations of statutes "applicable to the sale or marketing" of firearms. ECF No. 162, at 28–31. None of these arguments warrant entering judgment in favor of Walmart.

First, there is evidence that Walmart "knowingly" violated section 5-205(b)(6) by selling a shotgun to Mr. Mace. The Court previously held, based on the PLCAA's language, that the scienter required to establish a knowing violation of section 5-205(b)(6) is knowledge "or . . . reasonable cause to believe that Mr. Mace was prohibited from possessing a firearm under Maryland law." *Brady I*, 2022 WL 2987078, at *9. Arguing that it has not met the scienter requirement, Walmart relies on *Smith & Wesson Brands, Inc. v. Estados Unidos Meixcanos*, 605 U.S. 280, 254 (2025) to contend that it has not met the specific intent requirement because Walmart must "take[] an affirmative act in furtherance of that offense." ECF No. 162, at 27 (citing *Smith & Wesson*, 605 U.S. at 291). Defendant's argument is not persuasive.

In *Smith & Wesson*, the Mexican government brought suit against seven gun manufacturers, alleging that the manufacturers "aided and abetted unlawful sales" of firearms by "fail[ing] to exercise 'reasonable care' to prevent trafficking of their guns into Mexico." 605 U.S. at 285. The Supreme Court found that selling firearms is not culpable behavior, even knowing some of the firearms might be diverted to criminal use, "because there was no reason to believe that gun manufactures 'attend to the conduct' of parties 'two levels down' the supply chain." *Alsanabani v. Spear Operations Grp.*, No. 25-1684 (JDB), 2026 WL 983064, at *5 (D.D.C. Apr. 13, 2026) (quoting *Smith & Wesson*, 605 U.S. at 295). The Supreme Court explained that aiding and abetting is a "'a rule of secondary liability for specific wrongful acts,' not a 'broad category of misconduct.'" *Smith & Wesson*, 605 U.S. at 292 (quoting *Twitter, Inc. v. Toamneh*, 598 U.S.

471, 494 (2003)). Put another way, "[m]ore was needed . . . for a provider of generally available goods or services to be liable for a customer's misuse of them." *Id.* at 291–92.

Here, the facts presented at trial distinguish this case from *Smith & Wesson* in several ways. First, unlike the Mexican government which was unable to "pinpoint, as most aiding-and-abetting claims do, any specific transactions the defendants (allegedly) assisted," *id.* at 294, here the jury found that the specific transaction between Walmart and Mr. Mace that took place on November 15, 2019, violated section 5-205(b)(6). ECF No. 155, at 2. Second, the Supreme Court observed that Mexico's complaint did not allege a particular instance of "the aid given to a single named offender in violating a specified [firearms] law." *Smith & Wesson*, 605 U.S. at 294–95. Here, the jury found that Walmart had the requisite knowledge that Mr. Mace was prohibited from possessing a firearm. *See* Pls. Trial Ex. 2. Finally, this case does not have the "middleman" problem the plaintiff faced in *Smith & Wesson*. *See Smith & Wesson*, 605 U.S. at 295–96. Unlike *Smith & Wesson*, where the defendants did not sell directly to the violators of the firearms laws, here, the jury found that Walmart sold a shotgun directly to Mr. Mace, who it knew or had reason to know had a mental disorder and a history of violence against himself. This is enough to demonstrate "an affirmative act in furtherance of" a firearms offense and the "intent of facilitating" the commission of the offense – the possession of a shotgun by someone with a mental disorder and a history of violence against himself. *See Wiley v. Fleet Farm LLC*, 799 F. Supp. 3d 860, 894 (D. Minn. 2025) (citing *Rosemond v. United States*, 572 U.S. 65, 71 (2014)).

Viewing the evidence "in the light most favorable to the non-moving party" and "drawing every legitimate inference in the party's favor," the jury had sufficient evidence to find that Walmart had knowledge that Mr. Mace "had a mental disorder" and a "history of violent behavior" against himself. *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 610 (4th Cir. 2021)

(citing *Int'l Ground Transp. v. Mayor of Ocean City*, 475 F.3d 214, 218–19 (4th Cir. 2007)). Even if there was no evidence Walmart had direct knowledge of Mr. Mace's "history of violent behavior," which there was, a reasonable jury could find that based on the circumstances at the time of the sale, Walmart had reasonable cause to believe that Mr. Mace had this history. *See, e.g.*, *Horne v. State*, No. 1665, 2026 WL 1113363, at *5 (Md. Ct. App. Apr. 24, 2026) (unpublished) (finding defendant had "reasonable cause to believe" that the person he sold a gun to had been convicted of a disqualifying offense based on the circumstances surrounding the sale). Just as someone who sells a firearm does not need to be a lawyer to have "reasonable cause to believe" that a person he sold a gun to had been convicted of a felony, *see id.*, Walmart's managers did not need medical training to have "reasonable cause to believe" that Mr. Mace had a mental disorder. *See* ECF No. 181, at 16 (arguing Walmart could not knowingly violate the statute without medical expertise). Mr. Jones knew that Ms. O'Shea had called "911" because Mr. Mace suggested he would harm himself and he reported his discussion with her to both Ms. Madden, a human resources manager, and Mr. Crowley, store manager. ECF No. 135, at 23:19–24:2; 29:9–17. Ms. O'Shea testified that she told Mr. Jones that Mr. Mace was hospitalized. The trial evidence also showed that assistant manager Renard Mackell knew that Mr. Mace had suffered from mental health issues and had previously attempted suicide. *See Helton v. AT&T Inc.*, 709 F.3d 343, 356 (4th Cir. 2013) ("[A]n ERISA plan administrator can be charged with knowledge of information acquired by its employees in the scope of their employment and the contents of its books and records."); 3 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 790 (2023) ("The knowledge necessary to adversely affect the corporation does not have to be possessed by a single corporate agent; the cumulative knowledge of several agents can be imputed to the corporation.").

Second, as discussed above, the jury had sufficient evidence to find that Walmart's violation of the statute by selling Mr. Mace a shotgun proximately caused his death.

Finally, the Court has already rejected Defendant's argument that section 5-205(b)(6) of the Public Safety Article is not "applicable to the sale or marketing of" firearms and therefore cannot "trigger" the predicate exception. ECF No. 162, at 27. "[T]he relevant question is not, as Defendant[] claim[s], whether the predicate statute explicitly prohibits the sale of firearms, but whether it is capable of being applied to the sale of firearms." *Brady I*, 2022 WL 2987078, at *7; *see also Prescott v. Slide Fire Sol., LP*, 410 F. Supp. 3d 1123, 1138 (D. Nev. 2019) (holding a predicate statute would be sufficient if it either specifically regulated firearms or the sale and marketing of goods); *Smith & Wesson Corp. v. City of Gary*, 875 N.E. 2d 422, 433 (Ind. Ct. App. 2007) ("The word 'applicable' is not defined by the statute but is generally defined as '[c]apable of being applied.'"). Courts that have considered this issue have determined that "although a general tort statute may not provide a sufficient predicate for the purposes of 15 U.S.C. § 7903(5)(A)(iii), a statute that explicitly regulates firearms will satisfy this exception." *Brady I*, 2022 WL 2987078, at *8; *see, e.g.*, *City of New York v. Beretta USA Corp.*, 524 F.3d 384, 391 (2nd Cir. 2008) (holding that a statute that discussed firearms would meet the definition of the predicate exception); *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1136 (9th Cir. 2009) ("We find it more likely that Congress had in mind only these types of statutes—statutes that regulate manufacturing, importing, selling, marketing, *and using firearms* or *that regulate the firearms industry*—rather than general tort theories that happened to have been codified by a given jurisdiction." (emphasis added)). Section 2-505(b)(6) is not a general tort statute, can be applied to the sale of firearms, and therefore, can serve as the predicate statute of the predicate exception. *Brady I*, 2022 WL

2987078, at *8. Defendant presents no additional caselaw or evidence to cause the Court to revisit its prior holding.

Defendant again contends that even if the predicate exception is satisfied by a state statute that does not explicitly prohibit the sale of firearms, section 2-505(b)(6) is not applicable to the sale of firearms to individuals "suffer[ing] from a mental disorder . . . and ha[ve] a history of violent behavior against [themselves]" because it only criminalizes the possessor of the firearm, not the seller. ECF No. 162, at 31. The Court again rejects this argument. *See Brady I*, 2022 WL 2987078, at *8–9. The PLCAA provides specific examples of circumstances in which the exception will apply, including, but not limited to, "any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition [under federal law]". 15 U.S.C. § 7903(5)(A)(iii)(II). Therefore, as discussed above, the predicate exception is satisfied if Walmart aided and abetted Mr. Mace in violating section 2-505(b)(6) by selling a shotgun to him when it knew or had reason to know that he had a mental disorder and a history of violence against himself. *See Brady I*, 2022 WL 2987078, at *8–9.

Based on the previously rejected arguments, Defendant moves for a new trial asserting the jury instruction regarding PLCAA's predicate exception "was incorrect and confusing." ECF No. 162, at 32–33. Specifically, Defendant argues that the Court failed to "clearly state the scienter component of aiding and abetting."[8] *Id.* Walmart's argument fails on the merits. Defendant's

[8] Plaintiffs argue that Defendant did not preserve its objection to the Court's PLCAA instruction. ECF No. 177, at 38–39. However, Defendant did preserve its objection in the pre-charge conference. *See* ECF No. 174, at 76:13–25; *Goodman v. Praxair Servs., Inc.*, No. MJG-04-391, 2011 WL 13176593, at *11 (D. Md. Mar. 30, 2011) (holding the ability to argue entitlement to a

proposed instruction did not correctly define aiding and abetting: "Walmart [had to have] intended to assist Mr. Mace in violating that statute, which is necessary to aid and abet and to violate the statute." ECF No. 174, at 76:13–25. Instead of providing clarity, the instruction would confuse the jury by giving the impression that they would have to find that Walmart had intended to violate the law, rather than what was actually required, that it had the requisite knowledge that Mr. Mace had a mental disorder and a history of violence against himself. *See Chaudhry v. Gallerizzo*, 174 F.3d 394, 408 (4th Cir. 1999) ("Jury instructions are erroneous if, as a whole, they do not adequately state the controlling law and/or mislead or confuse the jury."). The Court's Jury Instruction No. 26 described the predicate exception in terms that were taken almost verbatim from the PLCAA. *Compare* ECF No. 147, at 30, *with* 15 U.S.C. § 7903(5)(A)(iii). Because the Court's jury instructions accurately conveyed the law, the Court denies Walmart's motion for a new trial based on the PLCAA instruction.

**2. The Jury Had Sufficient Evidence to Find that Walmart Negligently Entrusted the Firearm to Mr. Mace.**

The PLCAA also exempts from protection "an action brought against a seller for negligent entrustment or negligence per se." 15 U.S.C. § 7903(5)(A)(ii). The PLCAA defines "negligent entrustment" as:

> [T]he supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others.

---

new trial due to inadequate jury instructions depends on whether the party preserved objection to the instruction pre-verdict).

*Id.* § 7903(5)(B). Since the PLCAA does not "create a public or private cause of action or remedy," *id.* § 7903(5)(C), the Court looks to Maryland law to determine whether Plaintiffs have presented sufficient evidence for the jury to find Walmart negligently entrusted the firearm to Mr. Mace. *See Prescott v. Slide Fire Sols., LP*, 410 F. Supp. 3d 1123, 1132–33 (D. Nev. 2019); *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216, 1225 (D. Colo. Mar. 27, 2015); *Bryant-Bush v. Shawnee Gun Shop, Inc.*, No. 09-00397-CV-W-REL, 2011 WL 13177539, at *3 (W.D. Mo. Mar. 29, 2011).

Maryland courts have adopted the doctrine of negligent entrustment as stated in section 390 of the Restatement (Second) of Torts, which provides:

> One who supplies directly or through a third person a chattel for use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

*Broadwater v. Dorsey*, 688 A.2d 436, 439 (Md. 1997) (quoting Restatement (Second) of Torts § 390). To establish a negligent entrustment claim under Maryland law, a plaintiff must prove three elements: "(1) [t]he making available to another a chattel which the supplier (2) knows or should have known the user is likely to use in a manner involving risk of physical harm to others (3) the supplier should expect to be endangered by its use." *Mackey v. Dorsey*, 655 A.2d 1333, 1337 (Md. Ct. Spec. App. 1995) (quoting *Wright v. Neale*, 555 A.2d 518, 522 (Md. Ct. Spec. App. 1989), *rev'd on other grounds*, 585 A.2d 196 (Md. 1991)). Maryland courts have stated that "the principal features of the tort lie in the knowledge of the supplier concerning the dangerous propensities of the entrustee and in the foreseeability of harm." *Kahlenberg v. Goldstein*, 431 A.2d 76, 83 (Md. 1981); *accord Woolridge*, 163 A.3d at 868; *Herbert v. Whittle*, 517 A.2d 358, 361 (Md. Ct. Spec.

App. 1986). The jury found by a preponderance of the evidence that Defendant "negligently entrusted the firearm to Jacob Mace." ECF No. 155, at 1.

Defendant moves for judgment as a matter of law on this issue and argues that the negligent entrustment exception does not apply because Walmart did not have control over the gun at the time of Mr. Mace's suicide and Mr. Mace's suicide was not foreseeable. ECF No. 162, at 33–34. Specifically, Defendant makes the same argument that this Court twice rejected—a seller of a firearm can never be liable for negligent entrustment because negligent entrustment requires the ability to control the chattel at the time of the harm. *See Brady I*, 2022 WL 2987078, at *11–12; *Brady II,* 2024 WL 2273382, at *16. Walmart provides no additional authority requiring the Court revisit prior holdings.

First, "the Court maintains that, under Maryland law, ongoing control is not a necessary element of a negligent entrustment claim outside of the automobile context." *Brady II,* 2024 WL 2273382, at *16. Maryland's highest court has explicitly stated that the doctrine of negligent entrustment "imposes no requirement of a special relationship or control of another's conduct." *Kiriakos*, 139 A.3d at 1032. "Additionally, most jurisdictions to have addressed the issue in the firearms context have concluded that a sale does not preclude a negligent entrustment claim." *Brady II,* 2024 WL 2273382, at *16; *see, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 326 n.6 (Mo. 2016) (en banc) (citing cases); *see also Minnesota v. Fleet Farm LLC*, 679 F. Supp. 3d 825, 846 (D. Minn. 2023) (denying motion to dismiss negligent entrustment claim against firearms dealer for sales of firearms to straw purchasers); *Shirley v. Glass*, 308 P.3d 1, 4–5, 9 (Kan. 2013) (affirming denial of summary judgment on negligent entrustment claim against pawn shop and owners for selling gun to straw purchaser).

Defendant is unable to cite any case that requires firearms sellers to maintain ongoing control of the firearm to be liable for negligent entrustment.[9] *But see Valentine v. On Target, Inc.* (*Valentine I*), 686 A.2d 636, 640 (Md. Ct. Spec. App. 1996), *aff'd*, 727 A.2d (Md. 1999) (observing that "sellers of guns" can be liable for negligent entrustment). Instead, Defendant relies on *Broadwater v. Dorsey*, 688 A.2d 436 (Md. 1997), a case about the negligent entrustment of an automobile. As this Court previously explained, "there is significant cause to question whether *Broadwater* prohibits a finding that a seller of a firearm negligently entrusted a firearm." *Brady I*, 2022 WL 2987078, at *12; *see also Brady II*, 2024 WL 2273382, at *15. In holding that "the doctrine of negligent entrustment is generally limited to those situations in which chattel is under the control of the supplier at the time of the accident," *Broadwater* applies the requirements of vicarious liability to the tort of negligent entrustment. *Brady I*, 2022 WL 2987078, at *11 (quoting *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 555 (Tenn. 2005)).

The Court found *Broadwater* inconsistent with section 390 of the Restatement (Second) of Torts. *See Brady I*, 2022 WL 2987078, at *11–12. This Court observed the Restatement is "silent as to any requirement that the entruster of the chattel have controlled the chattel at the time the injury that led to the action occurred[.]" *Id.* Unlike *Broadwater*'s assertion that the Restatement requires the supplier to have control over the chattel at the time of injury, comment a to this section

[9] The cases Defendant cites in its Motion determined that defendant firearms sellers were not liable because it was not foreseeable that the customer would use the gun in a way that caused unreasonable risk, not because they no longer maintained control over the chattel. *See, e.g.*, *Phillips*, 84 F.Supp.3d at 1225–26 (holding defendant was not liable for negligent entrustment of ammunition because no facts alleged showed that it "had actual knowledge" of the purchaser's plan to use the ammunition in a mass shooting); *Hetherton v. Sears, Roebuck & Co*., 445 F. Supp. 294, 304–05 (D. Del. 1978) (denying liability where plaintiff argued that defendant firearm seller should have "foreseen that some convicted felons would lie . . . to obtain guns with which to commit crimes"). As discussed throughout, it was reasonably foreseeable that Mr. Mace would use the gun in a way that caused unreasonable risk.

of the Restatement clearly takes the position that the entruster can be a seller of chattel, and therefore, ongoing control is not required: "The rule stated applies to anyone who supplies a chattel for use of another. It applies to sellers, lessors, donors or lenders[.]"[10] Restatement (Second) of Torts § 390, cmt. a. Other courts analyzing this section of the Restatement have interpreted it to mean that sellers can be liable on a theory of negligent entrustment, even when they no longer have title or possession of the chattel. *See Vince v. Wilson*, 561 A2d 103, 105 (Vt. 1989) ("The comments to the Restatement support those decisions which extend the rule to individuals such as sellers[.]"); *Morris v. Giant Four Corners, Inc.*, 294 F. Supp. 3d 1207, 1214 (D.N.M. 2018) (collecting cases from jurisdictions that have adopted Restatement (Second) of Torts § 390 and held sellers can be held liable for entrusting chattel to an incompetent user); W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 104, at 718 (5th ed. 1984) ("[I]t is the negligent entrusting which creates the unreasonable risk; and this is none the less when the goods are conveyed."). These authorities "represent a nearly unanimous trend[,]" that merchants such as Defendant, can be held liable for negligent entrustment. *See Morris*, 294 F. Supp. 3d at 1214. Maryland court holdings outside of the automobile context have utilized an understanding of negligent entrustment that is aligned with the majority of jurisdictions. *See, e.g.*, *Kiriakos*, 139 A.3d at 1032 (finding the "doctrine of negligent entrustment . . . imposes no requirement of a

[10] *Broadwater* ignored comment a to Restatement § 390, focusing instead on comment b which provides that § 390 is a special application of § 308 which requires the chattel to be under the control of the supplier at the time of the accident. *Id*. at 440–41. However, as the Appellate Court of Connecticut recently observed, read together, §§ 308 and 390 require the plaintiff to show that the "potentially dangerous instrumentality supplied or entrusted by the defendant 'was under the control of' the defendant at the time possession was transferred," not at the time the instrumentality was misused. *Adams v. Aircraft Spruce & Specialty Co.*, 283 A.3d 42, 54–55 (Conn. App. Ct. 2022) (quoting Restatement (Second) Torts § 308). "This reading is consistent with other jurisdictions that have adopted the Restatement's approach to the tort of negligent entrustment." *Id.*

special relationship or control of another's conduct"); *Valentine I*, 686 A.2d at 640 (citing Restatement (Second) Torts § 302B, cmt. e, illus. 11 to observe that "sellers of guns" can be liable for negligent entrustment).

While not mentioning *Broadwater* explicitly, the court in *Valentine II* called into question *Broadwater*'s applicability to firearms. In *Valentine II*, family members of a woman who was murdered with a firearm by an unknown assailant filed suit alleging that defendant, a firearms retailer, had negligently allowed the firearm to be stolen. 727 A.2d at 948. In the intermediate appellate case, the Maryland Court of Special Appeals observed that "sellers of guns" can be liable for "negligent entrustment" and cited illustration 11 in Restatement (Second) of Torts § 302B: "A gives an air rifle to B, a boy of six years old. B intentionally shoots C, putting out C's eye. A may be found to be negligent toward C." *Valentine I*, 686 A.2d at 640 (citing Restatement (Second) of Torts § 302B, cmt. e, illust. 11). The illustration provides an example of a situation in which an actor is liable "[w]here the actor entrusts an instrumentality capable of doing serious harm if misused, to one whom he knows, or has strong reason to believe, to intend to be likely to misuse it to inflict intentional harm." Restatement (Second) Torts, §302B, cmt. e, example e. Here, both the Restatement and the *Valentine I* court make clear that ongoing control of the firearm is not necessary for negligent entrustment liability. In affirming the Court of Special Appeals' holding after the *Broadwater* decision was published, Maryland's highest court concluded that the facts of the case did not support recognizing a duty in this situation. *Valentine II*, 727 A.2d at 952–53. The court's decision hinged on foreseeability of the harm and found that it was not reasonable for the gun retailer to foresee that the string of events—the theft and illegal use of the gun by an unknown party—would lead to plaintiffs' injury. *Id.* at 950. The court, however, cautioned that its holding "does not mean that a gun store owner may never be held liable to another party for

negligence in the display and sale of guns when that other party is injured as a result of the negligence." *Brady I*, 2022 WL 2987078, at *11 (citing *Valentine II*, 727 A.2d at 953). Importantly, no Maryland case has analyzed the negligent entrustment liability of gun sellers since *Valentine II*.

Ignoring the *Valentine II* court's warning and its underlying reasoning, Defendant argues that *Valentine II* supports its interpretation of Maryland's negligent entrustment law. *See* ECF No. 162, at 36–37. Defendant specifically cites the *Valentine II* court's wariness of creating a new cause of action. *See id*. Because Mr. Mace's text message included his plan to "slit wrists," Walmart argues that the Court's negligent entrustment analysis would make Defendant liable for selling him a box cutter. ECF No. 162, at 37. This Court, like the court in *Valentine II*, focused on foreseeability in determining that negligent entrustment liability attaches to Walmart. *See Brady II*, 2024 WL 2273382, at *17 (finding Mr. Mace's use of the gun to harm himself foreseeable because Walmart knew or had reasonable cause to believe that Mr. Mace planned to use the gun in that way); *Valentine II*, 727 A.2d at 950 ("Petitioner does not allege any facts to support his claim that respondent knew or should have known of the existence of circumstances that increased the probability that a thief would steal guns from its retail store and that a third unknown party would obtain one of those stolen guns and use it in a criminal manner."). The particular facts of the instant case do not support a similar finding of negligent entrustment liability for "other implements" sold by Walmart that have numerous nondangerous uses. *See Brady II*, 2024 WL 2273382, at *24.

Second, as has already been discussed throughout this Opinion, it was reasonably foreseeable that Mr. Mace would use the gun purchased from Defendant to harm himself. Unlike Walmart's assertion, because Ms. O'Shea had warned Mr. Jones that Mr. Mace intended to

purchase a gun to harm himself, Walmart did not need to do any additional "investigat[ion] [into] the background of the person to whom [it] entrusts a chattel[,]" *Phillips*, 84 F. Supp. 3d at 1225, for it to have known it should not sell a gun to Mr. Mace. Defendant contends that because Mr. Mace had previously purchased a firearm from Walmart, and no managers had knowledge that his family had taken away his firearm, combined with Mr. Mace's representations at the time of sale that the gun was for Ms. Brady, "Walmart had no reason to expect Mace to use the shotgun 'to create an unreasonable risk of harm.'" ECF No. 162, at 36 (quoting *Broadwater*, 688 A.2d at 440–41). However, viewing the facts in light most favorable to the Plaintiffs, Defendant reasonably should have foreseen that Mr. Mace's intention was to purchase a gun to kill himself. *See Drummond Coal Sales, Inc.*, 3 F.4th at 610. Mr. Mace's text message to Ms. O'Shea, which she testified to sending to Mr. Jones, stated that he planned to "slit writs, buy gun," not merely use a gun, implying that he did not yet have access to this highly lethal means of suicide. *See* Pl. Trial Ex. 2. Additionally, Mr. Jones specifically asked the human resources manager about whether Walmart had a list that would prevent Mr. Mace from purchasing a gun, indicating that he knew that Mr. Mace planned to purchase a gun from Walmart. *See* ECF No. 135, at 23:19–24:2.

Based on its reliance on *Broadwater*, Defendant argues that the Court's negligent entrustment instruction was erroneous and prejudicial because it did not include, "In order to be liable for negligent entrustment, the entrusting party must have either the legal right to control the property or the property or the party using the property at the time of the accident." ECF No. 162, at 38 (quoting ECF No. 108-1, at 24). The Court's negligent entrustment instruction was adopted from MPJI-Cv 18:9. *See* ECF No. 147, at 26. The second comment to MPJI-Cv 18:9 states, "[t]he paramount requirement for liability under a theory of negligent entrustment is whether the defendant had a right to control the *vehicle*." MPJI-Cv 18:9, cmt. 2 (emphasis added) (citing

*Broadwater*, 688 A.2d at 436). As discussed above, because this case does not involve a vehicle, this instruction is not warranted. *See King*, 594 F.3d at 311 (holding that jury instructions should "adequately inform[] the jury of the controlling legal principles without misleading or confusing the jury").

Therefore, the Court denies Walmart's motion for judgment on the PLCAA's negligent entrustment exception and Plaintiffs' negligent entrustment claim and denies its motion for a new trial based on the denial of its negligent entrustment instruction.

**D. The ADA Does Not Prohibit Walmart from Fulfilling Its Duty of Care.**

Walmart claims that the Americans with Disabilities Act of 1990 (the "ADA") would have prohibited Walmart from complying with the duty of care it owed to Mr. Mace because the ADA provides strict limitations on the use and disclosure of an employee's medical information. ECF No. 162, at 39–40. Specifically, Defendant asserts that the "ADA mandates that information relating to an employee's medical condition may only be disclosed to supervisors and managers regarding work restrictions, employment duties, and necessary accommodations." *Id.* at 40.

As a threshold matter, Plaintiffs argue that Walmart failed to preserve this argument. ECF No. 177, at 43. Defendant responds that in its Rule 50(a) Motion, it preserved "any legal argument contained within its Briefs in Support of its Motion for Judgment on the Pleadings," ECF No. 181, at 29 (quoting ECF No. 137, at 1), and in its Reply in Support of its Motion for Judgment on the Pleadings, Walmart argued that Mr. Mace's mental health history could not be disseminated to the entirety of its California store without violating the ADA, ECF No. 37, at 10 ("Plaintiffs' unsupported suggestion that an employee's mental health history (and, by parity of reasoning, any other medical history) is imputed to the entirety of a corporation's employees would raise serious questions about employee confidentiality and privacy." (citing 42 U.S.C. § 12112(d)(3)(B); 29

C.F.R. § 1630.14)). Plaintiffs are correct that Walmart failed to preserve this ADA argument in its Rule 50(a) Motion. "A party may rely on specific facts or arguments not expressed in a Rule 50(a) motion only when the non-moving party is clearly on notice of a more general argument in the same genre." *Ziccarelli v. Dart*, 142 F.4th 477, 485 (7th Cir. 2025). Defendant raised its ADA argument only cursorily, addressing it in one sentence in a reply brief. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (holding that a party waives an argument by failing to present it in its opening brief or by taking only a "passing shot" at the issue).

Even if Walmart did preserve its argument, it fails on the merits. "The ADA provision that deals specifically with employee medical information, 42 U.S.C. § 12112(d), governs conduct by employers both before and after they hire an employee." *Rohan v. Networks Presentation*, *LLC*, 175 F. Supp. 2d 806, 813 (D. Md. 2001). An employer can require a medical examination or inquiry only when such examination or inquiry is shown to be job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(4). If a medical examination is requested, the information obtained generally must be "treated as a confidential medical record." *Id.* § 12112(d)(3)(B). "This disability information may be disclosed only in limited circumstances to supervisors and managers, first aid and safety personnel, and government officials investigating ADA compliance." *Rohan*, 175 F. Supp. 2d at 814 (citations omitted). "[W]hen an employer does not receive confidential medical information pursuant to § 12112(d), but receives the information another way, the ADA confidentiality provision is not triggered." *Sigley v. ND Paper, LLC*, No. 1:22-CV-52, 2023 WL 6300047, at *3 (N.D. W.Va. Sept. 27, 2023), *aff'd sub nom. Sigley v. ND Fairmont LLC*, 129 F.4th 256 (4th Cir. 2025). For example, "[w]hen an employee voluntarily discloses confidential medical information, the confidentiality requirements of the ADA

confidentiality section do not apply." *Id.* at *3 (citing *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000)).

Here, the information that Mr. Mace had a mental disorder and was suicidal came in two forms: 1) Mr. Mace's voluntary disclosure to Mr. Mackell; and 2) through text messages to a Walmart colleague, who shared those text messages with Walmart management. Neither of these methods implicate the ADA confidentiality provision because they were not part of a medical examination or inquiry initiated by Walmart or an employee health program. *See Rohan*, 175 F. Supp. 2d at 813 n.12 (identifying several cases holding that § 12112(d) does not protect confidentiality of voluntary disclosures initiated by the employee); *Sigley*, 2023 WL 6300047, at *3 (holding the confidentiality provision of the ADA is only triggered if the information is disclosed pursuant to § 12112(d)). Finally, the ADA does not require an employer to look the other way when firearms safety at work is implicated. *See, e.g.*, *Jackson v. Planco*, 660 F. Supp. 562, 577–80 (E.D. Pa. 2009) (holding that an employee's violation of employer's internet policy by viewing gun websites and employer's concerns about employee safety were legitimate, nondiscriminatory reasons under the ADA for terminating the employee).

The facts of the case do not support awarding judgment or providing an ADA confidentiality instruction. Walmart did not need to inquire into the specifics of Mr. Mace's mental health diagnosis because the jury found that Walmart had reasonable cause to know Mr. Mace planned to harm himself and should have taken precautions. Additionally, Walmart did not need to disclose Mr. Mace's medical information to prevent him from purchasing a firearm. Mr. Colucci testified that when someone is added to Walmart's blocklist, the employees working at the firearms counter do not see the reason someone is prohibited from purchasing a firearm. Mr. McLaughlin testified that if a manager had told him not to sell Mr. Mace a gun, he would not have needed any

additional information to follow that order. Finally, there is no evidence that Walmart failed to stop Mr. Mace from purchasing a gun because it was concerned that it would violate the confidentiality provision of the ADA. Rather, the evidence suggests that Walmart failed to include Mr. Mace on the blocklist because its managers were not trained in how to make such reports to Walmart's corporate office.

Because Walmart failed to preserve its argument, and neither the law nor the facts of the case support judgment or awarding of a new trial, the Court denies Walmart's motion based on its ADA arguments. *See Micro Focus (U.S.), Inc. v. Express Scripts, Inc.*, No. PX-16-0971, 2020 WL 292053, at *7 (D. Md. Jan. 21, 2020) ("It is axiomatic that jury instructions must correctly state the law and adequately cover the issues in the case." (internal quotation marks omitted)); *id.* ("[T]he Court must not instruct the jury on a theory 'unsupported by the evidence presented at trial.'" (quoting *Aldridge*, 789 F.2d at 1066)).

**E. Economic Damages**

The jury awarded economic damages for lost wages and lost services to Mr. Mace's two minor children as follows:

- G.M.:
    - Lost Wages: $948,000
    - Lost Services: $818,635
- C.C.:
    - Lost Wages: $632,000
    - Lost Services: $90,959

ECF No. 155, at 4. These numbers reflect Dr. Borzilleri's opinions regarding the value of Mace's income through the age of sixty-two, if he had obtained an associate's degree, and the value of the

household services Mr. Mace would have provided throughout his life had he remained married to Ms. Brady. ECF No. 162, at 45. Because the jury found Ms. Brady contributorily negligent, Ms. Brady was not awarded damages. ECF No. 155, at 2; *see also* ECF No. 147, at 31 ("[A]ny individual plaintiff may not recover damages arising from the death of Jacob Mace if that plaintiff negligently contributed to Jacob Mace's death."). Defendant argues that the jury's award of economic damages to Mr. Mace's minor children was not supported by evidence, based in part on the improper admission of Plaintiffs' expert economist, Dr. Borzilleri. ECF No. 162, at 41–42. Defendant makes three specific arguments: 1) Dr. Borzilleri's opinions were not helpful and likely to confuse the jury;[11] 2) Dr. Borzilleri's opinions on Mr. Mace's earnings and fringe benefits had he obtained an associate's degree were speculative, and 3) Dr. Borzilleri's testimony regarding the lost value of household services was inconsistent with Maryland law. *Id.* at 42.

**1. The Court Properly Admitted Dr. Borzilleri's Testimony.**

The Court properly admitted Dr. Borzilleri's testimony. "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.,* 370 U.S. 31, 35 (1962). Expert testimony is admissible under Rule 702, if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable—that is, whether it is supported by adequate validation to

[11] Plaintiffs argue that Walmart did not object at trial to Dr. Borzilleri offering opinions as to the amount of economic damages sustained collectively by the Mace family. ECF No. 177, at 47. However, Defendant preserved this argument when it moved to exclude Dr. Borzilleri's testimony. ECF No. 167, at 12:18-13:14

render it trustworthy. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 590 & n.9). The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue. *Id*. Thus, an expert's testimony is admissible under Rule 702 if it "rests on a reliable foundation and is relevant." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotation marks omitted). District courts considering admitting expert testimony should be conscious of two guiding principles. First, Rule 702 was intended to liberalize the introduction of relevant expert evidence. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1158–59 (4th Cir.1996). Thus, the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. *See id.*; *see also In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) ("[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in [an expert's] reasoning or methodology will warrant exclusion."). Second, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded. *See United States v. Dorsey*, 45 F.3d 809, 815–16 (4th Cir. 1995).

Here, Dr. Borzilleri's testimony met *Daubert*'s requirements. As discussed further below, courts—including courts interpreting Maryland law governing damages in negligence cases—have permitted expert testimony using Dr. Borzilleri's methodology. *See Thibodeaux*, 2020 WL 4286874, at *6; *Tempel v. Murphy*, 30 A.3d 952, 1002–03 (Md. Ct. Spec. App. 2011) (upholding the trial court's admission of Dr. Borzilleri's future loss of income expert testimony); *see also Phelps v. CBS Corp.*, No. 17-cv-8361 (AJN), 2020 WL 7028954, at *6 (S.D.N.Y Nov. 20, 2020) ("[C]ourts have noted that the value of lost household services is inexact, and testimony based on national averages has been deemed admissible to calculate such losses under the liberal standards of Rule 702 when there are no serious flaws in use of the data, even when the data is not 'tailored

especially well to the facts' of the case."). To the extent that Defendant disagreed with Dr. Borzilleri's method of calculation, the Court found that Defendant's "arguments go to weight, rather than admissibility, of the evidence, and [the Court permitted Defendant's counsel to] argue these points at trial." *Id.*; *see also* ECF No. 167, at 12:11–13:14 (denying Defendant's Motion to Exclude Dr. Borzilleri because Defendant's arguments went to weight rather than admissibility); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010) ("Minor flaws in an expert's analysis . . . can be probed through cross-examination and generally go to the weight to be accorded to the expert's testimony rather than admissibility.").

Defendant argues that Dr. Borzilleri's testimony should have been excluded because he did not calculate the specific amount of damages for each of Mr. Mace's minor children, but instead calculated a total for the entire family. ECF No. 181, at 32. Maryland law, however, permits the jury to apportion lump sum damages amounts based on the evidence presented at trial. *See Sun Cab Co. v. Walston*, 289 A.2d 804, 826 (Md. Ct. Spec. App. 1972); *see also* Md. Code Ann. Cts. & Jud. Proc. § 3-904(c)(2) ("[T]he amount recovered shall be divided among the beneficiaries in shares directed by the verdict."). Therefore, it was reasonable to permit Dr. Borzilleri to testify as to how he calculated the total economic damages for Mr. Mace's family and allow the jury to make the determination as to how the economic damages should be split amongst the plaintiffs based on his testimony and the facts of the case.

**2. Dr. Borzilleri's Method of Calculating Lost Wages Complied with Maryland Law, but the Court Will Deny Without Prejudice Defendant's Motion for Judgment on the Amount of Lost Wages Damages the Jury Awarded C.C. and G.M.**

Defendant has two objections to Dr. Borzilleri's calculation of amount of economic loss: 1) Dr. Borzilleri improperly assumed Mr. Mace would attain an associate's degree, ECF No. 162 at 47–48, and 2) the lost wages award was excessive because it included damages calculated

beyond C.C. and G.M.'s age of majority, *id.* at 44–45, and the total lost wages includes income that would have been afforded Ms. Brady if she had not been found contributorily negligent, *id.* at 40 n.11.

First, the jury had sufficient evidence to find that Mr. Mace would have obtained an associate's degree if he had survived. Therefore, Dr. Borzilleri's calculation of lost income based on the statistical averages for the income of an individual with that degree was not erroneous. Dr. Borzilleri did not offer expert testimony on whether Mr. Mace would obtain an associate's degree. ECF No. 170, at 13:25–14:3, 19:7–13. Rather he presented two sets of totals, one which assumed Mr. Mace would receive an associate's degree, and one assuming he would not. *Id*. In calculating future income losses, Maryland courts permit economics experts to present multiple damages amounts to allow the jury to make the ultimate determination, based on the evidence, of the total lost income. *See Tempel*, 30 A.3d at 1002–03 (permitting Dr. Borzilleri to present loss of income figures for various ages of retirement without plaintiffs having to "prove a specific age of retirement"). The jury reasonably concluded that Mr. Mace was likely to have achieved this degree after hearing testimony that he was only six credits shy of obtaining his associate's degree and was not currently enrolled because his college infrequently offered the two courses he needed to complete his degree. *See Ory v. Libersky*, 389 A.2d 922, 927–28 (Md. Ct. Spec. App. 1978) (holding that plaintiffs did not have to present evidence that each of decedent's children would attend college before the jury was allowed to consider whether to award the children economic damages in the form of loss of tuition support); *id.* at 931 ("In Maryland, the general rule in wrongful death cases is that award of damages is within sound discretion of jury.").

However, Defendant's next argument—that the evidence presented at trial did not support the jury's award of economic loss damages to C.C. and G.M. because there is no evidence that Mr.

Mace would have financially supported his children beyond their eighteenth birthday and the calculation included support for Ms. Brady who is barred from damages because of her contributory negligence—raises more legitimate concerns. *See* ECF No. 162, at 44–45. While the presumption that the jury can estimate a minor child's damages up to the age of marriage or majority is not strictly a rule, *Alden v. Maryanov*, 406 F. Supp. 547, 550–51 (D. Md. 1976), beyond the age of majority, "a jury can award prospective damages only if the claimant can show, without the benefit of any presumptions of parental support, potential pecuniary loss," *id.* *See Cincotta v. United States*, 362 F. Supp. 386, 410 (upholding an award of college tuition beyond the age of majority when evidence presented indicated that the deceased father would have paid for his son's tuition if he had survived). Reasonable expectation of pecuniary benefit must be established by "evidence of a legal duty, promise, or acts of intent." *Fowlkes v. Choudhry*, 248 A.3d 298, 317 (Md. 2021).

The Court is unaware of any evidence in the record that Mr. Mace had a legal duty to provide for his children beyond their age of majority. While there was testimony that Mr. Mace was a dedicated father who intended to be in his children's lives and support them, Plaintiffs have not identified any testimony that demonstrated Mr. Mace made promises or acts of intent to financially support his children beyond their age of majority. *Cf. Ory*, 389 A.2d at 927 (holding that a separation agreement between the decedent and the mother of his surviving children where the parties promised to "share equally in expenses of higher education" provided support for the jury's award of loss of educational support beyond the age of majority). The jury awarded a total of $1,580,000 in lost wages, which is Dr. Borzilleri's calculation for the value of Mr. Mace's income through age sixty-two, well beyond the years his children would turn eighteen. ECF No. 170, at 29:10–19. Plaintiffs provide no authority counseling a different result. In addition, the

number above appears to represent Dr. Borzilleri's calculation of total losses for the family, including Ms. Brady, but Ms. Brady is not entitled to damages. *Id.*; *see also* ECF No. 155, at 2 (finding Ms. Brady contributorily negligent).

However, Defendant's position that Mr. Mace's children were not entitled to any damages for lost wages is likewise incorrect. *See* ECF No. 162, at 48 ("The jury's entire award was thus a product of inappropriate expert speculation."). Having prevailed on their negligence and negligent entrustment wrongful death claims, Plaintiffs C.C. and G.M. are entitled to damages for the loss of financial support their father had a legal duty to provide. *See Alden*, 406 F. Supp. at 550. Therefore, the Court will deny without prejudice Defendant's motion for a new trial based on the lack of evidence for the lost wages awarded by the jury. Within twenty-one days of this Opinion, the parties are granted leave to file additional briefing addressing: 1) whether the jury had a sufficient basis to award Mr. Mace's children the amount of lost wages it did in light of the potential problems identified above; and 2) the proper remedy if the jury did not. *See McMurray v. Tallant*, No. 20-0919-TDC, 2025 WL 1489636, at *10, *13 (D. Md. May 23, 2025) (requesting recalculation of damages based on facts determined at trial); *see also* ECF No. 170, at 56:4–23 (Dr. Borzilleri testifying that he could "walk through the tables" of his report and "apportion [the damages] out to different parties" but he did not do that in his report).

**3. Dr. Borzilleri's Method of Calculating the Loss of Household Services Complied with Maryland Law, but the Jury's Award of Household Services to G.M Requires Further Briefing.**

Dr. Borzilleri determined that the value to replace the household services Mr. Mace would perform for his family for 48.6 more years after his death is $909,594. He calculated this value based in part on the Dollar Value of a Day economic study. ECF No. 177, at 50. "The publication reports the time expenditure for household work and other activities of daily living that were

studied as a part of the U.S. Department of Labor, Bureau of Labor Statistics, American Time Use Survey." *Thibodeaux*, 2020 WL 4286874, at *6. The American Time Use Survey is based on "nationally representative estimates of how, where, and with whom Americans spend their time, and is the only federal survey providing data on the full range of nonmarket activities, from childcare to volunteering." *Id.*

Defendant criticizes Dr. Borzilleri's calculation of household services for two reasons: 1) the Dollar Value of a Day is a generalized average and it includes "services" that are not considered pecuniary under Maryland law, ECF No. 162, at 46–47; and 2) the amount is inclusive of household services Mr. Mace would have provided only to Ms. Brady after G.M. turned eighteen, and Ms. Brady cannot be awarded damages, ECF No. 155, at 2.

Maryland beneficiaries looking to recover loss of household services must: 1) "identify domestic services that have a market value; 2) "have reasonably expected the decedent to provide the identified services, which—absent the decedent's legal obligation to provide the services—will typically require evidence showing that the decedent was regularly providing the services in the past"; and 3) "present some evidence concerning the duration the decedent would have likely provided the services." *Choudhry v. Fowlkes*, 219 A.3d 107, 113 (Md. Ct. Spec. App. 2019), *aff'd*, *Fowlkes v. Choudhry*, 248 A.3d 298, 317 (Md. 2021). The *Choudhry* court elaborated that: "a beneficiary must first identify specific household tasks that can be performed by domestic workers and, as a result, have an identifiable market value if the beneficiary is seeking an economic damages award. These tasks may include 'cooking, cleaning, and gardening' and can range from 'polishing the family silver to pulling up weeds from the garden.'" *Id.* at 114 (quoting *Edmonds v. Murphy*, 573 A.2d 853, 869 (Md. 1990)).

The testimony elicited during trial demonstrated that Mr. Mace performed the type of household services the court in *Choudhry* contemplated: he actively contributed to household chores, including cleaning, doing laundry, doing dishes, taking out the trash, working on their car, buying groceries, setting up furniture, driving Ms. Brady who could not drive, doing yard work, and taking care of their two cats. In addition, he also provided these types of services to his son C.C.: watching him, cooking for him, taking him to the park, and driving him and his mother. *See Choudhry*, 219 A.3d at 114. Testimony supports the conclusion that he planned to continue being an involved father in both of his children's lives and he took an active role in taking care of C.C. *See id.* at 113.

Additionally, Dr. Borzilleri's use of the Dollar Value of a Day study comports with Maryland law. As the Court discussed in denying Walmart's motion to exclude Dr. Borzilleri's testimony at trial, numerous courts, including this one, have permitted experts like Dr. Borzilleri to offer lost household services opinions based on this publication. *See Thibodeaux*, 2020 WL 4286874, at *6 (admitting expert testimony using Dollar Value of a Day in a Maryland negligence case); *see also McAsey v. U.S. Dep't of Navy*, 201 F. Supp. 2d 1081, 1098 (N.D. Cal. 2002); *Handley v. United States*, No. 5:17-CV-01278-HNJ, 2021 WL 2023057, at *51 (N.D. Ala. Mar. 18, 2021); *Hersko*, 2016 WL 6126461, at *11. As one court observed, "[a]lthough some experts may be better than others at tailoring their calculations of pecuniary damages to the facts of a particular case, courts have recognized that such valuations do not lend themselves to 'mathematical precision' and that they 'invoke[] elements necessarily uncertain in nature.'" *Hersko*, 2016 WL 6126461, at *11. Dr. Borzilleri explained at trial that using the Dollar Value of a Day study more accurately measures lost household services as compared to valuing the specific tasks that a deceased person performed in the past, because memories are generally

inaccurate or incomplete and the day-to-day services that someone performs changes over time. ECF No. 177, at 52. For example, when an individual has an infant child, the number of hours of services increases; conversely, the number decreases as the child becomes older and, then significantly, after the child turns eighteen. *Id.* "Given the inherent uncertainty in valuing the lifetime services of [Mr. Mace], the Court cannot conclude that relying on statistical averages is an unreasonable approach." *Hersko*, 2016 WL 6126461, at *11.

However, Defendant's argument that the evidence presented at trial did not indicate that Mr. Mace would provide household services to G.M. beyond his eighteenth birthday raises more serious concern. *See Fowlkes*, 248 A.3d at 313 ("In the absence of legal entitlement, proof of a decedent's intent to provide services in the future could be adduced through evidence of a written or oral promise to do so."). Additionally, Dr. Borzilleri calculated the loss of household services based on Mr. Mace providing services to Ms. Brady for the rest of their lives. *See* ECF No. 170, at 67:19–21 ("Q: And your opinions also assume that [Mr. Mace] would have provided those services to Kayla Brady for the rest of her life, right? A. Yes, they do."). However, Ms. Brady is not entitled to an award of damages based on her contributory negligence. ECF No. 155, at 2. Similarly, Dr. Borzilleri's calculation assumed that Mr. Mace would stop providing these services to G.M. once he turned eighteen. ECF No. 162-1, at 28 (Schedule 2 of Dr. Borzilleri's report listing family size for the years 2020 to 2037 as three but reducing the size to two when G.M. turns eighteen).

"Whether a jury award is excessive is a question of law." *Konkel v. Bob Evans Farms, Inc.*, 165 F.3d 275, 280 (4th Cir. 1999). "If the court finds that a jury award is excessive, it may 'grant a new trial nisi remittitur, which gives the plaintiff the option of accepting the remittitur or of submitting to a new trial.'" *Hicks v. Ferreyra*, 582 F. Supp. 3d 269, 291 (D. Md. 2022), *aff'd*, 64

F.4th 156 (4th Cir. 2023) (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 n.2 (4th Cir. 1998)). Indeed, "if a court finds that a jury award is excessive, it is the court's duty to require a remittitur or order a new trial." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 593 (4th Cir. 1996). Although the Court can subtract any damages the jury awarded G.M. after he turned eighteen, it is not immediately apparent how an additional adjustment would be made to account for the potential inclusion of Ms. Brady in Dr. Borzilleri's calculations regarding the damages for household services that Mr. Mace would have rendered. Nonetheless, contrary to Defendant's arguments and for the reasons stated above, G.M. is entitled to some measure of damages. *See* ECF No. 181, at 39 ("Plaintiffs' claims do not meet that standard and the damages awarded were improper and so should be vacated or retried."). Accordingly, within twenty-one days of the filing of this Opinion, the Court grants the parties leave to file additional briefing addressing: 1) whether the jury had a sufficient basis to award G.M. the amount of damages for household services it did in light of the potential problems identified above; and 2) the proper remedy if the jury did not. For the time being, the Court shall deny, without prejudice, Defendant's motion for a new trial based on the lack of evidence supporting damages for loss of household services that would have been provided to G.M. awarded by the jury.

Finally, based on the testimony that Mr. Mace took care of C.C., there is sufficient evidence for the jury to have awarded him $90,959 for loss of household services for the fourteen years between Mr. Mace's death and when C.C. turns eighteen. *See Edmonds*, 573 A.2d at 871 (finding that compensation for services which can be performed by hired help falls within the loss of household services category of damages). Given Dr. Borzilleri's testimony as to the value of household services more generally, the testimony noted above regarding the services Mr. Mace provided C.C., and the relatively modest amount the jury awarded C.C., the jury's award, on this

point, was reasonable. *Ory*, 389 A.2d at 931 ("In Maryland, the general rule in wrongful death cases is that award of damages is within sound discretion of jury.").

**F. The Court's Evidentiary Rulings Were Not Erroneous, Nor Prejudicial.**

Defendant argues that four evidentiary rulings made during trial prejudiced the trial outcome warranting a new trial. ECF No. 162, at 44. The evidentiary rulings Defendant cites are not erroneous. Even if they are, Defendant has not met its burden to demonstrate that it is entitled to a new trial because the errors were not prejudicial, nor can Defendant demonstrate that the result was substantially unjust. *Modern Remodeling, Inc. v. Tripod Holdings, LLC*, No. CCB-19-1397, 2022 WL 21782160, at *2 (D. Md. June 10, 2022) ("A new trial should not be granted unless it is reasonably clear that prejudicial error has occurred or substantial justice has otherwise not been done.").

**1. Evidence of Walmart's "Block List" Was Properly Admitted and not Prejudicial.**

Walmart claims that its "block list" was improperly admitted into evidence as "hearsay" because it was "an out of court statement . . . offered for its truth—i.e., that Walmart had barred the individuals on it from purchasing weapons." ECF No. 162, at 48 (citing Fed. R. Evid. 801). Walmart stipulated to the document's authenticity and Walmart's corporate designee, Mr. Colucci, confirmed the existence of the block list in the designated portions of his deposition transcript. Plaintiffs offered the list through Ms. Wagner, but Ms. Wagner testified that she had no knowledge of the list's existence and Defendant argues no hearsay exception applies. *Id.* However, as Plaintiffs argue, and as the Court made clear in admitting the document, the document was not admitted for the truth of the matter asserted, that the individuals included on the list were actually

blocked from purchasing firearms from Walmart, but rather for the fact of its existence. *See* ECF No. 177, at 54.

Even if admission of the list was erroneous, Walmart cannot demonstrate that it was prejudiced by the admission. Walmart's corporate designee confirmed the existence of the block list, so its admission is not the only evidence of its existence. Walmart argues that without the block list, it would have been "nearly impossible" for the jury to infer that Walmart had the ability to prevent the sale of the firearm to Mr. Mace. ECF No. 162, at 49. However, there was sufficient evidence presented at trial for the jury to conclude that Walmart had the ability to stop the sale of the firearm to Mr. Mace. In addition to Mr. Colucci's testimony, Walmart's own policies, separately admitted into evidence, made clear that Walmart had the ability to deny the sale of the firearm for any non-discriminatory reason. *See* Pls. Trial Ex. 4.

**2. The Court Instructed the Jury that Mr. Mace Unlawfully Used a Firearm, Effectively Taking Judicial Notice of the Fact.**

Walmart claims the Court failed to take judicial notice of the fact that Mr. Mace "committed a criminal act by discharging the shotgun." ECF No. 162, at 49. The fact was based on the Court's holding finding that the PLCAA applied to the case, specifically, that "there is no genuine dispute that Mr. Mace did not have the requisite permission to discharge a gun in the parking lot of the Laurel Glen Shopping Center. Accordingly, the Court concludes that this is a qualified civil liability action." *Brady II*, 2024 WL 2273382, at *7. During trial, counsel for Walmart requested the Court judicially notice the following: "It is the determination of this Court that this lawsuit arises out of Mr. Mace's criminal or unlawful use of a firearm." ECF No. 162, at 50–51. Walmart states that the Court refused its request. The Court, however, did include in Jury Instruction No. 26 the following statement, "The Court has already determined that this action

arises from the unlawful use of a firearm by Jacob Mace." ECF No. 147, at 30. A "judicially noticed fact," is a "fact that is not established by admissible evidence but may be accepted by the court because the fact is generally known within the trial court's territorial jurisdiction, or because its validity can be determined from sources whose accuracy cannot be reasonably questioned." Judicially Noticed Fact, Black's Law Dictionary (12th ed. 2024). By including the statement in Jury Instruction No. 26, the Court established the fact without Defendant needing to submit admissible evidence during trial. *Id*. Thus, Defendant's concern seems to be unwarranted because it has received the benefits of the Court taking judicial notice of the fact. *See United States v. Bauzó-Santiago*, 867 F.3d 13, 22 (1st Cir. 2017) (finding no error where the jury instruction accurately conveyed the judicially noticed fact).

In its Reply, Defendant argues that the "lack of judicial notice was prejudicial because notice of this indisputable fact would have had significantly more impact than a stray clause in lengthy jury instructions." ECF No. 181, at 40. Defendant cites no case law to support its contention that "judicially noticed facts" are entitled to announcements separate from jury instructions. *See Bauzó-Santiago*, 867 F.3d at 22 (including a judicially noticed fact in the jury instructions). To the extent that Defendant objects that the instruction did not contain the phrase, "judicial notice," Defendant does not explain how this prejudiced it to warrant the extreme remedy of a new trial. Similarly, to the extent that the Defendant wanted the term "criminal . . . use of a firearm" included in the instruction, the Court specifically rejected this wording as prejudicial to the Plaintiffs. *See Figg v. Schroeder*, 312 F.3d 625, 640 (4th Cir. 2002) (holding that courts have considerable discretion in choosing the specific wording of jury instructions).

**3. Walmart Was not Prejudiced by the Exclusion of Ms. Nicole Mace's Statement.**

Walmart claims the Court improperly sustained a hearsay objection to the statement by Mr. Mace's sister, Ms. Nicole Mace, who is not a party to the case, to Mr. Mace: "you're a bitch, and you won't do it [commit suicide]." ECF No. 162, at 50; ECF No. 177, at 55. Counsel for Defendant elicited the statement on direct examination of Ms. Krebs, who was asked, "what did Jake [Mace] tell you his family said that made him feel upset?" ECF No. 162, at 50. Krebs identified a few things, including that Mr. Mace's sister said that he tried to attempt suicide for attention, and "he was a bitch who wouldn't do it." Plaintiffs did not object to this statement. Defendant's counsel then posed a follow up question, "Jake told you that his sister said, that he's a bitch who would not commit suicide." At that point Plaintiff's counsel objected and the Court sustained the objection as hearsay.

Even if the Court erroneously excluded this statement, Walmart was not prejudiced. As Walmart points out, the statement by Mr. Mace's sister was previously stated unobjected by Ms. Krebs and heard by the jury. Accordingly, the jury was presented with the same evidence which Defendant argues was incorrectly excluded. Even if the jury misunderstood the Court's instruction and discounted both statements, it is hard to see how one statement of a non-party could have impacted the jury's determination that Walmart proximately caused Mr. Mace's suicide. The jury heard Defendant's expert, Dr. Means, testify that the primary cause of Mr. Mace's depression was family discord. Similarly, the jury heard evidence that Ms. Mace would often side with Ms. Brady during family arguments and was hard on Mr. Mace for his perceived infidelity in his marriage and still found Walmart negligent. The jury also found Ms. Brady contributorily negligent, demonstrating that the jury considered the family strife and whether it was the cause of Mr. Mace's death. Therefore, Walmart has not met its burden of demonstrating prejudice.

**4. The Court Properly Excluded Undated Text Messages from Mr. Mace to Ms. O'Shea.**

Walmart argues that the Court incorrectly omitted from evidence an undated text message from Mr. Mace to Ms. O'Shea relating to the marital struggles between Mr. Mace and his wife. ECF No. 162, at 50–51. Plaintiffs note that "Walmart attempted to admit this text message at the end of its trial presentation without a witness on the stand." ECF No. 177, at 56. The Court excluded the text message based on Federal Rule of Evidence 403, determining "that the probative value of an undated text message was substantially outweighed by the danger of confusing the jury by having [an] . . . undated text message admitted into evidence without context." *Id.* Defendant argues "the temporal context of the text did not matter; rather, its importance came from how Mace perceived his family's treatment of him, all of which led to his suicide." ECF No. 162, at 51. The Court agrees with Plaintiffs that the timing of the text messages is necessary because the texts included evidence of Mr. Mace and Ms. Brady's marital struggles, "but also evidence that they were working through those troubles." ECF No. 177, at 56. The timing of Mr. Mace's marital problems and Ms. Brady's actions are critical to the jury's contributory negligence and causation analysis.

However, even if the Court should have admitted the text messages, Walmart cannot demonstrate any prejudice from their exclusion. The jury repeatedly heard testimony that Ms. Brady and Mr. Mace were having difficulties in their marriage. As a result, the jury found Ms. Brady contributorily negligent in Mr. Mace's death. Accordingly, it is unlikely that additional evidence on this same topic would have altered the verdict.

## II. Plaintiffs' Cross-Motion for a New Trial as to Ms. Brady

The jury found by a preponderance of the evidence, that Ms. Brady "negligently contributed to the death of [Mr. Mace]." ECF No. 155. Plaintiffs now move for a new trial as to Ms. Brady because the Court's decision to instruct the jury on contributory negligence as to Ms. Brady was erroneous and the error "seriously prejudiced Ms. Brady." ECF No. 177, at 57. Because there was sufficient evidence to send the question of Mr. Brady's contributory negligence to the jury, and the jury had sufficient evidence to find Ms. Brady was negligent, the Court will deny Plaintiff's motion for a new trial as to Ms. Brady.

Whether a plaintiff was contributorily negligent is a question of fact for the jury to resolve. *Woolridge*, 163 A.3d at 864. "Only when no reasonable person could find in favor of the plaintiff on the issue of contributory negligence should the trial court take the issue from the jury." *Id.* (citation omitted). To prove contributory negligence, the defendant must show that the plaintiff "acted, or failed to act, with knowledge and appreciation, either actual or imputed danger of injury which [her] conduct involves." *Menish v. Polinger Co.*, 356 A.2d 233, 237 (Md. 1976).

Plaintiffs focus solely on the causation element of contributory negligence, arguing that nothing Ms. Brady did or did not do caused Mr. Mace's death. ECF No. 177, at 57. What Ms. Brady "did not do" provides sufficient evidence for the Court to have submitted the question to the jury. *See Menish*, 356 A.2d at 235–36 (holding that the focus of contributory negligence defense is whether the plaintiff took appropriate precautions to protect her own interests). Although Ms. Brady saw Mr. Mace messaging Mr. McLaughlin about purchasing a firearm on the same day he was discharged from the hospital for suicidal ideation, she did not communicate with Mr. McLaughlin that he should not sell a gun to Mr. Mace. Ms. Brady also did not contact anyone at Walmart, a place where he had previously purchased a gun, to let the managers know that Mr.

Mace should not be allowed to purchase a firearm. Nor did she inform Mr. Mace's therapist, whom they shared, or anyone else on Mr. Mace's medical team that he was inquiring about purchasing a gun.

Ignoring these facts, Plaintiffs assert that Dr. Bryan was the only expert that spoke specifically to causation. Plaintiffs characterize Dr. Means as testifying only that marital and family strife caused Mr. Mace's depression and not his suicide. Therefore, in Plaintiffs' view, there was insufficient evidence to instruct the jury on Ms. Brady's contributory negligence. ECF No. 177, at 57.

Plaintiffs' argument suffers from multiple flaws. First, expert testimony is not always needed to establish causation. *See Jubb v. Ford*, 157 A.2d 422 (Md. 1960) (holding that "[w]hether [proximate cause] exists is to be decided in a common sense fashion in the light of the attending facts and circumstances"); *Hunt v. Mercy Med. Ctr.*, 710 A.2d 362, 374–75 (Md. Ct. Spec. App. 1998) (holding that expert testimony is not needed to establish causation where the jury can rely on their "common experience, knowledge or observation" (citing *Tully v. Dasher*, 244 A.2d 207, 214 (Md. 1968)). A layperson's understanding would have allowed the jury to conclude that Ms. Brady's failure to act negligently contributed to Mr. Mace's death. Further, Dr. Bryan's testimony supports the jury's verdict: it demonstrated the impact that access to firearms—due in part, as the jury concluded, to Ms. Brady's failure to act—increased the likelihood of Mr. Mace's death. Accordingly, a reasonable jury could find that Ms. Brady's failure to act precluded her from recovery.

Because there was sufficient evidence for the jury to find Ms. Brady contributorily negligent, the Court denies Plaintiffs' Motion for a New Trial.

### III. Consent Motion for Remittitur to Reduce Jury Award for Non-Economic Damages

Defendant moves, with Plaintiffs' consent, for the Court to reduce the amount of the jury's award of non-economic damages, in accordance with Maryland law. ECF No. 160, at 1. Because the jury's award of non-economic damages exceeds the limitation under Maryland law, the Court will grant Defendant's motion and reduce the amount of award when entering judgment.

Under Federal Rule of Civil Procedure 59(e), a party may move to alter or amend a judgment. Section 11-108 of the Maryland Courts and Judicial Proceedings Article establishes a limitation on recovery of non-economic damages. Section 11-108 defines non-economic damages as: "in an action for wrongful death, mental anguish, emotional pain and suffering, loss of society, companionship, comfort protection, care, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education, or other noneconomic damages authorized under Title 3, Subtitle 9 of this article." Md. Code Ann., Cts. & Jud. Proc. § 11.108(a)(i)(2). As of October 1, 2019, Section 11-108 capped non-economic damages at $875,000. *See* ECF No. 160, at 2 (citing Md. Code Ann., Cts. & Jud. Proc. § 11.108(b)(2)(i), (ii)). "[I]n a wrongful death action in which there are two or more claimants or beneficiaries, an award for noneconomic damages may not exceed 150% of the [statutory] limitation[.]" Md. Code Ann., Cts. & Jud. Proc. § 11.108(b)(3)(ii). Here, there are more than two primary claimants or beneficiaries. Therefore, the non-economic damages that may be awarded to all the Plaintiffs is limited to $1,312,500. ECF No. 160, at 2.

On January 22, 2026, the jury returned a verdict awarding a total of $8,020,000 in non-economic damages as follows: Debra McCreary: $1,760,000, Mark Mace: $1,760,000, G.M.: $2,060,000, and C.C.: $2,440,000. ECF No. 155, at 3–4. When the jury awards an amount in excess of the statutory limitation, Section 11-108(d)(2)(ii) requires the court to "[r]educe each

individual award of a primary claimant proportionately to the total award of all of the primary claimants so that the total award to all claimants or beneficiaries conforms to the limitation." Md. Code Ann., Cts. & Jud. Proc. § 11.108(d)(2)(ii)(A). Here, the proportional reduction of the non-economic damages results in the following respective awards: Debra McCreary: $288,093.75 (21.95% of the total), Mark Mace: $288,093.75 (21.95% of the total), G.M.: $337,312.50 (25.7% of the total), and C.C.: $399,000.00 (30.4% of the total). ECF No. 160, at 3.

Therefore, the Court reduces the total amount of non-economic damages awarded by the jury to $1,312,500 to be awarded as follows: Debra McCreary: $288,093.75; Mark Mace: $288,093.75; G.M.: $337,312.50; C.C.: $399,000.00.

## CONCLUSION

For the reasons stated above, the Court denies Defendant's Motion for Judgment on the Evidence or in the Alternative Motion for a New Trial. Specifically, as to Defendant's motion for judgment on the evidence related to: 1) the jury's award of lost wages; and 2) the jury's award of damages for loss of household services to G.M., the Court denies the motion without prejudice. The rest of the Motion is denied with prejudice. Within twenty-one days of entry of this Opinion, both parties shall submit briefing on the amount of lost wages damages the Court should award Mr. Mace's minor children and the amount of damages for household services the Court should award G.M. Each party's brief shall be no more than fifteen pages in total. The Court denies with prejudice Plaintiffs' Motion for a New Trial as to Kayla Brady, and grants Defendant's Consent Motion for Remittitur. Once the Court has resolved the two remaining issues, the Court shall enter judgment, which shall constitute a final appealable Order of this Court.

9/28/2026
Date

/s/
Ajmel A. Quereshi
United States Magistrate Judge